U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2022 AUG -9 PM 1:33

CLERK
BY /s/
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Case No. 2:21-cr-00068 |
| ) | |
| DENNIS MARTIN, ) | |
| ) | |
| Defendant. ) | |

**OPINION AND ORDER DENYING DEFENDANT'S
MOTIONS TO SUPPRESS**
(Docs. 22 & 35)

Pending before the court are Defendant Dennis Martin's motion to suppress statements made to law enforcement and any evidence derived therefrom (Doc. 22) and motion to suppress all state law enforcement evidence that was allegedly unlawfully retained by the state and seized by the federal government (Doc. 35). On July 15, 2022, the court held an evidentiary hearing. At the hearing, the parties advised the court that they may be able to resolve Defendant's motion to suppress state law enforcement evidence. Accordingly, the court ordered the parties to meet and confer regarding a potential resolution. On July 27, 2022, the parties notified the court they were unable to reach an agreement, at which point the court took the pending motions under advisement.

Defendant was indicted on August 12, 2021 on a single count of being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). The government is represented by Assistant United States Attorney Wendy L. Fuller. Defendant is represented by Michelle Anderson Barth, Esq.

**I.    Findings of Fact.**

Based upon the preponderance of evidence, the court makes the following findings of fact.

**A.    Defendant's *Miranda* Waiver and Subsequent Statements.**

On or about February 17, 2019, Jennifer Patch reported to the Colchester,

Vermont police department ("CPD") that she had been the victim of domestic abuse by her husband, Defendant Dennis Martin. Her allegations included a report that Defendant had recently struck her with a machete causing an injury to her arm and thumb that required surgery. She further alleged that Defendant had struck her with a hammer on the spine, ribs, and shoulder blade and, on a previous occasion, had hit her in the eye with a firearm. CPD photographed her injuries allegedly caused by Defendant's attacks with a machete and hammer.

On or about February 18, 2019, Ms. Patch's mother called CPD to report that Defendant had sent her a Snapchat video in which he brandished a firearm and threatened to kill her. On that same day, CPD officers went to the Colchester residence shared by Defendant and Ms. Patch and parked outside. The CPD officers were in uniform with their firearms holstered. Also present at the scene were several tactical unit officers dressed in camouflage, wearing goggles and other protective gear, carrying long guns, and walking or running between a large military jeep and large dark van. One of the officers had a canine on a leash. These officers appeared to be preparing to execute a state court search warrant at Defendant's residence.

Shortly after the CPD officers' arrival, Defendant was observed entering a vehicle with three other individuals that then left his residence. Law enforcement stopped the vehicle and Defendant was separated from the vehicle's other occupants and arrested. The other occupants of the vehicle told at least one officer that they were in the process of taking Defendant to the hospital.

Defendant was initially cooperative with the CPD officer who arrested him. He asked what he was charged with and was told attempted murder, aggravated domestic assault, and disturbing the peace by use of a telephone or other electronic communications. The arresting officer asked Defendant if he had smoked marijuana, and Defendant admitted doing so. The arresting officer replied he could smell it on him. Defendant denied any other illegal drug use and advised that he took medication for sickle cell anemia.

After Defendant attempted to access pills he had on his person, and was stopped from doing so, Defendant told the arresting officer that his medication was in a black bag in the vehicle he had just left. A law enforcement officer retrieved the bag so that it could be transported with Defendant. Defendant did not mention he had a coat in the vehicle or ask for one. Defendant was dressed in slacks and a windbreaker-type jacket. The temperatures at the time were frigid.

After his arrest, Defendant was placed in the back of a CPD cruiser. The door to the cruiser was left open for approximately twelve minutes, during which Defendant complained of the cold and its impact on his medical condition. Because Defendant had tried to access something in his pocket, the arresting officer asked another CPD officer to accompany the transport of Defendant to the CPD.

At the time of his arrest, Defendant was an approximately thirty-seven-year-old man with a prior criminal history that included at least one felony. He had no intellectual disabilities. He spoke and understood English fluently. It appears that, on a previous occasion, he had been arrested by CPD Lieutenant James Roy, who later questioned him following this arrest.

En route to the CPD, Defendant accused the CPD officers of harassment, told them that he wanted everything recorded because he would be calling his attorney,[1] and told the officers that he planned to sue everyone involved. Defendant's tone was elevated, accusatory, belligerent, and laced with profanity. The CPD officers either ignored

---

[1] At the evidentiary hearing, Defendant's counsel conceded this statement was not an invocation of the right to counsel. *See McNeil v. Wisconsin*, 501 U.S. 171, 182 n.3 (1991) ("We have in fact never held that a person can invoke his *Miranda* rights anticipatorily, in a context other than "custodial interrogation[.]" ... The fact that we have allowed the *Miranda* right to counsel, once asserted, to be effective with respect to future custodial interrogation does not necessarily mean that we will allow it to be asserted initially outside the context of custodial interrogation, with similar future effect."); *United States v. Smith*, 2012 WL 5187922, at *7 (D. Vt. Oct. 18, 2012) ("The Second Circuit has adopted the *McNeil* Court's rationale, holding that a defendant can only invoke the Fifth Amendment right to counsel once it attaches in the context of custodial interrogation.") (collecting cases).

3

Defendant's comments or responded briefly to them. They did not question him during the transport.

When Defendant arrived at the CPD, he again advised the CPD officers that he had a medical condition, that it was not going to be resolved by warming up, that he needed his medication, he was in crisis, and that he needed treatment at a hospital. Defendant yelled and swore at the officers, called them names, and told them he hated them. When the arresting officer inquired about his medical condition, Defendant told him to "go look it up, dummy" or words to that effect. Defendant sought repeated assurances that the encounter was being recorded and accused the arresting officer of being racist and using profanity.

After Defendant was placed in a holding cell in handcuffs, his jewelry and the contents of his pockets were removed, and he was provided with a blanket. The arresting officer left the area in recognition that his presence was escalating Defendant's agitation.

Lieutenant Roy entered the holding cell approximately thirty minutes after Defendant was arrested and approximately ten minutes after he arrived at CPD. Defendant mentioned that Lieutenant Roy had afforded him better treatment during a prior police encounter and complained about the arresting officer's treatment. Lieutenant Roy took off Defendant's handcuffs and sat across from him at a small table. The door to the interview room was open, but another officer witnessing the interview was seated in the doorway. The interview was recorded and lasted approximately forty minutes.

Lieutenant Roy read *Miranda* warnings to Defendant from an "advice of rights" form. Defendant was given the "advice of rights" form to read along as the warnings were provided. Defendant replied that he understood each *Miranda* warning and signed a written waiver of his *Miranda* rights at 3:28 p.m.

Lieutenant Roy questioned Defendant in a courteous, low-key, and conversational manner. His tone was not accusatory. He employed no deception or trickery. He explained that the interview was Defendant's opportunity to provide his side of the story. Defendant was animated and engaged throughout the interview. At times, he used his hands to gesture or point. Although he occasionally moaned, complained of joint pain,

4

and mentioned his medical condition, he did not ask to stop the interview at any time. He signed a medical release so that the CPD could obtain his medical records and advised that he was in the vehicle with his friends prior to his arrest because they were going out to lunch.

Defendant was coherent, lucid, and intelligible throughout the interview. He was vehement in denying his wife's account of the alleged assaults, although he acknowledged she had been truthful when recounting the injuries she had inflicted upon him. He asked questions, at times interrupted and contradicted Lieutenant Roy, volunteered information, and appeared emotionally distressed only when confronted with his wife's reported injuries and how she claimed they were inflicted. He denied all material aspects of the charges against him.

At the conclusion of the interview, Defendant was placed in a holding cell for approximately thirty-five minutes. He wrapped himself in the blanket, appeared at times to be shivering, and frequently moaned. At one point, he wrapped the blanket around his neck and appeared to attempt to strangle himself. Defendant became increasingly vocal about his condition. Lieutenant Roy entered the holding cell, confirmed Defendant wanted "rescue," and asked where in his house he had left the machete. Defendant answered this question.[2]

Emergency medical personnel entered the holding cell where they found Defendant with the blanket wrapped around his neck. They transported Defendant to a hospital. The time period between Defendant's arrest and transportation to the hospital was approximately two hours. Defendant was admitted to the hospital on February 18, 2019 and discharged on March 14, 2019.

### B. State Court Expungement Order.

In February 2019, Defendant was charged in Vermont Superior Court, Chittenden Criminal Division, with two counts of aggravated domestic assault in the first degree with

---

[2] The government represents that it does not intend to introduce any statements made by Defendant in the holding cell after the formal interview was concluded.

5

a weapon and a single count of disturbing the peace by phone. In May 2019, Defendant was charged with an additional count of aggravated domestic assault in the first degree with a weapon.

In May 2020, Defendant reached a plea agreement with the State of Vermont, pursuant to which he entered a plea of nolo contendere to a single count of disturbing the peace by phone and a single count of misdemeanor domestic assault. He was adjudicated guilty and sentenced on those counts. The three counts of aggravated domestic assault in the first degree with a weapon were dismissed with prejudice.

On February 12, 2021, pursuant to 13 V.S.A. § 7603(e), a Vermont Superior Court judge entered an order expunging records relating to the three counts of aggravated domestic assault in the first degree with a weapon which had been dismissed with prejudice. The order provided that "[a]ll agencies and officials in custody of such documents shall comply with this order and applicable law." (Doc. 35-1 at 2.)

## II.     Conclusions of Law and Analysis.

### A.     Whether Defendant's Waiver of His *Miranda* Rights and Statements to Law Enforcement Were Voluntary.

Defendant argues his waiver of *Miranda* rights and his subsequent statements to law enforcement were involuntary. While Defendant advances largely the same arguments as to both his *Miranda* waiver and his statements, the court addresses the grounds for suppression separately.

#### 1.     Whether Defendant's Waiver Was Voluntary

"No person . . . shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law[.]" U.S. Const. amend. V. "To protect the Fifth Amendment right against self-incrimination, the Supreme Court in *Miranda v. Arizona* ruled that police may not interrogate a suspect who has been taken into custody without first warning the person 'that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.'" *United States v. Newton*,

6

369 F.3d 659, 668 (2d Cir. 2004) (quoting *Miranda v. Arizona*, 384 U.S. 436, 479 (1966)).

> "The purpose of the *Miranda* warning is to ensure that the person in custody has sufficient knowledge of his or her constitutional rights relating to the interrogation and that any waiver of such rights is knowing, intelligent, and voluntary." *United States v. Carter*, 489 F.3d 528, 534 (2d Cir. 2007). The Government bears the burden of proving by a preponderance of evidence that a valid waiver occurred. *Berghuis v. Thompkins*, 560 U.S. 370, 130 S.Ct. 2250, 2261, 176 L.Ed.2d 1098 (2010); *United States v. Male Juvenile*, 121 F.3d 34, 39 (2d Cir. 1997). The waiver inquiry has two components: the accused's relinquishment of his rights must have been (1) "'knowing,' which is to say that 'the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it,'" and (2) "'voluntary,' which is to say 'that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.'" *United States v. Plugh*, 648 F.3d 118, 127 (2d Cir. 2011) (quoting *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986))[.]

*United States v. Murphy*, 703 F.3d 182, 192 (2d Cir. 2012) (footnote omitted).

Defendant concedes that his written *Miranda* waiver, which followed Lieutenant Roy's oral and written explanation of his *Miranda* rights, was knowing and intelligent. The remaining issue is whether it was voluntary. The court's "inquiry" is "'directed to a defendant's state of mind, which can be inferred from his actions and statements.'" *In re Terrorist Bombings of U.S. Embassies in E. Afr.*, 552 F.3d 177, 211 (2d Cir. 2008) (quoting *United States v. Spencer*, 995 F.2d 10, 11 (2d Cir. 1993)). "The question key to voluntariness is whether the subject's 'will was overborne.'" *United States v. Corbett*, 750 F.3d 245, 252-53 (2d Cir. 2014) (quoting *Plugh*, 648 F.3d at 128). The court "must focus on the totality of the circumstances to determine whether defendant was given the opportunity to deliberately waive his rights." *Male Juv.*, 121 F.3d at 41.

Defendant signed a clear and unequivocal "advice of rights" and waiver form. He neither exhibited confusion nor claimed his medical or emotional conditions were causing him undue distress. After signing the waiver form, he immediately began offering information and answering Lieutenant Roy's questions.

7

"In general, a suspect who reads, acknowledges, and signs an 'advice of rights' form before making a statement has knowingly and voluntarily waived *Miranda* rights." *United States v. Taylor*, 745 F.3d 15, 23 (2d Cir. 2014) (citing *Plugh*, 648 F.3d at 127-28); *see also North Carolina v. Butler*, 441 U.S. 369, 373 (1979) ("An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver[.]"). While Defendant may have been suffering pain and discomfort at the time of the waiver, there is no evidence that his "will was overborne" in any way while waiving his *Miranda* rights. *Plugh*, 648 F.3d at 128 (internal quotation marks omitted). Considering the totality of the circumstances, Defendant's waiver was voluntary and his motion to suppress on that basis (Doc. 22) is therefore DENIED.

### 2. Whether Defendant's Subsequent Statements Were Voluntary.

"The existence of a knowing and voluntary waiver does not, however, guarantee that all subsequent statements were voluntarily made[,]" *United States v. Taylor*, 745 F.3d 15, 23 (2d Cir. 2014) (quoting *In re Terrorist Bombings*, 552 F.3d at 211-12), which is required by the Due Process Clause. *See, e.g., Lego v. Twomey*, 404 U.S. 477, 483 (1972) ("[A] defendant in a criminal case is deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession, without regard for the truth or falsity of the confession[.]"). The Supreme Court has nonetheless observed that "cases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* are rare." *Dickerson v. United States*, 530 U.S. 428, 444 (2000) (alteration adopted) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 433 n.20 (1984)).

"The government bears the burden of demonstrating that the defendant's statements were voluntary." *United States v. Siddiqui*, 699 F.3d 690, 707 (2d Cir. 2012), *as amended* (Nov. 15, 2012) (citing *United States v. Capers*, 627 F.3d 470, 479 (2d Cir. 2010); *United States v. Anderson*, 929 F.2d 96, 99 (2d Cir. 1991)). To determine if Defendant's statements were voluntary, the court "must examine the totality of the

8

circumstances. Specifically, these circumstances include 1) the accused's characteristics, 2) the conditions of the interrogation, and 3) the conduct of the police." *In re Terrorist Bombings*, 552 F.3d at 213 (internal quotation marks omitted) (quoting *Parsad v. Greiner*, 337 F.3d 175, 183 (2d Cir. 2003)); *see also Siddiqui*, 699 F.3d at 707 ("Relevant factors include the accused's age, his lack of education or low intelligence, the failure to give *Miranda* warnings, the length of detention, the nature of the interrogation, [] any use of physical punishment[, and] [a] defendant's mental vulnerability[.]") (alteration adopted) (internal quotation marks and citations omitted)). The "crucial element[,]" however, is "police overreaching[,]" as there must be "a substantial element of coercive police conduct." *Colorado v. Connelly*, 479 U.S. 157, 163-64 (1986) (footnotes omitted). "Absent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law." *Id.* at 164 (footnote omitted).

At the time of questioning, Defendant had been informed of his *Miranda* rights and had waived them. The interrogation was relatively short, lasting less than an hour. *Cf. United States ex rel. Burns v. LaVallee*, 436 F.2d 1352, 1355 (2d Cir. 1970) (holding a written confession to be involuntary when given "after over eighteen hours of uninterrupted custodial interrogation, after he had been without sleep, and almost without food, for thirty hours"); *Connelly*, 479 U.S. at 163 n.1 (collecting Supreme Court cases finding statements involuntary after interrogations of four hours, eighteen hours, thirty-six hours, three days, four days, five days, and sixteen days). Defendant was an adult with prior experience with the criminal justice system and no apparent intellectual or language impairments. He did not appear to be under the influence of drugs or alcohol. While he admitted to smoking marijuana prior to his arrest, he does not claim it rendered him impaired.

Defendant was not physically touched or threatened, and Lieutenant Roy was not hostile, accusatory, or confrontational. He did not brandish a weapon or otherwise make or threaten a show of force. *See Plugh*, 648 F.3d at 128 (finding statements voluntary because defendant "was never threatened physically or psychologically abused in any

9

manner, or made any type of promises such that his will was overborne") (internal quotation marks omitted).

Defendant contends that his "medical issue impacted his ability to make . . . voluntary statements." (Doc. 34 at 6.) As the Second Circuit has explained,

> A number of decisions have assessed the voluntariness of a defendant's statements where the defendant was in medical distress. For example, in *Mincey* [*v. Arizona*, 437 U.S. 385, 398-400 (1978)], the Supreme Court held that a defendant's statements to police were involuntary where the defendant (1) arrived at the hospital a few hours before the interrogation "depressed almost to the point of coma"; (2) suffered "unbearable" pain; (3) was unable to think coherently; (4) was "encumbered by tubes, needles, and [a] breathing apparatus"; (5) expressed his desire that the interrogation cease numerous times to no avail; and (6) was falling in and out of consciousness. By contrast, courts tend to view a hospitalized defendant's statements as voluntary where the defendant was lucid and police conduct was not overbearing. *See* [*United States v. Khalil*, 214 F.3d 111, 121-22 (2d Cir. 2000)]; *Pagan v. Keane*, 984 F.2d 61, 63 (2d Cir. 1993); *Campaneria* [*v. Reid*, 891 F.2d 1014, 1019-20, 2d Cir. 1989.]

*Siddiqui*, 699 F.3d at 707. This case falls in the latter category.

Defendant did not ask to pause or terminate the interview or claim his medical condition precluded him from understanding and answering questions. He remained "lucid[,]" engaged, and responsive to questions throughout the interrogation. *Id.*; *see also Khalil*, 214 F.3d at 121 (upholding voluntariness finding where "although [defendant] was in pain, he was alert, seemed to understand the agent's questions, and gave responsive answers"). Although he complained of joint pain, the "decisive issue" is not whether Defendant was in medical distress but "whether [his] will was 'overborne' by the police, so that the [D]efendant [wa]s not using such faculties as he has." *Taylor*, 745 F.3d at 25.

In this case, Defendant's medical distress "was not so severe as to render him unable to make a voluntary statement or unduly susceptible to manipulation by his interrogators." *Campaneria*, 891 F.2d at 1020. There is no evidence that his will was overborne. To the contrary, he repeatedly and vehemently denied inflicting any injury upon his wife. Against this backdrop, the conduct of Lieutenant Roy was not only neither

coercive nor deceptive but was also not "causally related" to Defendant's statements. *Connelly*, 479 U.S. at 164. As a result, "there is simply no basis for concluding that any state actor has deprived [Defendant] of due process of law." *Id.*

Considering the totality of the circumstances, Defendant's statements were voluntary and his motion to suppress on that basis (Doc. 22) must be DENIED.

### B. Whether State Law Enforcement Evidence Should Be Suppressed.

Defendant argues that this case is largely "based on CPD's investigation into ongoing domestic abuse between [him] and his wife" and that the government's disclosures consist almost entirely of "CPD's law enforcement records that appear subject to the expungement order." (Doc. 35 at 2, 4, 5.) He contends that CPD retained his records in violation of Vermont law and the Vermont Superior Court's expungement order. He asserts that he had a reasonable expectation of privacy in the records subject to the expungement order and that their seizure by the government was unreasonable under the Fourth Amendment.

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. const. amend. IV. Defendant's Fourth Amendment rights are implicated only if the government's seizure of the state court evidence "infringed 'an expectation of privacy that society is prepared to consider reasonable.'" *O'Connor v. Ortega*, 480 U.S. 709, 715 (1987) (quoting *United States v. Jacobsen*, 466 U.S. 109, 113 (1984)). Federal law governs whether the search or seizure of state law enforcement evidence by the government was reasonable. *See United States v. Santini*, 2022 WL 575474, at *8 (D. Vt. Feb. 25, 2022) ("[F]ederal law governs a federal criminal prosecution, including any questions relating to the lawfulness of the searches conducted.") (alteration adopted) (quoting *United States v. Bethea*, 388 F. App'x 20, 21 n.2 (2d Cir. 2010)). "State law is relevant only to the extent it provides 'a source outside of the Fourth Amendment' that can render an expectation of privacy objectively reasonable." *Id.* (quoting *Minnesota v. Carter*, 525 U.S. 83, 88 (1998)).

11

In general, under Vermont law, "records of arrest and conviction are public records available for public inspection" and "the custodian of those records has a legal duty to the public to accord that right." *Doe v. Salmon*, 378 A.2d 512, 515 (Vt. 1977); *see also* 1 V.S.A. § 317(c)(5)(B) (providing that "records reflecting the initial arrest of a person" and "records reflecting the charge of a person shall be public"); 20 V.S.A. § 2056c (providing for the "[d]issemination of criminal conviction records to the public" via an online portal). However, Vermont law provides a mechanism to remove certain arrest records from public access.

"Unless either party objects in the interests of justice, the court shall issue an order expunging a criminal history record related to the citation or arrest of a person[] within 60 days after the final disposition of the case if . . . the charge is dismissed with prejudice[.]" 13 V.S.A. § 7603(e)(1)(B). "Criminal history record" is defined as "all information documenting an individual's contact with the criminal justice system, including data regarding identification, arrest or citation, arraignment, judicial disposition, custody, and supervision." 13 V.S.A. § 7601(2).

The "effect" of an expungement order "is to annul the record of the arrest, conviction, and sentence and that such person shall be treated in all respects as if the person had never been arrested, convicted, or sentenced for the offense." 13 V.S.A. § 7606(a). The issuing court must provide notice of an expungement order to, among others, "the arresting agency." *Id.* "The response to an inquiry from any person regarding an expunged record shall be that 'NO CRIMINAL RECORD EXISTS.'" *Id.* at (b)(3).

While an expungement order under Vermont law could render a criminal defendant's expectation of privacy in the expunged records objectively reasonable, that issue does not control the outcome in this case. The Vermont Superior Court's expungement order applied only to records relating to Defendant's dismissed aggravated domestic assault charges, not the misdemeanor domestic assault and disturbing the peace by phone charges for which Defendant was adjudicated guilty.[3] The state law

---

[3] To expunge records following a conviction, Vermont law requires that, among other things, "[a]t least five years have elapsed since the date on which the person successfully completed the

12

enforcement records at issue relate equally to those misdemeanor charges, and the expungement order did not, by its terms, require expungement of any records relating to a charge that was not dismissed with prejudice. Records relating to Defendant's convictions for misdemeanor domestic assault and disturbing the peace by phone thus remained "public records available for public inspection[,]" *Salmon*, 378 A.2d at 515, with regard to which Defendant had no reasonable expectation of privacy. *See Doe v. City of New York*, 15 F.3d 264, 268 (2d Cir. 1994) ("Certainly, there is no question that an individual cannot expect to have a constitutionally protected privacy interest in matters of public record.") (citations omitted); *Cline v. Rogers*, 87 F.3d 176, 179 (6th Cir. 1996) (holding that "there is no constitutional right to privacy in one's criminal record" because "arrest and conviction information are matters of public record"). Defendant's motion to suppress state law enforcement evidence (Doc. 35) is therefore DENIED.

## CONCLUSION

For the foregoing reasons, Defendant's motion to suppress statements and evidence derived therefrom (Doc. 22) and his motion to suppress state law enforcement evidence (Doc. 35) are DENIED.

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 9th day of August, 2022.

Christina Reiss, District Judge
United States District Court

---

terms and conditions of the sentence for the conviction" and expungement "serves the interests of justice." 13 V.S.A. §§ 7602(b)(1)(A), (D).

13