VOLUME:     2
PAGES:  11-186

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

UNITED STATES OF AMERICA            )        CRIMINAL ACTION NO.
                                    )        2:21-cr-068-1
            v.                      )
                                    )
DENNIS MARTIN,                      )
            Defendant.              )


JURY TRIAL
Tuesday, February 7, 2023
Burlington, Vermont



BEFORE:

    THE HONORABLE CHRISTINA C. REISS,
    District Judge, and a Jury



APPEARANCES:

JONATHAN A. OPHARDT, ESQ., and CORINNE M. SMITH, ESQ., U.S.
    Attorney's Office, 11 Elmwood Avenue, 3rd Floor, P. O. Box
    570, Burlington, VT 05402-0570, Counsel for the Government

MICHELLE ANDERSON BARTH, ESQ., Law Office of Michelle Anderson
    Barth, P. O. Box 4240, Burlington, VT 05406, Counsel for
    the Defendant

DENNIS MARTIN, DEFENDANT



Johanna Massé, RMR, CRR
Official Court Reporter
P. O. Box 5852
Burlington, VT 05402
802-951-8102 | 802transcripts@gmail.com

INDEX TO EXAMINATIONS

WITNESS                                                                          PAGE

MARK L. JACOBS
        Direct by Mr. Ophardt                                                      36
        Cross by Ms. Barth                                                         50

FRANCIS C. GONYAW
        Direct by Mr. Ophardt                                                      55

MATTHEW R. DALEY
        Direct by Ms. Smith                                                        62
        Cross by Ms. Barth                                                         68

SONIA E. VELA
        Direct by Ms. Smith                                                        75

FRANCIS J. THORNTON, JR.
        Direct by Mr. Ophardt                                                      85

PEGGY E. GERMAINE
        Direct by Mr. Ophardt                                                     116
        Cross by Ms. Barth                                                        122

JAMES R. ROY
        Direct by Ms. Smith                                                       124
        Cross by Ms. Barth                                                        136
        Redirect by Ms. Smith                                                     144

ANTHONY L. CIRAVOLO
        Direct by Ms. Smith                                                       146

INDEX TO EXHIBITS

| GOVERNMENT EXHIBIT | DESCRIPTION | I.D. | RECEIVED |
|---|---|---|---|
| 1 | Photograph - Back of Car, Bates 589 | 41 | 41 |
| 2 | Photograph - Open Door of Car, Bates 590 | 41 | 41 |
| 3 | Photograph - Back Seat of Car, Bates 595 | 41 | 41 |
| 4 | Photograph - Seat Back Pocket, Bates 591 | 41 | 41 |

INDEX TO EXHIBITS
(Continued)

GOVERNMENT

| EXHIBIT | DESCRIPTION | I.D. | RECEIVED |
|---|---|---|---|
| 5 | Photograph - Gun on Car Seat, Bates 592 | 41 | 41 |
| 6 | Photograph - Gun, Bates 593 | 41 | 41 |
| 7 | Photograph - Gun and Ammunition, Bates 594 | 41 | 41 |
| 8 | Photograph - Outside of Evidence Box, Bates 503 | 45 | 46 |
| 9 | Gun | 48 | 49 |
| 10 | Photograph - Gun, Bates 507 | 49 | 49 |
| 11 | DVD of Snapchat Production | 79 | |
| 11A | Snapchat .csv File Headers, Bates 1514 | 82 | 82 |
| 11B | DVD Containing Snapchat Video | 92 | 107 |
| 11C | Snapchat Data for Video, Bates 1513 | 105 | 107 |
| 11D | Snapchat Metadata Associated with Video, Bates 1512-1512.02 | 109 | 110 |
| 13 | Penn. Probation Office Photo of Dennis Martin, Bates 1298 | 135 | |
| 14 | *Miranda* Warnings, Bates 298 | 129 | 130 |
| 15 | CD Containing Clips of 2/18/19 Colchester PD Audio Interview | 133 | 134 |
| 17 | Photographs from Mr. Ciravolo's Report, Bates 840-848 | 160 | 160 |
| 18 | Stipulation re Previous Conviction | 177 | 177 |
| 19 | Stipulation re Gun | 177 | 177 |

(Continued)

INDEX TO EXHIBITS
(Continued)

DEFENDANT

| EXHIBIT | DESCRIPTION | I.D. | RECEIVED |
|---|---|---|---|
| A | Video Clip - Waiver of *Miranda* Rights | 137 | 137 |
| B | Video Clip - Authorization to Disclose Medical Records | 140 | 140 |
| C | Authorization to Disclose Protected Health Information, Bates 330-331 | 141 | 142 |
| D | Plea Agreement for Peggy Germaine | 123 | |

MISCELLANEOUS

|  | PAGE |
|---|---|
| Government's Opening Statement | 17 |
| Defense Opening Statement | 23 |

1  Tuesday, February 7, 2023

2        (The following was held in open court at 9:20 AM.)

3            THE COURT:  Anything to bring to my attention before

4  we bring back the jurors?

5            MR. OPHARDT:  No, your Honor.

6            MS. BARTH:  No, your Honor.

7            THE COURT:  Let's do it.  Thank you.

8            MR. OPHARDT:  Oh.  Your Honor, we would invoke the

9  rule, sequestration.

10           THE COURT:  All right.  It's mandatory that I grant

11 it, so I'm going to ask that your witnesses stay outside the

12 courtroom prior to their testimony.  Once they have testified,

13 they may remain in the courtroom even if they're called on

14 rebuttal.

15           MR. OPHARDT:  Your Honor, there are two exceptions I'd

16 like to bring to the Court's attention.  One is Agent Brown.

17           THE COURT:  Yes.

18           MR. OPHARDT:  And then the second is our expert, Frank

19 Thornton.  Ms. Barth's okay with him being in the courtroom

20 during some testimony.

21           THE COURT:  No objections to either?

22           MS. BARTH:  No objections to either.

23           THE COURT:  All right.  That's fine.  Do I have to

24 have a dispute with Ms. Barth whether it's either or either?  I

25 don't know.

1              MS. BARTH:  Oh.  And/and.

2              THE COURT:  Tomato, tomato.  We're going to go through

3  it.

4       (The following was held in open court with the jury

5  present at 9:24 AM.)

6              COURTROOM DEPUTY:  Your Honor, the matter before the

7  Court is criminal case number 21-CR-68-1, United States of

8  America v. Dennis Martin.  Representing the Government are

9  Assistant United States Attorneys Jonathan Ophardt and Corinne

10  Smith; present with the defendant is his attorney, Michelle

11  Anderson Barth; and we are here for jury trial.

12             THE COURT:  Good morning, ladies and gentlemen of the

13  jury.  I understand that there was an accident and that caused

14  some delay, but we're getting off to a good start.

15      Did anybody acquire any outside information, do any

16  research, talk to anyone about the case, have anyone talk to

17  them about the case, talk to each other about the case, in any

18  way acquired any other information about this case, no matter

19  how remotely connected to it, that did not come from our

20  courtroom?  Seeing no hands raised.

21      And remember, you've heard no evidence because no evidence

22  has been presented at this time.

23      Mr. Poblubinski, I'm wondering if you ever feel

24  uncomfortable with your leg stuck in that position, we can set

25  up a podium chair for you so you're more comfortable, so you

1  just let me know.

2      JUROR POBLUBINSKI:  Okay.  Thank you.

3      THE COURT:  We are here for opening statements, and as

4  always, we start with the Government, and the prosecutors may

5  proceed.

6      MS. SMITH:  Members of the jury, Dennis Martin

7  possessed a gun when he wasn't supposed to have a gun.  That's

8  what this case is about.  That's why he's the defendant.  Mr.

9  Martin was convicted of a felony in 2015.  The evidence will

10  show that he knew he was a convicted felon.  The law prohibited

11  him from possessing a gun.  But he possessed a gun twice on

12  February 18th, 2019.  He's on video holding a small handgun,

13  waving it in the camera, and he was found within arm's reach of

14  that gun just hours later.  For that conduct, Mr. Martin is

15  charged with being a felon in possession of a firearm.

16      At the end of this trial, you're going to be asked if Mr.

17  Martin possessed a firearm.  Now, that's possession, not

18  ownership.  The judge is going to instruct you on the law

19  before you deliberate, and what the judge says on the law goes,

20  but I'll just mention a few things for you to be aware of as

21  you hear the evidence.

22      Possession is not ownership.  You can possess something

23  without owning it.  And there are a couple different ways to

24  possess something.  There's actual possession, you have

25  something in your pocket, and there's something that's called

1  constructive possession.  That's something you left in the

2  trunk of your car.  So you're going to be asked to decide if

3  Mr. Martin possessed a firearm.

4      I mentioned he's on video.  You're going to see that

5  video.  In that video, you're going to see Mr. Martin holding a

6  Ruger LCP .380 caliber pistol up to the camera and waving it in

7  front of the camera.  Mr. Martin sent that video in the early

8  morning hours of February 18th, 2019, to his mother-in-law,

9  Peggy Germaine.  You'll hear directly from Peggy Germaine, who

10 received that video and who will testify that it's the

11 defendant, Dennis Martin, that appears in the video.

12     Now, Mr. Martin sent the video to Ms. Germaine via the

13 Snapchat application.  So you're going to hear from Sonia Vela,

14 who works at Snapchat, and she'll explain that Snapchat is a

15 messaging application that lets users exchange photos, videos,

16 text, and she'll explain a little bit about how it works.

17     You're also going to hear from Frank Thornton, who will

18 talk about some of the technical characteristics of the video

19 that show that it was created the same day that it was sent.

20     So that's the video.

21     You're also going to hear testimony that just hours after

22 Mr. Martin appeared in that video, he was found riding in a car

23 near his residence in Colchester sitting within arm's reach of

24 a Ruger LCP .380 caliber pistol.  Now, how did that come about?

25 During the day on February 18th, 2019, law enforcement was

1  preparing to arrest Mr. Martin and to conduct a search of his
2  residence.  The Colchester Police Department and Vermont State
3  Police were involved.  You'll hear from Mark Jacobs, who was
4  tasked with helping search that day.  You'll hear from Sergeant
5  Francis Gonyaw of the Colchester Police, who had obtained the
6  search warrant for Mr. Martin's residence and was there to help
7  with its execution.  You'll also hear from Captain Matthew
8  Daley of the Vermont State Police, who assisted in helping Mr.
9  Martin out of the car.
10       You'll hear that during a search of the car Colchester
11  Police Department recovered a Ruger LCP .380 caliber pistol.
12  Mark Jacobs found it.  Sergeant Gonyaw saw him recover it.  The
13  same Ruger LCP .380 caliber pistol will be here admitted into
14  evidence, and you'll see that it's a smaller handgun.  You'll
15  hear that there were four people in the car and that Mr. Martin
16  was seated in the back seat within arm's reach of the Ruger.
17  So you'll see the Ruger that was recovered from the car, and
18  you'll get to compare it to the Ruger in the video.
19       You'll hear from Anthony Ciravolo.  He's worked in the
20  firearms industry for over six years.  He's a certified
21  gunsmith, and he's currently employed by the Bureau of Alcohol,
22  Tobacco, Firearms and Explosives.  He's a firearms enforcement
23  officer.  He looked at the video frame by frame, and he
24  carefully examined the Ruger.  And he took photographs of the
25  Ruger, and he compared them to still frames of the video.  And

1  his testimony will show you the ways that you can conclude that
2  it's the same firearm.
3        So we've talked about possession.  There's the video;
4  there's the testimony you'll hear about the Ruger being found
5  in the car; there's the Ruger itself.
6        There are some other things that we'll have to prove to
7  you.  In addition to possession, we'll have to prove that the
8  possession of the firearm was in or affecting commerce.  That's
9  just a fancy way of saying that the Ruger had crossed state
10 lines.  And here the parties have stipulated to that fact,
11 meaning the parties agree that before February 18, 2019, the
12 Ruger had crossed state lines.
13       The other elements of the offense relate to Mr. Martin's
14 criminal history.  We'll have to prove that before February
15 18th, 2019, Mr. Martin had been convicted of a felony, meaning
16 he'd been convicted of a crime with a maximum punishment of
17 more than one year in prison.  The parties have also stipulated
18 to that fact, meaning the parties agree that in 2015 in
19 Pennsylvania Mr. Martin was convicted of a felony.
20       And we'll have to prove that as of February 18th, 2019,
21 Mr. Martin knew he'd been convicted of a felony.  About
22 knowledge of his felony, you're going to be asked whether he
23 knew if he'd been convicted of a crime with a maximum
24 punishment of more than one year in prison.  You're going to
25 see records from Mr. Martin's prior conviction.  You're going

1  to see that he pled guilty to the offense; that it was in
2  Philadelphia, Pennsylvania, in 2015.  You'll see on those
3  records that he was sentenced to probation but that the maximum
4  penalty for the offense he pled guilty to was 10 years in
5  prison.  You'll see Mr. Martin's signature on those records.
6  In fact, you'll see his signature on two different pages that
7  say that the maximum penalty for the offense he was pleading
8  guilty to was 10 years in prison.

9      You're going to hear from the prosecutor in that case,
10 Shuaiyb Newton.  Mr. Newton was a prosecutor in Philadelphia
11 for a number of years.  As a prosecutor, he attended plea
12 hearings in the same court where he was when Mr. Martin pled
13 guilty hundreds of times, and although he doesn't recall Mr.
14 Martin's particular case, he'll provide you with some insights
15 on how a plea hearing where a defendant pleads guilty goes and
16 what happens during that hearing.

17     You're also going to hear from Mr. Martin's probation
18 officer from the 2015 conviction, Mr. Ronnie Ford.  He's going
19 to appear by video because he's not able to make it here in
20 person.  You'll hear that Mr. Ford met with Mr. Martin the same
21 day that Mr. Martin pled guilty to the offense and was
22 convicted.  You'll hear that they signed paperwork about Mr.
23 Martin's probation and about the prohibition on possessing a
24 firearm for anyone convicted of a felony.  You'll get to see
25 that prohibition spelled out in the paperwork just above Mr.

1  Martin's signature.

2      You're also going to hear that on February 18th, 2019,
3  after he'd been found within arm's reach of the Ruger and hours
4  after he'd appeared on video holding the Ruger, Mr. Martin was
5  interviewed by Colchester Police.  You'll hear from Lieutenant
6  James Roy, who conducted that interview.  You'll hear that
7  Lieutenant Roy informed Mr. Martin of his rights, that he told
8  Mr. Martin that he didn't have to participate in the interview,
9  he didn't have to say anything, talk to the police at all.
10 You'll hear that Mr. Martin signed a form called a *Miranda* form
11 waiving those rights and agreeing to talk to the police.  The
12 interview was recorded, and you'll hear clips from it.  You'll
13 hear Lieutenant Roy ask Mr. Martin about possession of
14 firearms.  And you'll hear that despite appearing on video
15 holding a firearm just hours earlier, Mr. Martin claimed that
16 he didn't have any guns, didn't possess any guns.

17     In sum, Mr. Martin was convicted of a felony in 2015.  The
18 evidence will show you that he knew he was a convicted felon;
19 that he knew he had pled guilty to a crime with a maximum
20 punishment of more than one year in prison; he was prohibited
21 from possessing a gun but he did possess a gun on February
22 18th, 2019.  He's on video, and he was found within arm's reach
23 of that gun just hours later.

24     After you've seen and heard all the evidence, you'll hear
25 from the Government again.  My colleague, Mr. Ophardt, will

1    address you and ask you to find Mr. Martin guilty.  In the

2    meantime, thank you for your time and your service and your

3    close attention to the evidence.

4              THE COURT:  Defendant's opening statement.

5              MS. BARTH:  In 2015, almost eight years ago in

6    Philadelphia, Mr. Martin pleaded guilty to a crime.  And when

7    he pleaded guilty, there was one thing that mattered to him,

8    and it was the only thing that mattered to him:  How much time

9    am I going to get?  When he pleaded guilty, he signed an

10   agreement, and what he understood about that agreement was that

11   he was going to get a sentence of probation only, no jail time.

12   That is what he understood, and that is exactly the sentence

13   that he received.

14        Now, almost five years later, he was arrested in this case

15   for unlawful possession of a firearm by a felon.  In order for

16   him to be guilty of the crime charged here, the Government has

17   to prove that he knew his prior conviction was one that was

18   punishable by more than one year in prison.  Put simply, at the

19   time of his arrest in this case, Mr. Martin did not know, and

20   because he did not know, he is not guilty.

21        Now, in this trial you will hear the lawyers use the terms

22   "felony" and "misdemeanor," but these labels can be a little

23   bit misleading.  They are misleading because what is important,

24   what is critical, really, is not what label is given to Mr.

25   Martin's prior conviction.  What is important is whether Mr.

1 Martin knew that despite having received a sentence of no time

2 in custody, that he could have been punished to more than one

3 year in prison.

4      So before we start talking about what we believe the

5 evidence will show, let's begin with the premise that he did

6 not know, because that is what the presumption of innocence

7 means.  You take a look at Mr. Martin, and you say, There sits

8 an innocent person, a person who did not know.  Which brings us

9 to the evidence.

10      In its opening statement, the Government has focused on

11 what it believes the evidence will show, and it really boils

12 down to a few items of evidence:  the Snapchat video, the

13 conviction documents from Mr. Martin's case in Pennsylvania,

14 and the statements that Mr. Martin made at the time of his

15 arrest in this case.  Now, this evidence is important, and I

16 want you to pay careful attention to it, but it does not prove

17 that he knew.

18      Let's start by talking about the Snapchat video.  We

19 anticipate you will hear about a Snapchat video that Mr. Martin

20 made, and in that video you will see Mr. Martin with a firearm.

21 We do not contest that Mr. Martin is in the video.  We do not

22 contest that he had a firearm.  But ultimately that Snapchat

23 video tells you nothing about what Mr. Martin knew about his

24 prior conviction.

25      Now let's talk about that prior conviction in

1 Philadelphia.  Let's begin with the fact that we do not contest
2 that the conviction that Mr. Martin suffered in Pennsylvania is
3 in fact a crime that is theoretically punishable by more than
4 one year.  But it is important to remember the Government's
5 burden here is to establish that Mr. Martin knew it was a crime
6 punishable by more than one year.  You will learn that Mr.
7 Martin signed some documents in relation to his prior
8 conviction, and when he signed those documents some eight years
9 ago, you will learn that Mr. Martin did not read any of those
10 documents himself.  We anticipate that the evidence will show
11 that Mr. Martin routinely signs documents without reading them
12 or fully understanding their contents.
13     You will hear from the former Philadelphia prosecutor who
14 was assigned to the case at the time of Mr. Martin's
15 conviction.  You will also hear from a probation officer who
16 gave him a copy of the rules he was to follow while he was on
17 probation.  What is important about this evidence is that these
18 witnesses will testify not from their recollection about what
19 actually happened eight years ago but what theoretically might
20 have happened.
21     You will hear the prosecutor testify that it was his
22 practice to ask a defendant at the time of the guilty plea
23 whether there is anything that the defendant does not
24 understand.  But even if this is true, you will hear that Mr.
25 Martin did understand.  He understood he was getting probation.

1      You will hear from the probation officer that he remembers
2  what Mr. Martin looked like from eight years ago because Mr.
3  Martin resembled his neighbor, and he remembers that Mr. Martin
4  has sickle cell anemia, which I'll talk about in a minute, but
5  you will also hear he has no specific memory of talking to Mr.
6  Martin about his felony conviction.  Thus he will share instead
7  what he usually does with people who have a felony conviction,
8  and that is emphasize that they are not to be around guns.  But
9  you will also learn that any person on probation in
10 Pennsylvania, whether for a felony or for a misdemeanor, may
11 not possess guns.  To do so would be a violation of their
12 probation.  So this evidence does not establish what Mr. Martin
13 knew about the felony conviction when he possessed a firearm in
14 this case.

15      Also, as you consider the evidence related to Mr. Martin's
16 Philadelphia conviction, whether it be the documents he signed
17 or what the prosecutor or the probation officer may have said
18 to him, it is important to know the following things about Mr.
19 Martin:

20      Signing documents written in English without fully
21 understanding them was a longtime habit that Mr. Martin
22 developed after he immigrated to the United States as a young
23 man.

24      Mr. Martin is Jamaican by birth, and his first language is
25 Jamaican Patois.  As you will learn, Jamaican Patois, or

sometimes called Patois, is creole language spoken primarily in
Jamaica.  It is a beautiful, colorful language, but it is very
different from English, and it is hard to understand if you
don't speak it.  You will hear Mr. Martin speak English in some
of the evidence presented to you, and while Mr. Martin speaks
English, he does so with a heavy Jamaican accent.  You will
hear from his English words can sometimes be difficult to
understand, and his English vocabulary is limited and
unsophisticated.

The evidence will show that even as a child in Jamaica,
Mr. Martin's reading comprehension was not his strong suit.
From an early age, Mr. Martin was steered towards trades such
as cooking because he had difficulty with his academic studies.

The evidence will show that Mr. Martin has routinely
depended on other people to go over and fill out paperwork for
him, particularly after coming to the United States.

As such, he tends to sign paperwork without reading that
paperwork himself.  So for Mr. Martin, when he signed paperwork
related to this conviction, a sentence of probation meant, in
his mind, that the crime to which he pleaded guilty was a
misdemeanor.

Mr. Martin also signed probation forms that he did not
read himself.  And when he did so, he believed he was agreeing
that he had to abide by certain conditions of probation.  To
Mr. Martin, those conditions forbade him from possessing a

1  firearm.  And at the time of his arrest in this case, he was

2  still on probation, which brings us to his postarrest

3  statements.

4      The prosecution pointed out that Mr. Martin made

5  statements to police postarrest that were demonstrably false.

6  According to the Government, this evidence will prove that Mr.

7  Martin knew he had been convicted of a felony at the time he

8  possessed the firearm.  We do not dispute that Mr. Martin said

9  these things.  But the reasons he said them are quite different

10 than what the Government would have you believe.

11     First, the evidence will show at the time Mr. Martin was

12 interviewed by law enforcement, he had a deep distrust of

13 police.  That distrust kept him from being fully candid with

14 the police about possessing the seized firearm.  And that

15 distrust began in the country of his birth, in Jamaica.

16     You will learn that during his formative years, Mr. Martin

17 had several experiences in Jamaica in which government and law

18 enforcement officials behaved corruptly, even criminally.  When

19 Jamaica -- when Mr. Martin was a kid, his uncle warned him to

20 stay away from police.  "Babylon" was the term used by locals

21 to describe Jamaican police.  "Watch out for Babylon."

22 "Babylon" is a common Jamaican term for law enforcement, and

23 it's meant to describe police as trouble.  So you will learn

24 that Mr. Martin grew up in a parish in Jamaica where you did

25 not call Babylon when your family was in trouble.  In fact, you

1   could expect your problems to become much worse if you did.

2        Mr. Martin lived in Jamaica until he was 21 years old, so

3   he spent all of his formative years in a corrupt system of

4   government, and this was part of the reason why Mr. Martin was

5   interested in leaving Jamaica.  But these memories remain

6   seared in his consciousness.  Now, unfortunately, he didn't

7   leave these experiences behind when he immigrated to the United

8   States.

9        When Mr. Martin and his siblings immigrated, they expected

10  white picket fences, safety, and economic opportunity.  Where

11  they ended up, however, looked very different.  The family

12  lived in a notoriously rough neighborhood in Philadelphia with

13  a high crime rate and a heavy police presence, and that heavy

14  police presence made the entire family feel uncomfortable.  It

15  made even going to the corner store an unpleasant experience.

16  And on top of that, his family felt like outsiders.

17       When Mr. Martin moved to Vermont, he hoped to be in a

18  safer environment, and it was, but Mr. Martin stood out and

19  felt it.  So it is with these circumstances in mind that we

20  consider what the evidence will show about what happened at Mr.

21  Martin's arrest.  And the circumstances of Mr. Martin's arrest

22  in this case were intimidating.

23       You will learn that several police officers were there in

24  uniform with firearms.  Also on scene were at least 13 tactical

25  unit officers dressed in camouflage.  Some were wearing goggles

1  and other protective gear.  They were carrying long guns.  Some
2  were running.  Some emerged from a large military Jeep, and
3  there was a large dark van there.  There were several marked
4  and unmarked police vehicles and at least one officer with a
5  canine.  You will learn that Mr. Martin was on his way to the
6  hospital at the time of his arrest in this case.

7       As I mentioned earlier, Mr. Martin has sickle cell, and as
8  such, he is a frequent visitor to the emergency room.  When his
9  ride arrived, the car was surrounded and Mr. Martin was removed
10 from the car.  You will learn that Mr. Martin told officers on
11 the scene that he needed to go to the hospital.  Instead, they
12 took him to the police station to be questioned.  Mr. Martin
13 was very upset that the officers did not seem to appreciate the
14 seriousness of his medical condition.

15      Now, also keep in mind that when Mr. Martin sat down with
16 law enforcement, he knew he was on probation for that
17 conviction out of Pennsylvania, and he thought as a condition
18 of that probation he could not possess the firearm.  He was
19 concerned it could result in a violation of his probation.
20 Thus when Mr. Martin was questioned about the firearm, he
21 denied ever possessing it.  And of course that was not true.
22 But Mr. Martin did not trust that the officers were impartial
23 or that they would take an objective approach to gathering
24 evidence.  And it is notable that it is only after Mr. Martin
25 completed his postarrest interview that he was taken to the

1  hospital, where you will learn he remained for about a month.

2      When Mr. Martin spoke to police, he believed they were

3  looking for reasons to put him in jail, and a probation

4  violation would give them the basis to do just that.  So when

5  Mr. Martin denied possessing the firearm, it had nothing to do

6  with being a felon and it had everything to do with the fact he

7  was on probation, and that is why he is not guilty.

8      So in our system, the Government gets to present its

9  evidence first, so I ask you to simply wait to make a decision.

10 By the end of this case, the Government will not have met its

11 burden.  The lack of evidence will lead to one conclusion:

12 that Mr. Martin is not guilty.

13      THE COURT:  At this point we begin our presentation of

14 evidence.  As always, we start with the prosecution.

15      You may call your first witness.

16      MR. OPHARDT:  Your Honor, may we approach?

17      THE COURT:  Yes, you may approach in the -- do you

18 want to do it in the side room?

19      MR. OPHARDT:  I think so, Judge.  Sorry.

20      THE COURT:  Okay.  Let's do that.

21      (The following was held out of the hearing of the jury.)

22      MR. OPHARDT:  Judge, Ms. Barth just put front and

23 center law enforcement's response in Colchester and how they

24 responded.  The fact that Mr. Martin had been reported to be

25 both violent and be armed with a machete and a firearm is very

1  relevant to the way in which they responded.  We had agreed to

2  not talk much about the underlying investigation because of the

3  inflammatory nature of domestic violence, but certainly the

4  tactical team being present was because of that aspect of the

5  investigation and the fact that the search warrant actually

6  referenced attempted murder.

7          THE COURT:  As I was listening to it, I thought it

8  presented a false impression of why they approached the

9  residence in the manner that they did.  If that was a response

10  to a felon in possession of a firearm, that was way overkill,

11  and so we're going to have to do something to cure that

12  misimpression.

13      I'm going to hear from you, but I'm talking.

14      Because it created a false impression of why the response

15  was what it was, and I'm concerned about that.

16      Go ahead.

17          MS. BARTH:  I am not going to argue in any way that

18  the response by law enforcement was inappropriate.  What I was

19  focusing on is the intimidating environment from Mr. Martin's

20  perspective, and that would go to voluntariness.  So that is --

21  I'm not going to argue at all that their response was

22  inappropriate or over the top.  It was -- and I think I used

23  the word "intimidating" when talking about how that was seen

24  from Mr. Martin's perspective.

25          THE COURT:  So this is not a scolding because you have

1  a point.  You are entitled to talk about the circumstances and

2  how intimidating it would be and what his response would be.

3  Perfectly appropriate.  But then the door gets opened to:  Is

4  this a crazy law enforcement response to a felon in possession

5  of a firearm?  And that would be false.  So we have to do

6  something.  I haven't figured out what it was.  But we have to

7  allow some balance, like having the Government ask:  Now, when

8  you approached the house, was it your understanding that Mr.

9  Martin had a firearm?

10       "Yes.

11       "And was it also your understanding that he had a machete?

12       "Yes.

13       "And were you concerned that he could be violent?

14       "Yes.

15       "Is that why you had that presence there?"

16       That is something that would be permissible because the

17 door has been opened, creating a somewhat false impression that

18 this is a response to a felon in possession of a firearm.  So

19 that's the kind of thing I would allow.

20       Is that what you're asking me to allow?

21           MR. OPHARDT:  Yes, Judge.  In particular, Sergeant

22 Gonyaw was the affiant on the search warrant, and I would ask

23 him those types of leading questions.  We can certainly do it

24 through what the search warrant authorized as well for the

25 machete purposes, because the machete's listed.  I am concerned

1  about talking about what crimes were outlined in the search

2  warrant.

3      THE COURT:  The search warrant's not coming in.

4      MR. OPHARDT:  Well, the fact that they were there to

5  execute a search warrant.

6      THE COURT:  Right.  So yes.  I would steer away from

7  the search warrant and talk about this is what you were

8  concerned, that there was a machete in the house, that there

9  was a firearm in the house, that you were concerned that Mr.

10 Martin could be violent, not talk about the crimes.

11     MS. BARTH:  I'm noting my objection.  I understand

12 your Honor's concern.  It truly is to focus on the

13 voluntariness of the statement.  All of those facts I think are

14 neutral as long as they are not used -- and when I say "all of

15 the facts," the facts that I listed during my opening

16 statement.  Obviously my opening statement is not evidence.

17 But the fact that there were so many officers there, I am not

18 going to argue that that response was inappropriate.  I'm

19 concerned about the prejudicial effect of introducing a machete

20 and calling him a violent person.

21     THE COURT:  No, it's not calling him a violent person.

22 "You understood that there was a machete in the home, that

23 there was a firearm, and you were concerned he might be

24 violent?"  Something like that.  Not he is violent, he's got --

25 you know, he was wanted for attempted murder.  I, listening to

1 it, thought there was a false impression with a racial

2 component that this crazy outsized response was because of a

3 Snapchat video with a man with a limited criminal history

4 holding a gun.  I think that impression is out there.  I think

5 it opened the door.  I'm going to allow very limited leading

6 questions to indicate why they approached it that way, and I

7 believe that would be sufficient.  I'm not saying you did

8 anything wrong.  It's just -- the problem is -- it would be

9 wonderful if the facts only pointed in one direction, but they

10 often don't.  So they are great for voluntariness, but they're

11 not so good on something else.  So you can go ahead and argue

12 about how intimidating this is.  But I am going to allow that.

13      Anything further on this subject?

14          MR. OPHARDT:  No, your Honor.

15          THE COURT:  All right.  Let's go back.

16          MR. OPHARDT:  Thank you.

17      (The following was held in open court.)

18          THE COURT:  We are back on the record in United States

19 of America v. Dennis Martin.

20      The Government may call its first witness.

21          MR. OPHARDT:  Your Honor, the United States calls Mark

22 Jacobs to the stand.

23          COURTROOM DEPUTY:  You can step right up front, Mr.

24 Jacobs.  Please raise your right hand.  State your full name

25 for the record.

Mark L. Jacobs - Direct

1          THE WITNESS:  Mark L. Jacobs.

2                      MARK L. JACOBS,

3      having been first duly sworn by the courtroom deputy,

4            was examined and testified as follows:

5          THE WITNESS:  I do.

6                      DIRECT EXAMINATION

7  BY MR. OPHARDT:

8  Q     Good morning, Mr. Jacobs.

9  A     Good morning.

10 Q     You've got the mic perfect.

11       Where are you currently employed, sir?

12 A     I am currently employed by the Colchester, Vermont, School

13 District.

14 Q     And what's your position at the school district?

15 A     I am a behavior interventionalist.

16 Q     Prior to the school system, where were you employed?

17 A     I was employed by the Town of Colchester Police

18 Department.

19 Q     And how long did you work there?

20 A     Twenty-six years.

21 Q     So you were working for them in February of 2019?

22 A     That is correct.

23 Q     In that time period, what were your primary

24 responsibilities?

25 A     I at the time was a school resource officer for the police

Mark L. Jacobs - Direct

1  department.

2  Q    Meaning that you were assigned to the school system?

3  A    Yes, I was.

4  Q    Would that be all that you would do with the police

5  department, or were there times you helped with other things?

6  A    Because I was attached to the school, I also was assigned

7  different details as -- if needed extra officers, I would be

8  involved in other details, yes.

9  Q    Okay. So I want to talk about February 18th, 2019.  That

10 day did that involve one of those times when you had tasks

11 outside the school?

12 A    It did.

13 Q    Okay. So what exactly were you asked to help with that

14 day?

15 A    On the 18th, that day, I was asked to participate in an

16 execution of a search warrant.

17 Q    And where was that search warrant to be executed?

18 A    192 Grey Birch Drive in the town of Colchester, Vermont.

19 Q    Okay. Was Colchester Police to be the only police

20 department involved in that search warrant execution?

21 A    I remember seeing the Vermont State Police there.

22 Q    Okay. That day, where did you -- where did you start out

23 before going to the residence?

24 A    That particular day, I would have been at the school.

25 Q    Okay. After the school, where did you proceed to?

Mark L. Jacobs - Direct

1  A    At the -- at the end of the school day, I would have met

2  with officers at the police department and then proceeded down

3  to execute the search warrant.

4  Q    Okay.  When you're proceeding to execute the search

5  warrant, where do you start out?  Do you go straight to the

6  house, or are you someplace else?

7  A    My responsibility was to set up behind the residence on a

8  side street, Wheatley Court, as a perimeter as part of the

9  first step of that investigation.

10  Q    While you're on the perimeter, what happens next?

11  A    At a certain point, I was called to come to Grey Birch

12  Drive to the front of the residence, where I met with

13  Colchester police officer Sergeant Francis Gonyaw.

14  Q    Okay.  What did you learn from Francis Gonyaw at that

15  point?

16  A    That our first step was to be involved in a search of a

17  motor vehicle.

18  Q    Okay.  Where was the motor vehicle located in proximity to

19  the residence?

20  A    It was positioned on Grey Birch Drive very close to the

21  residence that we were supposed to execute the search warrant

22  at.

23  Q    What were your responsibilities to be during the search of

24  the vehicle?

25  A    My responsibilities were to take photographs of the

Mark L. Jacobs - Direct

1 vehicle as well as then participate in searching of the

2 vehicle.

3 Q    What part of the vehicle did you yourself search?

4 A    I searched the passenger side front and back of the

5 vehicle.

6 Q    Just the passenger side or the whole passenger

7 compartment?

8 A    The whole passenger side of the entire car.

9 Q    Okay.  What, if anything, did you find during that search?

10 A    At one point during the search, I located a handgun that

11 was in a pocket on the back side of the front passenger's seat.

12 Q    Do you recall what type of handgun?

13 A    It was a small, dark Ruger handgun.

14 Q    What did you do when you located it?

15 A    At first when I found it inside that pocket, I took an

16 image of the contents of -- inside that pocket.

17 Q    Meaning you took a picture?

18 A    I took a picture.

19 Q    Okay.  What did you do after you took that picture?

20 A    Then I ended up reaching in and securing the firearm and

21 removing it from that pocket.

22 Q    After you removed it from the pocket, what did you do with

23 it?

24 A    I then placed it on the seat of that vehicle and then took

25 an image, a photograph, of that firearm.

Mark L. Jacobs - Direct

1  Q    After you photographed the firearm, where did it go?

2  A    The firearm was then cleared for any type of ammunition in

3  it, and then it was secured in a marked police vehicle.

4  Q    As part of your time at the scene, did you participate in

5  the search of the residence?

6  A    After the search of the car, I was involved with a search

7  of a residence.

8  Q    During the search of the residence, was one of the things

9  you were looking for a semiautomatic handgun?

10 A    It was.

11 Q    What, if anything, did you see in the residence consistent

12 with a semiautomatic handgun?

13 A    I personally did not see anything.

14 Q    Would you have been asked to photograph such an item if it

15 was found in the residence?

16 A    Absolutely.

17 Q    How many people helped you in the search of the residence?

18 A    Myself and two other officers.

19 Q    I want to talk through with you some of those photographs

20 you mentioned.

21        MR. OPHARDT:  Your Honor, may I approach the witness?

22        THE COURT:  You may.

23 Q    I've provided you with eight yellow folders that have

24 Exhibits 1 through 8.  I'm sorry.  Let me retrieve 8 from you.

25 We're going to start with 1 through 7.  Would you please look

Mark L. Jacobs - Direct

1  at each of those, and let me know when you're done.

2  A    Yes.

3  Q    What are Exhibits 1 through 7?

4  A    They are a -- photographs of the vehicle that I took part

5  in in searching, and they are also the interior of the car that

6  I searched, as well as a handgun that I found in that pocket.

7  Q    You took them -- you took those photographs yourself?

8  A    I took those photographs, yes.

9  Q    Are they fair and accurate depictions of the photographs

10 you took that day?

11 A    Absolutely.

12         MR. OPHARDT:  Your Honor, I move to admit Exhibits 1

13 through 7 at this time.

14         THE COURT:  Any objection?

15         MS. BARTH:  No, your Honor.

16         THE COURT:  1 through 7 are admitted.

17     (Government's Exhibits 1-7 were received in evidence.)

18         MR. OPHARDT:  Your Honor, I'd request permission to

19 publish them to the jury.

20         THE COURT:  You may do so.

21         MR. OPHARDT:  Ms. Tallman, can we have Exhibit 1 on

22 the screen.

23 Q    BY MR. OPHARDT:  Mr. Jacobs, what's depicted in this

24 photograph?

25 A    That is an image of the vehicle that I took part in

Mark L. Jacobs - Direct

1  searching.

2          MR. OPHARDT:  Exhibit 2, Ms. Tallman.

3  Q    What's in Exhibit 2?

4  A    That is a photograph of the rear passenger area as well as

5  the pocket that I found the handgun in.

6  Q    Okay.  So the tech should work.  You should have a touch

7  screen capability there.  Can you circle the pocket that you're

8  talking about for the jury.

9       Okay.  Thank you, Mr. Jacobs, for drawing that circle of

10 the pocket.

11         MR. OPHARDT:  If we could have Exhibit 3, please.

12 Q    And, Mr. Jacobs, what's this a picture of?

13 A    It is a close-up of the area -- of the rear compartment

14 area of that vehicle, again depicting the pocket that I found

15 the firearm in.

16 Q    Okay.  And for the jury, would you circle the pocket in

17 this.

18         MR. OPHARDT:  And for the record, Mr. Jacobs circled

19 the pocket that is in the bottom right-hand corner of that

20 exhibit.

21      May I have Exhibit 4, please.

22 Q    Mr. Jacobs, what's this a picture of?

23 A    It is an image inside the pocket that I attempted to take

24 depicting the handgun that I found.

25         MR. OPHARDT:  Ms. Tallman, can we blow up this area a

Mark L. Jacobs - Direct

1  little bit.

2  Q    Mr. Jacobs, can you look at your screen, and do you see

3  anything within the pocket in that photograph?

4  A    Unfortunately, a blurried picture, but it looked like --

5  if I may.

6  Q    You may draw on your screen, yes, sir.

7  A    In this area, the handle of a handgun.

8         MR. OPHARDT:  Ms. Tallman, can we have the next photo,

9  please.

10  Q    And this is Exhibit 5.  Mr. Jacobs, what's depicted on the

11  screen?

12  A    That is the handgun that I located in that pocket where I

13  placed it on the seat inside the vehicle to the rear.

14         MR. OPHARDT:  Ms. Tallman, can we just zoom in on the

15  firearm portion of that.

16  Q    And, Mr. Jacobs, is this consistent with how you recall

17  the firearm looking on the day you located it?

18  A    Absolutely.

19  Q    And that was February 18th of 2019?

20  A    Yes.

21         MR. OPHARDT:  Ms. Tallman, can we have Exhibit 6,

22  please.

23  Q    Mr. Jacobs, what's this a photo of?

24  A    This is a close-up of the firearm that I found inside that

25  pocket trying to depict the serial number on that firearm.

Mark L. Jacobs - Direct

1            MR. OPHARDT:  Ms. Tallman, can we blow up this portion

2   of the photograph.

3   Q    Fair to say, Mr. Jacobs, you're not a photography teacher

4   at the school?

5   A    I am a cop, and I was not a photographer.

6   Q    Okay.  So it's a little blurry?

7   A    Unfortunately, yes.

8   Q    Are you able to make out the last three digits of the

9   serial number?

10  A    Yes.  702.

11  Q    Thank you.

12           MR. OPHARDT:  And if we could have Exhibit 7, please.

13  Q    Mr. Jacobs, what's this a photograph of?

14  A    Again, the firearm that I found in that pocket of the

15  vehicle with the magazine out of the firearm.

16  Q    And just for those on the jury who may not know, what's

17  the magazine in this photo?

18  A    If I may circle it?

19  Q    You may circle it, yes.

20       Thank you.

21       And, Mr. Jacobs, was the firearm loaded at the time it was

22  found?

23  A    Yes, it was.

24  Q    And fair to say you can't recall how many rounds this --

25  this magazine would have held?

Mark L. Jacobs - Direct

1  A    No, I cannot recall that.

2  Q    Can you tell from the photograph how many rounds are in

3  the magazine?

4  A    Five rounds.

5  Q    And that's because there's four circles with kind of gold

6  in it as well as the round that's at the top?

7  A    Yes.

8  Q    Thank you.  After the searches were completed of both the

9  vehicle and the residence, where did you take the firearm?

10 A    The firearm would have been transported to the Colchester

11 Police Department.

12 Q    What would you -- what did you do with it there?

13 A    At the Colchester Police Department, I then would have

14 taken that firearm, put it inside a firearm evidence box.  That

15 particular box has a specific area where you can write notes on

16 the box as well as attach a computer-generized evidence tag.

17 Q    Basically putting it into the inventory of the police

18 department?

19 A    Yes.  Where it would have been put in a locker for

20 evidence chain.

21        MR. OPHARDT:  Your Honor, may I approach the witness?

22        THE COURT:  You may.

23        MR. OPHARDT:  I'm retrieving Exhibits 1 through 7,

24 provided the witness with Exhibit 8.

25 Q    Mr. Jacobs, do you recognize the contents of Exhibit 8?

Mark L. Jacobs - Direct

1 A    I do.

2 Q    What is it?

3 A    It's a picture depicting the evidence box that I would

4 have put that firearm in.

5 Q    Okay.  And how do you recognize it to be related to this

6 firearm seizure?

7 A    Based on the notes that were written on the box is my

8 handwriting as well as my name attached to it.

9        MR. OPHARDT:  Your Honor, I'd move to admit Exhibit 8

10 at this time.

11        THE COURT:  Any objection?

12        MS. BARTH:  No objection.

13        THE COURT:  It's admitted.

14    (Government's Exhibit 8 was received in evidence.)

15        MR. OPHARDT:  Can we publish Exhibit 8, please.  Thank

16 you.

17 Q    BY MR. OPHARDT:  And, Mr. Jacobs, when you were filling

18 out this information, you would have done it that same day; is

19 that right?

20 A    After we got back to the police department, it would have

21 been logged.

22 Q    Okay.

23 A    That day, yes.

24 Q    When you complete the serial number information, what

25 would you have been looking at?

Mark L. Jacobs - Direct

1  A    I would have taken the information off of that handgun,

2  that number written on that firearm, and retraced -- or rewrote

3  it on to the box.

4  Q    Okay.

5        MR. OPHARDT:  Ms. Tallman, can we blow up this section

6  here.

7  Q    And, Mr. Jacobs, on your screen would you please circle

8  where the serial number is listed in the information that you

9  wrote on the box.

10       Job well done with circling.

11 A    Thank you.

12 Q    Would you please read that to the jury.

13 A    Thank you for blowing it up, because I forgot my glasses.

14       372120702.

15 Q    And the date and time that it was collected are listed

16 there as well, correct?

17 A    Yes, they are.

18 Q    And what is the date and time listed?

19 A    February 18, 2019, time 1531, 3:51 PM.

20 Q    Thank you.

21       MR. OPHARDT:  And, Ms. Tallman, can we --

22       THE COURT:  So let me just -- isn't it 3:31 PM?

23       THE WITNESS:  I apologize.  1531.  Thank you, your

24 Honor.

25 Q    You definitely needed those glasses.

Mark L. Jacobs - Direct

1 A    Yes.

2        MR. OPHARDT:  Ms. Tallman, if we could put that back

3 in the blowup of the description and leave that on the screen.

4 I'm going to retrieve Exhibit 9 at this time.

5        Your Honor, may I approach?

6        THE COURT:  Yes.

7 Q    And the court reporter, who couldn't write down what she

8 was doing, gave the witness some glasses that don't look like

9 your style, but --

10 A    Not at all.

11 Q    -- they'll work.

12    Okay.  Mr. Jacobs, I'm handing you what's marked as

13 Exhibit 9.  Do you recognize that item?

14 A    I do.

15 Q    What is it?

16 A    It is a Ruger semiautomatic handgun with an accessory

17 attached laser.

18 Q    What is the serial number on that firearm?

19 A    372120702.

20 Q    Thank you.

21        MR. OPHARDT:  Your Honor, I'd move to admit Exhibit 9

22 at this time.

23        THE COURT:  Any objection?

24        MS. BARTH:  No objection.

25        THE COURT:  It's admitted.

Mark L. Jacobs - Direct

1      (Government's Exhibit 9 was received in evidence.)

2  Q    BY MR. OPHARDT:  Mr. Jacobs, is that firearm in the same

3  condition you recall it being, despite being almost four years

4  later, the day it was seized?

5  A    Absolutely.

6           MR. OPHARDT:  Your Honor, may I approach the witness?

7           THE COURT:  You may.

8           MR. OPHARDT:  I'm going to retrieve Exhibit 9 and

9  Exhibit 8 and hand the witness Exhibit 10.

10 Q    Mr. Jacobs, have you looked at Exhibit 10?

11 A    Yes.

12 Q    What is it?

13 A    It is a picture of the same firearm that I found inside

14 the vehicle.

15 Q    Okay.  A better photograph with the serial number visible?

16 A    A little bit better, yes.

17           MR. OPHARDT:  Okay.  Your Honor, I'd move to admit

18 Exhibit 10.

19           THE COURT:  Any objection?

20           MS. BARTH:  No objection.

21           THE COURT:  It's admitted.

22      (Government's Exhibit 10 was received in evidence.)

23           MR. OPHARDT:  If we could publish Exhibit 10 briefly.

24      Your Honor, may I have a moment?

25           THE COURT:  You may.

Mark L. Jacobs - Cross

1          MR. OPHARDT:  Your Honor, I pass the witness.  Thank

2  you.

3          THE COURT:  Any cross-examination?

4          MS. BARTH:  Yes, your Honor.

5      Is it okay if we unpublish?

6                        CROSS-EXAMINATION

7  BY MS. BARTH:

8  Q     Good morning.

9  A     Good morning.

10 Q     You were not part of the actual stop of the car, correct?

11 A     I was not.

12 Q     You were not present when Mr. Martin was removed from the

13 vehicle; is that right?

14 A     I was not.

15 Q     You arrived shortly thereafter to search the vehicle; is

16 that right?

17 A     That is correct.

18 Q     You weren't the only Colchester police officer there, were

19 you?

20 A     I was not the only one.

21 Q     How many officers were there?

22 A     I recall myself and Officer Mellen.

23 Q     Okay.  So they were there in uniform?

24 A     They were there in uniform.

25 Q     Do you remember if Sergeant Gonyaw was there as well?

Mark L. Jacobs - Cross

1  A    Yes, he was.

2  Q    Okay.  And are there any other Colchester Police

3  Department officers you can remember who were there?

4  A    That I can recall, no.

5  Q    Okay.  Do you recall how many marked police vehicles were

6  present?

7  A    I can't answer that.  I have no idea.

8  Q    Was there more than one?

9  A    Yes.

10 Q    Okay.  Were there officers there in unmarked vehicles as

11 well?

12 A    I don't recall if there was or not.

13 Q    And the reason you don't remember is because this happened

14 a while ago, correct?

15 A    Absolutely.

16      MS. BARTH:  Okay.  No further questions.

17      THE COURT:  Any redirect?

18      MR. OPHARDT:  No, your Honor.

19      THE COURT:  Thank you, sir.  You may step down.

20   (The witness was excused.)

21      THE COURT:  We're going to take our midmorning break,

22 approximately 15 minutes.

23   Ladies and gentlemen of the jury, don't talk about the

24 case.  Don't let anybody talk to you about the case.

25   We'll excuse the jury and we'll have the attorneys remain

1 in the courtroom.

2      (The jury exited the courtroom, after which the following
3 was held in open court at 10:22 AM.)

4           THE COURT:  I have one thing to bring up with you, and
5 then I'll ask if you have anything to bring up with me.  Do all
6 of the Government's exhibits have that blue "Redacted" stamp on
7 it?  It seems to me to draw attention to something that if it
8 was just blacked out people would not be paying attention to.
9 So when I see a blue label showing "Offense:  Redacted," that's
10 exactly where my eyes go.  So am I going to see more of that?

11          MR. OPHARDT:  Judge, that's our default coloring.  I
12 did not have any intent with it.  It wasn't chosen on purpose.

13          THE COURT:  People are getting -- if I have a problem,
14 I'll tell you directly.  I don't like it.  Is it going to be on
15 everything?

16          MR. OPHARDT:  Well, your Honor, we have exhibits ready
17 to go that -- of multiple variations of paperwork.  We're
18 waiting on the Court's ruling for whether we can talk about the
19 nature of the prior offense.

20          THE COURT:  At this point, my ruling is the door has
21 not been opened, so --

22          MR. OPHARDT:  Okay.

23          THE COURT:  But am I going to see "Redacted"?  It's
24 not the worst thing in the world.  It's just I haven't seen it
25 before like that, especially the color, and that's exactly

1  where my eyes went, and I thought it was counterproductive to

2  draw somebody's attention to something that we don't want them

3  to see.

4          MR. OPHARDT:  Understood.  I think the rest of our

5  exhibits that have "Redacted" on them are paperwork that's

6  already in black and white, so we can probably burn copies, but

7  my bigger concern is what we have digitally to display.

8      Your Honor, may I have a moment?

9      We can verify that the remainder -- they all say

10 "Redacted."  Is that okay with your Honor?

11         THE COURT:  I'm not hearing an objection.  I just

12 wanted to tell you my own experience.

13     And let me hear from Ms. Barth.

14         MS. BARTH:  I think your point is well taken, your

15 Honor.  My eye is drawn to the blue as well.  It's the same

16 thing when things are blacked out.  It would be better if it

17 was just a blank.

18         THE COURT:  Yeah.  It would be.  See what you can do.

19 It's not the end of the world.  But if we're going to take

20 something out, drawing your attention back to it is not what we

21 want to do.  And of course I don't think there was any

22 malintent.  If I have a concern about malintent, you will hear

23 from me directly on that issue.

24         MR. OPHARDT:  Your Honor, may I ask one quick

25 clarification?

1          THE COURT:  Sure.

2          MR. OPHARDT:  Would the Court prefer it to not say

3  "Redacted"?  That's going to take us more time to apply.

4          THE COURT:  I don't care much about that.

5          MR. OPHARDT:  Okay.  Thank you, Judge.

6          THE COURT:  Anything that you need to bring to my

7  attention?

8          MR. OPHARDT:  Not from the Government, your Honor.

9          MS. BARTH:  Not from the defense.

10          THE COURT:  All right.  We will come back in

11  approximately ten minutes.

12      (A recess was taken.)

13          THE COURT:  I have been told by the marshals that Mr.

14  Martin needs to leave by 11:15.  I'm talking to them about

15  whether or not we can guarantee he'll be back here by 1:00.

16      We're going to do whatever we have to do for your health.

17  That's more important than anything else.

18      But our original plan was 11:30 to 1:00, so don't worry;

19  I'm giving the marshals a hard time about deviating from that

20  plan.  I just wanted to keep you apprised of where we are at

21  this point.  Okay?

22          MS. BARTH:  Thank you, your Honor.

23          THE COURT:  Anything to bring to my attention before

24  we bring back the jurors?

25          MR. OPHARDT:  No, your Honor.

Francis C. Gonyaw - Direct

1           MS. BARTH:  No, your Honor.

2       (The following was held in open court with the jury

3   present at 10:39 AM.)

4           THE COURT:  The Government may call its next witness.

5           MR. OPHARDT:  Your Honor, the United States calls

6   Colchester Police Sergeant Francis Gonyaw.

7           COURTROOM DEPUTY:  Mr. Gonyaw, please step right up

8   front.  Please raise your right hand.  State your full name for

9   the record.

10          THE WITNESS:  Francis C. Gonyaw.

11                          FRANCIS C. GONYAW,

12       having been first duly sworn by the courtroom deputy,

13              was examined and testified as follows:

14          THE WITNESS:  I do.

15                      DIRECT EXAMINATION

16  BY MR. OPHARDT:

17  Q    Good morning.

18  A    Good morning.

19  Q    Sergeant Gonyaw, where are you currently employed?

20  A    I'm currently employed with the Town of Colchester, the

21  Colchester Police Department.

22  Q    And how long have you been working there?

23  A    Almost 34 years.

24  Q    What are your duties as of now?

25  A    I'm currently assigned as a patrol sergeant.

Francis C. Gonyaw - Direct

1  Q    Back in 2019, what were your duties?

2  A    I was a patrol sergeant then as well.

3  Q    Okay.  Do you recall working on February 18th of 2019?

4  A    Yes, I do.

5  Q    In fact, you'd been working a bit that weekend; is that

6  right?

7  A    That is correct.

8  Q    As part of your work that weekend, had you obtained a

9  search warrant for 192 Grey Birch Drive in Colchester, Vermont?

10  A    Yes, I did.

11  Q    When you're preparing to get a search warrant, you

12  understand the type of residence that you're going to be

13  searching; is that right?

14  A    Yes, I do.

15  Q    Okay.  So what type of residence was 192 Grey Birch Drive?

16  A    So 192 Grey Birch Drive is actually part of a duplex, so

17  there's two -- two residences in the overall building.

18  Q    The residences are side by side?

19  A    Yes, they are.

20  Q    Okay.  And Dennis Martin lived at one of the residences;

21  is that right?

22  A    Yes.  The address was 192.

23  Q    Was the whole building 192, or were there different

24  numbers for the duplex?

25  A    No.  There's -- 192 was the right side of the residence,

Francis C. Gonyaw - Direct

1  and 194 was the left side.

2  Q    Now, on February 18th, 2019, law enforcement intended to

3  execute that search warrant; is that correct?

4  A    That is correct.

5  Q    And law enforcement also intended to arrest Mr. Martin at

6  the same time; is that right?

7  A    That is correct.

8  Q    Now, when Colchester Police has concerns about potential

9  weapons during -- being possessed at the time the search

10 warrant is being executed, is it common to ask the Vermont

11 State Police to assist in the execution of the search warrant?

12 A    Yes.  It's common to ask anybody that may have a specialty

13 more than what our capabilities are to assist with a search

14 warrant under these circumstances.

15 Q    Okay.  So you're aware that the request was made by

16 Colchester to VSP for tactical assistance?

17 A    Yes, I am.

18 Q    And that was because of the potential for a firearm in the

19 residence?

20 A    That is correct.

21 Q    The potential for a machete in the residence?

22 A    That is correct.

23 Q    And also concerns about potential violence during the

24 execution of the warrant?

25 A    That is correct.

Francis C. Gonyaw - Direct

1 Q    Because the Vermont State Police tactical team was going

2 to be assisting, where were you located in preparation for the

3 warrant?  Were you with them, or were you elsewhere?

4 A    No.  I was elsewhere.  I was actually -- I was not near

5 the residence at the time.  I was located at an intersecting

6 road to Grey Birch Drive on River Road.

7 Q    Okay.  While you're positioned there, what happens?

8 A    So while I'm waiting there - I'm actually there to block

9 any traffic that would drive down Grey Birch - there was radio

10 communication, radio traffic, that a car had come to the

11 residence at 192 Grey Birch and that the occupants of that

12 residence had entered that car and were leaving.

13 Q    What were you asked to do after the car was stopped?

14 A    So after the car was stopped, there was a little bit of

15 time that had passed.  I was then asked if I would respond to

16 the location on Grey Birch Drive with a consent search card.

17 Q    When you arrived at 192 Grey Birch, was there a vehicle

18 there?

19 A    Yes, there was.

20 Q    What did you do upon arriving?

21 A    So when I arrived, I ended up speaking with Bryan, who was

22 the owner of the car that was stopped, and I asked him about a

23 consent to search his vehicle and read to him a consent search

24 card authorizing us to search that vehicle, the police.

25 Q    Did you obtain consent?

Francis C. Gonyaw - Direct

1  A    Yes, I did.

2  Q    I'd like to show you Exhibit 1, which has been admitted.

3         COURTROOM DEPUTY:  It might take a second to switch

4  over.

5  Q    Sergeant Gonyaw, what's depicted on your screen which is

6  to your left?

7  A    Yes.  So that's the Saab car that was operated by Bryan

8  Phillips.

9  Q    And that's the car you obtained consent to search?

10 A    Yes, it is.

11 Q    Who helped you with the search?

12 A    Mark Jacobs.

13 Q    What was your responsibilities during the search?

14 A    So the search of this car, I ended up just searching the

15 trunk of the car, and Mark Jacobs ended up searching the

16 interior of the car.

17 Q    While you were searching the trunk, what, if anything,

18 happened?

19 A    So as I'm searching or looking through the trunk of the

20 car, Mark Jacobs had said to me -- made mention to me that --

21 he says, "Come here and look at this," and in the -- in a pouch

22 behind the passenger seat, there was a black handgun in that

23 pouch.

24 Q    What did you observe Officer Jacobs do after he located

25 the firearm in the pouch?

Francis C. Gonyaw - Direct

1  A    So he eventually -- he ended up seizing the weapon out of
2  that pouch and securing it.
3          MR. OPHARDT:  If I could have Exhibit 3, please.
4  Q    Sergeant Gonyaw, you can -- that's a touch screen.  You
5  can circle.  Would you circle the pouch you recall Officer
6  Jacobs having found the firearm.
7  A    Oh, sorry.  See how I can move that.  So this would be the
8  pouch right there.
9          MR. OPHARDT:  For the record, that was the bottom
10 right-hand corner of the exhibit.
11 Q    Was anything else of interest found in the vehicle?
12 A    No.
13 Q    Did you assist in the search of the house?
14 A    I did.
15 Q    How many officers assisted in that search?
16 A    There was three of us.
17 Q    General description of the interior.  Do you recall how
18 many rooms there were?
19 A    So as you made entry, there was a living room to the
20 right, which then walked into a kitchen, and then right
21 basically in front as you walked in, there was a set of stairs
22 that went to the second floor; and then up there -- there was
23 primarily two bedrooms up there on the second floor.
24 Q    How many people were living at 192 Grey Birch Drive, if
25 you know?

Francis C. Gonyaw - Direct

1  A    I believe there was three people living there.

2  Q    During the search of the residence, did law enforcement

3  locate anything resembling a firearm in the house?

4  A    No.

5  Q    When you arrived at the car, were there other people on

6  scene who had been in the car?

7  A    Yes, there was.

8  Q    Did you talk with them?

9  A    Yes, I did.

10 Q    Do you recall today who was in the vehicle?  Who were the

11 people who were still on scene when you arrived?

12 A    So when I arrived on scene, everybody was out of the

13 vehicle, but the people that were still at the scene were Bryan

14 Phillips, Carl Martin, and Kimberly Tyler.

15 Q    And who is Carl Martin in relation to Dennis Martin?

16 A    That was -- Carl is Dennis' brother.

17 Q    And you stated when you arrived everyone was out of the

18 car; is that right?

19 A    That is correct.

20 Q    So you don't know where folks were seated?

21 A    I don't know where everybody was seated in the car.

22 Q    Thank you.

23        MR. OPHARDT:  Your Honor, may I have a moment?

24        THE COURT:  You may.

25        MR. OPHARDT:  Your Honor, I pass the witness.  Thank

                        Matthew R. Daley - Direct

 1  you.

 2          THE COURT:  Any cross-examination?

 3          MS. BARTH:  No, your Honor.

 4          THE COURT:  Thank you, sir.  You may step down.

 5      (The witness was excused.)

 6          THE COURT:  The Government may call its next witness.

 7          MS. SMITH:  The Government calls Captain Matthew

 8  Daley, Vermont State Police.

 9          COURTROOM DEPUTY:  You can step right up front.

10  Please raise your right hand.  State your full name.

11          THE WITNESS:  Matthew Daley.

12                      MATTHEW R. DALEY,

13      having been first duly sworn by the courtroom deputy,

14              was examined and testified as follows:

15          THE WITNESS:  I do.

16          THE COURT:  Ms. Smith, before you get started, I just

17  wanted to let the attorneys and jurors know that we're going to

18  break for lunch at 11:30.  We've got a technical issue that

19  we're working on, and we're going to do it over the lunch hour.

20  But I thought it would be earlier than that, and I've just been

21  told it's 11:30.  Okay?

22                      DIRECT EXAMINATION

23  BY MS. SMITH:

24  Q    Mr. Daley, where are you currently employed?

25  A    The Vermont State Police.

Matthew R. Daley - Direct

1  Q    How long have you worked with Vermont State Police?

2  A    Approximately 17 years.

3  Q    What's your current position?

4  A    I'm a captain with the state police.

5  Q    What was your position in February of 2019?

6  A    I was a sergeant.

7  Q    What did your duties and responsibilities as a sergeant

8  include?

9  A    I was also a patrol commander.  Just oversee day-to-day

10 operations of troopers out in the field, traffic accidents,

11 stuff like that.

12 Q    I want to take you to February 18th, 2019.  What were your

13 responsibilities that day?

14 A    We were to -- we were assisting Colchester PD in executing

15 a search warrant.

16 Q    And was that to occur in Colchester?

17 A    Yes.

18 Q    What was to be searched pursuant to the search warrant?

19 A    A residence.

20 Q    Do you know whose residence?

21 A    Dennis Martin.

22 Q    You mentioned Colchester Police asked for the assistance

23 of Vermont State Police.  They asked specifically because the

24 Vermont State Police has a tactical team; is that correct?

25 A    Correct.

Matthew R. Daley - Direct

1  Q     And you were part of the tactical team that day?

2  A     I was.

3  Q     And Vermont State Police agrees to provide tactical

4  assistance when law enforcement has concerns that they might

5  find or encounter weapons, that a search might potentially be

6  violent; is that correct?

7  A     Correct.  When there's a higher risk of potential

8  violence, then -- then we -- we will assist with that.

9  Q     How does a tactical team alter its approach if a residence

10 to be searched is a duplex rather than a single-family

11 residence?

12 A     It all depends case by case, but you also have to account

13 for the people in the other part of the duplex that aren't

14 involved, so it will involve a good -- for our team, it's

15 probably anywhere between -- it fluctuates in numbers, but

16 anywhere between 18 and 22 members, so we probably would have

17 had the full team there.

18 Q     And what kind of equipment does the tactical team bring

19 with it when it comes?

20 A     We would have the BearCat there, and then we have

21 different chest -- chest blades and helmets and things of that

22 nature.

23 Q     What's the BearCat?

24 A     BearCat's -- to put it in laymen's terms, it's kind of an

25 armored vehicle.  It just allows us to be able to deploy our --

Matthew R. Daley - Direct

1  our guys in a safe manner, gives them somewhere safe.  We also

2  can communicate through a loudspeaker if people are inside and

3  can't hear us.

4  Q    What did you do when you first arrived?

5  A    On scene?

6  Q    Yes.

7  A    I was in a -- I was in a vehicle, and we were parked

8  down -- down the road.

9  Q    When you were on scene, what, if anything, did you learn

10 by radio communication?

11 A    Learned that a vehicle had left the target residence

12 and -- and that our possible target of the investigation was

13 seated behind the driver in the back seat.

14 Q    Who was the target of the investigation?

15 A    Dennis Martin.

16       MS. SMITH:  Ms. Tallman, can we see Government's

17 Exhibit 1.

18 Q    What's depicted in Government's Exhibit 1?

19 A    It's a vehicle we stopped.

20 Q    How many occupants were there in the car?

21 A    Four.

22 Q    Did you have an opportunity to observe any of the other

23 occupants?

24 A    Yes.

25 Q    Did you observe the driver?

Matthew R. Daley - Direct

1 A    Yes.

2 Q    What, if any, descriptors do you recall about the driver?

3 A    It was a white male.

4 Q    Was there a front seat passenger?

5 A    Yes.

6 Q    What, if any, descriptors do you recall about the front

7 seat passenger?

8 A    It was a white female.

9 Q    And what about a back seat passenger on the passenger

10 side?  What, if any, descriptors do you recall?

11 A    It was a Black male.

12 Q    And who was seated in the back seat on the driver's side?

13 A    Dennis Martin.

14 Q    So after the car was stopped, what did you do?

15 A    After the car was stopped, knowing that our possible

16 target was seated behind the driver, we would yell up to them

17 and have them walk back to us.

18 Q    It's fair to say that this was a high-risk stop; is that

19 correct?

20 A    Yes.

21 Q    And is that why you would first ask the target to exit the

22 vehicle rather than, say, talk to the driver?

23 A    Yes.  I mean, essentially we wanted to get the target of

24 the investigation out of the vehicle first, and being a

25 high-risk traffic stop, that's why we call them out.  It's not

Matthew R. Daley - Direct

1  a normal traffic stop where you would pull somebody over and

2  walk up and ask them for their credentials.

3  Q    So who got out of the car when you asked the target to get

4  out of the car?

5  A    Dennis Martin.

6  Q    When you're concerned that someone might be armed or that

7  there might be a potential for violence, how do you have

8  someone approach your position when they're getting out of a

9  car?

10  A    We would call to them, have them show us their hands.

11  They would eventually get out of the car.  We'd have them face

12  away from us, and then we would instruct them to walk backwards

13  to our location.  And if there's different obstacles in the

14  way, we'd tell them to stop, take two steps to the left,

15  continue walking back.  That's typically how it goes.

16  Q    Is that what occurred in this case?

17  A    Yes.

18  Q    What, if anything, did Mr. Martin use to assist him in

19  walking backward toward your position?

20  A    Nothing.

21  Q    Do you recognize Mr. Martin in the courtroom today?

22  A    Yes.

23  Q    Would you please identify him.

24  A    Red shirt.

25          MS. SMITH:  Let the record reflect that the witness

Matthew R. Daley - Cross

1  gestured towards the defense table.

2          THE COURT:  So how about a little bit of a descriptor

3  as to where this person is sitting in the courtroom.  Red shirt

4  is -- I see --

5          THE WITNESS:  At the defense table.

6          THE COURT:  Okay.

7          THE WITNESS:  Sorry.  I just wanted to make sure . . .

8          MS. SMITH:  Your Honor, may I have a moment?

9          THE COURT:  Yes.

10 Q    When Mr. Martin got out of the car, did you ask him to

11 identify himself?

12 A    Yes.

13 Q    And what did he say his name was?

14 A    Dennis Martin.

15          MS. SMITH:  Your Honor, I pass the witness.

16          THE COURT:  Any cross-examination?

17          MS. BARTH:  Yes, your Honor.

18                       CROSS-EXAMINATION

19 BY MS. BARTH:

20 Q    Good morning.

21 A    Good morning.

22 Q    So you were part of the actual stop of the car, correct?

23 A    Yes, ma'am.

24 Q    And you were present when Mr. Martin was removed from the

25 car, correct?

Matthew R. Daley - Cross

1  A    Yes.

2  Q    In fact, you were the officer who removed him?

3  A    Yes.  We called him back.

4  Q    And he was seated behind the driver's side; is that

5  correct?

6  A    Correct.

7  Q    He -- you issued commands, correct?

8  A    Yes.

9  Q    And he obeyed them?

10  A    Yes.

11  Q    He didn't refuse to get out of the car, right?

12  A    No.

13  Q    Got out right away?

14  A    Yes.

15  Q    You said he walked backwards?

16  A    Yes.  That's how we would call people back.

17  Q    Do you remember him walking backwards?

18  A    No, but I wouldn't --

19  Q    So --

20  A    Yes.  No.

21  Q    Okay.  That's fine.  And I'm not trying to trip you up

22  here, but this happened a while ago, correct?

23  A    2019.

24  Q    Yeah.  Yeah.  So it's a little harder to remember those

25  details now, right?

Matthew R. Daley - Cross

1  A    Some of them, yes.

2  Q    Yes.  And one of them being whether or not he walked

3  backwards, correct?

4  A    Correct.

5  Q    Okay.  So, Captain, you had mentioned your tactical

6  services team was there that day; is that correct?

7  A    Yes, ma'am.

8  Q    And it was approximately 18 to 22 unit officers; is that

9  right?

10  A    I don't know.  Again, I don't know how many people were

11  available, but if we're doing a search warrant on a residence,

12  it's -- we're going to try to get our whole team there.

13  Q    Okay.  And your whole team is 18 to 22 unit officers?

14  A    It varies.  Yes.

15  Q    More than ten?

16  A    More than ten.

17  Q    Okay.  Maybe more than 15?

18  A    Yes.

19  Q    Okay.  How did you arrive?  Did you come in a vehicle?

20  A    I came in a cruiser.

21  Q    Okay.  You mentioned a BearCat.  What is a BearCat?

22  A    It's just a -- it's an armored vehicle.

23  Q    And how big is that armored vehicle?

24  A    I mean, it's big -- it's big.  I don't know the dimensions

25  of it, but it's not like a regular vehicle.  It's got pretty

Matthew R. Daley - Cross

1  big tires on it.  It's definitely probably nine feet tall, ten

2  feet tall, a little bit longer than an Econovan or, you know,

3  one of the 18-passenger vans.

4  Q    So it kind of looks like a really big Humvee?

5  A    You could make that assumption, yes.

6  Q    Okay.  What were you wearing that day?

7  A    I would have been wearing my tactical vest, our camouflage

8  fatigues, and a helmet.

9  Q    Would all of your team members have been wearing camo and

10  tactical vests and helmets?

11  A    Yes.

12  Q    And some of the members of your team were snipers; is that

13  correct?

14  A    We do have snipers, yes.

15  Q    And the snipers carry long guns; is that right?

16  A    It depends on where they were stationed or even if they

17  were out there, but I don't remember -- I don't remember

18  what -- what they had issued that day.

19  Q    Okay.  And the reason you don't remember, again, is

20  because this happened several years ago?

21  A    Yes.

22  Q    Do you recall - you may not recall - how many officers

23  were there from the Colchester Police Department?

24  A    I don't remember.

25  Q    Do you remember if officers were there from the Colchester

Matthew R. Daley - Cross

1  Police Department?

2  A     Yes.

3  Q     Okay.  And they were armed as well?

4  A     Yes.

5  Q     Okay.  Was there a K-9 unit on-site as well?

6  A     I don't -- I don't remember.

7  Q     It's just because it happened a while ago, right?

8  A     Yes.

9  Q     Do you recall if there were marked police vehicles

10 present?

11 A     If there were what?  I'm sorry.

12 Q     Marked police vehicles present.

13 A     Yes.

14 Q     Do you recall how many?

15 A     No.

16 Q     Okay.  But more than one?

17 A     Yes.

18 Q     Okay.  Were there also officers there in unmarked

19 vehicles?

20 A     Yes.

21 Q     Do you recall how many?

22 A     No.

23 Q     Do you recall more than one?

24 A     No.

25 Q     At least one?

Matthew R. Daley - Cross

1  A    At least one.

2  Q    Okay.  And all the traffic had been stopped in the

3  neighborhood as well?

4  A    Yes.  If we're taking down the vehicle, we would have

5  stopped at either side.

6  Q    Okay.  But you don't quite remember because it happened a

7  while ago, but that --

8  A    I don't remember.

9  Q    Okay.  So other than removing Mr. Martin from the car, you

10  had no other interactions with him, correct?

11  A    No.

12  Q    And you recall that the driver was a white male; is that

13  correct?

14        THE COURT:  So let's go back.  Yes, it's correct that

15  you didn't have any other interactions with him, or no?

16        MS. BARTH:  Oh, did I not get an answer?

17        THE COURT:  No.  He answered "no" when you asked --

18  I'll just -- my real time's not following.

19        MS. BARTH:  I can just reask the question.

20        THE COURT:  Yes, it's correct that you didn't have any

21  other interactions with him?

22        THE WITNESS:  I had the interaction at -- at the front

23  of the cruiser.  I asked him his name, and then Colchester PD

24  handcuffed him and took him away.  So at that point, that's --

25  that's all the interaction I remember having with him.

Matthew R. Daley - Cross

1 Q    I understand.  Do you recall who handcuffed him from

2 Colchester PD?

3 A    I don't.

4 Q    That's okay.

5         MS. BARTH:  All right.  I don't have any further

6 questions.

7         THE COURT:  Any redirect?

8         MS. SMITH:  Your Honor, may I have a moment?

9         THE COURT:  Sure.

10         MS. BARTH:  Oh.

11         THE COURT:  Yes?

12         MS. BARTH:  I'm so sorry, your Honor.  I forgot -- I

13 asked him a question and then didn't get an answer to it.  May

14 I?  Thank you.

15         THE COURT:  Come right up.

16 Q    BY MS. BARTH:  Sir, you recall that Mr. Bryan Phillips,

17 the driver of the car, was a white male?

18 A    Yes.

19         MS. BARTH:  Thank you.

20         MS. SMITH:  Nothing from the Government, your Honor.

21         THE COURT:  All right.  Thank you.  You may step down.

22     (The witness was excused.)

23         THE COURT:  The Government may call its next witness.

24         MS. SMITH:  The Government calls Sonia Vela.

25         COURTROOM DEPUTY:  You can step right up front, Ms.

Sonia E. Vela - Direct

1  Vela.  And you can come a little further in front of me.

2  Please raise your right hand.  State your full name for the

3  record.

4          THE WITNESS:  Sonia Elizabeth Vela.

5                        SONIA E. VELA,

6      having been first duly sworn by the courtroom deputy,

7              was examined and testified as follows:

8          THE WITNESS:  I swear.

9                     DIRECT EXAMINATION

10 BY MS. SMITH:

11 Q    Ms. Vela, where are you currently employed?

12 A    Snap Inc., also known as Snapchat.

13 Q    What is your position?

14 A    I'm a law enforcement operations specialist.

15 Q    How long have you held that position?

16 A    Three years.

17 Q    How long have you worked for Snapchat?

18 A    Three years.

19 Q    What are your duties and responsibilities?

20 A    I review and respond to law enforcement requests.

21 Q    Were you working for Snap as of February in 2019?

22 A    No.

23 Q    Are you aware of how Snap operated in February of 2019?

24 A    Yes.

25 Q    What product is Snap Inc. most known for?

Sonia E. Vela - Direct

1  A    Snap Inc. is a camera and messaging platform.

2  Q    Is it commonly referred to as Snapchat?

3  A    Yes.

4  Q    So you said it's a camera and messaging platform.  Can you

5  explain how it's used.

6  A    Yes.  Users communicate on the app through the chat

7  feature.  They send messages and Snaps as well.

8  Q    What are Snaps?

9  A    Snaps are -- it's content that's taken on the Snap camera.

10 Q    Is that how the app worked in February 2019, or are there

11 any differences from what you just described?

12 A    Yes, that's how they worked in 2019.

13 Q    What is the difference between a chat and a Snap?

14 A    A chat is done on the chat feature within the Snapchat

15 app, and a Snap is taken on the Snap -- on the camera.

16 Q    Is it possible to send a photo using the chat feature?

17 A    Yes.

18 Q    How would that work?

19 A    A user would access the photos from the Snapchat feature.

20 They could send texts on the chat feature and also send

21 content, which is images or videos.

22 Q    Is it possible to send a photograph that exists outside of

23 the Snap application?

24 A    Yes.

25 Q    How would that work?

Sonia E. Vela - Direct

1 A     I believe the user would open the Snapchat app, go to

2 messages, and they can attach an image or a video.

3 Q     How long are communications retained in the part of the

4 app that the user sees?

5 A     One-to-one conversations I believe are visible and

6 available as soon as both users view it.  Chat messages I

7 believe are until -- group -- group messages are until 24

8 hours, I believe.

9 Q     How long are communications sent via the Snap application

10 retained on Snap's systems?

11 A     I don't know.

12 Q     Are they retained for any longer, or is it the same amount

13 of time as they exist as viewable by the user?

14 A     I believe so.

15 Q     You believe that they're retained for longer, or is it the

16 same amount of time?

17 A     There is -- there may be a delay within the Snap servers

18 in purging that data.

19 Q     What is a preservation request?

20 A     A preservation request is the act of preserving account

21 data at that point in time.

22 Q     What types of entities send Snap Inc. preservation

23 requests?

24 A     Law enforcement agencies.

25 Q     How long will Snap store data that's been requested to be

Sonia E. Vela - Direct

1  preserved?

2  A    Ninety days.

3  Q    In 2019, did Snap receive a search warrant from the

4  Colchester Police Department?

5  A    Yes.

6  Q    Are you familiar with that warrant?

7  A    Yes.

8  Q    What was requested by the search warrant?

9  A    Basic subscriber information and content.

10  Q    Was that request associated with any particular user

11  account?

12  A    Yes.

13  Q    What was the name of that account?

14  A    Lovemoneymake.

15  Q    Had Snap received a preservation request prior to

16  receiving the search warrant?

17  A    Yes.

18  Q    What, if any, materials did Snap provide in response to

19  the search warrant?

20  A    Basic subscriber information and content.

21  Q    When did Snap send that response?

22  A    April 9th, 2019.

23  Q    And how did it send that response to the Colchester Police

24  Department?

25  A    Via a download link.

Sonia E. Vela - Direct

1  Q    And what would happen if -- once you click on the download

2  link, how would Colchester Police retrieve it?

3  A    It's a zip file.

4  Q    Have you had a chance to review what Snap sent the

5  Colchester Police in response to the search warrant?

6  A    Yes.

7  Q    Have you had a chance to compare what was sent to what is

8  stored on Snap's systems?

9  A    Yes.

10 Q    How did you conduct that comparison?

11 A    I reviewed the records that you have here today and

12 compared them to the records in Snap's servers and confirmed

13 that they are true and accurate records.

14 Q    How did you confirm that they match?

15 A    The file size.

16 Q    Is that the normal approach you take to confirming that

17 things match?

18 A    Yes.

19        MS. SMITH:  Your Honor, may I approach the witness?

20        THE COURT:  You may.

21 Q    I'm showing you what's been marked for identification as

22 Government's Exhibit 11.  Take a look at that.  You can open

23 the envelope there and see what's inside.

24 A    It is a disc.

25 Q    Do you recognize that?

Sonia E. Vela - Direct

1  A    Yes.

2  Q    What is that?

3  A    These are the records that were produced in response to

4  the search warrant.

5  Q    Have you reviewed what's on that disc there?

6  A    Yes.

7  Q    How do you know that that is a disc that you've reviewed

8  before?

9  A    I inserted it into a laptop and reviewed the records that

10 are in this disc.

11 Q    And did you make any notation on the disc about having

12 reviewed it?

13 A    Yes.  I initialed and dated them.

14 Q    What date appears?

15 A    February 7, 2023.

16 Q    Are the contents of the disc a true and accurate copy of

17 what Snap sent to Colchester Police in response to the search

18 warrant?

19 A    Yes.

20 Q    At any point did you become aware of the date on which

21 Snap sent the materials to Colchester Police?

22 A    Yes.

23 Q    Do you recall that date today?

24 A    March 8, 2019.

25 Q    What types of files are included -- so I believe you just

Sonia E. Vela - Direct

1  said March 8th, 2019.  Was that the date the records were sent

2  to Colchester, or was that the date of the search warrant?

3  A    That's -- March 8, 2019, is when we received the search

4  warrant.

5  Q    Do you recall when the records were sent in response to

6  the search warrant?

7  A    Yes.  We produced records on April 9, 2019.

8  Q    What types of files are on the disc?

9  A    There's subscriber information, Snap and chat information.

10 Q    I want to talk to you about the chat information.  How is

11 that information presented on the disc?

12 A    In a spreadsheet labeled "Chat CSV."

13 Q    What does CSV refer to?

14 A    I believe it's the spreadsheet, the CSV file.

15 Q    The file type?

16 A    Um-hum.

17      THE COURT:  "Yes"?

18      THE WITNESS:  Yes.

19 Q    What type of data does the chat spreadsheet contain?

20 A    It contains the usernames, the ID -- the usernames, the

21 text, the media file names, the time stamps of the records.

22 Q    Is that information associated with chat messages in

23 particular?

24 A    Yes.

25      MS. SMITH:  Your Honor, may I approach the witness?

Sonia E. Vela - Direct

1          THE COURT:  You may.

2          MS. SMITH:  I'm retrieving Government's Exhibit 11 and

3   I'm handing the witness what's been marked as Government's

4   Exhibit 11A.

5   Q    Would you take a look at what's in that folder.  Do you

6   recognize that?

7   A    Yes.

8   Q    What is it?

9   A    These are the headers to the Chat Messages CSV file.

10  Q    Based on your review of the files that Snap sent to

11  Colchester PD, do the headers that appear in front of you match

12  those on the Chat CSV spreadsheet that was sent to Colchester?

13  A    Yes.

14  Q    Are the headers you see there a true and accurate copy of

15  the corresponding information and what was sent to Colchester?

16  A    Yes.

17          MS. SMITH:  Your Honor, I move the admission of

18  Government's Exhibit 11A.

19          THE COURT:  Any objection?

20          MS. BARTH:  No objection.

21          THE COURT:  11A is admitted.

22      (Government's Exhibit 11A was received in evidence.)

23          MS. SMITH:  May I publish it to the jury, your Honor?

24          THE COURT:  You may.

25          MS. SMITH:  Ms. Tallman, can we see 11A.

Sonia E. Vela - Direct

1          COURTROOM DEPUTY:  There will be a slight delay.

2   Q    BY MS. SMITH:  So you mentioned that what appears here are

3   headers.  I want to talk about what each header refers to, what

4   types of information would appear below each one.  Let's go

5   through them one by one.

6          What does "id" refer to?

7   A    "id" refers to the username.

8   Q    And which username is that?

9   A    The usernames involved in the message, the chat message.

10  Q    "from" and "to" might be self-explanatory, but can you

11  explain what those refer to?

12  A    Yes.  The "from" column will be the username of the user

13  who sent a message, and "to" will be the username of the user

14  who received the message.

15  Q    And what about "body"?

16  A    Will include any text in the chat message.

17  Q    If a user sends a photo or a video but no text, would the

18  "body" column be blank?

19  A    Yes.

20  Q    What is "href"?

21  A    Will be if the user included a URL.

22          MS. SMITH:  Ms. Tallman, can we see the other half.

23  Q    What does "media_id" refer to?

24  A    It refers to the unique identifier that corresponds to any

25  media that was sent.

Sonia E. Vela - Direct

1  Q    How does that unique identifier appear?  What types of

2  characters does it usually contain?

3  A    I believe it's a hexadecimal, so letters, numbers.

4  Q    What does "saved" refer to?

5  A    It's -- the "saved" column refers to if the user saved or

6  unsaved a chat message.

7  Q    How would that work?

8  A    It would work by the user opening the Snapchat app and

9  holding down on a message to save it.  The user can then unsave

10 it by holding down on it again to unsave it from the chat

11 message.

12 Q    Can the sending user do that?

13 A    Yes.

14 Q    Can the receiving user also do that?

15 A    Yes.

16 Q    What does "timestamp" refer to?

17 A    The time that the message was sent.

18 Q    Would it be possible to use what appears in the "media_id"

19 column to find a file on the disc of materials that was sent to

20 Colchester?

21 A    Yes.

22 Q    How would you do that?

23 A    I would copy the media ID and I would then control F,

24 search it within the records, and it would pull the

25 corresponding media related to that media ID.

Francis J. Thornton, Jr. - Direct

1  Q    Would it pull the file name?

2  A    Yes.

3  Q    Is it fair to say that media ID is part of the file name?

4  A    Yes.

5          MS. SMITH:  Your Honor, may I have a moment?

6          THE COURT:  You may.

7          MS. SMITH:  Pass the witness, your Honor.

8          THE COURT:  Any cross-examination?

9          MS. BARTH:  No, your Honor.

10         THE COURT:  Thank you.  You may step down.

11      (The witness was excused.)

12         THE COURT:  The Government may call its next witness.

13         MR. OPHARDT:  Your Honor, the United States calls

14 Frank Thornton to the stand.

15         COURTROOM DEPUTY:  Good morning.  Please raise your

16 right hand.  State your full name for the record.

17         THE WITNESS:  Francis Joseph Thornton, Jr.

18              FRANCIS J. THORNTON, JR.,

19      having been first duly sworn by the courtroom deputy,

20           was examined and testified as follows:

21         THE WITNESS:  I do.

22              DIRECT EXAMINATION

23 BY MR. OPHARDT:

24 Q    Good morning.

25 A    Good morning.

Francis J. Thornton, Jr. - Direct

1  Q    Mr. Thornton, what's your current employment?

2  A    I'm self-employed.

3  Q    Doing what?

4  A    I do digital forensic work.

5  Q    Do you have a company that you work with?

6  A    Yes.  I have a d/b/a company.  It's Blackthorn Digital

7  Forensics, also Blackthorn Information Security.

8  Q    Prior to your employment in this way, how were you

9  employed?

10 A    I had self-employment for a while doing generic computer

11 items, and I was previously a law enforcement officer.

12 Q    How long have you been working in the field of digital

13 forensics?

14 A    It goes back a minimum of 10 years at this point.

15 Q    Do you have any formal education in the field?

16 A    Yes, I do.

17 Q    What's that?

18 A    I've taken a number of courses at Champlain College up to

19 master's level courses.

20 Q    How about continuing education courses?  Have you been

21 taking those as well?

22 A    Yes.  I have to do -- to maintain certifications, I have

23 to do continuing education courses in digital forensics.

24 Q    You mentioned certifications.  What certifications do you

25 have?

Francis J. Thornton, Jr. - Direct

1  A     I hold several, including -- kind of the big one, if you

2  will, is a Certified Computer Examiner through the

3  International Society of Forensic Computer Examiners.

4  Q     And you currently have that certification?

5  A     Yes, I do.

6  Q     How long have you had it?

7  A     Going back to 2013 I believe was the original

8  certification date.

9  Q     Have you written any publications in this area?

10 A     Yes.

11 Q     What types?

12 A     Several books on information security.

13 Q     How about classes?  Do you teach any classes?

14 A     I've done some.  Most recently at the National Cybercrime

15 Conference, which is held annually in Massachusetts.

16 Q     Have you testified previously in court?

17 A     Yes, I have.

18 Q     Criminal cases, civil cases?  What types of cases?

19 A     I've done a number of criminal and civil cases.

20 Q     For criminal cases, how often -- well, how many times have

21 you appeared in U.S. District Court here in Vermont as a

22 witness?

23 A     I believe it's about a dozen times at this point.

24 Q     How many matters a year -- well, let me start by saying

25 there's a contract between your company and the United States

Francis J. Thornton, Jr. - Direct

1  government; is that right?

2  A    Yes.

3  Q    Specifically with the United States Attorney's Office?

4  A    Yes.

5  Q    And that contract is specific to this case?

6  A    Yes.  It's actually a subcontract, but --

7  Q    This isn't the only case you work on related to the work

8  of the United States Attorney's Office, though; is that right?

9  A    That's correct.

10 Q    How many matters a year would you say you're asked to

11 assist on?

12 A    It probably works out to about two a month on average.

13 Q    What types of work?

14 A    It's varied all over from simple cases to very complex

15 cases.  I think I've done everything from some relatively minor

16 felonies up to homicide cases.

17 Q    Now, when you're doing that type of work, it might be a

18 variety of different items you're looking at; is that fair to

19 say?

20 A    Yes.

21 Q    Sometimes there's a phone; sometimes there's a computer;

22 sometimes there's just data that you're provided?

23 A    Yes.

24 Q    And what hourly rate is associated with your contract?

25 A    It's complicated, but it works out to an average of

Francis J. Thornton, Jr. - Direct

1  probably $150 per hour.

2  Q    There's different things you can bill out for different

3  rates?

4  A    Yes.

5  Q    I'd like to speak with you about -- speak with you about

6  some terms we're going to cover.  What's metadata?

7  A    Metadata is data about other data.  Typically in a

8  computer context, it's data about a given file's internal data.

9  Q    Are there different types of metadata based upon different

10  types of files?

11  A    Yes, there are.

12  Q    What's -- let me rephrase that.

13       What's the different types of data that might be on, say,

14  a word processing document versus a media file?

15  A    Okay.  In the case of a word processing document, for

16  instance, there will be some metadata pertaining to the fonts,

17  for instance, that are used within the file; paragraph

18  indentations, that kind of thing; printer information if it was

19  printed out will all be contained in the metadata of a given

20  Word document.

21       In something like a media file, you typically have other

22  information, such as, in the case of a movie or a picture file,

23  you'll have things like the lens distance that is incorporated

24  into the device; you will have information such as the frame

25  size, the size of the picture; or the number of frames per

Francis J. Thornton, Jr. - Direct

1  second, for instance, in a movie file.

2  Q    Now, there are some aspects of metadata that relate to how

3  the file associates with the operating system; is that right?

4  A    Yes.

5  Q    What are those -- what is that metadata telling us?

6  A    That file metadata is usually somewhat universal across

7  the device in that it will have things like when the file was

8  created, when it was modified, when it was accessed.

9  Q    Can that metadata change that's related to the operating

10 system interactions?

11 A    Yes, it can.

12 Q    What causes it to change?

13 A    Well, copying it from one device to another, for instance,

14 will change the metadata.  Accessing it can change it.

15 Modifying it.  For instance, if a picture is resized or

16 cropped, for instance, it will change all that metadata for the

17 files.

18 Q    How about the metadata we talked about on media files

19 related to, for example, lens information?  That type of

20 metadata, is that possible to change?

21 A    It is possible to change it through different editors, but

22 it is usually not changed dramatically.  It is certainly not

23 changed unless you're using an editor specifically for those

24 things.

25 Q    So you talked about some metadata changing when data's

Francis J. Thornton, Jr. - Direct

1  moved from a device to a different device.  That type of data

2  related to the lens and other information for media files,

3  would that data be susceptible to change through that type of

4  movement?

5  A    Typically, no.

6  Q    What were you asked to do in this case?

7  A    I was asked to review some information -- some data from

8  Snap Inc.

9          MR. OPHARDT:  Your Honor, may I approach the witness?

10          THE COURT:  You may.

11          MR. OPHARDT:  Handing the witness what's been marked

12  for identification as Exhibit 11.

13  Q    BY MR. OPHARDT:  Mr. Thornton, do you recognize that?

14  Take a minute to open it.

15  A    Yes.

16  Q    What is it?

17  A    It's a DVD.

18  Q    And how do you recognize it?

19  A    Well, I previously handled it during the examination.

20  Q    And what did you do so that you'd know that's the disc you

21  previously handled?

22  A    I put my initials and the date on it.

23  Q    What's the date?

24  A    January 24th, 2023.

25          MR. OPHARDT:  Your Honor, may I approach the witness

Francis J. Thornton, Jr. - Direct

1  to retrieve it?

2          THE COURT:  You may.

3          MR. OPHARDT:  Ms. Cronin, can you pull 11A for me,

4  please.  Oh, I already have it.  Sent you on a fishing

5  expedition.  I need 11B and C, please.  Thank you.

6      Your Honor, may I approach?

7          THE COURT:  You may.

8  Q    Mr. Thornton, I'm handing you what's been marked as

9  Exhibit 11B.  Do you recognize that?

10  A    Yes, I do.

11  Q    What is it?

12  A    This is also a DVD.

13  Q    And how do you recognize it?

14  A    I created this one.

15  Q    How do you know you created it?

16  A    Well, I have -- the file name of the information is on the

17  DVD and also my initials.

18  Q    Okay.  What data is on 11B?

19  A    It is one movie file.

20  Q    Where did you obtain that movie file?

21  A    It was extracted from the information provided by Snap.

22  Q    That we just looked at in Exhibit 11?

23  A    Yes.

24  Q    So you took that data from 11 and put it on 11B?

25  A    Correct.

Francis J. Thornton, Jr. - Direct

1  Q    Did you move it directly from disc to disc, or how did you

2  just mechanically do that?

3  A    It was -- the information was extracted on to my computer

4  from Snap because it was a zip file.  I pulled out the single

5  file that I wanted and copied it and burned it on to this DVD.

6         THE COURT:  Is this a logical breaking point?

7         MR. OPHARDT:  Because I have logically broken down?

8  Yes, your Honor.

9         THE COURT:  All right.  I took advantage of that

10  pause.

11      We are going to break for lunch.  You are going to come

12  back at 1 o'clock.  We will have places you can be here in the

13  building.  I don't know what the temperature is.  It was moving

14  around when I came in this morning.  We can't get started

15  without you, so we'll see you back here at 1:00.

16      Don't do any research.  Don't talk about the case.  Don't

17  let anybody talk to you about the case.  I wish you a good

18  lunch.

19      We'll excuse the jury, and the attorneys will remain in

20  the courtroom.

21      (The jury exited the courtroom, after which the following

22  was held in open court at 11:30 AM.)

23         THE COURT:  Anything to bring to my attention before

24  we take our own lunch break?  When you come back, I will have a

25  first draft of the jury instructions for you and a verdict

Francis J. Thornton, Jr. - Direct

1  form.

2          MR. OPHARDT:  Your Honor, I want to flag that we will

3  need a ruling from the Court regarding the audio of the -- of

4  the Snapchat video.  Ms. Germaine will be our next witness

5  after Mr. Thornton is concluded, and the Government would like

6  to argue slightly more about that related to the opening

7  statement and what we believe to be its increased probative

8  nature.

9          THE COURT:  Do you want to do that now?

10          MR. OPHARDT:  I'm happy to, Judge, if that works for

11  the marshals' timing, or if we want to wait to do it at 1:00,

12  we can do that too.

13          THE COURT:  We'll do it at 1:00.  If we keep the jury

14  waiting for a few minutes, that's not a problem.

15          MR. OPHARDT:  Thank you, Judge.

16          THE COURT:  Okay.  Anything from you, Ms. Barth,

17  before we break?

18          MS. BARTH:  No, your Honor.

19          THE COURT:  Okay.  Thank you.

20      (A lunch recess was taken, after which the following was

21  held in open court without the jury present at 12:58 PM.)

22          THE COURT:  We are back on the record in United States

23  of America v. Dennis Martin.

24      Mr. Ophardt raised a renewed request to discuss the

25  video/audio section and I assume also the designated portions

Francis J. Thornton, Jr. - Direct

1  of the transcript in which alleged threats were made.

2         MR. OPHARDT:  Yes, your Honor.  We're getting to the

3  point in the case where we're asking the Court for a ruling.

4  Mr. Thornton is on the stand right now, and Ms. Barth told me

5  she's okay with him still being up here.

6      So the video is now in evidence.  We haven't published it

7  yet, but my concern is that we need to know how to publish it.

8  In addition, our witness after Ms. Germaine is here.  He's

9  going to be testifying about the interview, so we need time to

10  adjust fire if need be on the exhibits and how much of them we

11  can play.

12         THE COURT:  Do you have any additional argument today?

13         MR. OPHARDT:  I do, Judge.  I'll stop being

14  long-winded.  The Government's concern is that Mr. Martin's

15  statements in the video are one of the reasons why -- they were

16  known to law enforcement at the time that a decision as to how

17  to execute the warrant came up.  So they were pertinent to law

18  enforcement's reason for responding in the way they did.  His

19  statements in relation to the threatening remarks are one of

20  the reasons why they were concerned of violent conduct in the

21  execution.  So the Government submits it's another reason that

22  now exists for the pertinence of the audio.

23         THE COURT:  Although I allowed you to ask about

24  "Concerns about violence, a machete in the house, firearm in

25  the house, this is what we do."

Francis J. Thornton, Jr. - Direct

1      Tell me what contested material fact the audio is relevant
2  to beyond that.

3           MR. OPHARDT:  Your Honor, you phrase it as "contested
4  material fact."

5           THE COURT:  Well, it has to be a fact of consequence,
6  and if Mr. Martin is saying, "That's me and that's a gun," why
7  do we need any audio or statements about threats?

8           MR. OPHARDT:  Mr. Martin hasn't said that yet.  His
9  attorney has, and his attorney's statements are not evidence.

10          THE COURT:  Right.  Okay.  But he's already -- we
11 don't have -- I believe she said in opening statement, "He's in
12 the video.  It's a gun.  We don't dispute that," and that's
13 quite the concession.  I don't think there's going to be any
14 cross-examination.  So let's assume that the evidence supports
15 Ms. Barth's representation that "We're not contesting that
16 that's him," and Mr. Martin certainly does not have to testify
17 and say, "That's me in the video.  That's a gun in my hand," in
18 order for it to be uncontested.  What is it relevant to?

19          MR. OPHARDT:  Your Honor, we would submit it's
20 relevant to the nature and law enforcement's response.

21          THE COURT:  Okay.  But you already told me that.

22          MR. OPHARDT:  Understood.  It's also, I believe,
23 relevant to -- to Mr. Martin's physical condition at the time
24 that he's being -- he's making the statements.  It's the
25 evening between that and the law enforcement's response.  Part

Francis J. Thornton, Jr. - Direct

1  of the defendant's statements was that he was so physically

2  ill, he had to stay in the hospital for 30 days thereafter,

3  with implications that law enforcement in essence set aside Mr.

4  Martin's physical well-being to focus on their interrogation of

5  him.

6          THE COURT:  So -- but we can do that:  He got out of

7  the car, wasn't in a wheelchair; he was walking on his own.

8  You don't need a *de facto* death threat against his

9  mother-in-law to establish that he was in ambulatory condition,

10 and that isn't a video of him doing anything physical other

11 than he's drunk at the time and admits it on the video and he's

12 standing.  So he's hardly running a mile.

13         MR. OPHARDT:  Your Honor, he certainly indicated that

14 he would be present at the home with no indication that he was

15 concerned about his medical state in which he would be at the

16 hospital.

17         THE COURT:  Don't we have also statements from people

18 saying they were going to lunch?

19         MR. OPHARDT:  Mr. Martin himself said that, Judge.

20         THE COURT:  Okay.  Yes.  I originally thought it would

21 be relevant to motive as to why you might acquire a gun.  I am

22 understanding that acquisition and possession of the firearm is

23 uncontested and the only issue is knowing, so I don't believe

24 the door has been opened.

25     Ms. Barth, you want to be heard on this?

Francis J. Thornton, Jr. - Direct

1          MS. BARTH:  No, your Honor.

2          THE COURT:  All right.  I would also say that I think

3    that the prejudicial impact of the testimony is significant.

4    It's not on the crime charged.  It's a collateral issue.  It's

5    a separate crime.  It's significantly prejudicial.  Its

6    probative value is very limited.  The Court has allowed other

7    evidence on the same contested points that give rise to the

8    request, the renewed request to admit it.  Namely, the Court

9    has allowed the circumstances that preceded the search to be

10   introduced.  It will allow the Government to challenge Mr.

11   Martin's statements about his physical condition, and you in

12   fact have already done so by explaining that the defendant was

13   walking backwards as the search warrant and the arrest was

14   executed.  So I am not going to find that the door has been

15   opened.

16          MR. OPHARDT:  Your Honor, I do have just a slight

17   request -- or request for clarification.  The audio won't be

18   played.

19          THE COURT:  Right.

20          MR. OPHARDT:  We understand that.  Are the witnesses

21   allowed to identify Mr. Martin by the audio saying they've

22   listened to it and it was Mr. Martin's voice?

23          THE COURT:  Yes.  Yes.  Yes.

24          MR. OPHARDT:  Okay.  Thank you, Judge.

25          THE COURT:  Yes.

2:21-cr-00068-cr    Document 114    Filed 03/13/23    Page 89 of 200                    99

Francis J. Thornton, Jr. - Direct

1          MR. OPHARDT:  Judge, there's also the question of the

2    interview and what portions we can play from the interview in

3    relation to the Snapchatting aspect of it.  Judge, we now have

4    some allegations in front of the jury about the voluntariness

5    of that.  Certainly the fewer clips we play, the less the

6    jury's going to hear how Mr. Martin was acting during the

7    interview, and I think that's a different question than the

8    audio from the video itself in relation to his physical

9    well-being.  In addition, Judge --

10         THE COURT:  So there's a preceding chunk that was

11   objected to that I didn't see anything wrong with it, and then

12   there's, like, five statements of threats about the redneck and

13   that kind of thing.  I haven't precluded you from playing

14   anything other than that, and if I had the piece of paper, you

15   know what I'm talking about.

16         MR. OPHARDT:  I do, Judge.

17         THE COURT:  It's in one of the parties' motions.  So

18   you may do so.

19         MR. OPHARDT:  Okay.  It will take us a little time to

20   create the disc that contains the abbreviated clip, and I

21   always find it risky to play something that hasn't been

22   abbreviated in court, intentionally cut off, and have Ms.

23   Tallman have to stop the audio.  So we might need a brief

24   period of time to create that so we don't have an accidental

25   playing of more than the Court's directed.

Francis J. Thornton, Jr. - Direct

1          THE COURT:  All right.  But you're talking about the

2   interview transcript -- the interview, correct?

3          MR. OPHARDT:  The audio, yes, Judge.

4          THE COURT:  All right.  And the Court made its ruling

5   last week.  And when is that going to be played?

6          MR. OPHARDT:  Your Honor, I believe you reserved

7   ruling on that.

8          THE COURT:  I did reserve ruling, but I also told you

9   that at this point I hadn't seen that it was relevant, I was

10  looking for the open door, cross-examination, make your plans

11  accordingly.  Is that going to be played today?

12         MR. OPHARDT:  It might.  We're moving efficiently,

13  Judge.  More efficiently than I anticipated.

14         THE COURT:  Okay.

15         MR. OPHARDT:  So Lieutenant Roy is here.  We're able

16  to put him on the stand.  He might get on and off today.  We

17  anticipated he might be on for a brief period and there be a

18  lag.  So -- can I ask Ms. Tallman, who's here, about how long

19  it would take to create the abbreviated clip?

20         THE COURT:  Sure.

21         MS. BARTH:  And, your Honor, too, I want to make sure

22  that we're all talking about the same things.

23         THE COURT:  Just -- if he's talking to her, he's not

24  going to be able to listen to you.

25         MS. BARTH:  Of course.

Francis J. Thornton, Jr. - Direct

1          MR. OPHARDT:  I'm sorry, Judge.  I missed that.

2          THE COURT:  That's why I stopped it, because you can't

3  do two things at once.

4          MR. OPHARDT:  Thank you, your Honor.

5      Judge, Ms. Tallman, thinking ahead, as the Court had hoped

6  and as I should have accurately relayed to her, has a clip with

7  that shortened version.  It's just not on the disc.  So we'll

8  have to swap the exhibit itself, the physical hard copy, and if

9  Ms. Barth doesn't have an issue with that.  I just don't want

10  the record to be messed up.

11          THE COURT:  All right.  And before Ms. Barth says

12  anything, what I'm talking about is on Document No. 77 at page

13  2.  I found nothing inflammatory, unfairly prejudicial about

14  the first paragraph.  "My phone, yeah, it says tell me, babe, I

15  want to come home, me and her talking (unintelligible) and but

16  my mom, oh, and this and that.  That's when me and her mom get

17  into it and I call her.  She send me Facetime stuff and I call

18  her back and start Snapchatting.  We going back and forth.  And

19  me and her mom going back and forth.  I'm not going to lie.  I

20  was back and forth on the phone with her mom and her mom say

21  something to me -- to call me and say something.  And I say,

22  bitch, I'm not scared of you all."  So that's permissible.

23      The second statement, "I say I'm not f'ing scared of you

24  all, you redneck, you killed, you can send hits out and all

25  that shit, I can find your house, too.  That's what I say, your

Francis J. Thornton, Jr. - Direct

1 house is not too hard to find so stop telling me you got

2 rednecks and your son them a hunter." So that I'm not

3 allowing, so you're on the same page with that and Ms. Barth.

4          MS. BARTH: Just an objection to the first chunk that

5 you are allowing.

6          THE COURT: Well, articulate your objection.

7          MS. BARTH: So, your Honor, I think what the

8 Government is eliciting this for is to show that my client was

9 lucid in answering questions in a responsive manner.

10          THE COURT: And admitting he sent the Snapchat.

11          MS. BARTH: But we don't contest that he sent the

12 Snapchat.

13          THE COURT: But you can't -- it's relevant. It's not

14 inflammatory. It's not unfairly prejudicial. It does not

15 contain a threat, and I don't take all the facts out of the

16 case because they're not contested. The only reason why the

17 Court precludes evidence from being admissible is if it's

18 relevant but it's so unfairly prejudicial that that's going to

19 swamp the relevance and the balancing test under 403 requires

20 its exclusion. So all relevant evidence is admissible. This

21 is relevant. What's your objection to it?

22          MS. BARTH: At least with the last sentence that says

23 "And I say, bitch, I'm not scared of you all." That seems to

24 reference the audio.

25          THE COURT: That's okay. I'm going to allow that.

Francis J. Thornton, Jr. - Direct

1          MR. OPHARDT:  Your Honor, there's also one last
2  concern about the interview.  There is a clip that Ms. Barth is
3  going to use on cross-examination.  We're in agreement that she
4  can expand the scope beyond the scope of direct for efficiency
5  purposes so that the witness can get on and off in one day.
6  Part of that is about a medical release form Mr. Martin was
7  signing.  The reason why he's signing that is because there was
8  conversation with Colchester Police about the underlying
9  domestic abuse allegations, and Mr. Martin's in essence saying,
10 "I was in the hospital at that time" or "I was too weak and in
11 the hospital.  Medically I couldn't even have hurt her."  So
12 the relevancy of that exchange is because of the underlying
13 investigation.  You divorce that out of its context and it
14 seems like law enforcement's just trying to get information out
15 of Mr. Martin that they don't need about his medical
16 conditions.  So I'm -- those are some of my concerns.  And in
17 addition, Judge, the jury's already heard the allegation Mr.
18 Martin wound up in the hospital for 30 days.

19         THE COURT:  Right.  So you can ask the law enforcement
20 officer "Were you trying to determine Mr. Martin's whereabouts
21 on a prior date, and did he tell you that he was in the
22 hospital on that date, and is that why you obtained the medical
23 waiver, because you wanted to see if he was in fact in the
24 hospital?"  That's fine.

25         MR. OPHARDT:  Okay.  I just wanted to talk about that,

Francis J. Thornton, Jr. - Direct

1 Judge, because it references the underlying investigation.

2          THE COURT:  Okay.

3          MS. BARTH:  And, your Honor, I just wanted to clarify

4 that I'm not offering that because of the reason; rather, it's

5 the process that the lieutenant used with my client in having

6 him execute that form.

7          THE COURT:  It's perfectly permissible to do what

8 you're doing.  It may create a false impression that it's about

9 this event as opposed to a prior event.  I'm going to cure that

10 false impression by allowing these leading questions, which are

11 customary in any investigation:  "Where were you on a

12 particular date?

13      "I was in the hospital."

14          MS. BARTH:  Okay.  Thank you.

15          THE COURT:  All right.  Ready to bring back the

16 jurors?  Yes and yes?

17          MR. OPHARDT:  Yes, your Honor.

18      (The following was held in open court with the jury

19 present at 1:14 PM.)

20          THE COURT:  We are back on the record in United States

21 of America v. Dennis Martin.  We have Mr. Thornton on the

22 witness stand.  He is still under oath, and we are in the

23 Government's direct examination.

24      And you may resume.

25          MR. OPHARDT:  Thank you, your Honor.

Francis J. Thornton, Jr. - Direct

1  Q    BY MR. OPHARDT:  Mr. Thornton, when we left off, you had

2  looked at a disc which had been labeled Exhibit 11B.  I'm going

3  to walk back up to you with that.

4          MR. OPHARDT:  Your Honor, may I approach?

5          THE COURT:  You may.

6  Q    Mr. Thornton, I believe you have testified that you

7  recognized your initials on that; is that right?

8  A    Yes.

9  Q    And you had created this disc itself; is that right?

10 A    Yes.

11 Q    You did so from data from the Snapchat disc?

12 A    That's correct.

13 Q    Looking at the disc, are you able to know the file name of

14 what's on it?

15 A    Yes.

16 Q    Would you please -- well, we'll do it this way.

17         MR. OPHARDT:  Your Honor, may I approach?

18         THE COURT:  You may.

19         MR. OPHARDT:  Handing Mr. Thornton what's marked as

20 Government's Exhibit 11C.

21 Q    Mr. Thornton, do you recognize that document?

22 A    Yes, I do.

23 Q    What is it?

24 A    It's a screenshot of the Chat CSV file that was part of

25 the Snapchat data.

Francis J. Thornton, Jr. - Direct

1  Q    Is it the whole file?

2  A    It is not.

3  Q    What line from that Excel spreadsheet is depicted?  What's

4  the line number?

5  A    Well, there's lines 1, 2, 3, and 4 showing the header

6  information, and then there's line 37, which shows the specific

7  file information.

8  Q    Okay.  Would you look at the "media_id" field.

9  A    Yes.

10 Q    And compare it to the disc that's in front of you and the

11 file name written on the outside of that disc.

12 A    Yes.

13 Q    Do they match?

14 A    Yes, they do.

15 Q    It's a long string.  Have you looked at it before?

16 A    Yeah.  I've looked at it quite a bit.

17 Q    Okay.  Have you looked at the contents of the file that's

18 on 11B?

19 A    Yes, I have.

20 Q    What's depicted in -- in that video?

21 A    It is a video of a Black male subject, it's approximately

22 10 seconds long, and he's talking into the camera and he's

23 holding a gun.

24 Q    Do you see that person in the courtroom today?

25 A    Yes, I do.

Francis J. Thornton, Jr. - Direct

1 Q    Where is he seated?

2 A    He's seated at the defense table.

3 Q    What type -- what color clothing is he wearing?

4 A    Burgundy sweater.

5         MR. OPHARDT:  Your Honor, may the record reflect the

6 defendant's been identified by the witness.

7         THE COURT:  The record so reflects.

8         MR. OPHARDT:  Your Honor, I'd move to admit 11B and

9 11C at this time.

10        THE COURT:  Any objection?

11        MS. BARTH:  No, your Honor.

12        THE COURT:  11B and C are admitted.

13    (Government's Exhibits 11B and 11C were received in

14 evidence.)

15        MR. OPHARDT:  11C, could we have that published to the

16 jury, please, Judge?

17        THE COURT:  Yes.

18 Q   BY MR. OPHARDT:  Okay, Mr. Thornton.  You talked earlier

19 about how the headers are visible here.  Were you in the

20 courtroom when the Snapchat representative was testifying?

21 A    Yes, I was.

22 Q    So you heard the same testimony we did?

23 A    Yes.

24 Q    And you recall her talking about the "media_id" field; is

25 that right?

Francis J. Thornton, Jr. - Direct

1  A    Yes.

2  Q    Is that how you were able to determine that the file links

3  to -- the file on the disc links to this entry?

4  A    In part, yes.

5  Q    Okay.  What other ways did you be sure that the two linked

6  up?

7  A    The name of the file also contains the usernames.  It also

8  has a date and time stamp that's all in the file name.

9  Q    Okay.  And that file name date and time stamp, is that the

10 same as the file -- the time stamp that's depicted in column H?

11 A    Yes.

12 Q    UTC.  What's UTC?

13 A    UTC is the universal time coordinate.  It is commonly

14 referred to as Greenwich Mean Time.  For military people, it's

15 also known as Zulu Time.

16 Q    Kind of a standard time zone for computer systems?

17 A    Yes.  It's often used in computers.

18 Q    You can convert it from Greenwich Mean, which is over in

19 England, to our time zone; is that right?

20 A    Yes.  You simply subtract the time zone offset the number

21 of hours.  You have to account for whether it's Daylight

22 Savings or not.

23 Q    Okay.  So have you done that for -- for this time stamp?

24 A    Yes, I have.

25 Q    What does that time in UTC equate to here in Vermont?

Francis J. Thornton, Jr. - Direct

1  A    Well, the time in UTC was 05:53, and the time here would

2  have been 05 -- or it would have been 00:53, which would have

3  been approximately 20 minutes to 1 o'clock in the morning.

4  Q    Approximately seven minutes to 1 o'clock?

5  A    I'm sorry.  Yes.  Seven minutes to 1 o'clock.

6  Q    So just before 1:00 AM?

7  A    Yes.

8  Q    Have you looked at the data on the Snapchat full data and

9  been sure that this is accurate with the data from that full

10 Excel spreadsheet?

11 A    Yes.

12 Q    So this data is what's also on the data from Snapchat?

13 A    Yes, it is.

14 Q    What did you do in relation to the metadata associated

15 with the video file?

16 A    I examined it in more detail.

17 Q    Okay.  How did you do that?

18 A    The metadata that's commonly associated with movie files

19 is called EXIF data.  It stands for the extended image format.

20 And I used a tool called ExifTool to review the data.

21       MR. OPHARDT:  May I have a moment, your Honor, to

22 confer with Ms. Barth?

23       THE COURT:  Yes.

24       MR. OPHARDT:  Thank you, your Honor.  So I'd like to

25 approach with Government's Exhibit 11D at this time.

Francis J. Thornton, Jr. - Direct

1            THE COURT:  You may.

2  Q    Mr. Thornton, do you recognize 11D?

3  A    Yes, I do.

4  Q    What is it?

5  A    This is the printout of the data that I obtained using

6  ExifTool from the video that's on 11B.

7  Q    And how does that tool operate?

8  A    Basically it goes into a media file and it pulls out all

9  the appropriate data, the metadata, that's in there.  It

10 ignores things like the actual video itself but pulls out all

11 this information which is available to be seen.

12 Q    Does it require you to manipulate anything, or is it

13 pretty automated?

14 A    It's pretty automated.

15 Q    How often have you used that tool?

16 A    I use it fairly commonly for reviewing video files like

17 this.

18            MR. OPHARDT:  Your Honor, I'd move to admit 11D at

19 this time.

20            MS. BARTH:  No objection.

21            THE COURT:  11D is admitted.

22     (Government's Exhibit 11D was received in evidence.)

23            MR. OPHARDT:  Your Honor, may I publish?

24            THE COURT:  You may.

25            MR. OPHARDT:  Okay.  So let's, if we can, Ms. Tallman,

Francis J. Thornton, Jr. - Direct

1  increase the size of this top portion here.

2  Q    BY MR. OPHARDT:  Mr. Thornton, let's -- we're not going to

3  cover every line, but let's talk about the top line.  It says

4  "ExifTool Version Number."  What's that indicate?

5  A    Exactly what it says.  It's the version.  It's 12.52 of

6  the -- this version of the tool.

7  Q    Of the software you used?

8  A    Yes.

9  Q    It then lists "File Name."  Is that the file name on 11B?

10 A    Yes, it is.

11 Q    And we spoke earlier about the information that was in it

12 related to the time.  Would that be this portion right here?

13 A    Yes.

14 Q    And then the two usernames, is that that portion right

15 there?

16 A    Yes.

17 Q    And then this portion here, is that the media ID that we

18 referenced?

19 A    Yes, it is.

20 Q    "File Size" is pretty self-explanatory.  That's the amount

21 of data in kilobytes; is that right?

22 A    That's correct.

23 Q    Okay.  What's this data here about file modification,

24 access, creation?

25 A    That's the actual file metadata that the ExifTool pulls

Francis J. Thornton, Jr. - Direct

1 out.

2 Q    We talked about earlier before our lunch break how that

3 data's created in relation to the operating system; is that

4 right?

5 A    Yes.

6 Q    And we see some pretty recent dates and times here.

7 What's that associated with?

8 A    That's associated with my copying it myself from the

9 chat -- Snapchat data to my computer.

10 Q    We have a modification date and time that's back in 2019,

11 April 9th, 2019.  Is that -- is that accurate?

12 A    Yes.

13 Q    Any -- based on your training and experience, any thoughts

14 on why that date is so far removed from the access and creation

15 date?

16 A    It would have been when Snap created the file for

17 submission to Colchester PD.  It would have been back on that

18 date when they would have created the file.

19 Q    Here we have "File Type" information.  What does "MP4"

20 mean to a layperson?

21 A    To a layperson, it basically means a video file.

22 Q    Now, we also have some information down here about "Create

23 Date" and "Modify Date."  Do you see that?

24 A    Yes, I do.

25 Q    What's that date and time, approximately?

Francis J. Thornton, Jr. - Direct

1  A    That is the actual video date and time creation.

2  Q    Now, there are about five seconds between "Create Date"

3  and "Modify Date."  Is that type of discrepancy normal?

4  A    Yeah.  It's pretty common in these types of things just

5  because there's -- some delay can be introduced from either

6  writing the file to disc or just the user taking a couple

7  seconds to press "Save," that type of thing.

8  Q    When you say "writing to disc," I always think of the

9  old-school 3-1/2-inch floppy disc or maybe 5-1/4 if we're old

10  enough.  What do you mean by that?

11  A    Exactly that.  But disc in this connotation could be any

12  media, memory media.  That's typically phone or other device.

13  Q    So the delay between the recording and the saving it on

14  the phone?

15  A    Yes.

16  Q    The "Duration" down here at the bottom, what's the

17  duration of the video?

18  A    It's the length of time of the video that was taken.  It's

19  9.98 seconds, or just under 10 seconds.

20        MR. OPHARDT:  Ms. Tallman, can we move down to the

21  next set of data.  Thank you.

22  Q    We have some more information here about "Track Create

23  Date" and "Track Modify Date."  Are those times consistent with

24  the ones we saw earlier about creation and modify?

25  A    Yes, they are.

Francis J. Thornton, Jr. - Direct

1  Q    Same with the duration?

2  A    Yes.  It's one hundredth of a second off.

3  Q    And then we have another set of dates and times down here

4  with "Media Create Date" and "Media Modify Date."  Do you see

5  those?

6  A    Yes.

7  Q    Are they also consistent with the times further above in

8  this exhibit?

9  A    Yes, they are.

10 Q    There is some "Image Width," "Image Height" information.

11 What's that referring to?

12 A    Exactly what it sounds like.  It's the size of the image

13 in height and width -- or the -- image *per se*.  It's the movie

14 file.

15        MR. OPHARDT:  If we could go to the next page of the

16 exhibit, please.

17 Q    Mr. Thornton, we have some additional information here at

18 the bottom relating to resolution, megapixels, things along

19 those lines.  What does that indicate to you about the type of

20 file?

21 A    It's just how the file is basically both stored and

22 information about playback for the computer that it gets sent

23 to.

24 Q    Based on your review of the metadata associated with that

25 file, approximately when was it created?

Francis J. Thornton, Jr. - Direct

1  A    It would have been created at about quarter to 1:00 in the

2  morning of the 18th of February, 2019.

3         MR. OPHARDT:  If we could back out and go back up to

4  Exhibit 1 *[sic]*, and blow up the file name, please.

5  Q    So approximately nine minutes before the date and time

6  that's listed here in the file name?

7  A    That's correct.

8         MR. OPHARDT:  May I have a moment, your Honor?

9         THE COURT:  Yes.

10         MR. OPHARDT:  Your Honor, I believe I moved to admit

11  11B and D?  Okay.  Thank you.

12      No further questions, Judge.

13         THE COURT:  Any cross-examination?

14         MS. BARTH:  No, your Honor.

15         THE COURT:  Thank you, sir.  You may step down.

16         THE WITNESS:  Thank you, your Honor.

17      (The witness was excused.)

18         THE COURT:  The Government may call its next witness.

19         MR. OPHARDT:  Your Honor, the United States calls Ms.

20  Peggy Germaine to the stand.

21         COURTROOM DEPUTY:  Ms. Germaine, you can step right up

22  front.  And you can keep coming around to me.  Please raise

23  your right hand.  State your full name for the record.

24         THE WITNESS:  Peggy Elizabeth Germaine.

25  /  /  /

Peggy E. Germaine - Direct

1                          PEGGY E. GERMAINE,

2          having been first duly sworn by the courtroom deputy,

3                  was examined and testified as follows:

4              THE WITNESS:  Yes.

5                         DIRECT EXAMINATION

6  BY MR. OPHARDT:

7  Q    Good afternoon, Ms. Germaine.  In what county do you

8  reside?

9  A    Lamoille County.

10 Q    And how long have you lived there?

11 A    Basically at least 25 years.

12             THE COURT:  So I'm going to ask you to scoot a little

13 closer to that microphone.

14             THE WITNESS:  Sorry.

15             THE COURT:  And if you want to pull it down a little

16 bit, and then just project your voice.

17             THE WITNESS:  Okay.

18             THE COURT:  Thank you.

19 Q    Ms. Germaine, are you currently employed?

20 A    Yes.

21 Q    Where do you work?

22 A    I work at the Lamoille Restorative Center.

23 Q    And where is that located?

24 A    In Hyde Park, Vermont.

25 Q    What are your duties there?

Peggy E. Germaine - Direct

1 A    I'm a school engagement specialist.  I work with six- to

2 16-year-old children that struggle with going to school.

3 Q    Are you a mother?

4 A    Yes.

5 Q    How many kids do you have?

6 A    I have four children.

7 Q    Is one of them Jennifer Patch?

8 A    Yes.

9 Q    Who is Ms. -- who was your daughter Jennifer married to in

10 the fall of 2018?

11 A    Dennis Martin.

12 Q    How long had they known each other before they got

13 married?

14 A    For years.  More than five.

15 Q    During their relationship, did you have opportunity to be

16 with Mr. Martin?

17 A    Yes.

18 Q    You observed his appearance?

19 A    Yes.

20 Q    You spoke with him?

21 A    Yes.

22 Q    Was that pretty regular, or was it sporadic?

23 A    Early on it was sporadic, and then it became more frequent

24 in 2017, 2018.

25 Q    Up until the time they got married?

Peggy E. Germaine - Direct

1  A    Yes.

2  Q    Where were they living from the fall of 2018 into 2019?

3  A    Colchester.

4  Q    Had you been to their house?

5  A    Yes.

6  Q    Anyone else living with them that you're aware of?

7  A    I'm unsure.  I think possibly Mr. Martin's brother.

8  Q    What was his name?

9  A    Carl.

10 Q    Do you see Mr. Martin here in the courtroom today?

11 A    I do.

12 Q    Where is he seated?

13 A    He's seated in the red sweater.

14 Q    Here at defense counsel table?

15 A    Yes.

16      MR. OPHARDT:  Your Honor, may the record reflect that

17 Ms. Germaine has identified the defendant.

18      THE COURT:  The record so reflects.

19 Q    You said you'd lived in Lamoille County most of your life.

20 I want to take you back about 15 years ago in Lamoille County.

21 You were in a courtroom about 15 years ago; is that right?

22 A    Yes.

23 Q    What was that related to?

24 A    I was convicted of embezzlement.

25 Q    You were convicted of embezzlement.  Was that at a trial?

Peggy E. Germaine - Direct

1  Did you plead?

2  A    I pled no contest.

3  Q    You pled no contest.  As part of it, did you accept

4  responsibility for what you'd done?

5  A    Yes.  Absolutely.

6  Q    What about restitution related to the embezzlement?  Was

7  that ordered?

8  A    Yes.

9  Q    And are you still paying?

10  A    I am still paying it.

11  Q    How much money are we talking about?  A few thousand?  A

12  lot of money?

13  A    It was under 50,000 but more than a thousand.

14  Q    Could it have been over 50,000?

15  A    No.

16  Q    You don't recall it being around 70,000?

17  A    No, I didn't.

18  Q    Okay.  How many years ago are we talking about?

19  A    Fifteen.  2008.

20  Q    Okay.  Are you still paying restitution?

21  A    Yes.

22  Q    I want to talk with you about a period between Valentine's

23  Day and Presidents' Day in 2019.  Do you remember that period

24  of time?

25  A    Yes.

Peggy E. Germaine - Direct

1  Q    Was that a period of time when there was a tough time in

2  Jennifer's life?

3  A    Yes.

4  Q    She had moved out of the Colchester house shortly after

5  Valentine's Day; is that right?

6  A    Yes.

7  Q    And do you recall Dennis being upset about that?

8  A    Yes.

9  Q    Over that weekend, did you receive any communications from

10 Mr. Martin?

11 A    Yes, I did.  Several.

12 Q    How was he communicating with you?

13 A    Snapchat mostly.

14 Q    Were you a frequent Snapchat user?

15 A    No.

16 Q    How would you receive the videos on Snapchat?  Do you

17 recall?  Were they on your phone?  Were they on a computer?

18 A    Oh, on my phone.  Sorry.

19 Q    It was an app on your phone?

20 A    Yes.

21 Q    At any point in time over that weekend, did you send any

22 messages to Mr. Martin?

23 A    No, I did not.

24 Q    Was there one particular video that stood out to you that

25 you received that weekend?

Peggy E. Germaine - Direct

1  A    Yes.

2  Q    And would you describe it for the jury, please.

3  A    It was -- Mr. Martin sent me a video on Presidents' Day or

4  sometime in that night.  I opened it the morning of Presidents'

5  Day, and he was waving a gun --

6  Q    Ms. Germaine, I'm just going to stop you there.  He was

7  waving a gun in the video; is that right?

8  A    Yes.

9  Q    How could you recognize him?  Was it decently well lit?

10 A    Yes.  There was lighting.

11 Q    Based on the audio, without discussing the contents of the

12 audio, did you recognize his voice?

13 A    Yes.

14 Q    How was it that you -- what time of day did you receive

15 this?

16 A    It was probably between 6:00 and 7:00 AM.  I didn't have

17 to work that day.  Yeah.  Early morning.

18       MR. OPHARDT:  Your Honor, at this time I'd like to

19 publish 11B for the jury.

20       THE COURT:  You may do so.

21 Q    Ms. Germaine, it's going to play on the screen to your

22 left.  If you could watch, please.

23    (Government's Exhibit 11B was played in open court.)

24 Q    BY MR. OPHARDT:  Ms. Germaine, what did you do after

25 receiving this video?  Did you tell anybody about it?

Peggy E. Germaine - Cross

1 A    Yes.  I let the Colchester Police Department know.

2 Q    Thank you.

3         MR. OPHARDT:  May I have a moment, your Honor?

4         THE COURT:  Yes.

5         MR. OPHARDT:  Thank you, your Honor.  I have no

6 further questions.

7         THE COURT:  Any cross-examination?

8         MS. BARTH:  Just briefly, your Honor.

9                    CROSS-EXAMINATION

10 BY MS. BARTH:

11 Q    So, Ms. Germaine, I wanted to talk about that embezzlement

12 conviction for a moment.  What was the sentence that you

13 received for that?

14 A    Eight months.

15 Q    Was the sentence actually five to ten years' incarceration

16 with the majority of that suspended and you served eight

17 months?

18 A    I don't recall, but yes, I served eight months.

19 Q    Would taking a look at the plea agreement you signed in

20 that refresh your recollection?

21 A    Yes, ma'am.

22         MS. BARTH:  Your Honor, may I approach?

23         THE COURT:  Yes.  Let's have this marked for

24 identification.

25         MS. BARTH:  Sure.  We'll mark it as Defendant's

Peggy E. Germaine - Cross

1  Exhibit D.

2      May I approach?

3          THE COURT:  You may.

4  Q    So, Ms. Germaine, after you've had a chance to look at

5  that document for a moment, look up and let me know.

6  A    I'm all set.

7  Q    Okay.  So I'm going to ask you again, the sentence that

8  you received for that was five to ten years, correct?

9  A    Yes, ma'am.

10 Q    But you were allowed to argue for less than that?

11 A    I am not sure how it became less than that.  I -- yeah.  I

12 was having a hard time at that point in my life.

13 Q    Okay.  And you just made a mistake during a hard point in

14 your life; is that correct?

15 A    I was having a hard point in my life during the trial, so

16 I don't remember all of the arguments.

17 Q    And it happened a while ago, right?

18 A    Yes, ma'am.

19 Q    And your memory hasn't gotten better over time, correct?

20 A    No.

21 Q    And I think you said earlier that it was less than

22 $50,000.  Why don't you take a look at that document again and

23 see if it refreshes your recollection.  And for ease of

24 reference, why don't you look near your signature to the

25 left-hand side.

James R. Roy - Direct

1  A     Yes.

2  Q     Okay.  And how much was it?

3  A     $72,000.

4  Q     Okay.  Thank you.

5  A     You're welcome.

6  Q     I don't have any further questions for you.

7            THE COURT:  Any redirect?

8            MR. OPHARDT:  No, your Honor.

9            THE COURT:  Thank you.  You may step down.

10        (The witness was excused.)

11            THE COURT:  The Government may call its next witness.

12            MS. SMITH:  The United States calls Lieutenant James

13 Roy.

14            COURTROOM DEPUTY:  You can step right up front.  Good

15 afternoon.

16            THE WITNESS:  Good afternoon.

17            COURTROOM DEPUTY:  Please raise your right hand.

18 State your full name for the record.

19            THE WITNESS:  James Robin Roy.

20                      JAMES R. ROY,

21      having been first duly sworn by the courtroom deputy,

22              was examined and testified as follows:

23                    DIRECT EXAMINATION

24 BY MS. SMITH:

25 Q     Good afternoon, Mr. Roy.

James R. Roy - Direct

1  A    Good afternoon.

2  Q    Where are you currently employed?

3  A    By the Town of Colchester Police Department.

4  Q    How long have you worked for the Colchester Police

5  Department?

6  A    Since July 13th of 1987.

7  Q    What is your current position?

8  A    I am a lieutenant in charge of the support service

9  division.

10 Q    And what was your position in February of 2019?

11 A    The same.  Lieutenant in charge of support.

12 Q    What do your duties and responsibilities include?

13 A    I oversee the Bureau of Criminal Investigations, or the

14 detective bureau; all of the civilian employees at Colchester

15 Police Department; our communications center at Colchester

16 Police Department; and the training section.

17 Q    I want to take you to February 18th of 2019.  What were

18 your responsibilities on that day?

19 A    On February 18th -- excuse me, February 18th, 2018, I

20 acted in a support role for an ongoing investigation.

21 Q    Just to be clear, is that February 18th, 2019?

22 A    2019.  I'm sorry.  Yes.

23 Q    Who did that investigation pertain to?

24 A    Dennis Martin.

25 Q    At some point on February 18th, 2019, did you encounter

James R. Roy - Direct

1 Dennis Martin?

2 A    Yes, I did.

3 Q    How did that come about?

4 A    My assignment as part of that support role was, when Mr.

5 Martin was located, to attempt to conduct an interview with

6 him.

7 Q    About how much time did you spend with Mr. Martin that

8 day?

9 A    I started reading paperwork to Mr. Martin at approximately

10 3:22.  I started the interview at 3:29 PM, and the interview

11 lasted a little over 40 minutes.

12 Q    Did you have any interactions with Mr. Martin after the

13 interview concluded?

14 A    I did.  A short bit of time in our processing area, yes.

15 Q    Where did you conduct the interview?

16 A    When I first started the process of the interview, it

17 would have been in our processing area, which is attached to

18 the police department, and then the actual interview itself

19 took place in a small interview room just off of the processing

20 area.

21 Q    How were you and Mr. Martin seated in the interview room?

22 A    In the interview room itself, you enter through a doorway,

23 and there is a small desk.  I was seated at the far side of the

24 desk.  Mr. Martin was seated at the near side with the desk in

25 between the two of us.

James R. Roy - Direct

1  Q    Were you facing each other?

2  A    Yes, we were.

3  Q    Would you recognize Mr. Martin today?

4  A    Yes, I would.

5  Q    Do you see Mr. Martin in the courtroom?

6  A    I do.  Behind you wearing a maroon sweater.

7       MS. SMITH:  May the record reflect that the witness

8  has identified the defendant.

9       THE COURT:  The record so reflects.

10 Q    What was Mr. Martin's demeanor prior to when you began the

11 interview?

12 A    He was quiet.  He was conversational.

13 Q    What about his demeanor during the interview?

14 A    I would say that it stayed the same.

15 Q    Any concerns throughout your time with Mr. Martin about

16 whether he understood English?

17 A    No concerns whatsoever.

18 Q    What, if any, concerns did you have about Mr. Martin's

19 mental state prior to the interview?

20 A    I had no concerns.

21 Q    What, if any, concerns did you have about Mr. Martin's

22 mental state during the interview?

23 A    His mental state during the interview?  I had no concerns

24 about his mental state.

25 Q    What, if any, concerns did you have about Mr. Martin's

James R. Roy - Direct

1 physical state during the interview?

2 A    There was a period of time during the interview, perhaps

3 30 minutes into the interview, where he apologized for some

4 moaning sounds that he was making, so that brought my attention

5 to perhaps something was going on.  Later on those sounds came

6 up a second time, and he stated that he had sickle cell anemia.

7 And then at the conclusion of the interview, within 30 minutes

8 or so, I checked on Mr. Martin in a holding cell and he seemed

9 to not be feeling very comfortable at that time, so we summoned

10 for the rescue squad to come and check on him.

11 Q    And did the rescue squad come?

12 A    Yes, they did.

13 Q    About how long after the interview did they arrive, if you

14 recall?

15 A    They were transporting Mr. Martin at about 4:50, and the

16 interview concluded maybe ten minutes -- excuse me, nine

17 minutes after 4:00, so within 31, 32 minutes.

18 Q    How many times, if ever, during the interview did Mr.

19 Martin appear not to understand your question?

20 A    At no times.  He seemed to understand the entirety.

21 Q    At any point in time during the interview, did Mr. Martin

22 ask to take a break?

23 A    No, he did not.

24 Q    Before you began the interview, what did you review with

25 Mr. Martin?

James R. Roy - Direct

1  A    I reviewed with him the Colchester Police Department

2  *Miranda* advice form.

3  Q    What's the *Miranda* advice form?

4  A    That explains his rights in a criminal investigation when

5  he is in custody.

6  Q    Can you give the jury a sense what those rights include.

7  A    I explained to him that he had the right to remain silent,

8  that anything he said could be used against him in a court of

9  law, that he had the opportunity to have an attorney -- to

10  speak with an attorney, rather, and to have an attorney present

11  with him during questioning, before any questioning.

12  Q    What was Mr. Martin doing while you were reviewing those

13  rights with him?

14  A    He was sitting on a small bench just outside of the

15  holding cell.

16  Q    Did he appear to understand what you were saying?

17  A    Yes.

18  Q    What documentation did you create about that conversation

19  with Mr. Martin?

20  A    That would be the Colchester Police Department *Miranda*

21  advice form.

22         MS. SMITH:  Your Honor, may I approach the witness?

23         THE COURT:  You may.

24  Q    I'm showing you what's been marked as Government's Exhibit

25  14.  Do you recognize that document?

James R. Roy - Direct

1  A    Yes, I do.

2  Q    What is it?

3  A    That would be the Colchester Police Department *Miranda*

4  warnings form that I completed on February the 18th, 2019.

5  Q    Is this a true and accurate copy of that *Miranda* form?

6  A    Yes, it is.

7         MS. SMITH:  Your Honor, I move the admission of

8  Government's Exhibit 14.

9         THE COURT:  Any objection?

10         MS. BARTH:  No objection.

11         THE COURT:  It's admitted.

12     (Government's Exhibit 14 was received in evidence.)

13         MS. SMITH:  May I publish it to the jury?

14         THE COURT:  You may.

15  Q    BY MS. SMITH:  Could you describe what we see on the form

16  here.

17  A    Yes.  The very top portion in blue would be my

18  handwriting, which has Mr. Martin's name, his address, his

19  provided date of birth; the Colchester Police Department case

20  number that was assigned to this particular investigation; my

21  name; where the interview was taking place; and then the date

22  and time that the interview was taking place.

23     The middle section where it says "Advice of Rights" would

24  have been the questions that I read to Mr. Martin, made sure

25  that he understood, and then wrote down his reply, and that

James R. Roy - Direct

1  would be the blue writing where it says "Yes."

2       The next portion down would have been the waiver that I

3  explained to him of his rights.

4       And then below that in blue was the date and time in which

5  we were completing the form.  And then to the right where it

6  says "Signature," in black writing would have been Mr. Martin's

7  signature.  And below that, the signature and radio number

8  would be that of Corporal Christopher Jones of the Colchester

9  Police Department certifying as a witness to the reading of

10 *Miranda*.

11 Q    You mentioned that you filled out on this form Mr.

12 Martin's responses to your questions about his rights.  Why did

13 you do it that way?

14 A    When I first read "You have the right to remain silent," I

15 believe his response was "uh-huh," and I didn't know how to

16 spell that, so I asked him if he could please respond with a

17 "yes" or a "no" so that I could accurately record what he said.

18 Q    Other times when you have gone over *Miranda* rights with

19 interviewees, have you filled in their responses?

20 A    I have my entire career.

21 Q    Did you do your process with Mr. Martin the way you always

22 did it?

23 A    Yes, I did.

24 Q    I think you mentioned that Mr. Martin's signature

25 appears -- is that where I've circled just there?

James R. Roy - Direct

1  A    Yes.

2        MS. SMITH:  For the record, I'm circling the top of

3  two signatures at the bottom right of the page.

4        You can take that down.

5  Q    At the time you interviewed Mr. Martin, what had you

6  learned about the firearm in the vehicle?

7  A    There came a point prior to my interviewing Mr. Martin or

8  during it where I was advised that a firearm, handgun, had been

9  located in the vehicle in which Mr. Martin had been stopped.

10 Q    Prior to the interview, were you aware of Mr. Martin

11 appearing in a video and appearing to be holding a firearm?

12 A    Yes, I was.

13 Q    Now I want to talk through the interview with you.  During

14 the interview, what did Mr. Martin say about his marital

15 status?

16 A    Mr. Martin said that he was married to Jennifer Martin and

17 that they had been married since October 2 of the previous

18 year, which would have been 2018.

19 Q    What did Mr. Martin say about Jennifer's mother?

20 A    He said that there had come a time recently where the two

21 had been engaged in some dialogue or banter back and forth.

22 Q    Did you learn the name of Mr. Martin's mother-in-law?

23 A    I do not know that, no.

24 Q    How did Mr. Martin say he had communicated with his

25 mother-in-law?

James R. Roy - Direct

1 A    Initially he referenced FaceTime and then added that they

2 had Snapchatted back and forth.

3 Q    What, if anything, did Mr. Martin say about the possession

4 of firearms?

5 A    He said that he did not possess a firearm and that it

6 would be against his probation.

7 Q    What, if anything, did Mr. Martin tell you about who else

8 had been in the car with him?

9 A    When I asked him, he said that he and his brother Carl

10 were in the car and that a friend by the name of Flip, and when

11 I asked him if there was more to the name, he could not provide

12 it.

13 Q    What, if anything, did Mr. Martin say about whose gun it

14 could have been that was in the car?

15 A    I asked him if Flip possessed a gun, and he stated that he

16 did not know.  I asked him if his brother Carl possessed a gun,

17 and he did say that Carl had a gun.  Yes.

18 Q    What else did he say about Carl's gun?

19 A    That he didn't -- didn't have it any longer because it had

20 been confiscated by the Burlington Police Department.

21        MS. SMITH:  Your Honor, may I approach?

22        THE COURT:  You may.

23 Q    I'm going to retrieve Exhibit 14 and show you what's been

24 marked as Government's Exhibit 15.  Do you recognize that?

25 A    Yes, I do.

James R. Roy - Direct

1  Q    What is it?

2  A    It is a compact disc.

3  Q    How do you recognize it?

4  A    By my initials and my date, the date.

5  Q    What's the date?

6  A    7 February 2023.

7  Q    Have you reviewed the contents of Exhibit 15?

8  A    Yes, I have.

9  Q    What are they?

10 A    They are clips of the interview that I conducted with Mr.

11 Martin.

12 Q    Now, a couple of -- there are a couple of instances where

13 the audio has been removed from the clips; is that right?

14 A    Yes.

15 Q    Other than those instances, do the clips on that disc

16 truly and accurately capture the portions of your interview?

17 A    Yes, they do.

18      MS. SMITH:  Your Honor, I move the admission of

19 Government Exhibit 15.

20      THE COURT:  Any objection?

21      MS. BARTH:  No objection.

22      THE COURT:  It's admitted.

23   (Government's Exhibit 15 was received in evidence.)

24      MS. SMITH:  May I publish it to the jury?

25      THE COURT:  You may.

James R. Roy - Direct

1  Q    BY MS. SMITH:  Now we're going to play those clips from

2  the interview where you talk about those topics.

3          MS. SMITH:  Ms. Tallman, could we please play the

4  clips.

5      (Government's Exhibit 15 was played in open court.)

6          THE COURT:  We have no video.  Do you know that we

7  have no video?

8          MS. SMITH:  Of this?

9          THE COURT:  Yes.

10          MS. SMITH:  Yes, your Honor.

11          THE COURT:  Okay.  Thank you.

12      (Government's Exhibit 15 was played in open court.)

13  Q    BY MS. SMITH:  Where did Mr. Martin say he was going in

14  the car that day before the traffic stop?

15  A    I believe he said they were going to get lunch.

16          MS. SMITH:  Your Honor, may I approach?

17          THE COURT:  You may.

18  Q    I'm retrieving Government's Exhibit 15 and showing you

19  what's been marked for identification as Government's Exhibit

20  13.  Do you recognize the person in that photo?

21  A    Yes, I do.

22  Q    Who is it?

23  A    Dennis Martin.

24          MS. SMITH:  Now we'd like to play what's been admitted

25  as Government's Exhibit 11B.

James R. Roy - Cross

1  Q    This is going to be a video on the screen to your left.

2       (Government's Exhibit 11B was played in open court.)

3  Q    BY MS. SMITH:  Lieutenant Roy, who's the person in that

4  video?

5  A    Dennis Martin.

6  Q    Is that the same Dennis Martin that's here today?

7  A    Yes.

8  Q    When you watched the video previously, was there audio?

9  A    Yes, there was.

10 Q    Who was speaking?

11 A    Dennis Martin.

12 Q    How do you know that it was him?

13 A    I believe it was the same voice that I heard during the

14 interview that I conducted at the Colchester Police Department.

15          MS. SMITH:  May I have a moment, your Honor?

16          THE COURT:  You may.

17          MS. SMITH:  No further questions at this time.

18          THE COURT:  Any cross-examination?

19          MS. BARTH:  Yes, your Honor.  But I will need a moment

20 to set up.

21          THE COURT:  Sure.

22                    CROSS-EXAMINATION

23 BY MS. BARTH:

24 Q    Okay.  Thank you for your patience.

25      Sir, have you seen a video clip of you advising Mr. Martin

James R. Roy - Cross

1 of his rights?

2 A    Yes, I have.

3 Q    Thank you.  I'm going to show you a still shot from that

4 video on a disc that I've marked for identification as

5 Exhibit A.  Okay?

6 A    Okay.

7          COURTROOM DEPUTY:  And, Ms. Barth, did you just want

8 it displayed to the witness or --

9          MS. BARTH:  I think there is a stipulation as to

10 authenticity, so --

11          MR. OPHARDT:  We don't have a formal stipulation,

12 Judge, but I am perfectly fine with Ms. Barth showing this

13 video.  We've seen it, and the witness watched it earlier.

14          THE COURT:  And the exhibit is what?

15          MS. BARTH:  Exhibit A.

16          THE COURT:  Exhibit A.  And so there's no objection to

17 its admission, and Exhibit A is admitted.

18      (Defendant's Exhibit A was received in evidence.)

19          MS. BARTH:  Thank you.

20 Q    BY MS. BARTH:  So, Lieutenant Roy --

21          MS. BARTH:  Does everyone have this on their -- no,

22 not yet.

23          COURTROOM DEPUTY:  Pretty soon.  There we go.

24          MS. BARTH:  Okay.  It's not displaying on my screen,

25 so I don't know --

James R. Roy - Cross

1          THE COURT:  It will take a minute.  We're seeing
2   "Denon Professional" and "Blu-ray Disc," "Media Center," and
3   "Setting."
4          COURTROOM DEPUTY:  Do you need to push "Blu-ray," Ms.
5   Barth?
6          MS. BARTH:  No.  It's on laptop setting.
7          COURTROOM DEPUTY:  It's on laptop?
8          MS. BARTH:  It's definitely on laptop.  I'll go out of
9   it and go back into it and see if that works.  And that seems
10  to have produced what we needed.
11  Q    Okay.  So I am going to play this clip for you, and then
12  I'm going to ask you some questions about that.  Okay, sir?
13  A    Yes.
14       (Defendant's Exhibit A was played in open court.)
15  Q    BY MS. BARTH:  Okay.  So in this video, Mr. Martin is not
16  reading that form himself, correct?
17  A    That's correct.
18  Q    You're holding it, you're reading it slowly, and you're
19  tracing with your finger every word on the form while you're
20  talking to him, correct?
21  A    Yes.
22  Q    And I think we established this earlier, but let's go
23  ahead and go over this again.  Okay.  I'm showing you what has
24  been previously admitted into evidence, Government's Exhibit
25  14.  All of the blue handwriting on this form is yours,

James R. Roy - Cross

1  correct?

2  A    Yes, it is.

3  Q    And you were recording all of his responses?

4  A    Yes.

5  Q    And he did not fill out this form himself, correct?

6  A    That is correct, yes.

7  Q    And at the end you had him just sign the bottom; is that

8  right?

9  A    Yes.

10 Q    Okay.  And it was only after you obtained his waiver that

11 you interviewed him, correct?

12 A    That is correct.

13 Q    Now, Mr. Martin, he answered all of your questions,

14 correct?

15 A    During the interview?

16 Q    Yes.

17 A    Yes, he did.

18 Q    He did not refuse to answer any of your questions,

19 correct?

20 A    He did not refuse.

21 Q    You also had Mr. Martin fill out a medical records release

22 form; is that correct?

23 A    Yes, I did.

24 Q    And have you had a chance to take a look at that video

25 clip?

James R. Roy - Cross

1  A    I haven't seen that video clip, no.  I have seen the form,

2  but more recently I don't believe I've seen the video where I

3  read him that, no.  Is it during the interview?

4          MR. OPHARDT:  May I have a moment, your Honor?

5          THE COURT:  Yes.

6          MS. BARTH:  Your Honor, there is a video clip of a

7  medical records release.  I've had a chance to speak with Mr.

8  Ophardt.  He agrees that it is authentic, and the Government

9  has no objection to me playing it live.

10          MR. OPHARDT:  That's correct, your Honor.  We agree to

11  its admission, and certainly it occurred during the interview

12  portion, and this witness can talk about that clip.  I

13  apologize to the Court.  We were trying to prep Mr. Roy and

14  another witness, and we neglected to have him watch it before

15  the hearing.

16          THE COURT:  Okay.  That's fine.  He doesn't have to

17  watch it before the hearing anyway.  Is this still part of

18  Exhibit A?

19          MS. BARTH:  This is now Exhibit B, which I would move

20  to admit and then play the clip.

21          THE COURT:  I understand there's no objection, so it's

22  admitted.

23      (Defendant's Exhibit B was received in evidence.)

24      (Defendant's Exhibit B was played in open court.)

25  Q    BY MS. BARTH:  So when you went over this medical release

James R. Roy - Cross

1 form with him, you did not go over every provision with him

2 before you had him sign the document, correct?

3 A    Through every provision on the form?

4 Q    Yes.

5 A    I explained to him that we wanted his medical records and

6 the certain date/time frame that we were seeking, yes.

7 Q    I'm going to show you what I'm marking for identification

8 only as Defendant's Exhibit C.

9        MS. BARTH:  May I approach?

10        THE COURT:  You may.

11 Q    Sir, if you could take a look at that document and look at

12 both pages, and when you're done, let me know.

13 A    Okay.

14 Q    Okay.  Sir, what do you recognize that document to be?

15 A    Do I recognize it?  Yes.

16 Q    Yes.  What do you recognize that document to be?

17 A    I recognize that this was a form that we completed during

18 that interview as you saw in the video.

19 Q    Okay.  So that is the form that you used when -- that you

20 had Mr. Martin sign; is that correct?

21 A    Yes, it is.  Yes.

22 Q    I'm going to take that back from you.

23        MS. BARTH:  Your Honor, may I publish -- I move to

24 admit Defendant's Exhibit C.

25        THE COURT:  Any objection?

James R. Roy - Cross

1        MS. SMITH:  No, your Honor.

2        THE COURT:  C is admitted.

3     (Defendant's Exhibit C was received in evidence.)

4        COURTROOM DEPUTY:  You might have to hit auto focus or

5  use the little rolly -- there you go.

6  Q    BY MS. BARTH:  Okay.  So you did not advise Mr. Martin

7  that the health information released to the police department

8  could include information about hepatitis, correct?

9  A    That is correct.

10 Q    Or sexually transmitted diseases, correct?

11 A    That is correct.

12 Q    Or AIDS, correct?

13 A    Yes.

14 Q    Or HIV, correct?

15 A    Correct.

16 Q    Any genetic testing he might have had done, correct?

17 A    Yes.

18 Q    Or any behavioral services he might have received,

19 correct?

20 A    Yes.

21 Q    Or any mental health services he may have received,

22 correct?

23 A    That is correct.

24 Q    Or treatment for alcohol or drug abuse, correct?

25 A    That is correct.

James R. Roy - Cross

1  Q    You also -- let's see.  I'm going to move this a little

2  bit.

3       You also didn't tell him that the information used or

4  disclosed pursuant to this authorization could be redisclosed

5  by the recipient and may no longer be protected under federal

6  and state law; is that correct?

7  A    Yes.

8  Q    But after you summarized what you thought were the

9  important parts, you had him sign and date the bottom; is that

10 correct?

11 A    That is correct.

12 Q    All right.  Let's move to the next page.

13 A    Okay.

14 Q    So, sir, all of the blue handwriting we see on page two of

15 Exhibit C is yours, correct?

16 A    Yes, it is.

17 Q    And the only handwriting on this form is Mr. Martin's

18 name, is that correct, and where he put the date in?

19 A    Yes.

20 Q    And then after you were done with the interview, I think

21 we've established he went to the hospital; is that right?

22 A    Yes.

23 Q    Okay.  Thank you.

24      MS. BARTH:  Did I admit Exhibit C?

25      THE COURT:  You did.

James R. Roy - Redirect

1    MS. BARTH:  Okay.  Thank you.  No further questions.

2    THE COURT:  Any redirect?

3    MS. SMITH:  Yes, your Honor.  May I have one moment?

4    THE COURT:  Yes.

5                     REDIRECT EXAMINATION

6  BY MS. SMITH:

7  Q    Lieutenant Roy, you discussed Mr. Martin's whereabouts on

8  certain dates with him; is that correct?

9  A    Yes.

10 Q    The dates were important for your investigation of Mr.

11 Martin; is that correct?

12 A    Yes, it was.

13 Q    And Mr. Martin made statements about medical treatments in

14 relation to those dates; is that right?

15 A    That is correct.

16 Q    Is that why you wanted the records?

17 A    Yes.  To help corroborate his story.

18        MS. SMITH:  I'd like to put up C again.

19        COURTROOM DEPUTY:  You just need to turn it on on the

20 side.  There you go.  Actually, it's not on.

21        MS. BARTH:  I just did it.  I can help you with that.

22 And I'm happy to do that.

23        COURTROOM DEPUTY:  It should be showing up.

24        MR. OPHARDT:  Thank you, Madam Clerk.

25 Q    Directing your attention to the top left part of the first

James R. Roy - Redirect

1  page of Defendant's Exhibit C, whose form is this, Lieutenant

2  Roy?

3  A     University of Vermont Medical Center's form.

4  Q     This is not a Colchester Police form?

5  A     This is not, no.

6  Q     Why do you use this form?

7  A     We utilize this form if we believe that medical records

8  would be pertinent to our investigation or help in

9  understanding what took place with a particular complaint.

10 Q     Turning to the second page, in the middle part of the page

11 here, there's an area with check boxes.  Can you tell me what's

12 checked here?

13 A     What's checked is I was looking for inpatient admission

14 hospital records, strictly at The University of Vermont Medical

15 Center emergency department; and it is checked "Hospital

16 Abstract," which "includes any available documents below OR

17 check only documents needed," and I checked only the "Discharge

18 Summary" and "History & Physical" information.

19 Q     Is it fair to say there are other types of records listed

20 here that are not checked?

21 A     Yes, it would be.

22         MS. SMITH:  Your Honor, may I have a moment?

23         THE COURT:  Yes.

24         MS. SMITH:  No more questions, your Honor.

25         THE COURT:  Any recross?

Anthony L. Ciravolo - Direct

1          MS. BARTH:  No, your Honor.  Thank you.

2          THE COURT:  Thank you, sir.  You may step down.

3          THE WITNESS:  Thank you, your Honor.

4      (The witness was excused.)

5          THE COURT:  The Government may call its next witness.

6          MS. SMITH:  The Government calls Anthony Ciravolo.

7          COURTROOM DEPUTY:  You can step right up front, Mr.

8  Ciravolo.  Please raise your right hand.  State your full name

9  for the record.

10         THE WITNESS:  Anthony Louis Ciravolo.

11                   ANTHONY L. CIRAVOLO,

12     having been first duly sworn by the courtroom deputy,

13            was examined and testified as follows:

14         THE WITNESS:  Yes.

15                   DIRECT EXAMINATION

16 BY MS. SMITH:

17 Q    Good afternoon.  Mr. Ciravolo, where are you employed?

18 A    With the Bureau of Alcohol, Tobacco, Firearms and

19 Explosives.

20 Q    How long have you worked there?

21 A    Approximately two years.

22 Q    What is your position?

23 A    Firearms enforcement officer.

24 Q    What do your duties and responsibilities include?

25 A    We examine firearms which are submitted as evidence by

Anthony L. Ciravolo - Direct

1 agents within the bureau and other federal law enforcement

2 agencies and render classifications based on those examinations

3 and prepare technical reports based on them.

4      We also examine firearms which are submitted by the

5 industry, the firearms industry, and prepare correspondence,

6 which are these technical reports, based on our classification

7 under federal law.

8      And we also answer questions from the general public in

9 relation to firearms classifications.

10      We prepare and provide training about firearms

11 identification, operation, and design for federal law

12 enforcement.

13      We help maintain the national firearms collection, which

14 houses approximately 12,000 firearms of different types and

15 a -- we also maintain a approximately 2,000-publication library

16 about different firearms books and catalogs.

17 Q    What, if any, regulations do you operate under?

18 A    The Gun Control Act of 1916 and the National Firearms Act

19 of 1934.

20 Q    How do you use those regulations?

21 A    We examine firearms, and then, based upon the regulatory

22 definitions that are in those statutes, we make our

23 classifications based on those.

24 Q    Are you familiar with the legal definition of a firearm?

25 A    I am.

Anthony L. Ciravolo - Direct

1  Q    What are the basic features you look for to determine
2  whether something is a firearm?
3  A    If it's a weapon which will or is designed to or may be
4  readily converted to expel a projectile by the action of an
5  explosive or whether or not the item contains a frame or
6  receiver of such a weapon.
7  Q    How were you employed before starting at ATF?
8  A    I was a gunsmith in the firearms industry.
9  Q    What did your duties and responsibilities include as a
10 gunsmith?
11 A    I completed period-correct firearm restoration along with
12 general repairs and customizations.  I have built/manufactured
13 different firearms based upon customers' needs.  I assisted
14 with our ordering inventory and maintaining inventory along
15 with any acquisition/disposition books of firearms.  I helped
16 with our inspections with the ATF industry operations
17 investigators.  I also helped write and prepare technical
18 invoices or job quotes based upon customers' needs.
19 Q    What, if any, firearms training did you complete prior to
20 your employment with ATF?
21 A    I attended the Pennsylvania Gunsmith School, which is a
22 2500-hour accredited college that teaches gunsmiths.  And then
23 I've also attended multiple armorers classes.
24 Q    What, if any, firearms training have you completed since
25 joining ATF?

Anthony L. Ciravolo - Direct

1  A    ATF -- with ATF, I've completed multiple other armorer

2  certifications, and I've also done a lot of internal training

3  with ATF, on-the-job training.

4  Q    Just for clarification, does ATF refer to the Bureau of

5  Alcohol, Tobacco, Firearms and Explosives?

6  A    Yes.

7  Q    Are you familiar with how firearms are manufactured?

8  A    Generally speaking, yes.

9  Q    What, if any, training have you had as to specific firearm

10  features?

11  A    In starting gunsmith school, your first semester starts

12  out your basic firearms identification and nomenclature, what

13  is each part, how do they interact.  You go over different

14  designs of firearms, different firearms from different periods

15  showing the features of them, the operation of them, how they

16  all work, and that education is carried through the remaining

17  semesters.

18      And then while gunsmithing, we did period-correct

19  restoration, which requires us to do extensive research on to

20  how firearms are manufactured, what manufacturing techniques

21  they use, what finishes they used.

22      And then within ATF, we follow very similar training where

23  we start off with general firearms identification,

24  nomenclature, and we look at and study historical firearms and

25  their designs.

Anthony L. Ciravolo - Direct

1  Q    Have you given any trainings on firearms?

2  A    I have.

3  Q    What types of trainings have you given?

4  A    When I was a gunsmith, I had two, like, apprentice

5  gunsmiths underneath me who I fully trained, and with ATF I've

6  provided multiple trainings on general firearms operation to

7  specific machine guns or machine gun conversion devices to

8  federal and state law enforcement.

9  Q    Who have you provided those trainings to while you've been

10 at ATF?

11 A    Different ATF field offices or field divisions have come

12 out to our facility to request specific training, and I've also

13 been sent out to the field to provide training, and then we've

14 also done -- with the industry operation investigators, I've

15 met with some of them to teach them some basic firearms

16 identification.

17 Q    About how many firearms trainings would you say you've

18 given?

19 A    With ATF?

20 Q    Yes.

21 A    Approximately 25.

22 Q    Have you had any training in photography?

23 A    I have.

24 Q    What was that training?

25 A    I took photography classes all throughout high school, and

Anthony L. Ciravolo - Direct

1  when I originally went to college, I took photography and film

2  classes, and then I stayed with it as a hobby since then.  And

3  with ATF, just recently I traveled to the Federal Law

4  Enforcement Training facility and I took a digital photography

5  for law enforcement class, which was a week-long class.

6  Q    Have you testified in court before today?

7  A    I have not.

8  Q    During your time so far at ATF, what types of

9  opportunities have you had to use your experience and training

10 to assist law enforcement?

11 A    We are sometimes requested out for search warrants, so

12 when agents conduct search warrants, we can be there to assist

13 on a technical level to walk through and examine to see if

14 there's any type of firearms or classify them kind of on the

15 spot, so to speak.  And then I've also provided other

16 demonstrations and technical classes for them.

17 Q    Now I want to talk to you about your involvement in this

18 case.

19        THE COURT:  Before we get there, is this a logical

20 breaking point?

21        MS. SMITH:  Yes, your Honor.

22        THE COURT:  We're due for our midafternoon break.

23     Ladies and gentlemen of the jury, don't talk about the

24 case.  Don't let anybody talk to you about the case.  I wish

25 you a good break.  We'll come back in approximately 15 minutes.

Anthony L. Ciravolo - Direct

1          I'll have the attorneys remain in the courtroom.

2          (The jury exited the courtroom, after which the following

3    was held in open court at 2:30 PM.)

4          THE COURT:  I have three things to raise with you.  We

5    should be thinking about our charge conference.  It generally

6    works best if we do it in the morning, so we have the jurors

7    come in later.  We can also do it in the afternoon.  I'm going

8    to respect Mr. Martin's schedule.  So I'm thinking that we may

9    want to do it Wednesday morning, we may want to do it Thursday

10   morning.  We're moving at a clip, but we are not at that point.

11   So I've got that on my mind.  I hope you do as well.

12         Make sure at the end of the day you confer with Ms. Ruddy

13   so that her exhibit list jives with what you think is admitted.

14   It's much easier for me to figure out where the conflict is if

15   we have one day as opposed to the whole week.

16         You need to let me know about whether you want to retain

17   alternates in deliberations.  There's no good and easy way to

18   do it.  You have to tell them to follow the same rules about

19   not acquiring outside information.  If they come back into the

20   jury as Juror No., say, 12, they have to -- the jurors have to

21   resume their deliberations as if they have started all over

22   again.  We can go down to an 11-person jury and still have a

23   valid verdict.  I think I had that with Ms. -- Mr. Barth.

24         MS. BARTH:  I know him.

25         THE COURT:  Yes, you do know him.  But anyways, think

Anthony L. Ciravolo - Direct

1  about it, because there's no good or easy answers and there's

2  kind of mixed authority on it, which I'm happy to provide you

3  with.

4      That's all I had.  Anything to bring to my attention from

5  either of you?

6          MR. OPHARDT:  Your Honor referenced we are moving at a

7  clip.  We have two witnesses slated for Wednesday.  Mr. Newton

8  is traveling right now, so not available.  And the Court's

9  aware of Mr. Ford, who will be by video first thing tomorrow

10  morning.  So we are at a position where Mr. Ciravolo is our

11  last witness available.  We do have stipulations to cover with

12  the jury.

13      Does the Court want them marked as exhibits?  I don't

14  recall the best practice for that.

15          THE COURT:  I think in the past we have had the

16  stipulations go back in the exhibit book, but they're marked as

17  an exhibit; one of you reads them into the record.  I haven't

18  recently done the research on that, so if you find a different

19  product -- I have actually a page marked for that, and it does

20  not cover whether or not the stipulation itself should go back

21  to the jury.

22          MR. OPHARDT:  There is a provision in the stipulation

23  that it is evidence, an agreement of the parties, so I'm not

24  sure that it's really an issue we need the Court to opine on.

25  I just want the Court to be aware.  I most likely will publish

Anthony L. Ciravolo - Direct

1  them this afternoon to fill some time.

2          THE COURT:  Okay.

3          MR. OPHARDT:  Because I think we're going to run out

4  of witnesses.  In addition, we have the court records, Exhibit

5  12.  I was planning to publish them, and we have versions

6  redacted that I think we can pull up with the black boxes that

7  say "Redacted."  All of the offense information has been

8  redacted.  It's my understanding that's the Court's ruling at

9  this time.  I may ask the Court to revisit that if Mr. Martin

10 testifies under the 609 arguments that we were making.  But I

11 think we would publish in our case in chief the redacted

12 versions.

13         THE COURT:  Okay.  If we end early, that's not a major

14 problem.  Sometimes we would use that for our charge

15 conference, but I just gave you the jury instructions.  So I do

16 want you to look at them between today and tomorrow.  Sometimes

17 we have an odd break in the middle of the case, but we deal

18 with it.

19     Ms. Barth, anything from you?

20         MS. BARTH:  No, your Honor.

21         THE COURT:  All right.  We'll see you back after the

22 break.

23     (A recess was taken, after which the following was held in

24 open court without the jury present at 3:02 PM.)

25         THE COURT:  Anything to bring to my attention before

Anthony L. Ciravolo - Direct

1  we bring back the jury?

2        MS. BARTH:  No, your Honor.

3        MR. OPHARDT:  Your Honor, there's been some discussion

4  about the redactions on 12.  I'm not sure we're at a point

5  where we're ready to publish those today.  We might table that

6  till tomorrow.

7        THE COURT:  Okay.

8        MR. OPHARDT:  But we'd like just a little more

9  guidance from you on what you'd prefer so we don't get it wrong

10 before it's shown.

11       THE COURT:  The best thing is to show me what you've

12 done so I can see it.

13    Todd, can you bring back the jurors?

14       CSO LEBLANC:  Yup.

15       MR. OPHARDT:  So, Judge, we might ask you to do that

16 after we dismiss the jury when we're done with evidence.

17       THE COURT:  Sure.

18    Ms. Smith, you had a pending question, so if you want to

19 strike that or resume it, I can tell you that you left off on

20 asking about his work in this case.

21       MS. SMITH:  Let's just strike that and I'll pick up

22 there.

23       THE COURT:  All right.

24    (The following was held in open court with the jury

25 present at 3:05 PM.)

Anthony L. Ciravolo - Direct

1        THE COURT:  We are back on the record in United States

2  of America v. Dennis Martin.  We have Agent Ciravolo on the

3  witness stand.  We are in the Government's direct examination.

4      And you may proceed.

5  Q    BY MS. SMITH:  Mr. Ciravolo, when we took a break, we'd

6  been talking about your experience and training, and now I want

7  to move to your involvement with this case.  Have you examined

8  any evidence in connection with this case?

9  A    I have.

10 Q    What have you examined?

11 A    I examined a firearm that was submitted to our office, and

12 there was a USB drive additionally that had a video file on it.

13         MS. SMITH:  Your Honor, may I approach the witness?

14         THE COURT:  You may.

15 Q    I'm showing you Government's Exhibit 9.  Is that the

16 firearm you examined?

17 A    Yes, it is.

18 Q    How do you know that that's the firearm you examined?

19 A    My signature is on the evidence tag from when I obtained

20 it.

21 Q    Does it look similar today to how it did when you examined

22 it?

23 A    Yes, it does.

24 Q    Any differences you notice?

25 A    None.

Anthony L. Ciravolo - Direct

1          MS. SMITH:  May I approach the witness?

2          THE COURT:  You may.

3          MS. SMITH:  I'd now like to play Government's Exhibit

4  11B.

5  Q    The screen is going to be on your left there.

6       (Government's Exhibit 11B was played in open court.)

7          MS. SMITH:  I think you might have missed a little

8  part of it.  If we could replay.

9       (Government's Exhibit 11B was played in open court.)

10      You can take that down.  Thank you.

11 Q    BY MS. SMITH:  Was that the video you examined?

12 A    Yes.

13 Q    Had you examined firearms prior to your work in this case?

14 A    Yes.

15 Q    About how many firearms have you examined?

16 A    Thousands.

17 Q    Have you examined any images of firearms prior to your

18 work in this case?

19 A    Yes, I have.

20 Q    About how many photographs of firearms have you examined?

21 A    Hundreds.  I don't have a count.

22 Q    Have you examined videos depicting firearms prior to your

23 work on this case?

24 A    I have.

25 Q    About how many would you say?

Anthony L. Ciravolo - Direct

1  A    Two or three dozen.

2  Q    Where did you conduct your examination of the firearm in

3  the video?

4  A    At our office in Martinsburg, West Virginia.

5  Q    Please describe for the jury the firearm you examined.

6  A    The firearm I examined was a Ruger Model LCP.  It's a .380

7  caliber small-frame firearm.

8  Q    And is Ruger the manufacturer?

9  A    Yes.

10 Q    Do you know the location where the firearm was

11 manufactured?

12 A    Yes.

13 Q    How do you know that?

14 A    It was marked on the side of the firearm.

15 Q    And what was that location?

16 A    Mayodan, North Carolina.

17 Q    What about functionality?  Did you make any assessment as

18 to the firearm's functionality?

19 A    Yes.  I did a function check of the firearm.

20 Q    What is a function check?

21 A    It's a manual systems test of it where we ensure it's

22 clear, pull the trigger, cycle it, make sure that it functions

23 as designed before we go live-fire it with a real cartridge

24 case.

25 Q    And what did you determine as to its functionality from

Anthony L. Ciravolo - Direct

1  the function test?

2  A    It functioned as designed.

3  Q    And you mentioned a live fire test.  What's that?

4  A    We get live ammunition and shoot the firearm at our range.

5  Q    And did you do that in this case?

6  A    I did.

7  Q    What, if any, determination did you make about whether the

8  Ruger is a firearm under the legal definition?

9  A    It is a firearm.

10  Q    And how did you come to that determination?

11  A    It operated as designed during the test fire and it

12  expelled a projectile by the action of an explosive.

13  Q    So you mentioned that you examined the Ruger in the video.

14  Describe for the jury how you conducted the comparison.

15  A    So first with the video, I just watched the video in its

16  entirety and then I -- using Windows Movie Maker, I just go

17  through the video frame by frame to try to get the clearest

18  image I can, and I take a screenshot of that, and at the end of

19  it I go through all of my screenshots and I look at the design

20  features and characteristics of the item and try to make a

21  determination about what it could possibly be.

22      With this case, it seemed to resemble a Ruger Model LCP.

23  So then I took the firearm that I had in my hand, like, with

24  the exhibit and I re-created those same angles that were

25  depicted in the video so I could kind of do a side-by-side

Anthony L. Ciravolo - Direct

1  comparison of the same angles in the video.

2          MS. SMITH:  Your Honor, may I approach?

3          THE COURT:  You may.

4  Q    I show you what's been marked as Government's Exhibit 17.

5  This is a multipage exhibit.  If you could look at each page

6  and let me know when you're done.

7  A    I'm done.

8  Q    Do you recognize what's shown on these pages?

9  A    I do.

10 Q    How do you recognize them?

11 A    These are photographs or screenshots that I have taken.

12 Q    And what are those photographs and screenshots of?

13 A    Pictures of the firearm exhibit that was submitted and

14 screenshots from the exhibit that were submitted.

15 Q    Are the pages of Exhibit 17 fair and accurate depictions

16 of the photos you took and the still frame images you prepared?

17 A    Yes.

18         MS. SMITH:  Your Honor, I move the admission of

19 Exhibit 17.

20         THE COURT:  Any objection?

21         MS. BARTH:  No objection, your Honor.

22         THE COURT:  It's admitted.

23     (Government's Exhibit 17 was received in evidence.)

24         MS. SMITH:  May we publish to the jury?

25         THE COURT:  You may.

Anthony L. Ciravolo - Direct

1  Q    BY MS. SMITH:  Let's start with page 1.  Will you please

2  describe for the jury what's depicted here on page 1 of

3  Government's Exhibit 17.

4  A    They're two, left and right side, photos I took of the

5  exhibit.

6  Q    When you say "the exhibit," you're referring to the

7  firearm I just brought up and that you looked at?

8  A    Yes.

9  Q    There are some technical features of the gun that might

10 come up in our discussion, so I want to go over a few of those

11 to make sure that the jury can follow along with any technical

12 terms we're using.

13      What is a slide on a gun?

14 A    A slide is the part of a pistol that houses the barrel and

15 typically the firing pin.  It would be the topmost portion of

16 it.

17 Q    Can you point out the slide.  And this is a touch screen,

18 so you can circle if you like.

19      Can you point out the slide on page 1 of 17.

20 A    Yeah.  The slide is this piece here.

21      MS. SMITH:  Let the record reflect the witness has

22 circled the top portion of each of two images of the firearm.

23 Q    What is a barrel on a firearm?

24 A    A barrel is a portion of the firearm that is designed

25 for -- once the explosion happens, for the projectile to go

Anthony L. Ciravolo - Direct

1  down and exit.

2  Q    Could you circle the barrel on these photographs.

3  A    You can see the barrel right here and right here, and the

4  barrel travels from here to the end of the firearm.

5         MS. SMITH:  For the record, the witness has circled

6  the top middle portion of each slide, each portion of the slide

7  that's depicted.

8  Q    What's the muzzle on a firearm?

9  A    The muzzle refers to the forwardmost portion of the barrel

10  and slide.  The very front of the firearm.

11  Q    Is the muzzle visible on these photographs?

12  A    From a side profile.

13  Q    Can you point out where we would see the muzzle?

14  A    Yup.  The muzzle would be the forward section right there.

15  Q    What is a trigger guard on a firearm?

16  A    A trigger guard is a feature on a firearm that's designed

17  to guard the trigger from having anything be inside of it.

18  Q    Is there a trigger guard on this firearm?

19  A    Yes, there is.

20  Q    Can you point that out on the photo.

21  A    Yes.  It is this section right here.

22         MS. SMITH:  For the record, the witness is circling a

23  portion that is situated right in front of the trigger.

24  Q    What about a recoil spring?  What's that?

25  A    A recoil spring on a semiautomatic firearm is designed so

Anthony L. Ciravolo - Direct

1  that once the slide moves rearward under pressure from the

2  explosion, it will pull the slide forward, completing the cycle

3  of operations.  It's an internal part.

4  Q    So is that not visible on these photos because it's

5  internal?

6  A    No, it is not.

7  Q    You mentioned a semiautomatic handgun.  Is that -- is this

8  gun a semiautomatic?

9  A    Correct.

10 Q    What about a receiver?  What's a receiver on a firearm?

11 A    A receiver of the firearm is the one part that we consider

12 to be the firearm.  They have different styles and designs

13 depending on the type of firearm.

14 Q    Could you circle the receiver on this page.

15 A    The receiver on the Ruger LCP is an internal receiver, but

16 it's inside of the grip shell, approximately here.  You can

17 actually see a window where the serial number is cut out that

18 it's marked on the receiver.

19        MS. SMITH:  For the record, the witness has circled a

20 portion of the firearm just below the slide and to the right.

21 Q    Could you describe what a receiver is, what it -- what its

22 job is in the functionality of the firearm?

23 A    Essentially it houses the trigger and the firing mechanism

24 of the firearm in -- in this firearm.  It also houses the slide

25 rails, which is how the slide attaches to the firearm.

Anthony L. Ciravolo - Direct

1  Q    What about a laser sight?  What's that?

2  A    Broadly, it's an attachment that goes on firearms that you

3  can press a button and a laser will go out.

4  Q    Is there a laser sight on this firearm here in Exhibit 17?

5  A    There is.

6  Q    Could you circle it, please.

7        MS. SMITH:  For the record, the witness is circling a

8  portion in the bottom front of the firearm.

9  Q    And what does the laser do?

10  A    When you push a button, it just produces a red or green

11  dot, like, out in the distance.

12  Q    What's a magazine?

13  A    A magazine is a part of a firearm which holds the

14  ammunition.

15  Q    Can you circle the magazine in this photograph.

16  A    Yes.

17        MS. SMITH:  For the record, the witness has circled a

18  separate piece that's depicted below the firearm.

19  Q    Does the magazine go into the firearm?

20  A    Yes.

21  Q    Where would that fit in?

22  A    It fits into the bottom of the grip.

23  Q    Can you point to where it would be inserted.

24  A    Yes.  Right there.

25        MS. SMITH:  For the record, the witness has pointed to

Anthony L. Ciravolo - Direct

1  the bottom of the grip.

2  Q    What about the magazine baseplate?

3  A    The baseplate of a magazine is essentially what retains

4  the spring and the follower.  So the rounds are held in under

5  spring tension, so as the firearm cycles, it can feed the next

6  round, and the baseplate is what holds it all together.

7  Q    Is the baseplate visible in this photograph?

8  A    Yes, it is.

9  Q    Can you please circle it.

10        MS. SMITH:  For the record, the witness has circled a

11  portion of the magazine on each photo towards the center of the

12  page.

13  Q    What about housing?  What is housing on a firearm?

14  A    In relation to what?

15  Q    Well, I'm not sure.

16  A    Because you could have something like a trigger housing or

17  a seer housing.  Depending on different firearms, the word

18  "housing" might be a different item.

19  Q    Is there anything in this photograph that you would

20  describe with the word "housing"?

21  A    Yes, I believe so.

22  Q    Could you point out what that is.

23  A    This section down here is a plug which houses the hammer

24  spring of this.  That's how the hammer spring is attached to

25  the firearm in this specific model.

Anthony L. Ciravolo - Direct

1  Q    And is it fair to say that that's positioned on the bottom

2  back part of the grip?

3  A    Yes.

4  Q    And what about, finally, an ejection port?  What's that?

5  A    An ejection port is a portion generally of the receiver

6  which is cut out to allow the spent cartridge case to eject

7  prior to the next cartridge case being loaded into the firearm.

8  Q    You mentioned you've had some photography training.  What,

9  if any, photography training did you use to take these

10  photographs?

11  A    Most of my photography training has been about the use of

12  a camera and how to take pictures, so essentially the goal is

13  to take a picture that looks as realistic to what your eye

14  sees, so essentially I would say I've used all of my training.

15          MS. SMITH:  Can we go to page 2, please.

16  Q    Describe for the jury what's depicted on page 2 of Exhibit

17  17.

18  A    This is the markings on the firearm.

19  Q    What are the markings?

20  A    Manufacturers are required to place certain markings on

21  firearms when they manufacture them, so this is all of the

22  required markings.

23  Q    What markings do you see here?

24  A    There's a serial number, a manufacturer, a model, a

25  caliber, and a place of manufacture.

Anthony L. Ciravolo - Direct

1  Q    And would you identify what each of those is for the jury

2  and circle them.

3  A    Sure.  The serial number is this plate here.

4  Q    And what is the serial number?

5  A    As in reading it or describe what a serial number is?

6  Q    If you could read it.

7  A    It is 372120702.

8  Q    And what is a serial number on a firearm?

9  A    A serial number is essentially an identification mark

10 that's used by manufacturers and then law enforcement for

11 tracing purposes.

12 Q    Is it fair to say that a serial number is unique to a

13 firearm?

14 A    Yes, it is.

15 Q    Could you point to -- or circle the manufacturer.

16 A    Yes.  It's marked in multiple places:  on the grip housing

17 on the left and right, and then additionally on the slide,

18 there.

19 Q    And what does the manufacturer say on this firearm?

20 A    Ruger.

21 Q    And I think you mentioned the place of manufacture.  If

22 you would circle that.

23 A    Yes.

24 Q    And what does that part say?

25 A    Mayodan, North Carolina, USA.

Anthony L. Ciravolo - Direct

1  Q     And what about the model?  What does the model say?

2  A     Model is the LCP.

3        MS. SMITH:  For the record, the witness circled the

4  letters LCP in the photograph on the right.

5        Can we go to page 3.

6  Q     Describe for the jury what's depicted on this page.

7  A     This is a side profile view of the firearm with the laser

8  attachment removed and the bottom side of the firearm.

9  Q     And what is depicted in the top photograph with respect to

10 the laser attachment?  It was removed, and then was it split?

11 What happened here?

12 A     The way this laser attaches to the firearm is essentially

13 like a clamshell.  It sits over top of the trigger guard and

14 then screws down into itself in two spots, so I was depicting

15 what the shape of the firearm looks like without it and also

16 how the laser attaches to the firearm.

17 Q     Had you seen a laser like this one before?

18 A     Yes, I have.

19 Q     Are you aware of who makes it?

20 A     Yes, I am.

21 Q     Who makes it?

22 A     Viridian.

23 Q     Are you aware of whether it's made to fit particular

24 firearms?

25 A     Yes.

Anthony L. Ciravolo - Direct

1  Q    What firearms is this one made to fit?

2  A    It's specifically made to fit the Ruger LCP.

3  Q    Would this laser fit another type of firearm, to your

4  knowledge?

5  A    No.

6         MS. SMITH:  Could we go to page 4, please.

7  Q    Describe for the jury what's depicted on page 4 of Exhibit

8  17.

9  A    A screenshot from the video that was submitted and a

10 similar profile shot that I took of the firearm.

11 Q    What, if any, observations did you make about the

12 comparison between the screenshot and the photograph that

13 appear on this page?

14 A    The general overall size and shape of the barrel and the

15 muzzle of the firearm along with the recoil spring guide rod.

16 And the laser attachment that is on there, you can see the red

17 button along with a slight semicircle guard that's around that

18 button.

19 Q    Do the red arrows on this image refer to the parts you

20 just referenced?

21 A    Yes, they do.

22 Q    So let's go through one by one.  What does the top set of

23 red arrows refer to?

24 A    On the left, you can just barely see the top of the

25 integral sight of the firearm, and then you also see the round

Anthony L. Ciravolo - Direct

1  profile of the barrel and where it's positioned in the slide.

2  Just below that, you see the end of the recoil spring guide rod

3  and where that is in relation to the barrel and their overall

4  shape and profile.

5  Q    Is the guide rod what's pointed to with the middle arrow?

6  A    Yes.

7  Q    And what about the bottom arrow?  What is that pointing

8  to?

9  A    The bottom arrow's pointing to the power switch of the

10 laser.  That red button is how you would turn it on and off.

11 Along with that, if you look on the right, you see that kind of

12 half-moon-shape protrusion there.  That's essentially a place

13 for your finger to rest so you can feel where that power button

14 is, and you can see that same kind of half-moon protrusion on

15 the left image.

16 Q    And at the top of this page, it says "Screenshot from

17 00.27."  What does that refer to?

18 A    The time of the video when it was took.  It was zero

19 seconds and .27 milliseconds.

20       MS. SMITH:  Can we go to page 5, please.

21 Q    Please describe for the jury what's depicted here and what

22 the arrows refer to.

23 A    A screenshot from the video and a picture that I took

24 resembling that same profile of the firearm.

25 Q    What is the top arrow referring to?

Anthony L. Ciravolo - Direct

1  A    Showing the similarities in the silhouette of the two

2  firearms.  You could see if you start at the right of the

3  firearm where the muzzle is and how there's a step-down to

4  where that flat right here on the laser is.  Right there.  And

5  there's another step-down in front of that at approximately a

6  45-degree angle, which you see right here, and then you see

7  another angled protrusion coming down here.  So we're kind of

8  looking at that whole profile of the firearm, what I would call

9  the silhouette, with the first arrow specifically what I was

10 trying to draw attention to there.

11      MS. SMITH:  For the record, the witness has pointed

12 out the top part of the photograph of the firearm in -- on the

13 right and in the screenshot and its outline.

14 Q    What does the second arrow refer to?

15 A    Again, we're looking at the power button of it.  You can

16 see it clearly there in red.  And on the right, this is the

17 protrusion I was speaking of for your finger to rest on.  If

18 you could imagine your finger fitting in that.  On the left

19 image, you see it clearly as well right there.

20      MS. SMITH:  For the record, the witness has pointed

21 out an area on the screen that meets the left part of the

22 second arrowhead.

23      Can we go to page 6.

24 Q    Can you describe for the jury what's depicted on page 6 of

25 Exhibit 17.

Anthony L. Ciravolo - Direct

1    A    Again, a screenshot I captured from the video along with a

2    photo taken of the firearm.

3    Q    And what does the top red arrow on this picture refer to?

4    A    Again showing the power switch in that area along with the

5    general overall profile of the laser sight attachment and how

6    it interacts with the top of the -- or the muzzle of the

7    firearm.

8    Q    And what about the second arrow?

9    A    The second arrow is showing -- I was speaking earlier

10   about how the laser attachment is a clamshell type and it

11   clamps over.  On the right you can clearly see where that seam

12   is where the left and the right side of the laser meet, and on

13   the left image you can also see where that split is.

14   Q    And what about the third arrow?

15   A    The third arrow you can see the rear portion of the slide

16   and how that interacts with the frame.  That same angle between

17   here and here matches with here and here.  Additionally, on

18   this picture you can see there is a -- what appears to be a

19   white, like, sticker on the bottom of the firearm that I

20   examined along with what appears to be the same sticker in the

21   left image from the screenshot in the video.

22   Q    And is that sticker situated on the bottom -- what part of

23   the firearm is that sticker situated on?

24   A    It's on the laser attachment, which is covering the

25   trigger guard.  So the laser attachment essentially becomes the

Anthony L. Ciravolo - Direct

1  trigger guard.

2          MS. SMITH:  Go to page 7.

3  Q    Describe for the jury what's depicted on page 7 of Exhibit

4  17.

5  A    Again we're looking at the same overall shape and profile,

6  especially at the muzzle end where we follow the angles of the

7  laser and the firearm and how they match up.  And then you see

8  again the red power switch with the protrusion; you can kind of

9  see the split of how it interacts with the firearm.  At the

10  bottom of the image -- you can again see a bottom portion of

11  the sticker on these images.

12          And then the bottom arrow is depicting the magazine

13  baseplate where you can see on the right the Ruger LCP has the

14  Ruger logo down there.  The circle you see underneath that,

15  which I'm pointing to now, is a hole for the magazine locking

16  plate, the baseplate lock plate.  It's what stops it from

17  sliding off the magazine.  And then along with "Ruger" written

18  at the bottom of it, and then where the main spring housing is

19  and how all of these -- you see the same logo, and then there's

20  the circle right underneath it, there is words written

21  underneath that, and there's the main spring housing.

22          MS. SMITH:  For the record, the last set of items the

23  witness pointed out are in the screenshot on the left side of

24  the page.

25          Can we move to page 8, please.

Anthony L. Ciravolo - Direct

1  Q    Describe for the jury what's depicted on page 8 of Exhibit
2  17.

3  A    Again, a screenshot of the video that I watched and a
4  picture that I took of the firearm.

5  Q    And what is pointed out by the top arrow on the page?

6  A    Again, the overall profile of the firearm.  You see on the
7  right where -- I'm kind of looking at it from the side of the
8  slide versus the top where you can see there's this relief
9  angle here, what I would refer to as a chamfer.  It's not a
10 sharp edge.  You can see that --

11       MS. SMITH:  I'll just pause to say that for the
12 record, the witness is circling the top portion of the
13 photograph on the right.

14 Q    Please continue.

15 A    You can see those same angles and surfaces in the
16 reflection of the light on the picture to the left showing that
17 it's the same.  And then you again can see the top of the
18 sticker between the two photos.

19 Q    And that's on the bottom of the laser sight?

20 A    Correct.

21 Q    And what does the third arrow point to?

22 A    The third arrow is pointing to the magazine baseplate.

23 Q    And that was the portion you described in detail with
24 respect to page 7; is that right?

25 A    Yes.

Anthony L. Ciravolo - Direct

1          MS. SMITH:  Could we move to page 9, please.

2          THE COURT:  Before you do that, I'm going to ask the

3   jury to stand up and stretch.  We're getting into the late

4   afternoon hours.  Just stand up, stretch, move around.

5      All right.  And let's resume.

6   Q    Would you describe for the jury what's depicted on page 9

7   of Exhibit 17, please.

8   A    A screenshot from the video along with a picture I took

9   re-creating the same essential profile.

10  Q    And what is the top arrow pointing out?

11  A    The top arrow is pointing out on the right image how you

12  can clearly see the slide is rounded where it meets the muzzle.

13  It's a feature of the Ruger LCP.  You can see that same kind of

14  rounded profile on the image on the left where those two

15  surfaces interact.

16  Q    And what about the middle arrow?

17  A    The middle arrow is showing the ejection port which we

18  discussed earlier.  You can see where the cutout is.  You see

19  it's kind of this shape.  You see that same profile here on the

20  image to the left along with the trigger-shapen profile too.

21          MS. SMITH:  For the record, the witness has marked

22  both ends of the middle arrow on the page.

23  Q    And what about the bottom arrow?

24  A    The bottom arrow is showing the grip texture and style.

25  You see on the right image below "Ruger" the grip follows this

Anthony L. Ciravolo - Direct

1  pattern, essentially.  You see that same kind of slope here

2  along with, in the center of the grip texture on the right,

3  that rounded logo is the Ruger logo.  You can see on the left

4  that same round logo on the left.

5         MS. SMITH:  For the record, the witness has circled

6  the bottom left portion of the screenshot on page 9.

7      Can we take that down.  Thank you.

8  Q   Based on your review of the still images of the video,

9  what was your opinion as to the firearm depicted?

10 A   The firearm depicted is consistent with a Ruger Model LCP.

11 Q   Is it possible that it could be another type of firearm in

12 the video?

13 A   No.

14 Q   What about privately manufactured firearms?  Could it be

15 one of those?

16 A   No.

17 Q   Why do you say no?

18 A   To my knowledge, there is no PMF, or privately made or

19 manufactured, Ruger frame or grip housing or anything that's on

20 the market right now.

21 Q   If this weren't a firearm, could it be anything else?

22 A   No.

23         MS. SMITH:  Your Honor, may I have a moment?

24         THE COURT:  You may.

25         MS. SMITH:  No more questions at this time, your

1  Honor.

2              THE COURT:  Any cross-examination?

3              MS. BARTH:  No, your Honor.

4              THE COURT:  All right.  The Government may call its

5  next witness.

6              MR. OPHARDT:  Your Honor, at this time the Government

7  would request to publish stipulations.

8              THE COURT:  All right.  You may do so.

9              MR. OPHARDT:  May Mr. Ciravolo step down?

10             THE COURT:  Yes.  Sorry.

11        You may step down.  Thank you.

12             THE WITNESS:  Thank you.

13        (The witness was excused.)

14             MR. OPHARDT:  Your Honor, I had marked these as

15  Government's Exhibit 18 and 19, and I intend to read them to

16  the jury.  Does the Court want to -- anything peremptory to

17  that?  I'm sorry.  I haven't done this with your Honor.

18             THE COURT:  No.  Just read them to the jury.

19        And my understanding, Ms. Barth, is there's no objection

20  to the admission of 18 and 19?

21             MS. BARTH:  No, your Honor.

22             THE COURT:  They're admitted.

23        (Government's Exhibits 18 and 19 were received in

24  evidence.)

25             MR. OPHARDT:  Government Exhibit 18 is now depicted on

1  the screens in front of the jury.  It reads as follows from the

2  top.  United States District Court for the District of Vermont.

3      United States v. Dennis Martin, Defendant.

4      Stipulation.

5      It is hereby stipulated and agreed by and between the

6  undersigned parties that:

7      1.  As of February 18, 2019, Defendant Dennis Martin had

8  previously been convicted of a crime punishable by a term of

9  imprisonment exceeding one year.

10      2.  This stipulation is admissible as evidence at trial.

11      And signed by the parties.

12      Government Exhibit 19 is now on the screen.  Government

13  Exhibit 19 reads as follows:

14      United States District Court for the District of Vermont.

15      United States of America v. Dennis Martin, Defendant.

16      Stipulation.

17      It is hereby stipulated and agreed by and between the

18  undersigned parties that:

19      1.  Government Exhibit 9 is a Ruger Model LCP .380 caliber

20  pistol bearing serial number 372120702.

21      2.  Government Exhibit 19 is a firearm; that is, a weapon

22  that will, or is designed to, or may readily be converted to

23  expel a projectile by action of an explosive.

24      3.  Government Exhibit 9 was manufactured outside the

25  state of Vermont and had traveled in interstate commerce prior

1  to February 18, 2019.

2       4.  This stipulation is admissible as evidence at trial.

3       Signed by the parties.

4       Your Honor, as the Court's aware, the Government's next

5  witness is available by video tomorrow morning due to some

6  prior scheduling conflicts, so at this time the Government is

7  without a witness to call.

8            THE COURT:  All right.  We are going to end the jury's

9  participation for today now.  I'm going to have the attorneys

10 remain.  We'll work on something outside your presence that we

11 need to address, which is the jury instructions.

12      Don't talk about the case.  Don't let anybody talk to you

13 about the case.  Do no research.  Come back exactly as you are

14 today.  I wish you a good evening.  We'll see you at 9:00.  We

15 cannot start without you.

16      (The jury exited the courtroom, after which the following

17 was held in open court at 3:42 PM.)

18            THE COURT:  I propose that we use our time

19 productively as follows, but I'm happy to have you push back on

20 it.  I think that if I gave you 15 minutes to look at the jury

21 instructions, we could nail down the verdict form and most of

22 the boilerplate instructions.  You've seen them before.  So you

23 would read them, you'd tell me that you're ready, we'd do a

24 preliminary charge conference.  It wouldn't be everything, but

25 we would get a lot of it out of the way.

1      It's late.  It's quarter of 4:00.  You might be exhausted.
2  I always like to take people until the last possible minute,
3  but I could be persuaded.  We could do it some other time,
4  because you're certainly on track.
5      This time I'm going to start with Ms. Barth.  What's your
6  preference?
7            MS. BARTH:  Your Honor, I am exhausted.
8            THE COURT:  Okay.
9            MS. BARTH:  And I would like to have access to
10  Westlaw, which I don't have in the building.
11            THE COURT:  Okay.  Mr. Ophardt?  Ms. Smith?
12            MR. OPHARDT:  Judge, I certainly don't want to push
13  Ms. Barth, and I'm happy she went first.  Thank you for calling
14  on her first.
15            THE COURT:  Okay.
16            MR. OPHARDT:  I'm also exhausted.  This was a
17  whirlwind.  We didn't expect to get through all these folks
18  today.
19            THE COURT:  Okay.  You're totally on time.  I'll see
20  you at 9:00.  You'll let Ms. Ruddy know if you need to see me
21  earlier.
22      Do you have exhibits for me to look at?
23            MR. OPHARDT:  Judge, we wanted just some more guidance
24  on the redactions.  Ms. Barth had made a request of our office
25  to make them in white.

1          THE COURT:  So can we all see them?

2          MR. OPHARDT:  Well, we can pull up right now them in

3  black, which is what we have ready to go.  At least they'll say

4  "Redacted" in white.  You know, Ms. Barth's concern is I think

5  there's some case law about redactions in an indictment.

6      Your Honor, I'm going to approach the podium, if that's

7  okay.

8          THE COURT:  Sure.

9          MR. OPHARDT:  So Ms. Tallman has them up on the screen

10  now.  Count 1, we've redacted the full name of the charge as

11  well as the statute.  This is a situation where I think the

12  jury's going to obviously know things are missing, and we don't

13  want -- the Government's concern is that we look too sneaky.

14          THE COURT:  You look too what?

15          MR. OPHARDT:  Sneaky.

16          THE COURT:  Sneaky.  Okay.

17          MR. OPHARDT:  That we've altered the document without

18  anyone knowing.  So -- and in addition, Judge, it would look

19  like things were omitted by the person completing the form,

20  which might go to the weight of the evidence, that they just

21  didn't bother writing offense.

22          THE COURT:  How difficult would it be for you to take

23  out the word "Redacted"?

24          MR. OPHARDT:  That can be done, your Honor.

25          THE COURT:  All right.  That's what's drawing my

1 attention.  I see a line of black.  I'm not like, "And now I'm
2 going to supply the name of the offense."

3     Let me hear from you, Ms. Barth, on this.  I'm not aware
4 of redaction of indictment, although my book says "If a count
5 has been dismissed or a particular count does not pertain to
6 the defendant on trial, the indictment should be retyped to
7 eliminate the count or counts for which the defendant is not
8 being tried."  Since I don't send the indictment back to the
9 jury, I'm not going to refer to it as a superseding indictment,
10 and "It is within the court's discretion to send a copy of the
11 indictment to the jury, but the court should consider whether
12 doing so would prejudice the defendant."  That's an Eighth
13 Circuit case.  I don't do it.  That's not going to happen.

14     What is the case law that you have found about redaction?

15     MS. BARTH:  So it's not so much that I found.  It
16 triggered a memory of an appeal that I lost several years ago.
17 I know the name of the appeal.  I don't remember the case that
18 I cited in it.  But it is error -- I was drawing a parallel to
19 redactions in this document, so I wasn't concerned necessarily
20 that the indictment would be going back to the jury room.  I
21 remember what you had said about that.  But in the case law
22 that I remember, it is error to send an indictment back that
23 has big black redactions on it because it piques a jury's
24 curiosity -- jurors' curiosity and can suggest there are more
25 things that are being hidden from them.  So --

```
 1              THE COURT:  So the analogy here is -- is imperfect
 2   because we redact medical records all the time, so nobody needs
 3   to know the sexual history of somebody who's got a spinal
 4   injury.  Using the word "redacted."  But go ahead.
 5              MS. BARTH:  So I saw something that Ms. Tallman had
 6   pulled up that I thought might be a little less jumping off the
 7   page, and I don't remember where she had it, but it was white
 8   with just black font that said "Redacted."  Right there.  No.
 9   That is not it.  Can you go back up?
10              MS. TALLMAN:  I got it to all go black.
11              MR. OPHARDT:  She was tinkering and it no longer
12   exists, Ms. Barth.
13              MS. BARTH:  What I had seen - it looks like it isn't
14   available anymore - it was just white with black text that just
15   said "Redacted," and it seemed to jump off the page a little
16   less than the -- my client has indicated if we go up one, that
17   perhaps --
18              THE DEFENDANT:  Are you talking about that?
19              MS. BARTH:  No, I'm not, but thank you for helping.
20        So I wish she was able to re-create that, because it
21   seemed to not quite be, like, what we're looking at right now,
22   which is giant.
23              THE COURT:  What we're looking at right now is
24   unacceptable.  That's just -- I don't know that somebody would
25   look at anything else but "Redacted."  But Ms. Tallman is very
```

1   facile with a computer, and she can probably come up with

2   something.  I think the words "Redacted" are not helpful.

3          MR. OPHARDT:  Understood, Judge.  We can absolutely

4   get them eliminated.  The proposal that Ms. Barth had was to

5   basically make it white with a small "Redacted" in it, which

6   wouldn't give the jury an idea of kind of how much information

7   was missing.  We tried to draw the black boxes in a way that

8   eliminated the whole area without really letting folks guess as

9   to what word would fit.  We didn't want folks kind of

10  speculating, well, how many letters might fit in that gap?  So

11  there's tension there, I understand.

12         THE COURT:  So when I have seen it in the past, I

13  don't think I've ever seen the word "Redacted."  I just see,

14  you know, this portion of somebody's medical history is not in

15  the record.  Would that work better for you?

16         MS. BARTH:  That's fine, your Honor.  I defer to the

17  Court on that.

18         MR. OPHARDT:  So we're going with black boxes, no

19  word.

20         THE COURT:  No black boxes.  Can you do white boxes

21  and no words?

22         MR. OPHARDT:  Judge, my concern with the white boxes

23  is then it looks like the person who's handwriting the form

24  omitted something and forgot to put in the offense and somehow

25  the records themselves were sloppily created.  That's my

1  concern with -- with the complete elimination of the

2  information from that -- especially that handwritten form, the

3  plea colloquy, the whole argument from the defense is that this

4  form was just slapped together and Mr. Martin just signed it

5  without really reading it, and so if it looks sloppy like

6  someone just left out information, that's -- that's not a fair

7  outcome.

8          THE COURT:  White with "Redacted" is better.  If you

9  want a curative instruction where the Court says, "The judge

10  ordered the redactions.  This is what we do in many cases.  We

11  don't have extraneous information that the jury doesn't

12  consider presented."  It may be contained in a document, and

13  that's the best way we do it.  I'm happy to do that.  You can

14  consider what you want the curative instruction to say.

15      I'm going to make an official finding with regard to the

16  stipulations that I find that Mr. Martin voluntarily and

17  knowingly and intelligently waived his right to the jury

18  deciding those based on the Court's colloquy yesterday.  I just

19  didn't want to forget that.

20      So we're going to go with white and small black letters

21  for "Redacted," and that works for you as well?

22          MS. BARTH:  Yes, your Honor.

23          THE COURT:  So if you come up with a curative

24  instruction, show it to Ms. Barth.  I'm happy to give it.

25          MR. OPHARDT:  Thank you, your Honor.

1           THE COURT:  Anything else?

2           MR. OPHARDT:  Not from the Government, Judge.

3           MS. BARTH:  No, your Honor.  Thank you.

4           THE COURT:  And we'll see you at 9:00.  Thank you.

5       (Court was in recess at 3:51 PM.)

6

7

8                   C E R T I F I C A T I O N

9       I certify that the foregoing is a correct transcript from

10  the record of proceedings in the above-entitled matter.

11

12

13  March 13, 2023                  _____
                                         Johanna Massé, RMR, CRR
14

15

16

17

18

19

20

21

22

23

24

25

## $

**$150** [1] - 89:1
**$50,000** [1] - 123:22
**$72,000** [1] - 124:3

## 0

**00.27** [1] - 170:17
**00:53** [1] - 109:2
**05** [1] - 109:2
**05:53** [1] - 109:1

## 1

**1** [22] - 40:24, 40:25, 41:3, 41:12, 41:16, 41:21, 45:23, 59:2, 65:17, 65:18, 93:12, 106:5, 109:3, 109:4, 109:5, 115:4, 161:1, 161:2, 161:19, 178:7, 178:19, 181:10
**1-7** [1] - 41:17
**10** [10] - 21:4, 21:8, 49:9, 49:10, 49:18, 49:22, 49:23, 86:14, 106:22, 113:19
**10:22** [1] - 52:3
**10:39** [1] - 55:3
**11** [5] - 79:22, 82:2, 91:12, 92:22, 92:24
**11-person** [1] - 152:22
**11:15** [1] - 54:14
**11:30** [4] - 54:18, 62:18, 62:21, 93:22
**11A** [6] - 82:4, 82:18, 82:21, 82:22, 82:25, 92:3
**11B** [19] - 92:5, 92:9, 92:18, 92:24, 105:2, 106:18, 107:8, 107:12, 107:13, 110:6, 111:9, 115:11, 121:19, 121:23, 135:25, 136:2, 157:4, 157:6, 157:9
**11C** [4] - 105:20, 107:9, 107:13, 107:15
**11D** [5] - 109:25, 110:2, 110:18, 110:21, 110:22
**12** [3] - 152:20, 154:5, 155:4
**12,000** [1] - 147:14
**12.52** [1] - 111:5
**12:58** [1] - 94:21
**13** [3] - 29:24, 135:20, 186:13
**13th** [1] - 125:6
**14** [5] - 129:25, 130:8, 130:12, 133:23, 138:25
**15** [13] - 51:22, 70:17, 118:20, 118:21, 133:24, 134:7, 134:19, 134:23, 135:5, 135:12, 135:18, 151:25, 179:20
**1531** [2] - 47:19, 47:23
**16-year-old** [1] - 117:2

## 17

**17** [14] - 63:2, 160:4, 160:15, 160:19, 160:23, 161:3, 161:19, 164:4, 166:17, 169:8, 171:25, 173:4, 174:2, 175:7
**18** [11] - 20:11, 47:19, 64:16, 70:8, 70:13, 177:15, 177:20, 177:23, 177:25, 178:7, 179:1
**18-passenger** [1] - 71:3
**18th** [20] - 17:12, 18:8, 18:25, 20:15, 20:20, 22:2, 22:22, 37:9, 37:15, 43:19, 56:3, 57:2, 63:12, 115:2, 125:17, 125:19, 125:21, 125:25, 130:4
**19** [6] - 177:15, 177:20, 177:23, 178:12, 178:13, 178:21
**1916** [1] - 147:18
**192** [10] - 37:18, 56:9, 56:15, 56:16, 56:22, 56:23, 56:25, 58:11, 58:17, 60:24
**1934** [1] - 147:19
**194** [1] - 57:1
**1987** [1] - 125:6
**1:00** [7] - 54:15, 54:18, 93:15, 94:11, 94:13, 109:6, 115:1
**1:14** [1] - 104:19

## 2

**2** [9] - 42:2, 42:3, 101:13, 106:5, 132:17, 166:15, 166:16, 178:10, 178:21
**2,000-publication** [1] - 147:15
**20** [1] - 109:3
**2008** [1] - 119:19
**2013** [1] - 87:7
**2015** [6] - 17:9, 20:18, 21:2, 21:18, 22:17, 23:5
**2017** [1] - 117:24
**2018** [5] - 117:10, 117:24, 118:2, 125:19, 132:18
**2019** [41] - 17:12, 18:8, 18:25, 20:11, 20:15, 20:20, 22:2, 22:22, 36:21, 37:9, 43:19, 47:19, 56:1, 56:3, 57:2, 63:5, 63:12, 69:23, 75:21, 75:23, 76:10, 76:12, 78:3, 78:22, 80:24, 81:1, 81:3, 81:7, 112:10, 112:11, 115:2, 118:2, 119:23, 125:10, 125:17, 125:21, 125:22, 125:25, 130:4, 178:7, 179:1
**2023** [5] - 15:1, 80:15, 91:24, 134:6, 186:13
**21** [1] - 29:2
**21-CR-68-1** [1] - 16:7

## 22

**22** [3] - 64:16, 70:8, 70:13
**24** [1] - 77:7
**24th** [1] - 91:24
**25** [2] - 116:11, 150:21
**2500-hour** [1] - 148:22
**27** [1] - 170:19
**2:30** [1] - 152:3

## 3

**3** [5] - 42:11, 60:3, 106:5, 168:5, 178:24
**3-1/2-inch** [1] - 113:9
**30** [4] - 97:2, 103:18, 128:3, 128:7
**31** [1] - 128:17
**32** [1] - 128:17
**34** [1] - 55:23
**37** [1] - 106:6
**372120702** [4] - 47:14, 48:19, 167:7, 178:20
**380** [6] - 18:6, 18:24, 19:11, 19:13, 158:6, 178:19
**3:02** [1] - 154:24
**3:05** [1] - 155:25
**3:22** [1] - 126:10
**3:29** [1] - 126:10
**3:31** [1] - 47:22
**3:42** [1] - 179:17
**3:51** [2] - 47:19, 186:5

## 4

**4** [5] - 42:21, 106:5, 169:6, 169:7, 179:12
**40** [1] - 126:11
**403** [1] - 102:19
**45-degree** [1] - 171:6
**4:00** [2] - 128:17, 180:1
**4:50** [1] - 128:15

## 5

**5** [2] - 43:10, 170:20
**5-1/4** [1] - 113:9
**50,000** [2] - 119:13, 119:14

## 6

**6** [3] - 43:21, 171:23, 171:24
**609** [1] - 154:10
**6:00** [1] - 121:16

## 7

**7** [12] - 15:1, 40:25, 41:3, 41:13, 41:16, 44:12, 45:23, 80:15, 134:6, 173:2, 173:3, 174:24
**70,000** [1] - 119:16
**702** [1] - 44:10
**77** [1] - 101:12

## 7:00

**7:00** [1] - 121:16

## 8

**8** [12] - 40:24, 45:24, 45:25, 46:9, 46:14, 46:15, 49:9, 80:24, 81:3, 173:25, 174:1
**8th** [1] - 81:1

## 9

**9** [12] - 48:4, 48:13, 48:21, 49:1, 49:8, 81:7, 156:15, 175:1, 175:6, 176:6, 178:19, 178:24
**9.98** [1] - 113:19
**9:00** [3] - 179:14, 180:20, 186:4
**9:20** [1] - 15:2
**9:24** [1] - 16:5
**9th** [2] - 78:22, 112:11

## A

**abbreviated** [3] - 99:20, 99:22, 100:19
**abide** [1] - 27:24
**able** [8] - 21:19, 44:8, 64:25, 100:15, 100:24, 105:13, 108:2, 183:20
**about** [182] - 16:16, 16:17, 16:18, 17:8, 18:16, 18:18, 18:24, 20:3, 20:4, 20:21, 21:22, 21:23, 22:13, 23:10, 24:4, 24:18, 24:19, 24:23, 24:25, 25:17, 25:18, 26:4, 26:6, 26:13, 26:18, 28:14, 29:20, 30:20, 31:1, 32:2, 32:15, 32:23, 33:1, 34:1, 34:7, 34:10, 34:19, 35:12, 37:9, 42:8, 51:23, 51:24, 52:18, 53:22, 54:4, 54:14, 54:19, 57:8, 57:23, 58:22, 66:2, 66:6, 66:9, 68:2, 80:11, 81:10, 83:3, 83:15, 86:20, 87:13, 87:23, 88:12, 89:5, 89:7, 89:8, 90:18, 90:25, 93:16, 93:17, 94:6, 95:9, 95:23, 95:24, 96:7, 97:15, 98:11, 99:4, 99:12, 99:15, 100:1, 100:18, 100:22, 101:12, 101:13, 103:2, 103:6, 103:8, 103:15, 103:25, 104:8, 107:19, 107:24, 111:3, 111:11, 111:23, 112:2, 112:22, 113:2, 113:22, 113:24, 114:19, 114:22, 115:1, 118:20, 118:21, 119:6, 119:11, 119:18, 119:22, 120:7, 121:25, 122:11, 126:3, 126:7,

127:13, 127:15, 127:18, 127:21, 127:24, 127:25, 128:13, 128:15, 129:18, 131:12, 132:6, 132:14, 132:19, 133:3, 133:7, 133:13, 133:18, 135:2, 138:12, 140:12, 142:8, 144:13, 147:10, 147:16, 150:17, 151:17, 151:23, 151:24, 152:5, 152:16, 152:18, 153:1, 155:4, 155:20, 156:6, 157:15, 157:20, 157:25, 158:17, 159:7, 159:21, 162:24, 163:10, 164:1, 165:2, 165:13, 166:4, 166:11, 168:1, 169:11, 170:7, 172:8, 172:10, 172:14, 175:16, 175:23, 176:14, 179:12, 179:13, 181:5, 182:14, 182:21, 183:18
**above** [3] - 21:25, 114:7, 186:10
**above-entitled** [1] - 186:10
**absolutely** [7] - 40:16, 41:11, 43:18, 49:5, 51:15, 119:5, 184:3
**Abstract** [1] - 145:16
**abuse** [2] - 103:9, 142:24
**academic** [1] - 27:13
**accent** [1] - 27:6
**accept** [1] - 119:3
**access** [4] - 76:19, 111:24, 112:14, 180:9
**accessed** [1] - 90:8
**accessing** [1] - 90:14
**accessory** [1] - 48:16
**accident** [1] - 16:13
**accidental** [1] - 99:24
**accidents** [1] - 63:10
**according** [1] - 28:6
**accordingly** [1] - 100:11
**account** [5] - 64:12, 77:20, 78:11, 78:13, 108:21
**accredited** [1] - 148:22
**accurate** [8] - 41:9, 79:13, 80:16, 82:14, 109:9, 112:11, 130:5, 160:15
**accurately** [3] - 101:6, 131:17, 134:16
**acquire** [2] - 16:15, 97:21
**acquired** [1] - 16:18
**acquiring** [1] - 152:19
**acquisition** [1] - 97:22
**acquisition/disposition** [1] - 148:15
**across** [1] - 90:6
**act** [1] - 77:20
**Act** [2] - 147:18
**acted** [1] - 125:20

**acting** [1] - 99:6
**action** [3] - 148:4, 159:12, 178:23
**actual** [7] - 17:24, 50:10, 68:22, 110:10, 111:25, 113:1, 126:18
**added** [1] - 133:1
**addition** [6] - 20:7, 95:8, 99:9, 103:17, 154:4, 181:18
**additional** [2] - 95:12, 114:17
**additionally** [3] - 156:12, 167:17, 172:17
**address** [4] - 23:1, 56:22, 130:18, 179:11
**adjust** [1] - 95:10
**admissible** [4] - 102:17, 102:20, 178:10, 179:2
**admission** [8] - 82:17, 130:7, 134:18, 137:17, 140:11, 145:13, 160:18, 177:20
**admit** [11] - 41:12, 46:9, 48:21, 49:17, 98:8, 107:8, 110:18, 115:10, 140:20, 141:24, 143:24
**admits** [1] - 97:11
**admitted** [19] - 19:13, 41:16, 46:13, 48:25, 49:21, 59:2, 82:21, 107:12, 110:21, 130:11, 134:22, 135:24, 137:17, 138:24, 140:22, 142:2, 152:13, 160:22, 177:22
**admitting** [1] - 102:10
**advantage** [1] - 93:9
**advice** [3] - 129:2, 129:3, 129:21
**Advice** [1] - 130:23
**advise** [1] - 142:6
**advised** [1] - 132:8
**advising** [1] - 136:25
**affecting** [1] - 20:8
**affiant** [1] - 33:22
**after** [38] - 18:21, 22:3, 22:4, 22:24, 26:22, 27:16, 30:24, 37:25, 39:19, 39:22, 40:1, 40:6, 45:8, 46:20, 52:2, 58:13, 58:14, 59:24, 66:14, 66:15, 93:21, 94:5, 94:20, 95:8, 120:4, 121:24, 123:4, 126:12, 128:13, 128:17, 139:10, 143:8, 143:20, 152:2, 154:21, 154:23, 155:16, 179:16
**afternoon** [9] - 116:7, 124:15, 124:16, 124:25, 125:1, 146:17, 152:7, 154:1, 175:4
**again** [20] - 22:25, 42:14, 44:14, 70:10, 71:19, 84:10, 123:7, 123:22, 138:23, 144:18, 152:22, 171:15,

172:1, 172:4, 173:5, 173:8, 173:10, 174:3, 174:6, 174:17
**against** [3] - 97:8, 129:8, 133:6
**age** [1] - 27:12
**agencies** [2] - 77:24, 147:2
**Agent** [2] - 15:16, 156:2
**agents** [2] - 147:1, 151:12
**ago** [14] - 23:5, 25:9, 25:19, 26:2, 51:14, 69:22, 71:20, 72:7, 73:7, 118:20, 118:21, 119:18, 123:17, 182:16
**agree** [3] - 20:11, 20:18, 140:10
**agreed** [3] - 32:1, 178:5, 178:17
**agreeing** [2] - 22:11, 27:23
**agreement** [5] - 23:10, 103:3, 122:19, 153:23
**agrees** [2] - 64:3, 140:8
**ahead** [5] - 32:16, 35:11, 101:5, 138:23, 183:4
**AIDS** [1] - 142:12
**Alcohol** [3] - 19:21, 146:18, 149:5
**alcohol** [1] - 142:24
**allegation** [1] - 103:17
**allegations** [2] - 99:4, 103:9
**alleged** [1] - 95:1
**allow** [8] - 33:7, 33:19, 33:20, 35:5, 35:12, 98:10, 102:25, 166:6
**allowed** [5] - 95:23, 98:6, 98:9, 98:21, 123:10
**allowing** [3] - 102:3, 102:5, 104:10
**allows** [1] - 64:25
**almost** [4] - 23:5, 23:14, 49:3, 55:23
**alter** [1] - 64:9
**altered** [1] - 181:17
**alternates** [1] - 152:17
**although** [3] - 21:13, 95:23, 182:4
**always** [6] - 17:4, 31:14, 99:21, 113:8, 131:21, 180:2
**AM** [7] - 15:2, 16:5, 52:3, 55:3, 93:22, 109:6, 121:16
**ambulatory** [1] - 97:9
**America** [6] - 16:8, 35:19, 94:23, 104:21, 156:2, 178:15
**ammunition** [3] - 40:2, 159:4, 164:14
**amount** [3] - 77:12, 77:16, 111:20
**analogy** [1] - 183:1
**and/and** [1] - 16:1
**Anderson** [1] - 16:11

**anemia** [2] - 26:4, 128:6
**angle** [3] - 171:6, 172:16, 174:9
**angled** [1] - 171:7
**angles** [4] - 159:24, 160:1, 173:6, 174:15
**annually** [1] - 87:15
**answer** [5] - 51:7, 73:16, 74:13, 139:18, 147:8
**answered** [2] - 73:17, 139:13
**answering** [1] - 102:9
**answers** [1] - 153:1
**ANTHONY** [1] - 146:11
**Anthony** [3] - 19:19, 146:6, 146:10
**anticipate** [2] - 24:19, 25:10
**anticipated** [2] - 100:13, 100:17
**anyway** [1] - 140:17
**anyways** [1] - 152:25
**apologize** [2] - 47:23, 140:13
**apologized** [1] - 128:3
**app** [7] - 76:6, 76:10, 76:15, 77:1, 77:4, 84:8, 120:19
**appeal** [2] - 182:16, 182:17
**appear** [7] - 21:19, 82:11, 83:4, 84:1, 128:19, 129:16, 169:13
**appearance** [1] - 117:18
**appeared** [3] - 18:22, 22:4, 87:21
**appearing** [3] - 22:14, 132:11
**application** [4] - 18:13, 18:15, 76:23, 77:9
**apply** [1] - 54:3
**appreciate** [1] - 30:13
**apprentice** [1] - 150:4
**apprised** [1] - 54:20
**approach** [28] - 30:23, 31:16, 31:17, 40:21, 45:21, 48:5, 49:6, 64:9, 67:8, 79:16, 79:19, 81:25, 91:9, 91:25, 92:6, 105:4, 105:17, 109:25, 122:22, 123:2, 129:22, 133:21, 135:16, 141:9, 156:13, 157:1, 160:2, 181:6
**approached** [3] - 32:8, 33:8, 35:6
**appropriate** [2] - 33:3, 110:9
**approximately** [18] - 51:22, 54:11, 63:2, 70:8, 106:21, 109:3, 109:4, 112:25, 114:25, 115:5, 126:9, 146:21, 147:14, 147:15, 150:21, 151:25, 163:16, 171:5
**April** [3] - 78:22, 81:7, 112:11
**area** [14] - 42:4, 42:13, 42:14, 42:25, 43:7, 45:15, 87:9,

3

126:14, 126:17, 126:20, 145:11, 171:21, 172:4, 184:8
**argue** [6] - 32:17, 32:21, 34:18, 35:11, 94:6, 123:10
**argument** [2] - 95:12, 185:3
**arguments** [2] - 123:16, 154:10
**arm's** [5] - 17:13, 18:23, 19:16, 22:3, 22:22
**armed** [3] - 31:25, 67:6, 72:3
**armored** [3] - 64:25, 70:22, 70:23
**armorer** [1] - 149:1
**armorers** [1] - 148:23
**arrest** [9] - 19:1, 23:19, 24:15, 28:1, 29:21, 30:6, 57:5, 98:13
**arrested** [1] - 23:14
**arrive** [2] - 70:19, 128:13
**arrived** [9] - 30:9, 50:15, 58:17, 58:21, 61:5, 61:11, 61:12, 61:17, 65:4
**arriving** [1] - 58:20
**arrow** [21] - 170:5, 170:7, 170:25, 171:9, 171:14, 172:3, 172:8, 172:9, 172:14, 172:15, 173:12, 174:5, 174:21, 174:22, 175:10, 175:11, 175:16, 175:17, 175:22, 175:23, 175:24
**arrow's** [1] - 170:9
**arrowhead** [1] - 171:22
**arrows** [3] - 169:19, 169:23, 170:22
**articulate** [1] - 102:6
**aside** [1] - 97:3
**aspect** [2] - 32:4, 99:3
**aspects** [1] - 90:2
**assessment** [1] - 158:17
**assigned** [5] - 25:14, 37:2, 37:6, 55:25, 130:20
**assignment** [1] - 126:4
**assist** [8] - 57:11, 57:13, 60:13, 64:8, 67:18, 88:11, 151:10, 151:12
**assistance** [3] - 57:16, 63:22, 64:4
**Assistant** [1] - 16:9
**assisted** [3] - 19:8, 60:15, 148:13
**assisting** [2] - 58:2, 63:14
**associated** [8] - 78:10, 81:22, 88:24, 109:14, 109:18, 112:7, 112:8, 114:24
**associates** [1] - 90:3
**assume** [2] - 94:25, 96:14
**assumption** [1] - 71:5
**ATF** [15] - 148:7, 148:16,

148:20, 148:25, 149:1, 149:3, 149:4, 149:22, 150:5, 150:10, 150:11, 150:19, 151:3, 151:8
**attach** [2] - 45:16, 77:2
**attached** [5] - 37:6, 46:8, 48:17, 126:17, 165:24
**attaches** [3] - 163:25, 168:12, 168:16
**attachment** [8] - 164:2, 168:8, 168:10, 169:16, 172:5, 172:10, 172:24, 172:25
**attempt** [1] - 126:5
**attempted** [3] - 32:6, 34:25, 42:23
**attended** [3] - 21:11, 148:21, 148:23
**attention** [17] - 15:3, 15:16, 23:3, 24:16, 52:7, 52:8, 53:2, 53:20, 54:7, 54:23, 93:23, 128:4, 144:25, 153:4, 154:25, 171:10, 182:1
**attorney** [5] - 16:10, 96:9, 129:9, 129:10
**attorney's** [1] - 96:9
**Attorney's** [2] - 88:3, 88:8
**attorneys** [5] - 51:25, 62:17, 93:19, 152:1, 179:9
**Attorneys** [1] - 16:9
**audio** [14] - 94:3, 95:22, 96:1, 96:7, 98:17, 98:21, 99:8, 99:23, 100:3, 102:24, 121:11, 121:12, 134:13, 136:8
**authentic** [1] - 140:8
**authenticity** [1] - 137:10
**authority** [1] - 153:2
**authorization** [1] - 143:4
**authorized** [1] - 33:24
**authorizing** [1] - 58:24
**auto** [1] - 142:4
**automated** [2] - 110:13, 110:14
**available** [8] - 70:11, 77:6, 110:11, 145:16, 153:8, 153:11, 179:5, 183:14
**average** [2] - 88:12, 88:25
**aware** [12] - 17:20, 57:15, 75:23, 80:20, 118:6, 132:10, 153:9, 153:25, 168:19, 168:23, 179:4, 182:3

### B

**babe** [1] - 101:14
**Babylon** [4] - 28:20, 28:21, 28:22, 28:25
**backward** [1] - 67:19

**backwards** [5] - 67:12, 69:15, 69:17, 70:3, 98:13
**balance** [1] - 33:7
**balancing** [1] - 102:19
**banter** [1] - 132:21
**barely** [1] - 169:24
**barrel** [10] - 161:14, 161:23, 161:24, 162:2, 162:3, 162:4, 162:9, 169:14, 170:1, 170:3
**BARTH** [84] - 15:6, 15:22, 16:1, 23:5, 32:17, 34:11, 41:15, 46:12, 48:24, 49:20, 50:4, 50:7, 51:16, 53:14, 54:9, 54:22, 55:1, 62:3, 68:17, 68:19, 73:16, 73:19, 74:5, 74:10, 74:12, 74:16, 74:19, 82:20, 85:9, 94:18, 98:1, 100:21, 100:25, 102:4, 102:7, 102:11, 102:22, 104:3, 104:14, 107:11, 110:20, 115:14, 122:8, 122:10, 122:22, 122:25, 130:10, 134:21, 136:19, 136:23, 137:9, 137:15, 137:19, 137:20, 137:21, 137:24, 138:6, 138:8, 138:15, 140:6, 140:19, 140:25, 141:9, 141:23, 142:6, 143:24, 144:1, 144:21, 146:1, 152:24, 154:20, 155:2, 160:21, 177:3, 177:21, 180:7, 180:9, 182:15, 183:5, 183:13, 183:19, 184:16, 185:22, 186:3
**Barth** [25] - 15:24, 16:11, 31:22, 53:13, 94:16, 95:4, 97:25, 101:9, 101:11, 102:3, 103:2, 109:22, 137:7, 137:12, 138:5, 152:23, 154:19, 177:19, 180:5, 180:13, 180:24, 182:3, 183:12, 184:4, 185:24
**Barth's** [3] - 15:19, 96:15, 181:4
**based** [15] - 46:7, 82:10, 89:9, 112:13, 114:24, 121:11, 147:2, 147:3, 147:6, 147:21, 147:23, 148:13, 148:18, 176:8, 185:18
**baseplate** [7] - 165:2, 165:3, 165:6, 165:7, 173:13, 173:16, 174:22
**basic** [5] - 78:9, 78:20, 148:1, 149:12, 150:15
**basis** [1] - 31:4
**BearCat** [4] - 64:20, 64:23, 70:21

**BearCat's** [1] - 64:24
**bearing** [1] - 178:20
**beautiful** [1] - 27:2
**became** [2] - 117:23, 123:11
**become** [2] - 29:1, 80:20
**becomes** [1] - 172:25
**bedrooms** [1] - 60:23
**began** [3] - 28:15, 127:10, 128:24
**begin** [3] - 24:5, 25:1, 31:13
**behaved** [1] - 28:18
**behavior** [1] - 36:15
**behavioral** [1] - 142:18
**behind** [7] - 29:7, 38:7, 59:22, 65:13, 66:16, 69:4, 127:6
**believes** [1] - 24:11
**below** [8] - 83:4, 131:4, 131:7, 145:16, 163:20, 164:18, 170:2, 175:25
**bench** [1] - 129:14
**best** [4] - 152:6, 153:14, 155:11, 185:13
**better** [6] - 49:15, 49:16, 53:16, 123:19, 184:15, 185:8
**between** [16] - 64:15, 64:16, 76:13, 87:25, 96:25, 113:2, 113:13, 119:22, 121:16, 126:25, 154:16, 169:12, 172:16, 174:18, 178:5, 178:17
**beyond** [2] - 96:2, 103:4
**big** [7] - 70:23, 70:24, 71:1, 71:4, 87:1, 182:23
**bigger** [1] - 53:7
**bill** [1] - 89:2
**Birch** [12] - 37:18, 38:11, 38:20, 56:9, 56:15, 56:16, 58:6, 58:9, 58:11, 58:16, 58:17, 60:24
**birth** [3] - 26:24, 28:15, 130:19
**bit** [12] - 18:16, 23:23, 43:1, 49:16, 56:5, 58:14, 68:2, 71:2, 106:16, 116:16, 126:14, 143:2
**bitch** [2] - 101:22, 102:23
**Black** [2] - 66:11, 106:21
**black** [14] - 53:6, 59:22, 131:6, 154:6, 181:3, 182:1, 182:23, 183:8, 183:10, 183:14, 184:7, 184:18, 184:20, 185:20
**blacked** [2] - 52:8, 53:16
**Blackthorn** [2] - 86:6, 86:7
**blades** [1] - 64:21
**blank** [2] - 53:17, 83:18
**block** [1] - 58:8
**blow** [4] - 42:25, 44:1, 47:5, 115:4

4

**blowing** [1] - 47:13
**blowup** [1] - 48:3
**Blu** [2] - 138:2, 138:4
**Blu-ray** [2] - 138:2, 138:4
**blue** [8] - 52:6, 52:9, 53:15, 130:17, 131:1, 131:4, 138:25, 143:14
**blurried** [1] - 43:4
**blurry** [1] - 44:6
**body** [2] - 83:15, 83:18
**boilerplate** [1] - 179:22
**boils** [1] - 24:11
**book** [2] - 153:16, 182:4
**books** [3] - 87:12, 147:16, 148:15
**bother** [1] - 181:21
**bottom** [24] - 42:19, 60:9, 113:16, 114:18, 132:3, 139:7, 143:9, 164:8, 164:22, 165:1, 166:1, 168:8, 170:7, 170:9, 172:19, 172:22, 173:10, 173:12, 173:18, 174:19, 175:23, 175:24, 176:6
**box** [7] - 45:14, 45:15, 45:16, 46:3, 46:7, 47:3, 47:9
**boxes** [7] - 145:11, 154:6, 184:7, 184:18, 184:20, 184:22
**break** [12] - 51:21, 62:18, 93:11, 93:24, 94:17, 112:2, 128:22, 151:22, 151:25, 154:17, 154:22, 156:5
**breaking** [2] - 93:6, 151:20
**brief** [2] - 99:23, 100:17
**briefly** [2] - 49:23, 122:8
**bring** [15] - 15:3, 15:4, 15:16, 52:4, 52:5, 54:6, 54:23, 54:24, 64:18, 93:23, 104:15, 153:4, 154:25, 155:1, 155:13
**brings** [2] - 24:8, 28:2
**broadly** [1] - 164:2
**broken** [1] - 93:7
**brother** [4] - 61:16, 118:7, 133:9, 133:16
**brought** [2] - 128:4, 161:7
**Brown** [1] - 15:16
**Bryan** [4] - 58:21, 59:7, 61:13, 74:16
**building** [4] - 56:17, 56:23, 93:13, 180:10
**built/manufactured** [1] - 148:12
**burden** [2] - 25:5, 31:11
**bureau** [2] - 125:14, 147:1
**Bureau** [4] - 19:21, 125:13, 146:18, 149:4
**burgundy** [1] - 107:4
**Burlington** [1] - 133:20

**burn** [1] - 53:6
**burned** [1] - 93:5
**button** [7] - 164:3, 164:10, 169:17, 169:18, 170:10, 170:13, 171:15
**BY** [34] - 36:7, 41:23, 46:17, 49:2, 50:7, 55:16, 62:23, 68:19, 74:16, 75:10, 83:2, 85:23, 91:13, 105:1, 107:18, 111:2, 116:6, 121:24, 122:10, 124:24, 130:15, 135:1, 135:13, 136:3, 136:23, 137:20, 138:15, 140:25, 142:6, 144:6, 146:16, 156:5, 157:11, 161:1

## C

**caliber** [7] - 18:6, 18:24, 19:11, 19:13, 158:7, 166:25, 178:19
**camera** [9] - 17:13, 18:6, 18:7, 76:1, 76:4, 76:9, 76:15, 106:22, 166:12
**camo** [1] - 71:9
**camouflage** [2] - 29:25, 71:7
**candid** [1] - 28:13
**canine** [1] - 30:5
**cannot** [2] - 45:1, 179:15
**capabilities** [1] - 57:13
**capability** [1] - 42:7
**captain** [1] - 63:4
**Captain** [3] - 19:7, 62:7, 70:5
**capture** [1] - 134:16
**captured** [1] - 172:1
**car** [46] - 18:2, 18:22, 19:9, 19:10, 19:15, 19:17, 20:5, 30:9, 30:10, 39:8, 40:6, 41:5, 50:10, 58:10, 58:12, 58:13, 58:14, 58:22, 59:7, 59:9, 59:14, 59:15, 59:16, 59:20, 61:5, 61:6, 61:18, 61:21, 65:20, 66:14, 66:15, 67:3, 67:4, 67:9, 67:11, 68:10, 68:22, 68:25, 69:11, 73:9, 74:17, 97:7, 133:8, 133:10, 133:14, 135:14
**card** [2] - 58:16, 58:24
**care** [1] - 54:4
**career** [1] - 131:20
**careful** [1] - 24:16
**carefully** [1] - 19:24
**Carl** [7] - 61:14, 61:15, 61:16, 118:9, 133:9, 133:16, 133:17
**Carl's** [1] - 133:18
**Carolina** [2] - 158:16, 167:25
**carried** [1] - 149:16
**carry** [1] - 71:15

**carrying** [1] - 30:1
**cartridge** [3] - 158:23, 166:6, 166:7
**case** [56] - 16:7, 16:16, 16:17, 16:18, 17:8, 21:9, 21:14, 23:14, 23:19, 24:13, 24:15, 25:14, 26:14, 28:1, 29:22, 30:6, 31:10, 51:24, 64:12, 67:16, 88:5, 88:7, 89:15, 89:22, 91:6, 93:16, 93:17, 95:3, 102:16, 130:19, 151:18, 151:24, 154:11, 154:17, 155:20, 156:7, 156:8, 157:13, 157:18, 157:23, 158:24, 159:5, 159:22, 166:6, 166:7, 179:12, 179:13, 181:5, 182:13, 182:14, 182:17, 182:21
**cases** [9] - 87:18, 87:19, 87:20, 88:14, 88:15, 88:16, 185:10
**catalogs** [1] - 147:16
**caused** [1] - 16:13
**causes** [1] - 90:12
**cell** [5] - 26:4, 30:7, 128:6, 128:8, 129:15
**Center** [3] - 116:22, 138:2, 145:15
**center** [4] - 31:23, 125:15, 165:11, 176:2
**Center's** [1] - 145:3
**certain** [5] - 27:24, 38:11, 141:6, 144:8, 166:20
**certainly** [9] - 32:3, 33:23, 90:22, 96:16, 97:13, 99:5, 140:11, 180:4, 180:12
**certification** [2] - 87:4, 87:8
**certifications** [4] - 86:22, 86:24, 149:2
**certified** [1] - 19:20
**Certified** [1] - 87:2
**certify** [1] - 186:9
**certifying** [1] - 131:9
**chain** [1] - 45:20
**chair** [1] - 16:25
**challenge** [1] - 98:10
**chamfer** [1] - 174:9
**Champlain** [1] - 86:18
**chance** [5] - 79:4, 79:7, 123:4, 139:24, 140:7
**change** [8] - 90:9, 90:12, 90:14, 90:16, 90:20, 90:21, 91:3
**changed** [2] - 90:22, 90:23
**changing** [1] - 90:25
**characteristics** [2] - 18:18, 159:20
**characters** [1] - 84:2
**charge** [6] - 125:8, 125:11,

152:5, 154:14, 179:24, 181:10
**charged** [3] - 17:15, 23:16, 98:4
**chat** [16] - 76:6, 76:13, 76:14, 76:16, 76:20, 77:6, 81:9, 81:10, 81:19, 81:22, 83:9, 83:16, 84:6, 84:10, 112:9
**Chat** [4] - 81:12, 82:9, 82:12, 105:24
**check** [5] - 128:10, 145:11, 145:17, 158:19, 158:20
**checked** [6] - 128:8, 145:12, 145:13, 145:15, 145:17, 145:20
**chest** [2] - 64:21
**chief** [1] - 154:11
**child** [1] - 27:10
**children** [2] - 117:2, 117:6
**chosen** [1] - 52:12
**Christopher** [1] - 131:8
**chunk** [2] - 99:10, 102:4
**Ciravolo** [9] - 19:19, 146:6, 146:8, 146:10, 146:17, 153:10, 156:2, 156:5, 177:9
**CIRAVOLO** [1] - 146:11
**circle** [19] - 42:7, 42:9, 42:16, 44:18, 44:19, 47:7, 60:5, 161:18, 162:2, 163:14, 164:6, 164:15, 165:9, 167:2, 167:15, 167:22, 173:14, 173:20
**circled** [9] - 42:18, 131:25, 161:22, 162:5, 163:19, 164:17, 165:10, 168:3, 176:5
**circles** [1] - 45:5
**circling** [5] - 47:10, 132:2, 162:22, 164:7, 174:12
**Circuit** [1] - 182:13
**circumstances** [5] - 29:19, 29:21, 33:1, 57:14, 98:9
**cited** [1] - 182:18
**civil** [2] - 87:18, 87:19
**civilian** [1] - 125:14
**claimed** [1] - 22:15
**clamps** [1] - 172:11
**clamshell** [2] - 168:13, 172:10
**clarification** [3] - 53:25, 98:17, 149:4
**clarify** [1] - 104:3
**class** [2] - 151:5
**classes** [6] - 87:13, 148:23, 150:25, 151:2, 151:16
**classification** [1] - 147:6
**classifications** [2] - 147:2, 147:9, 147:23
**classify** [1] - 151:14
**clear** [2] - 125:21, 158:22
**cleared** [1] - 40:2

5

**clearest** [1] - 159:17
**clearly** [4] - 171:16, 171:19, 172:11, 175:12
**Clerk** [1] - 144:24
**click** [1] - 79:1
**client** [3] - 102:8, 104:5, 183:16
**clip** [13] - 99:20, 100:19, 101:6, 103:2, 136:25, 138:11, 139:25, 140:1, 140:6, 140:12, 140:20, 152:10, 153:7
**clips** [7] - 22:12, 99:5, 134:10, 134:13, 134:15, 135:1, 135:4
**close** [4] - 23:3, 38:20, 42:13, 43:24
**close-up** [2] - 42:13, 43:24
**closer** [1] - 116:13
**clothing** [1] - 107:3
**Colchester** [55] - 18:23, 19:2, 19:5, 19:10, 22:5, 31:23, 36:12, 36:17, 37:18, 37:19, 38:13, 45:10, 45:13, 50:18, 51:2, 55:6, 55:20, 55:21, 56:9, 57:8, 57:16, 63:14, 63:16, 63:22, 71:23, 71:25, 73:23, 74:2, 78:4, 78:23, 79:2, 79:5, 80:17, 80:21, 81:2, 82:11, 82:12, 82:15, 84:20, 103:8, 112:17, 118:3, 120:4, 122:1, 125:3, 125:4, 125:14, 125:15, 129:1, 129:20, 130:3, 130:19, 131:8, 136:14, 145:4
**collateral** [1] - 98:4
**colleague** [1] - 22:25
**collected** [1] - 47:15
**collection** [1] - 147:13
**college** [2] - 148:22, 151:1
**College** [1] - 86:18
**colloquy** [2] - 185:3, 185:18
**color** [2] - 52:25, 107:3
**colorful** [1] - 27:2
**coloring** [1] - 52:11
**column** [5] - 83:12, 83:18, 84:5, 84:19, 108:10
**comfortable** [1] - 16:25, 128:9
**coming** [4] - 27:16, 34:3, 115:22, 171:7
**commander** [1] - 63:9
**commands** [1] - 69:7
**commerce** [2] - 20:8, 178:25
**common** [4] - 28:22, 57:10, 57:12, 113:4
**commonly** [4] - 76:2, 108:13, 109:18, 110:16
**communicate** [2] - 65:2, 76:6

**communicated** [1] - 132:24
**communicating** [1] - 120:12
**communication** [2] - 58:10, 65:10
**communications** [4] - 77:3, 77:9, 120:9, 125:15
**compact** [1] - 134:2
**company** [3] - 86:5, 86:6, 87:25
**compare** [3] - 19:18, 79:7, 106:10
**compared** [2] - 19:25, 79:12
**comparison** [4] - 79:10, 159:14, 160:1, 169:12
**compartment** [2] - 39:7, 42:13
**complaint** [1] - 145:9
**complete** [3] - 46:24, 148:19, 185:1
**completed** [7] - 30:25, 45:8, 130:4, 141:17, 148:11, 148:24, 149:1
**completing** [3] - 131:5, 163:2, 181:19
**complex** [1] - 88:14
**complicated** [1] - 88:25
**component** [1] - 35:2
**comprehension** [1] - 27:11
**computer** [10] - 45:16, 86:10, 88:21, 89:8, 93:3, 108:16, 112:9, 114:22, 120:17, 184:1
**Computer** [2] - 87:2, 87:3
**computer-generized** [1] - 45:16
**computers** [1] - 108:17
**concern** [10] - 34:12, 53:7, 53:22, 95:7, 95:14, 103:2, 181:4, 181:13, 184:22, 185:1
**concerned** [12] - 30:19, 32:15, 33:13, 33:25, 34:8, 34:9, 34:19, 34:23, 67:6, 95:20, 97:15, 182:19
**concerns** [11] - 57:8, 57:23, 64:4, 103:16, 127:15, 127:17, 127:18, 127:20, 127:21, 127:23, 127:25
**Concerns** [1] - 95:24
**concession** [1] - 96:13
**conclude** [1] - 20:1
**concluded** [3] - 94:5, 126:13, 128:16
**conclusion** [2] - 31:11, 128:7
**condition** [6] - 30:14, 30:17, 49:3, 96:23, 97:9, 98:11
**conditions** [3] - 27:24, 27:25, 103:16
**conduct** [8] - 17:14, 19:1, 79:10, 95:20, 126:5,

126:15, 151:12, 158:2
**conducted** [4] - 22:6, 134:10, 136:14, 159:14
**confer** [2] - 109:22, 152:12
**conference** [3] - 152:5, 154:15, 179:24
**Conference** [1] - 87:15
**confirm** [1] - 79:14
**confirmed** [1] - 79:12
**confirming** [1] - 79:16
**confiscated** [1] - 133:20
**conflict** [1] - 152:14
**conflicts** [1] - 179:6
**connected** [1] - 16:19
**connection** [1] - 156:8
**connotation** [1] - 113:11
**consciousness** [1] - 29:6
**consent** [5] - 58:16, 58:23, 58:25, 59:9
**consequence** [1] - 96:5
**consider** [6] - 26:15, 29:20, 163:11, 182:11, 185:12, 185:14
**consistent** [5] - 40:11, 43:16, 113:23, 114:7, 176:10
**constructive** [1] - 18:1
**contain** [3] - 81:19, 84:2, 102:15
**contained** [2] - 89:19, 185:12
**contains** [4] - 81:20, 99:20, 108:7, 148:5
**content** [4] - 76:9, 76:21, 78:9, 78:20
**contents** [7] - 25:12, 39:16, 45:25, 80:16, 106:17, 121:11, 134:7
**contest** [6] - 24:21, 24:22, 25:1, 102:11, 119:2, 119:3
**contested** [4] - 96:1, 96:3, 98:7, 102:16
**contesting** [1] - 96:15
**context** [2] - 89:8, 103:13
**continue** [2] - 67:15, 174:14
**continuing** [2] - 86:20, 86:23
**contract** [3] - 87:25, 88:5, 88:24
**Control** [1] - 147:18
**control** [1] - 84:23
**conversation** [2] - 103:8, 129:18
**conversational** [1] - 127:12
**conversations** [1] - 77:5
**conversion** [1] - 150:7
**convert** [1] - 108:18
**converted** [2] - 148:4, 178:22
**convicted** [15] - 17:9, 17:10, 20:15, 20:16, 20:19, 20:21, 20:23, 21:22, 21:24, 22:17, 22:18, 28:7, 118:24, 118:25, 178:8

**conviction** [17] - 20:25, 21:18, 23:17, 23:25, 24:13, 24:24, 24:25, 25:2, 25:8, 25:15, 26:6, 26:7, 26:13, 26:16, 27:19, 30:17, 122:12
**cooking** [1] - 27:13
**coordinate** [1] - 108:13
**cop** [1] - 44:5
**copied** [1] - 93:5
**copies** [1] - 53:6
**copy** [7] - 25:16, 80:16, 82:14, 84:23, 101:8, 130:5, 182:10
**copying** [2] - 90:13, 112:8
**Corinne** [1] - 16:9
**corner** [3] - 29:15, 42:19, 60:10
**Corporal** [1] - 131:8
**correct** [81] - 36:22, 47:16, 50:10, 50:17, 51:14, 56:7, 57:3, 57:4, 57:7, 57:20, 57:22, 57:25, 61:19, 63:24, 63:25, 64:6, 64:7, 66:19, 68:22, 68:25, 69:5, 69:6, 69:7, 69:22, 70:3, 70:4, 70:6, 71:13, 73:10, 73:13, 73:14, 73:20, 88:9, 92:25, 100:2, 105:12, 111:22, 115:7, 123:8, 123:14, 123:19, 138:16, 138:17, 138:20, 139:1, 139:5, 139:6, 139:11, 139:12, 139:14, 139:19, 139:22, 140:10, 141:2, 141:20, 142:8, 142:9, 142:10, 142:11, 142:12, 142:14, 142:15, 142:16, 142:19, 142:22, 142:23, 142:24, 142:25, 143:6, 143:10, 143:11, 143:15, 143:18, 144:8, 144:11, 144:15, 148:11, 149:18, 163:9, 174:20, 186:9
**correspondence** [1] - 147:5
**corresponding** [2] - 82:15, 84:25
**corresponds** [1] - 83:24
**corroborate** [1] - 144:17
**corrupt** [1] - 29:3
**corruptly** [1] - 28:18
**counsel** [1] - 118:14
**count** [4] - 157:21, 182:4, 182:5, 182:7
**Count** [1] - 181:10
**counterproductive** [1] - 53:1
**country** [1] - 28:15
**counts** [1] - 182:7
**county** [1] - 116:7
**County** [3] - 116:9, 118:19, 118:20
**couple** [4] - 17:23, 113:6,

134:12
**course** [3] - 30:21, 53:21, 100:25
**courses** [4] - 86:18, 86:19, 86:20, 86:23
**court** [28] - 15:2, 16:4, 21:12, 35:17, 48:7, 52:3, 55:2, 87:16, 93:22, 94:21, 99:22, 104:18, 121:23, 129:8, 135:5, 135:12, 136:2, 138:14, 140:24, 151:6, 152:3, 154:4, 154:24, 155:24, 157:6, 157:9, 179:17, 182:11
**COURT** [228] - 15:3, 15:7, 15:10, 15:17, 15:21, 15:23, 16:2, 16:12, 17:3, 23:4, 31:13, 31:17, 31:20, 32:7, 32:25, 34:3, 34:6, 34:21, 35:15, 35:18, 40:22, 41:14, 41:16, 41:20, 45:22, 46:11, 46:13, 47:22, 48:6, 48:23, 48:25, 49:7, 49:19, 49:21, 49:25, 50:3, 51:17, 51:19, 51:21, 52:4, 52:13, 52:20, 52:23, 53:11, 53:18, 54:1, 54:4, 54:6, 54:10, 54:13, 54:23, 55:4, 61:24, 62:2, 62:4, 62:6, 62:16, 68:2, 68:6, 68:9, 68:16, 73:14, 73:17, 73:20, 74:7, 74:9, 74:11, 74:15, 74:21, 74:23, 79:20, 81:17, 82:1, 82:19, 82:21, 82:24, 85:6, 85:8, 85:10, 85:12, 91:10, 92:2, 92:7, 93:6, 93:9, 93:23, 94:9, 94:13, 94:16, 94:19, 94:22, 95:12, 95:23, 96:5, 96:10, 96:21, 97:6, 97:17, 97:20, 98:2, 98:19, 98:23, 98:25, 99:10, 99:17, 100:1, 100:4, 100:8, 100:14, 100:20, 100:23, 101:2, 101:11, 102:6, 102:10, 102:13, 102:25, 103:19, 104:2, 104:7, 104:15, 104:20, 105:5, 105:18, 107:7, 107:10, 107:12, 107:17, 109:23, 110:1, 110:21, 110:24, 115:9, 115:13, 115:15, 115:18, 116:12, 116:15, 116:18, 118:18, 121:20, 122:4, 122:7, 122:23, 123:3, 124:7, 124:9, 124:11, 127:9, 129:23, 130:9, 130:11, 130:14, 133:22, 134:20, 134:22, 134:25, 135:6, 135:9, 135:11, 135:17, 136:16, 136:18, 136:21, 137:14, 137:16,

138:1, 140:5, 140:16, 140:21, 141:10, 141:25, 142:2, 143:25, 144:2, 144:4, 145:23, 145:25, 146:2, 146:5, 151:19, 151:22, 152:4, 152:25, 153:15, 154:2, 154:13, 154:21, 154:25, 155:7, 155:11, 155:17, 155:23, 156:1, 156:14, 157:2, 160:3, 160:20, 160:22, 160:25, 175:2, 176:24, 177:2, 177:4, 177:8, 177:10, 177:18, 177:22, 179:8, 179:18, 180:8, 180:11, 180:15, 180:19, 181:1, 181:8, 181:14, 181:16, 181:22, 181:25, 183:1, 183:23, 184:12, 184:20, 185:8, 185:23, 186:1, 186:4
**Court** [22] - 16:7, 38:8, 54:2, 87:21, 94:3, 95:3, 98:6, 98:8, 100:4, 101:5, 102:17, 140:13, 153:13, 153:24, 153:25, 154:9, 177:16, 178:2, 178:14, 184:17, 185:9, 186:5
**court's** [1] - 182:10
**Court's** [7] - 15:16, 52:18, 99:25, 153:8, 154:8, 179:4, 185:18
**courtroom** [26] - 15:12, 15:13, 15:19, 16:20, 36:3, 52:1, 52:2, 55:12, 62:13, 67:21, 68:3, 75:6, 85:19, 93:20, 93:21, 106:24, 107:20, 116:2, 118:10, 118:21, 124:21, 127:5, 146:12, 152:1, 152:2, 179:16
**COURTROOM** [19] - 16:6, 35:23, 55:7, 59:3, 62:9, 74:25, 83:1, 85:15, 115:21, 124:14, 124:17, 137:7, 137:23, 138:4, 138:7, 142:4, 144:19, 144:23, 146:7
**cover** [4] - 89:6, 111:3, 153:11, 153:20
**covering** [1] - 172:24
**crazy** [2] - 33:4, 35:2
**create** [6] - 99:20, 99:24, 100:19, 104:8, 129:18, 183:20
**Create** [4] - 112:22, 113:2, 113:22, 114:4
**created** [13] - 18:19, 32:14, 90:8, 92:14, 92:15, 105:9, 112:3, 112:16, 112:18,

114:25, 115:1, 159:24, 184:25
**creating** [2] - 33:17, 175:9
**creation** [4] - 111:24, 112:14, 113:1, 113:24
**credentials** [1] - 67:2
**creole** [1] - 27:1
**crime** [12] - 20:16, 20:23, 22:19, 23:6, 23:16, 25:3, 25:5, 27:20, 29:13, 98:4, 98:5, 178:8
**crimes** [2] - 34:1, 34:10
**Criminal** [1] - 125:13
**criminal** [7] - 16:7, 20:14, 35:3, 87:18, 87:19, 87:20, 129:4
**criminally** [1] - 28:18
**critical** [1] - 23:24
**Cronin** [1] - 92:3
**cropped** [1] - 90:16
**CROSS** [4] - 50:6, 68:18, 122:9, 136:22
**cross** [11] - 50:3, 62:2, 68:16, 85:8, 96:14, 100:10, 103:3, 115:13, 122:7, 136:18, 177:2
**cross-examination** [11] - 50:3, 62:2, 68:16, 85:8, 96:14, 100:10, 103:3, 115:13, 122:7, 136:18, 177:2
**CROSS-EXAMINATION** [4] - 50:6, 68:18, 122:9, 136:22
**crossed** [2] - 20:9, 20:12
**CRR** [1] - 186:13
**cruiser** [2] - 70:20, 73:23
**CSO** [1] - 155:14
**CSV** [6] - 81:12, 81:13, 81:14, 82:9, 82:12, 105:24
**curative** [3] - 185:9, 185:14, 185:23
**cure** [2] - 32:11, 104:9
**curiosity** [2] - 182:24
**current** [3] - 63:3, 86:1, 125:7
**custody** [2] - 24:2, 129:5
**customary** [1] - 104:11
**customers'** [2] - 148:13, 148:18
**customizations** [1] - 148:12
**cut** [3] - 99:22, 163:17, 166:6
**cutout** [1] - 175:18
**Cybercrime** [1] - 87:14
**cycle** [2] - 158:22, 163:2
**cycles** [1] - 165:5

## D

**d/b/a** [1] - 86:6
**DALEY** [1] - 62:12
**Daley** [4] - 19:8, 62:8, 62:11,

62:24
**dark** [2] - 30:3, 39:13
**data** [30] - 77:18, 77:21, 77:25, 81:19, 88:22, 89:7, 89:8, 89:13, 91:1, 91:3, 91:7, 92:18, 92:24, 105:11, 105:25, 109:8, 109:9, 109:12, 109:19, 109:20, 110:5, 110:9, 111:21, 111:23, 112:9, 113:21
**data's** [2] - 90:25, 112:3
**Date** [8] - 112:23, 113:2, 113:3, 113:23, 114:4
**date** [30] - 47:15, 47:18, 80:14, 80:20, 80:23, 81:1, 81:2, 87:8, 91:22, 91:23, 103:21, 103:22, 104:12, 108:8, 108:9, 112:10, 112:14, 112:15, 112:18, 112:25, 113:1, 115:5, 130:19, 130:21, 131:4, 134:4, 134:5, 143:9, 143:18
**date/time** [1] - 141:6
**dated** [1] - 80:13
**dates** [5] - 112:6, 114:3, 144:8, 144:10, 144:14
**daughter** [1] - 117:9
**day-to-day** [1] - 63:9
**Daylight** [1] - 108:21
**days** [3] - 78:2, 97:2, 103:18
**de** [1] - 97:8
**deal** [1] - 154:17
**death** [1] - 97:8
**decently** [1] - 121:9
**decide** [1] - 18:2
**deciding** [1] - 185:18
**decision** [2] - 31:9, 95:16
**deep** [1] - 28:12
**default** [1] - 52:11
**Defendant** [3] - 178:3, 178:7, 178:15
**DEFENDANT** [1] - 183:18
**defendant** [12] - 16:10, 17:8, 18:11, 21:15, 25:22, 25:23, 98:12, 118:17, 127:8, 182:6, 182:7, 182:12
**defendant's** [3] - 23:4, 97:1, 107:6
**Defendant's** [9] - 122:25, 137:18, 138:14, 140:23, 140:24, 141:8, 141:24, 142:3, 145:1
**defense** [6] - 54:9, 68:1, 68:5, 107:2, 118:14, 185:3
**defer** [1] - 184:16
**definitely** [3] - 47:25, 71:1, 138:8
**definition** [2] - 147:24, 159:8
**definitions** [1] - 147:22
**delay** [5] - 16:14, 77:17, 83:1,

113:5, 113:13
**deliberate** [1] - 17:19
**deliberations** [2] - 152:17, 152:21
**demeanor** [2] - 127:10, 127:13
**demonstrably** [1] - 28:5
**demonstrations** [1] - 151:16
**denied** [2] - 30:21, 31:5
**Dennis** [25] - 16:8, 17:6, 18:11, 35:19, 56:20, 61:15, 63:21, 65:15, 66:13, 67:5, 68:14, 94:23, 104:21, 117:11, 120:7, 125:24, 126:1, 135:23, 136:5, 136:6, 136:11, 156:2, 178:3, 178:7, 178:15
**Dennis'** [1] - 61:16
**Denon** [1] - 138:2
**Department** [23] - 19:2, 19:11, 36:18, 45:11, 45:13, 51:3, 55:21, 71:23, 72:1, 78:4, 78:24, 122:1, 125:3, 125:5, 125:15, 125:16, 129:1, 129:20, 130:3, 130:19, 131:9, 133:20, 136:14
**department** [9] - 37:1, 37:5, 37:20, 38:2, 45:18, 46:20, 126:18, 142:7, 145:15
**depended** [1] - 27:15
**depict** [1] - 43:25
**depicted** [23] - 41:23, 43:10, 59:5, 65:18, 106:3, 106:20, 108:10, 159:25, 161:2, 162:7, 164:18, 166:16, 168:6, 168:9, 169:7, 170:21, 171:24, 173:3, 174:1, 175:6, 176:9, 176:10, 177:25
**depicting** [6] - 42:14, 42:24, 46:3, 157:22, 168:14, 173:12
**depictions** [2] - 41:9, 160:15
**deploy** [1] - 64:25
**deputy** [8] - 36:3, 55:12, 62:13, 75:6, 85:19, 116:2, 124:21, 146:12
**DEPUTY** [19] - 16:6, 35:23, 55:7, 59:3, 62:9, 74:25, 83:1, 85:15, 115:21, 124:14, 124:17, 137:7, 137:23, 138:4, 138:7, 142:4, 144:19, 144:23, 146:7
**describe** [18] - 28:21, 28:23, 121:2, 130:15, 158:5, 159:14, 161:2, 163:21, 165:20, 166:16, 167:5, 168:6, 169:7, 170:21,

171:24, 173:3, 174:1, 175:6
**described** [2] - 76:11, 174:23
**description** [2] - 48:3, 60:17
**descriptor** [1] - 68:2
**descriptors** [3] - 66:2, 66:6, 66:10
**design** [2] - 147:11, 159:19
**designated** [1] - 94:25
**designed** [8] - 148:3, 158:23, 159:2, 159:11, 161:24, 162:16, 162:25, 178:22
**designs** [3] - 149:14, 149:25, 163:12
**desk** [3] - 126:23, 126:24
**despite** [3] - 22:14, 24:1, 49:3
**detail** [2] - 109:16, 174:23
**details** [3] - 37:7, 37:8, 69:25
**detective** [1] - 125:14
**determination** [3] - 159:7, 159:10, 159:21
**determine** [4] - 103:20, 108:2, 148:1, 158:25
**developed** [1] - 26:22
**deviating** [1] - 54:19
**device** [6] - 89:24, 90:7, 90:13, 91:1, 113:12
**devices** [1] - 150:7
**dialogue** [1] - 132:21
**difference** [1] - 76:13
**differences** [2] - 76:11, 156:24
**different** [29] - 17:23, 21:6, 27:3, 28:9, 29:11, 37:7, 56:23, 64:21, 67:13, 88:18, 89:2, 89:9, 89:13, 90:21, 91:1, 99:7, 147:14, 147:16, 148:13, 149:13, 149:14, 150:11, 153:18, 163:12, 165:17, 165:18
**difficult** [2] - 27:7, 181:22
**difficulty** [1] - 27:13
**digital** [4] - 86:4, 86:12, 86:23, 151:4
**Digital** [1] - 86:6
**digitally** [1] - 53:7
**digits** [1] - 44:8
**dimensions** [1] - 70:24
**DIRECT** [8] - 36:6, 55:15, 62:22, 75:9, 85:22, 116:5, 124:23, 146:15
**direct** [3] - 103:4, 104:23, 156:3
**directed** [1] - 99:25
**directing** [1] - 144:25
**direction** [1] - 35:9
**directly** [4] - 18:9, 52:14, 53:23, 93:1
**disc** [28] - 79:24, 80:5, 80:7, 80:10, 80:11, 80:16, 81:8, 81:11, 84:19, 91:20, 93:1,

99:20, 101:7, 105:2, 105:9, 105:11, 105:13, 106:10, 106:11, 108:3, 113:6, 113:8, 113:9, 113:11, 134:2, 134:15, 137:4
**Disc** [1] - 138:2
**Discharge** [1] - 145:17
**disclosed** [1] - 143:4
**discrepancy** [1] - 113:3
**discretion** [1] - 182:10
**discuss** [1] - 94:24
**discussed** [2] - 144:7, 175:18
**discussing** [1] - 121:11
**discussion** [2] - 155:3, 161:10
**diseases** [1] - 142:10
**dismiss** [1] - 155:16
**dismissed** [1] - 182:5
**display** [1] - 53:7
**displayed** [1] - 137:8
**displaying** [1] - 137:24
**dispute** [3] - 15:24, 28:8, 96:12
**distance** [2] - 89:23, 164:11
**District** [6] - 36:13, 87:21, 178:2, 178:14
**district** [1] - 36:14
**distrust** [3] - 28:12, 28:13, 28:15
**division** [1] - 125:9
**divisions** [1] - 150:11
**divorce** [1] - 103:13
**Document** [1] - 101:12
**document** [14] - 89:14, 89:15, 89:20, 105:21, 123:5, 123:22, 129:25, 141:2, 141:11, 141:14, 141:16, 181:17, 182:19, 185:12
**documentation** [1] - 129:18
**documents** [9] - 24:13, 25:7, 25:8, 25:10, 25:11, 26:16, 26:20, 145:16, 145:17
**domestic** [2] - 32:3, 103:9
**done** [22] - 41:1, 46:18, 47:10, 76:14, 87:14, 87:19, 88:15, 98:12, 108:23, 119:4, 141:12, 142:16, 143:20, 149:2, 150:14, 153:18, 155:12, 155:16, 160:6, 160:7, 177:17, 181:24
**door** [7] - 33:3, 33:17, 35:5, 52:20, 97:24, 98:14, 100:10
**doorway** [1] - 126:22
**dot** [1] - 164:11
**down** [39] - 24:12, 30:15, 38:2, 48:7, 51:19, 58:9, 62:4, 65:8, 73:4, 74:21, 84:9, 84:10, 85:10, 93:7, 112:22, 113:16, 113:20,

114:3, 115:15, 116:15, 124:9, 130:25, 131:2, 132:4, 146:2, 152:22, 157:10, 162:1, 165:23, 168:14, 171:3, 171:5, 171:7, 173:14, 176:7, 177:9, 177:11, 179:21
**download** [2] - 78:25, 79:1
**dozen** [2] - 87:23, 158:1
**draft** [1] - 93:25
**dramatically** [1] - 90:22
**draw** [5] - 43:6, 52:7, 53:2, 171:10, 184:7
**drawing** [4] - 42:9, 53:20, 181:25, 182:18
**drawn** [1] - 53:15
**dressed** [1] - 29:25
**drive** [2] - 58:9, 156:12
**Drive** [9] - 37:18, 38:12, 38:20, 56:9, 56:15, 56:16, 58:6, 58:16, 60:24
**driver** [7] - 65:13, 65:25, 66:2, 66:16, 66:22, 73:12, 74:17
**driver's** [2] - 66:12, 69:4
**drug** [1] - 142:24
**drunk** [1] - 97:11
**due** [2] - 151:22, 179:5
**duly** [8] - 36:3, 55:12, 62:13, 75:6, 85:19, 116:2, 124:21, 146:12
**duplex** [4] - 56:16, 56:24, 64:10, 64:13
**Duration** [1] - 113:16
**duration** [2] - 113:17, 114:1
**during** [36] - 15:20, 18:25, 19:10, 21:16, 28:16, 34:15, 38:23, 39:9, 39:10, 40:8, 57:9, 57:23, 59:13, 61:2, 91:19, 99:6, 117:15, 123:13, 123:15, 127:13, 127:22, 127:23, 128:1, 128:2, 128:18, 128:21, 129:11, 132:8, 132:13, 136:13, 139:15, 140:3, 140:11, 141:17, 151:8, 159:11
**duties** [8] - 55:24, 56:1, 63:7, 75:19, 116:25, 125:12, 146:24, 148:9
**DVD** [4] - 91:17, 92:12, 92:17, 93:5

**E**

**early** [5] - 18:7, 27:12, 117:23, 121:17, 154:13
**ease** [1] - 123:23
**easier** [1] - 152:14
**easy** [2] - 152:17, 153:1
**economic** [1] - 29:10

**Econovan** [1] - 71:2
**edge** [1] - 174:10
**editor** [1] - 90:23
**editors** [1] - 90:21
**education** [4] - 86:15, 86:20, 86:23, 149:16
**effect** [1] - 34:19
**efficiency** [1] - 103:4
**efficiently** [2] - 100:12, 100:13
**eight** [8] - 23:5, 25:8, 25:19, 26:2, 40:23, 122:14, 122:16, 122:18
**Eighth** [1] - 182:12
**either** [7] - 15:21, 15:22, 15:24, 73:5, 113:5, 153:5
**eject** [1] - 166:6
**ejection** [3] - 166:4, 166:5, 175:17
**elements** [1] - 20:13
**eliciting** [1] - 102:8
**eliminate** [1] - 182:7
**eliminated** [2] - 184:4, 184:8
**elimination** [1] - 185:1
**Elizabeth** [2] - 75:4, 115:24
**elsewhere** [2] - 58:3, 58:4
**embezzlement** [4] - 118:24, 118:25, 119:6, 122:11
**emerged** [1] - 30:2
**emergency** [2] - 30:8, 145:15
**emphasize** [1] - 26:8
**employed** [15] - 19:21, 36:11, 36:12, 36:16, 36:17, 55:19, 55:20, 62:24, 75:11, 86:2, 86:9, 116:19, 125:2, 146:17, 148:7
**employees** [1] - 125:14
**employment** [4] - 86:1, 86:8, 86:10, 148:20
**encounter** [2] - 64:5, 125:25
**end** [12] - 17:16, 31:10, 38:1, 53:19, 139:7, 152:12, 154:13, 159:18, 162:4, 170:2, 173:6, 179:8
**ended** [6] - 29:11, 39:20, 58:21, 59:14, 59:15, 60:1
**ends** [1] - 175:22
**enforcement** [26] - 18:25, 19:22, 28:12, 28:18, 28:22, 30:16, 32:18, 33:4, 57:2, 57:5, 61:2, 64:4, 75:14, 75:20, 77:24, 86:11, 95:16, 97:3, 103:19, 146:23, 147:1, 147:12, 150:8, 151:5, 151:10, 167:10
**Enforcement** [1] - 151:4
**enforcement's** [5] - 31:23, 95:18, 96:20, 96:25, 103:14
**engaged** [1] - 132:21
**engagement** [1] - 117:1

**England** [1] - 108:19
**English** [7] - 26:20, 27:3, 27:4, 27:6, 27:7, 27:8, 127:16
**ensure** [1] - 158:21
**enter** [1] - 126:22
**entered** [1] - 58:12
**entire** [3] - 29:14, 39:8, 131:20
**entirety** [2] - 128:20, 159:16
**entities** [1] - 77:22
**entitled** [2] - 33:1, 186:10
**entry** [2] - 60:19, 108:3
**envelope** [1] - 79:23
**environment** [2] - 29:18, 32:19
**equate** [1] - 108:25
**equipment** [1] - 64:18
**error** [2] - 182:18, 182:22
**especially** [3] - 52:25, 173:6, 185:2
**essence** [2] - 97:3, 103:9
**essential** [1] - 175:9
**essentially** [10] - 66:23, 163:23, 165:3, 166:12, 166:14, 167:9, 168:12, 170:12, 172:25, 176:1
**establish** [3] - 25:5, 26:12, 97:9
**established** [2] - 138:22, 143:21
**evening** [2] - 96:25, 179:14
**event** [2] - 104:9
**eventually** [2] - 60:1, 67:11
**evidence** [61] - 16:21, 17:9, 17:21, 19:14, 22:18, 22:24, 23:3, 24:5, 24:9, 24:11, 24:12, 24:15, 25:10, 25:17, 26:12, 26:15, 27:5, 27:10, 27:14, 28:6, 28:11, 29:20, 30:24, 31:9, 31:11, 31:14, 34:16, 41:17, 45:14, 45:16, 45:20, 46:3, 46:14, 49:1, 49:22, 82:22, 95:6, 96:9, 96:14, 98:7, 102:17, 102:20, 107:14, 110:22, 130:12, 134:23, 137:18, 138:24, 140:23, 142:3, 146:25, 153:23, 155:16, 156:8, 156:19, 160:23, 177:24, 178:10, 179:2, 181:20
**exactly** [8] - 23:12, 37:13, 52:10, 52:25, 111:5, 113:11, 114:12, 179:13
**examination** [15] - 50:3, 62:2, 68:16, 85:8, 91:19, 96:14, 100:10, 103:3, 104:23, 115:13, 122:7, 136:18, 156:3, 158:2, 177:2

**EXAMINATION** [13] - 36:6, 50:6, 55:15, 62:22, 68:18, 75:9, 85:22, 116:5, 122:9, 124:23, 136:22, 144:5, 146:15
**examinations** [1] - 147:2
**examine** [4] - 146:25, 147:4, 147:21, 151:13
**examined** [26] - 19:24, 36:4, 55:13, 62:14, 75:7, 85:20, 109:16, 116:3, 124:22, 146:13, 156:7, 156:10, 156:11, 156:16, 156:18, 156:21, 157:11, 157:13, 157:15, 157:17, 157:20, 157:22, 158:5, 158:6, 159:13, 172:20
**Examiner** [1] - 87:2
**Examiners** [1] - 87:3
**example** [1] - 90:19
**exceeding** [1] - 178:9
**Excel** [2] - 106:3, 109:10
**exceptions** [1] - 15:15
**exchange** [2] - 18:15, 103:12
**exclusion** [1] - 102:20
**excuse** [4] - 51:25, 93:19, 125:19, 128:16
**excused** [8] - 51:20, 62:5, 74:22, 85:11, 115:17, 124:10, 146:4, 177:13
**execute** [7] - 34:5, 38:3, 38:4, 38:21, 57:3, 95:17, 104:6
**executed** [3] - 37:17, 57:10, 98:14
**executing** [1] - 63:14
**execution** [6] - 19:7, 37:16, 37:20, 57:11, 57:24, 95:21
**exhausted** [3] - 180:1, 180:7, 180:16
**Exhibit** [98] - 41:21, 42:2, 42:3, 42:11, 42:21, 43:10, 43:21, 44:12, 45:24, 45:25, 46:9, 46:14, 46:15, 48:4, 48:13, 48:21, 49:1, 49:8, 49:9, 49:10, 49:18, 49:22, 49:23, 59:2, 60:3, 65:17, 65:18, 79:22, 82:2, 82:4, 82:18, 82:22, 91:12, 92:9, 92:22, 105:2, 105:20, 109:25, 110:22, 115:4, 121:23, 123:1, 129:24, 130:8, 130:12, 133:23, 133:24, 134:7, 134:19, 134:23, 135:5, 135:12, 135:18, 135:19, 135:25, 136:2, 137:5, 137:15, 137:16, 137:17, 137:18, 138:14, 138:24, 140:18, 140:19, 140:23, 140:24, 141:8, 141:24, 142:3,

143:15, 143:24, 145:1, 154:4, 156:15, 157:3, 157:6, 157:9, 160:4, 160:15, 160:19, 160:23, 161:3, 164:4, 166:16, 169:7, 171:25, 173:3, 174:1, 175:7, 177:15, 177:25, 178:12, 178:13, 178:19, 178:21, 178:24
**exhibit** [15] - 42:20, 60:10, 101:8, 114:8, 114:16, 137:14, 152:13, 153:16, 153:17, 159:24, 160:5, 160:13, 160:14, 161:5, 161:6
**exhibits** [6] - 52:6, 52:16, 53:5, 95:10, 153:13, 180:22
**Exhibits** [7] - 40:24, 41:3, 41:12, 41:17, 45:23, 107:13, 177:23
**EXIF** [1] - 109:19
**ExifTool** [4] - 109:20, 110:6, 111:4, 111:25
**exist** [1] - 77:13
**exists** [3] - 76:22, 95:22, 183:12
**exit** [2] - 66:21, 162:1
**exited** [4] - 52:2, 93:21, 152:2, 179:16
**expand** [1] - 103:4
**expect** [2] - 29:1, 180:17
**expected** [1] - 29:9
**expedition** [1] - 92:5
**expel** [2] - 148:4, 178:23
**expelled** [1] - 159:12
**experience** [5] - 29:15, 53:12, 112:13, 151:9, 156:6
**experiences** [2] - 28:17, 29:7
**expert** [1] - 15:18
**explain** [4] - 18:14, 18:16, 76:5, 83:11
**explained** [3] - 129:7, 131:3, 141:5
**explaining** [1] - 98:12
**explains** [1] - 129:4
**explanatory** [2] - 83:10, 111:20
**explosion** [2] - 161:25, 163:2
**explosive** [3] - 148:5, 159:12, 178:23
**Explosives** [3] - 19:22, 146:19, 149:5
**extended** [1] - 109:19
**extensive** [1] - 149:19
**extra** [1] - 37:7
**extracted** [2] - 92:21, 93:3
**extraneous** [1] - 185:11
**eye** [2] - 53:15, 166:13
**eyes** [2] - 52:10, 53:1

# F

**f'ing** [1] - 101:23
**face** [1] - 67:11
**Facetime** [2] - 101:17, 133:1
**facile** [1] - 184:1
**facility** [2] - 150:12, 151:4
**facing** [1] - 127:1
**fact** [18] - 20:10, 20:18, 21:6, 25:1, 25:3, 28:25, 31:6, 31:24, 32:5, 34:4, 34:17, 56:5, 69:2, 96:1, 96:4, 96:5, 98:12, 103:23
**facto** [1] - 97:8
**facts** [5] - 34:13, 34:15, 35:9, 102:15
**fair** [11] - 41:9, 44:3, 44:24, 66:18, 85:3, 88:18, 145:19, 160:15, 166:1, 167:12, 185:6
**fairly** [1] - 110:16
**fall** [2] - 117:10, 118:2
**false** [8] - 28:5, 32:8, 32:14, 33:5, 33:17, 35:1, 104:8, 104:10
**familiar** [3] - 78:6, 147:24, 149:7
**family** [5] - 28:25, 29:11, 29:14, 29:16, 64:10
**fancy** [1] - 20:9
**far** [3] - 112:14, 126:23, 151:8
**fatigues** [1] - 71:8
**feature** [7] - 76:7, 76:14, 76:16, 76:19, 76:20, 162:16, 175:13
**features** [5] - 148:1, 149:10, 149:15, 159:20, 161:9
**February** [32] - 15:1, 17:12, 18:8, 18:25, 20:11, 20:14, 20:20, 22:2, 22:21, 36:21, 37:9, 43:19, 47:19, 56:3, 57:2, 63:5, 63:12, 75:21, 75:23, 76:10, 80:15, 115:2, 125:10, 125:17, 125:19, 125:21, 125:25, 130:4, 134:6, 178:7, 179:1
**Federal** [1] - 151:3
**federal** [5] - 143:5, 147:1, 147:7, 147:11, 150:8
**feed** [1] - 165:5
**feet** [2] - 71:1, 71:2
**felon** [8] - 17:10, 17:15, 22:18, 23:15, 31:6, 32:10, 33:4, 33:18
**felonies** [1] - 88:16
**felony** [13] - 17:9, 20:15, 20:19, 20:21, 20:22, 21:24, 22:17, 23:22, 26:6, 26:7, 26:10, 26:13, 28:7
**felt** [2] - 29:16, 29:19

**female** [1] - 66:8
**fences** [1] - 29:10
**few** [5] - 17:20, 24:12, 94:14, 119:11, 161:10
**fewer** [1] - 99:5
**field** [8] - 63:10, 86:12, 86:15, 106:8, 107:24, 150:11, 150:13
**fifteen** [1] - 119:19
**figure** [1] - 152:14
**figured** [1] - 33:6
**file** [50] - 79:3, 79:15, 81:14, 81:15, 81:21, 82:9, 84:19, 85:1, 85:3, 89:14, 89:17, 89:21, 89:22, 90:1, 90:3, 90:6, 90:7, 92:16, 92:19, 92:20, 93:4, 93:5, 105:13, 105:24, 106:1, 106:7, 106:11, 106:17, 108:2, 108:3, 108:7, 108:8, 108:9, 108:10, 109:15, 110:8, 111:9, 111:23, 111:25, 112:16, 112:18, 112:21, 113:6, 114:14, 114:20, 114:21, 114:25, 115:4, 115:6, 156:12
**File** [3] - 111:9, 111:20, 112:19
**file's** [1] - 89:8
**files** [9] - 80:25, 81:8, 82:10, 89:10, 90:17, 90:18, 91:2, 109:18, 110:16
**fill** [4] - 27:15, 139:5, 139:21, 154:1
**filled** [2] - 131:11, 131:19
**filling** [1] - 46:17
**film** [1] - 151:1
**finally** [1] - 166:4
**fine** [6] - 15:23, 69:21, 103:24, 137:12, 140:16, 184:16
**finger** [4] - 138:19, 170:13, 171:17, 171:18
**finishes** [1] - 149:21
**fire** [4] - 95:10, 158:23, 159:3, 159:11
**firearm** [134] - 17:15, 17:17, 18:3, 20:2, 20:8, 21:24, 22:15, 23:15, 24:20, 24:22, 26:13, 28:1, 28:8, 28:14, 30:18, 30:20, 31:5, 31:25, 32:10, 33:5, 33:9, 33:18, 34:9, 34:23, 39:20, 39:25, 40:1, 40:2, 42:15, 43:15, 43:17, 43:24, 43:25, 44:14, 44:15, 44:21, 45:9, 45:10, 45:14, 46:4, 46:6, 47:2, 48:18, 49:2, 49:13, 57:18, 59:25, 60:6, 61:3, 95:24, 97:22, 132:6, 132:8, 132:11, 133:5, 147:24,

148:2, 148:11, 149:9, 156:11, 156:16, 156:18, 158:2, 158:5, 158:6, 158:7, 158:10, 158:14, 158:19, 159:4, 159:8, 159:9, 159:23, 160:13, 161:7, 161:22, 161:23, 161:24, 162:4, 162:8, 162:10, 162:15, 162:16, 162:18, 162:25, 163:10, 163:11, 163:12, 163:13, 163:20, 163:22, 163:24, 163:25, 164:4, 164:8, 164:13, 164:18, 164:19, 165:5, 165:13, 165:25, 166:7, 166:18, 167:8, 167:13, 167:19, 168:7, 168:8, 168:12, 168:15, 168:16, 169:3, 169:10, 169:15, 169:25, 170:24, 171:3, 171:8, 171:12, 172:2, 172:7, 172:19, 172:23, 173:7, 173:9, 174:4, 174:6, 176:9, 176:10, 176:11, 176:21, 178:21
**firearm's** [1] - 158:18
**Firearms** [4] - 19:22, 146:18, 147:18, 149:5
**firearms** [44] - 19:20, 19:22, 22:14, 29:24, 133:4, 146:23, 146:25, 147:4, 147:5, 147:9, 147:10, 147:13, 147:14, 147:16, 147:21, 148:8, 148:13, 148:15, 148:19, 148:24, 149:7, 149:12, 149:14, 149:20, 149:23, 149:24, 150:1, 150:6, 150:15, 150:17, 151:14, 157:13, 157:15, 157:17, 157:20, 157:22, 164:2, 165:17, 166:21, 168:24, 169:1, 171:2, 176:14
**firing** [2] - 161:15, 163:23
**first** [31] - 26:24, 28:11, 31:9, 31:15, 35:20, 36:3, 38:9, 38:16, 39:15, 55:12, 62:13, 65:4, 66:21, 66:24, 75:6, 85:19, 93:25, 101:14, 102:4, 116:2, 124:21, 126:16, 131:14, 144:25, 146:12, 149:11, 153:9, 159:15, 171:9, 180:13, 180:14
**fishing** [1] - 92:4
**fit** [7] - 164:21, 168:23, 169:1, 169:2, 169:3, 184:9, 184:10
**fits** [1] - 164:22
**fitting** [1] - 171:18
**five** [7] - 23:14, 45:4, 99:12,

113:2, 117:14, 122:15, 123:8
**flag** [1] - 94:2
**flat** [1] - 171:4
**flip** [2] - 133:10, 133:15
**floor** [2] - 60:22, 60:23
**floppy** [1] - 113:9
**fluctuates** [1] - 64:15
**focus** [3] - 34:12, 97:4, 142:4
**focused** [1] - 24:10
**focusing** [1] - 32:19
**folder** [1] - 82:5
**folders** [1] - 40:23
**folks** [4] - 61:20, 180:17, 184:8, 184:9
**follow** [5] - 25:16, 149:22, 152:18, 161:11, 173:6
**follower** [1] - 165:4
**following** [15] - 15:2, 16:4, 26:18, 31:21, 35:17, 52:2, 55:2, 73:18, 93:21, 94:20, 104:18, 152:2, 154:23, 155:24, 179:16
**follows** [12] - 36:4, 55:13, 62:14, 75:7, 85:20, 116:3, 124:22, 146:13, 175:25, 178:1, 178:13, 179:19
**font** [1] - 183:8
**fonts** [1] - 89:16
**forbade** [1] - 27:25
**Ford** [3] - 21:18, 21:20, 153:9
**foregoing** [1] - 186:9
**Forensic** [1] - 87:3
**forensic** [1] - 86:4
**Forensics** [1] - 86:7
**forensics** [2] - 86:13, 86:23
**forget** [1] - 185:19
**forgot** [3] - 47:13, 74:12, 184:24
**form** [34] - 22:10, 94:1, 103:6, 104:6, 129:2, 129:3, 129:21, 130:4, 130:5, 130:15, 131:5, 131:11, 138:16, 138:19, 138:25, 139:5, 139:22, 140:1, 141:1, 141:3, 141:17, 141:19, 143:17, 145:1, 145:3, 145:4, 145:6, 145:7, 179:21, 181:19, 184:23, 185:2, 185:4
**formal** [2] - 86:15, 137:11
**format** [1] - 109:19
**formative** [2] - 28:16, 29:3
**former** [1] - 25:13
**forms** [1] - 27:22
**forth** [5] - 101:18, 101:19, 101:20, 132:21, 133:2
**forward** [2] - 162:14, 163:2
**forwardmost** [1] - 162:9
**four** [5] - 19:15, 45:5, 49:3,

65:21, 117:6
**frame** [11] - 19:23, 89:24, 141:6, 148:5, 158:7, 159:17, 160:16, 172:16, 176:19
**frames** [2] - 19:25, 89:25
**FRANCIS** [2] - 55:11, 85:18
**Francis** [6] - 19:5, 38:13, 38:14, 55:6, 55:10, 85:17
**Frank** [3] - 15:18, 18:17, 85:14
**frequent** [3] - 30:8, 117:23, 120:14
**friend** [1] - 133:10
**front** [25] - 18:7, 31:22, 35:23, 38:12, 39:4, 39:11, 55:8, 60:21, 62:9, 66:4, 66:6, 73:22, 74:25, 75:1, 82:11, 99:4, 106:10, 115:22, 124:14, 146:7, 162:10, 162:23, 164:8, 171:5, 178:1
**full** [12] - 35:24, 55:8, 62:10, 64:17, 75:2, 85:16, 109:8, 109:9, 115:23, 124:18, 146:8, 181:10
**fully** [4] - 25:12, 26:20, 28:13, 150:5
**function** [3] - 158:19, 158:20, 159:1
**functionality** [4] - 158:17, 158:18, 158:25, 163:22
**functioned** [1] - 159:2
**functions** [1] - 158:22

**G**

**gap** [1] - 184:10
**gathering** [1] - 30:23
**gear** [1] - 30:1
**general** [7] - 60:17, 147:8, 148:12, 149:23, 150:6, 169:14, 172:5
**generally** [3] - 149:8, 152:5, 166:5
**generic** [1] - 86:10
**generized** [1] - 45:16
**genetic** [1] - 142:16
**gentlemen** [3] - 16:12, 51:23, 151:23
**GERMAINE** [1] - 116:1
**Germaine** [16] - 18:9, 18:12, 94:4, 95:8, 115:20, 115:21, 115:24, 116:7, 116:19, 118:17, 121:6, 121:21, 121:24, 122:11, 123:4
**gestured** [1] - 68:1
**giant** [1] - 183:22
**given** [6] - 23:24, 89:8, 89:19, 150:1, 150:3, 150:18
**glasses** [3] - 47:13, 47:25,

48:8
**goal** [1] - 166:12
**goggles** [1] - 29:25
**gold** [1] - 45:5
**GONYAW** [1] - 55:11
**Gonyaw** [12] - 19:5, 19:12, 33:22, 38:13, 38:14, 50:25, 55:6, 55:7, 55:10, 55:19, 59:5, 60:4
**Government** [39] - 16:8, 17:4, 22:25, 23:16, 24:10, 28:8, 28:10, 31:8, 31:10, 33:7, 35:20, 54:8, 55:4, 62:6, 62:7, 74:20, 74:23, 74:24, 85:12, 94:5, 95:21, 98:10, 102:8, 115:18, 124:11, 134:19, 140:8, 146:5, 146:6, 177:4, 177:6, 177:25, 178:12, 178:19, 178:21, 178:24, 179:6, 186:2
**government** [3] - 28:17, 29:4, 88:1
**Government's** [44] - 25:4, 41:17, 46:14, 49:1, 49:22, 52:6, 65:16, 65:18, 79:22, 82:2, 82:3, 82:18, 82:22, 95:14, 104:23, 105:20, 107:13, 109:25, 110:22, 121:23, 129:24, 130:8, 130:12, 133:24, 134:23, 135:5, 135:12, 135:18, 135:19, 135:25, 136:2, 138:24, 156:3, 156:15, 157:3, 157:6, 157:9, 160:4, 160:23, 161:3, 177:15, 177:23, 179:4, 181:13
**grant** [1] - 15:10
**great** [1] - 35:10
**green** [1] - 164:10
**Greenwich** [2] - 108:14, 108:18
**grew** [1] - 28:24
**Grey** [12] - 37:18, 38:11, 38:20, 56:9, 56:15, 56:16, 58:6, 58:9, 58:11, 58:16, 58:17, 60:24
**grip** [9] - 163:16, 164:22, 165:1, 166:2, 167:16, 175:24, 175:25, 176:2, 176:19
**group** [2] - 77:7
**guarantee** [1] - 54:15
**guard** [8] - 162:15, 162:16, 162:17, 162:18, 168:13, 169:17, 172:25, 173:1
**guess** [1] - 184:8
**guidance** [2] - 155:9, 180:23
**guide** [3] - 169:15, 170:2, 170:5

**guilty** [17] - 21:1, 21:4, 21:8, 21:13, 21:15, 21:21, 22:19, 23:1, 23:6, 23:7, 23:9, 23:16, 23:20, 25:22, 27:20, 31:7, 31:12
**Gun** [1] - 147:18
**gun** [25] - 17:7, 17:11, 17:14, 22:21, 22:23, 35:4, 96:6, 96:12, 96:17, 97:21, 106:23, 121:5, 121:7, 133:13, 133:15, 133:16, 133:17, 133:18, 150:7, 161:9, 161:13, 163:8
**guns** [7] - 22:16, 26:8, 26:11, 30:1, 71:15, 150:7
**Gunsmith** [1] - 148:21
**gunsmith** [5] - 19:21, 148:8, 148:10, 149:11, 150:4
**gunsmithing** [1] - 149:18
**gunsmiths** [2] - 148:22, 150:5
**guys** [1] - 65:1

**H**

**habit** [1] - 26:21
**half** [3] - 83:22, 170:12, 170:14
**half-moon** [1] - 170:14
**half-moon-shape** [1] - 170:12
**hammer** [2] - 165:23, 165:24
**hand** [14] - 35:24, 42:19, 49:9, 55:8, 60:10, 62:10, 75:2, 85:16, 96:17, 115:23, 123:25, 124:17, 146:8, 159:23
**handcuffed** [2] - 73:24, 74:1
**handgun** [17] - 17:12, 19:14, 39:10, 39:12, 39:13, 40:9, 40:12, 41:6, 42:5, 42:24, 43:7, 43:12, 47:1, 48:16, 59:22, 132:8, 163:7
**handing** [5] - 48:12, 82:3, 91:11, 92:8, 105:19
**handle** [1] - 43:7
**handled** [2] - 91:19, 91:21
**hands** [2] - 16:20, 67:10
**handwriting** [6] - 46:8, 130:18, 138:25, 143:14, 143:17, 184:23
**handwritten** [1] - 185:2
**happy** [7] - 94:10, 144:22, 153:2, 179:19, 180:13, 185:13, 185:24
**hard** [7] - 27:3, 54:19, 101:8, 102:1, 123:12, 123:13, 123:15
**harder** [1] - 69:24
**hardly** [1] - 97:12
**header** [2] - 83:3, 106:5
**headers** [5] - 82:9, 82:11,

82:14, 83:3, 107:19
**health** [3] - 54:16, 142:7, 142:21
**hear** [40] - 17:21, 18:9, 18:13, 18:17, 18:21, 19:3, 19:4, 19:7, 19:10, 19:15, 19:19, 20:4, 21:9, 21:17, 21:20, 21:22, 22:2, 22:5, 22:6, 22:10, 22:12, 22:13, 22:14, 22:24, 23:21, 24:19, 25:13, 25:15, 25:21, 25:24, 26:1, 26:5, 27:4, 27:7, 32:13, 53:13, 53:22, 65:3, 99:6, 182:3
**heard** [6] - 16:21, 22:24, 97:25, 103:17, 107:22, 136:13
**hearing** [6] - 21:15, 21:16, 31:21, 53:11, 140:15, 140:17
**hearings** [1] - 21:12
**heavy** [3] - 27:6, 29:13
**Height** [1] - 114:10
**height** [1] - 114:13
**held** [17] - 15:2, 16:4, 31:21, 35:17, 44:25, 52:3, 55:2, 75:15, 87:15, 93:22, 94:21, 104:18, 152:3, 154:23, 155:24, 165:4, 179:17
**helmet** [1] - 71:8
**helmets** [2] - 64:21, 71:10
**help** [6] - 19:6, 37:13, 144:17, 144:21, 145:8, 147:13
**helped** [5] - 37:5, 40:17, 59:11, 148:15, 148:17
**helpful** [1] - 184:2
**helping** [3] - 19:4, 19:8, 183:19
**hepatitis** [1] - 142:8
**hereby** [2] - 178:5, 178:17
**hexadecimal** [1] - 84:3
**hidden** [1] - 182:25
**high** [4] - 29:13, 66:18, 66:25, 150:25
**high-risk** [1] - 66:18, 66:25
**higher** [1] - 64:7
**himself** [7] - 25:10, 27:18, 27:23, 68:11, 97:19, 138:16, 139:5
**historical** [1] - 149:24
**history** [4] - 20:14, 35:3, 183:3, 184:14
**History** [1] - 145:18
**hit** [1] - 142:4
**hits** [1] - 101:24
**HIV** [1] - 142:14
**hobby** [1] - 151:2
**hold** [1] - 87:1
**holding** [12] - 17:12, 18:5, 22:4, 22:15, 35:4, 84:9,

84:10, 106:23, 128:8, 129:15, 132:11, 138:18
**holds** [2] - 164:13, 165:6
**hole** [1] - 173:15
**home** [3] - 34:22, 97:14, 101:15
**homicide** [1] - 88:16
**Honor** [133] - 15:5, 15:6, 15:8, 15:15, 16:6, 31:16, 35:14, 35:21, 40:21, 41:12, 41:15, 41:18, 45:21, 46:9, 47:24, 48:5, 48:21, 49:6, 49:17, 49:24, 50:1, 50:4, 51:18, 52:16, 53:8, 53:10, 53:15, 53:24, 54:8, 54:22, 54:25, 55:1, 55:5, 61:23, 61:25, 62:3, 68:8, 68:15, 68:17, 74:8, 74:12, 74:20, 79:19, 81:25, 82:17, 82:23, 85:5, 85:7, 85:9, 85:13, 91:9, 91:25, 92:6, 93:8, 94:2, 94:18, 95:2, 96:3, 96:19, 97:13, 98:1, 98:16, 100:6, 100:21, 101:4, 102:7, 103:1, 104:3, 104:17, 104:25, 105:4, 105:17, 107:5, 107:8, 107:11, 109:21, 109:24, 110:18, 110:23, 115:8, 115:10, 115:14, 115:16, 115:19, 118:16, 121:18, 122:3, 122:5, 122:8, 122:22, 124:8, 129:22, 130:7, 133:21, 134:18, 135:10, 135:16, 136:15, 136:19, 140:4, 140:6, 140:10, 141:23, 142:1, 144:3, 145:22, 145:24, 146:1, 146:3, 151:21, 153:6, 154:20, 155:2, 155:3, 156:13, 160:2, 160:18, 160:21, 176:23, 177:1, 177:3, 177:6, 177:14, 177:17, 177:21, 179:4, 180:7, 181:6, 181:24, 184:16, 185:22, 185:25, 186:3
**Honor's** [1] - 34:12
**hope** [1] - 152:11
**hoped** [2] - 29:17, 101:5
**Hospital** [1] - 145:15
**hospital** [13] - 30:6, 30:11, 31:1, 97:2, 97:16, 103:10, 103:11, 103:18, 103:22, 103:24, 104:13, 143:21, 145:14
**hour** [2] - 62:19, 89:1
**hourly** [1] - 88:24
**hours** [9] - 17:14, 18:8, 18:21, 22:3, 22:15, 22:23, 77:8,

108:21, 175:4
**house** [12] - 33:8, 34:8, 34:9, 38:6, 60:13, 61:3, 95:24, 95:25, 101:25, 102:1, 118:4, 120:4
**houses** [5] - 147:14, 161:14, 163:23, 163:24, 165:23
**housing** [10] - 165:13, 165:16, 165:17, 165:18, 165:20, 167:16, 173:18, 173:21, 176:19
**href** [1] - 83:20
**hum** [1] - 81:16
**Humvee** [1] - 71:4
**hundreds** [2] - 21:13, 157:21
**hundredth** [1] - 114:2
**hunter** [1] - 102:2
**hurt** [1] - 103:11
**Hyde** [1] - 116:24

**I**

**ID** [5] - 81:20, 84:23, 84:25, 85:3, 111:17
**id** [2] - 83:6, 83:7
**idea** [2] - 51:7, 184:6
**identification** [11] - 79:21, 91:12, 122:24, 135:19, 137:4, 141:7, 147:11, 149:12, 149:23, 150:16, 167:9
**identified** [3] - 107:6, 118:17, 127:8
**identifier** [2] - 83:24, 84:1
**identify** [4] - 67:23, 68:11, 98:21, 167:1
**ignores** [1] - 110:10
**ill** [1] - 97:2
**image** [19] - 39:16, 39:25, 41:25, 42:23, 77:2, 109:19, 114:12, 114:13, 159:18, 169:19, 170:15, 171:19, 172:13, 172:21, 173:10, 175:11, 175:14, 175:20, 175:25
**Image** [2] - 114:10
**images** [6] - 76:21, 157:17, 160:16, 161:22, 173:11, 176:8
**imagine** [1] - 171:18
**immigrated** [3] - 26:22, 29:7, 29:9
**impact** [1] - 98:3
**impartial** [1] - 30:22
**imperfect** [1] - 183:1
**implications** [1] - 97:3
**important** [9] - 23:23, 23:25, 24:15, 25:4, 25:17, 26:18, 54:17, 143:9, 144:10
**impression** [7] - 32:8, 32:14,

33:17, 35:1, 35:4, 104:8, 104:10
**imprisonment** [1] - 178:9
**inappropriate** [3] - 32:18, 32:22, 34:18
**Inc** [5] - 75:12, 75:25, 76:1, 77:22, 91:8
**incarceration** [1] - 122:15
**include** [7] - 63:8, 83:16, 125:12, 129:6, 142:8, 146:24, 148:9
**included** [2] - 80:25, 83:21
**includes** [1] - 145:16
**including** [1] - 87:1
**incorporated** [1] - 89:23
**increase** [1] - 111:1
**increased** [1] - 94:7
**indentations** [1] - 89:18
**indicate** [3] - 35:6, 111:4, 114:19
**indicated** [2] - 97:13, 183:16
**indication** [1] - 97:14
**indictment** [8] - 181:5, 182:4, 182:6, 182:8, 182:9, 182:11, 182:20, 182:22
**industry** [6] - 19:20, 147:5, 148:8, 148:16, 150:14
**inflammatory** [3] - 32:3, 101:13, 102:14
**information** [46] - 16:15, 16:18, 46:18, 46:24, 47:1, 47:8, 78:9, 78:20, 81:9, 81:10, 81:11, 81:22, 82:15, 83:4, 87:12, 89:18, 89:22, 89:24, 90:19, 91:2, 91:7, 92:16, 92:21, 93:3, 103:14, 106:6, 106:7, 110:11, 111:11, 112:19, 112:22, 113:22, 114:10, 114:17, 114:22, 142:7, 142:8, 143:3, 145:18, 152:19, 154:7, 184:6, 185:2, 185:6, 185:11
**Information** [1] - 86:7
**informed** [1] - 22:7
**initialed** [1] - 80:13
**initials** [4] - 91:22, 92:17, 105:7, 134:4
**injury** [1] - 183:4
**innocence** [1] - 24:6
**innocent** [1] - 24:8
**inpatient** [1] - 145:13
**inserted** [2] - 80:9, 164:23
**inside** [11] - 39:15, 39:16, 42:23, 43:13, 43:24, 45:14, 49:13, 65:2, 79:23, 162:17, 163:16
**insights** [1] - 21:14
**inspections** [1] - 148:16
**instance** [6] - 89:16, 89:17,

90:1, 90:13, 90:15, 90:16
**instances** [2] - 134:12, 134:15
**instead** [2] - 26:6, 30:11
**instruct** [2] - 17:18, 67:12
**instruction** [3] - 185:9, 185:14, 185:24
**instructions** [5] - 93:25, 154:15, 179:11, 179:21, 179:22
**integral** [1] - 169:25
**intelligently** [1] - 185:17
**intend** [1] - 177:15
**intended** [2] - 57:2, 57:5
**intent** [1] - 52:12
**intentionally** [1] - 99:22
**interact** [2] - 149:13, 175:15
**interaction** [2] - 73:22, 73:25
**interactions** [5] - 73:10, 73:15, 73:21, 90:10, 126:12
**interacts** [3] - 172:6, 172:16, 173:9
**interest** [1] - 60:11
**interested** [1] - 29:5
**interior** [3] - 41:5, 59:16, 60:17
**internal** [5] - 89:8, 149:2, 163:3, 163:5, 163:15
**International** [1] - 87:3
**interrogation** [1] - 97:4
**intersecting** [1] - 58:5
**interstate** [1] - 178:25
**interventionalist** [1] - 36:15
**interview** [49] - 22:6, 22:8, 22:12, 30:25, 95:9, 99:2, 99:7, 100:2, 103:2, 126:5, 126:10, 126:13, 126:15, 126:16, 126:18, 126:19, 126:21, 126:22, 127:11, 127:13, 127:19, 127:22, 127:23, 128:1, 128:2, 128:3, 128:7, 128:13, 128:16, 128:18, 128:21, 128:24, 130:21, 130:22, 132:10, 132:13, 132:14, 134:10, 134:16, 135:2, 136:14, 139:15, 140:3, 140:11, 141:18, 143:20
**interviewed** [4] - 22:5, 28:12, 132:5, 139:11
**interviewees** [1] - 131:19
**interviewing** [1] - 132:7
**intimidating** [5] - 29:22, 32:19, 32:23, 33:2, 35:12
**introduced** [2] - 98:10, 113:5
**introducing** [1] - 34:19
**inventory** [3] - 45:17, 148:14
**investigation** [15] - 32:2, 32:5, 38:9, 65:12, 65:14, 66:24, 103:13, 104:1,

104:11, 125:20, 125:23, 129:4, 130:20, 144:10, 145:8
**Investigations** [1] - 125:13
**investigators** [2] - 148:17, 150:14
**invoices** [1] - 148:18
**invoke** [1] - 15:8
**involve** [2] - 37:10, 64:14
**involved** [7] - 19:3, 37:8, 37:20, 38:16, 40:6, 64:14, 83:9
**involvement** [2] - 151:17, 156:7
**issue** [6] - 53:23, 62:18, 97:23, 98:4, 101:9, 153:24
**issued** [2] - 69:7, 71:18
**item** [5] - 40:14, 48:13, 148:5, 159:20, 165:18
**items** [4] - 24:12, 86:11, 88:18, 173:22
**itself** [9] - 20:5, 99:8, 101:8, 105:9, 110:10, 126:18, 126:22, 153:20, 168:14

**J**

**JACOBS** [1] - 36:2
**Jacobs** [29] - 19:3, 19:12, 35:22, 35:24, 36:1, 36:8, 41:23, 42:9, 42:12, 42:18, 42:22, 43:2, 43:10, 43:16, 43:23, 44:3, 44:13, 44:21, 45:25, 46:17, 47:7, 48:12, 49:2, 49:10, 59:12, 59:15, 59:20, 59:24, 60:6
**jail** [2] - 23:11, 31:3
**Jamaica** [8] - 27:2, 27:10, 28:15, 28:17, 28:19, 28:24, 29:2, 29:5
**Jamaican** [6] - 26:24, 26:25, 27:6, 28:21, 28:22
**JAMES** [1] - 124:20
**James** [3] - 22:6, 124:12, 124:19
**January** [1] - 91:24
**Jeep** [1] - 30:2
**Jennifer** [3] - 117:7, 117:9, 132:16
**Jennifer's** [2] - 120:2, 132:19
**jives** [1] - 152:13
**job** [4] - 47:10, 148:18, 149:3, 163:22
**Johanna** [1] - 186:13
**joining** [1] - 148:25
**Jonathan** [1] - 16:9
**Jones** [1] - 131:8
**Joseph** [1] - 85:17
**Jr** [1] - 85:17
**JR** [1] - 85:18

**Judge** [28] - 31:19, 31:22, 33:21, 52:11, 54:5, 94:10, 94:15, 95:13, 97:19, 98:24, 99:9, 99:16, 100:3, 100:13, 101:1, 101:5, 103:17, 104:1, 107:16, 115:12, 137:12, 155:15, 180:12, 180:23, 181:18, 184:3, 184:22, 186:2
**judge** [5] - 17:18, 17:19, 99:1, 99:3, 185:9
**July** [1] - 125:6
**jump** [1] - 183:15
**jumping** [1] - 183:6
**JUROR** [1] - 17:2
**Juror** [1] - 152:20
**jurors** [7] - 15:4, 54:24, 62:17, 104:16, 152:6, 152:20, 155:13
**jurors'** [1] - 182:24
**jury** [66] - 16:4, 16:11, 16:13, 17:6, 31:21, 41:19, 42:8, 42:16, 44:16, 47:12, 51:23, 51:25, 52:2, 55:2, 82:23, 93:19, 93:21, 93:25, 94:13, 94:21, 99:4, 104:18, 107:16, 121:2, 121:19, 129:6, 130:13, 134:24, 151:23, 152:2, 152:20, 152:22, 153:12, 153:21, 154:15, 154:24, 155:1, 155:16, 155:24, 158:5, 159:14, 160:24, 161:2, 161:11, 166:16, 167:1, 168:6, 169:7, 170:21, 171:24, 173:3, 174:1, 175:3, 175:6, 177:16, 177:18, 178:1, 179:11, 179:16, 179:20, 182:9, 182:11, 182:20, 184:6, 185:11, 185:17
**jury's** [5] - 99:6, 103:17, 179:8, 181:12, 182:23

**K**

**K-9** [1] - 72:5
**keep** [4] - 30:15, 54:20, 94:13, 115:22
**kept** [1] - 28:13
**kid** [1] - 28:19
**kids** [1] - 117:5
**killed** [1] - 101:24
**kilobytes** [1] - 111:21
**Kimberly** [1] - 61:14
**kind** [22] - 33:19, 45:5, 64:18, 64:24, 71:4, 87:1, 89:18, 99:13, 108:16, 151:14, 153:2, 159:25, 170:11, 170:14, 171:7, 173:8, 174:7, 175:13, 175:19,

176:1, 184:6, 184:9
**kitchen** [1] - 60:20
**knowing** [3] - 66:15, 97:23, 181:18
**knowingly** [1] - 185:17
**knowledge** [3] - 20:22, 169:4, 176:18
**known** [5] - 75:12, 75:25, 95:16, 108:15, 117:12

**L**

**label** [2] - 23:24, 52:9
**labeled** [2] - 81:12, 105:2
**labels** [1] - 23:22
**lack** [1] - 31:11
**ladies** [3] - 16:12, 51:23, 151:23
**lag** [1] - 100:18
**Lamoille** [4] - 116:9, 116:22, 118:19, 118:20
**language** [3] - 26:24, 27:1, 27:2
**laptop** [4] - 80:9, 138:6, 138:7, 138:8
**large** [2] - 30:2, 30:3
**laser** [21] - 48:17, 164:1, 164:3, 164:4, 164:9, 168:7, 168:10, 168:12, 168:16, 168:17, 169:3, 169:16, 170:10, 171:4, 172:5, 172:10, 172:12, 172:24, 172:25, 173:7, 174:19
**last** [7] - 44:8, 100:5, 102:22, 103:1, 153:11, 173:22, 180:2
**lasted** [1] - 126:11
**late** [2] - 175:3, 180:1
**law** [42] - 17:10, 17:18, 17:19, 18:8, 18:25, 28:12, 28:17, 28:22, 30:16, 31:23, 32:18, 33:4, 57:2, 57:5, 61:2, 64:4, 75:14, 75:20, 77:24, 86:11, 95:16, 95:17, 96:20, 96:25, 97:3, 97:9, 103:14, 103:19, 129:9, 132:22, 132:25, 143:6, 147:1, 147:7, 147:11, 150:8, 151:5, 151:10, 167:10, 181:5, 182:14, 182:21
**Law** [1] - 151:3
**lawyers** [1] - 23:21
**laymen's** [1] - 64:24
**layperson** [2] - 112:20, 112:21
**LCP** [14] - 18:6, 18:24, 19:11, 19:13, 158:6, 159:22, 163:15, 168:2, 168:4, 169:2, 173:13, 175:13, 176:10, 178:19

**lead** [1] - 31:11
**leading** [3] - 33:23, 35:5, 104:10
**learn** [13] - 25:6, 25:9, 26:9, 26:25, 28:16, 28:23, 29:23, 30:5, 30:10, 31:1, 38:14, 65:9, 132:22
**learned** [2] - 65:11, 132:6
**least** [7] - 29:24, 30:4, 72:25, 73:1, 102:22, 116:11, 181:3
**leave** [3] - 29:7, 48:3, 54:14
**leaving** [2] - 29:5, 58:12
**LEBLANC** [1] - 155:14
**left** [29] - 18:1, 57:1, 59:6, 65:11, 67:14, 105:1, 121:22, 123:25, 136:1, 144:25, 155:19, 157:5, 161:4, 167:17, 169:24, 170:15, 171:18, 171:21, 172:12, 172:13, 172:21, 173:23, 174:16, 175:14, 175:20, 176:3, 176:4, 176:6, 185:6
**left-hand** [1] - 123:25
**leg** [1] - 16:24
**legal** [2] - 147:24, 159:8
**length** [1] - 113:18
**lens** [3] - 89:23, 90:19, 91:2
**less** [6] - 99:5, 123:10, 123:11, 123:21, 183:6, 183:16
**letters** [4] - 84:3, 168:4, 184:10, 185:20
**letting** [1] - 184:8
**level** [2] - 86:19, 151:13
**library** [1] - 147:15
**lie** [1] - 101:19
**Lieutenant** [9] - 22:5, 22:7, 22:13, 100:15, 124:12, 136:3, 137:20, 144:7, 145:1
**lieutenant** [3] - 104:5, 125:8, 125:11
**life** [5] - 118:19, 120:2, 123:12, 123:14, 123:15
**light** [1] - 174:16
**lighting** [1] - 121:10
**likely** [1] - 153:25
**limited** [4] - 27:8, 35:3, 35:5, 98:6
**line** [6] - 106:3, 106:4, 106:6, 111:3, 182:1
**lines** [4] - 20:10, 20:12, 106:5, 114:19
**link** [2] - 78:25, 79:2
**linked** [1] - 108:5
**links** [2] - 108:2, 108:3
**list** [1] - 152:13
**listed** [7] - 33:25, 34:15, 47:8, 47:15, 47:18, 115:6, 145:19
**listen** [1] - 100:24

**listened** [1] - 98:22
**listening** [2] - 32:7, 34:25
**lists** [1] - 111:9
**lit** [1] - 121:9
**live** [4] - 140:9, 158:23, 159:3, 159:4
**live-fire** [1] - 158:23
**lived** [5] - 29:2, 29:12, 56:20, 116:10, 118:19
**living** [5] - 60:19, 60:24, 61:1, 118:2, 118:6
**loaded** [2] - 44:21, 166:7
**locals** [1] - 28:20
**locate** [1] - 61:3
**located** [11] - 38:18, 39:10, 39:14, 43:12, 43:17, 58:2, 58:5, 59:24, 116:23, 126:5, 132:9
**location** [4] - 58:16, 67:13, 158:10, 158:15
**lock** [1] - 173:16
**locker** [1] - 45:19
**locking** [1] - 173:15
**logged** [1] - 46:21
**logical** [2] - 93:6, 151:19
**logically** [1] - 93:7
**logo** [5] - 173:14, 173:19, 176:3, 176:4
**long-winded** [1] - 95:14
**longtime** [1] - 26:21
**look** [29] - 24:7, 40:25, 43:2, 48:8, 59:21, 79:22, 82:5, 106:8, 122:19, 123:4, 123:5, 123:22, 123:24, 139:24, 141:11, 148:1, 149:24, 154:16, 156:21, 159:19, 160:5, 170:11, 179:20, 180:22, 181:13, 181:14, 181:18, 183:25
**looked** [12] - 19:23, 26:2, 29:11, 43:4, 49:10, 92:22, 105:2, 106:15, 106:16, 106:17, 109:8, 161:7
**looking** [15] - 31:3, 40:9, 43:17, 46:25, 59:19, 88:18, 100:10, 105:13, 145:13, 171:8, 171:15, 173:5, 174:7, 183:21, 183:23
**looks** [6] - 71:4, 166:13, 168:15, 183:13, 184:23, 185:5
**lost** [1] - 182:16
**loudspeaker** [1] - 65:2
**Louis** [1] - 146:10
**lovemoneymake** [1] - 78:14
**lucid** [1] - 102:9
**lunch** [9] - 62:18, 62:19, 93:11, 93:18, 93:24, 94:20, 97:18, 112:2, 135:15

# M

**ma'am** [5] - 68:23, 70:7, 122:21, 123:9, 123:18
**machete** [8] - 31:25, 33:11, 33:25, 34:8, 34:19, 34:22, 57:21, 95:24
**machete's** [1] - 33:25
**machine** [2] - 150:7
**Madam** [1] - 144:24
**magazine** [15] - 44:15, 44:17, 44:25, 45:3, 164:12, 164:13, 164:15, 164:19, 165:2, 165:3, 165:11, 173:12, 173:15, 173:17, 174:22
**main** [2] - 173:18, 173:21
**maintain** [3] - 86:22, 147:13, 147:15
**maintaining** [1] - 148:14
**major** [1] - 154:13
**majority** [1] - 122:16
**Maker** [1] - 159:16
**male** [5] - 66:3, 66:11, 73:12, 74:17, 106:21
**malintent** [2] - 53:22
**man** [2] - 26:23, 35:3
**mandatory** [1] - 15:10
**manipulate** [1] - 110:12
**manner** [3] - 32:9, 65:1, 102:9
**manual** [1] - 158:21
**manufacture** [3] - 166:21, 166:25, 167:21
**manufactured** [6] - 149:7, 149:20, 158:11, 176:14, 176:19, 178:24
**manufacturer** [4] - 158:8, 166:24, 167:15, 167:19
**manufacturers** [2] - 166:20, 167:10
**manufacturing** [1] - 149:20
**March** [4] - 80:24, 81:1, 81:3, 186:13
**marital** [1] - 132:14
**Mark** [7] - 19:3, 19:12, 35:21, 36:1, 59:12, 59:15, 59:20
**MARK** [1] - 36:2
**mark** [2] - 122:25, 167:9
**marked** [25] - 30:3, 40:3, 48:12, 51:5, 72:9, 72:12, 79:21, 82:3, 91:11, 92:8, 105:19, 122:23, 129:24, 133:24, 135:19, 137:4, 153:13, 153:16, 153:19, 158:14, 160:4, 163:18, 167:16, 175:21, 177:14
**market** [1] - 176:20
**marking** [1] - 141:7
**markings** [5] - 166:18, 166:19, 166:20, 166:22,

166:23
**maroon** [1] - 127:6
**married** [5] - 117:9, 117:13, 117:25, 132:16, 132:17
**marshals** [2] - 54:13, 54:19
**marshals'** [1] - 94:11
**Martin** [173] - 16:8, 17:6, 17:9, 17:14, 17:17, 18:3, 18:5, 18:7, 18:11, 18:12, 18:22, 19:1, 19:9, 19:15, 20:15, 20:19, 20:21, 21:12, 21:20, 21:21, 22:4, 22:7, 22:8, 22:10, 22:13, 22:15, 22:17, 23:1, 23:6, 23:19, 24:1, 24:7, 24:14, 24:19, 24:20, 24:21, 24:23, 25:2, 25:5, 25:7, 25:9, 25:11, 25:25, 26:2, 26:3, 26:6, 26:12, 26:19, 26:21, 26:24, 27:4, 27:5, 27:12, 27:14, 27:18, 27:22, 27:25, 28:4, 28:7, 28:8, 28:11, 28:16, 28:19, 28:24, 29:2, 29:4, 29:9, 29:17, 29:18, 30:5, 30:7, 30:9, 30:10, 30:12, 30:15, 30:20, 30:22, 30:24, 31:2, 31:5, 31:12, 31:24, 33:9, 34:10, 35:19, 50:12, 54:14, 56:20, 57:5, 61:14, 61:15, 63:21, 65:15, 66:13, 67:5, 67:18, 67:21, 68:10, 68:14, 68:24, 73:9, 94:23, 96:6, 96:8, 96:16, 97:19, 98:21, 99:6, 103:6, 103:15, 103:18, 104:21, 117:11, 117:16, 118:10, 120:10, 120:22, 121:3, 125:24, 126:1, 126:5, 126:7, 126:9, 126:12, 126:21, 126:24, 127:3, 127:5, 127:15, 128:8, 128:15, 128:19, 128:21, 128:25, 129:12, 129:19, 130:24, 131:21, 132:5, 132:7, 132:9, 132:10, 132:14, 132:16, 132:19, 132:24, 133:3, 133:7, 133:13, 134:11, 135:13, 135:23, 136:5, 136:6, 136:11, 136:25, 138:15, 139:13, 139:21, 141:20, 142:6, 144:11, 144:13, 154:9, 156:2, 178:3, 178:7, 178:15, 185:4, 185:16
**Martin's** [37] - 19:6, 20:13, 20:25, 21:5, 21:14, 21:17, 21:23, 22:1, 23:25, 24:13, 25:14, 26:15, 27:11, 29:21, 32:19, 32:24, 95:14, 96:23, 97:4, 98:11, 98:22, 103:9,

103:20, 118:7, 127:10, 127:18, 127:21, 127:25, 130:18, 131:6, 131:12, 131:24, 132:22, 143:17, 144:7, 152:8
**Martinsburg** [1] - 158:4
**Massachusetts** [1] - 87:15
**Massé** [1] - 186:13
**master's** [1] - 86:19
**match** [5] - 79:14, 79:17, 82:11, 106:13, 173:7
**matches** [1] - 172:17
**material** [2] - 96:1, 96:4
**materials** [3] - 78:18, 80:21, 84:19
**matter** [3] - 16:6, 16:18, 186:10
**mattered** [2] - 23:7, 23:8
**matters** [2] - 87:24, 88:10
**MATTHEW** [1] - 62:12
**Matthew** [3] - 19:7, 62:7, 62:11
**maximum** [5] - 20:16, 20:23, 21:3, 21:7, 22:19
**Mayodan** [2] - 158:16, 167:25
**mean** [4] - 66:23, 70:24, 112:20, 113:10
**Mean** [2] - 108:14, 108:18
**meaning** [5] - 20:11, 20:15, 20:18, 37:2, 39:17
**means** [2] - 24:7, 112:21
**meant** [2] - 27:19, 28:23
**meantime** [1] - 23:2
**mechanically** [1] - 93:2
**mechanism** [1] - 163:23
**media** [14] - 81:21, 83:25, 84:23, 84:25, 85:3, 89:14, 89:21, 90:18, 91:2, 110:8, 111:17, 113:12
**Media** [3] - 114:4, 138:2
**media_id** [4] - 83:23, 84:18, 106:8, 107:24
**medical** [13] - 30:14, 97:15, 103:6, 103:15, 103:22, 139:21, 140:7, 140:25, 141:5, 144:13, 145:7, 183:2, 184:14
**Medical** [2] - 145:3, 145:14
**medically** [1] - 103:11
**meet** [1] - 172:12
**meets** [2] - 171:21, 175:12
**megapixels** [1] - 114:18
**Mellen** [1] - 50:22
**members** [4] - 17:6, 64:16, 71:9, 71:12
**memories** [1] - 29:5
**memory** [4] - 26:5, 113:12, 123:19, 182:16
**mental** [5] - 127:19, 127:22, 127:23, 127:24, 142:21

**mention** [2] - 17:20, 59:20
**mentioned** [15] - 18:4, 30:7, 40:20, 63:22, 70:5, 70:21, 83:2, 86:24, 131:11, 131:24, 159:3, 159:13, 163:7, 166:8, 167:21
**message** [9] - 83:9, 83:13, 83:14, 83:16, 84:6, 84:9, 84:11, 84:17
**messages** [6] - 76:7, 77:2, 77:6, 77:7, 81:22, 120:22
**Messages** [1] - 82:9
**messaging** [3] - 18:15, 76:1, 76:4
**messed** [1] - 101:10
**met** [5] - 21:20, 31:10, 38:1, 38:12, 150:15
**metadata** [19] - 89:6, 89:7, 89:9, 89:16, 89:19, 90:2, 90:5, 90:6, 90:9, 90:14, 90:16, 90:18, 90:20, 90:25, 109:14, 109:18, 110:9, 111:25, 114:24
**mic** [1] - 36:10
**Michelle** [1] - 16:10
**microphone** [1] - 116:13
**midafternoon** [1] - 151:22
**middle** [8] - 130:23, 145:10, 154:17, 162:6, 170:5, 175:16, 175:17, 175:22
**midmorning** [1] - 51:21
**might** [27] - 25:19, 34:23, 59:3, 64:4, 64:5, 67:6, 67:7, 83:10, 88:17, 89:13, 97:21, 99:23, 100:12, 100:16, 100:17, 142:4, 142:16, 142:18, 155:5, 155:15, 157:7, 161:9, 165:18, 180:1, 181:20, 183:6, 184:10
**mile** [1] - 97:12
**military** [2] - 30:2, 108:14
**milliseconds** [1] - 170:19
**mind** [4] - 27:20, 29:19, 30:15, 152:11
**minimum** [1] - 86:14
**minor** [1] - 88:15
**minute** [4] - 26:4, 91:14, 138:1, 180:2
**minutes** [15] - 51:22, 54:11, 94:14, 109:3, 109:4, 109:5, 115:5, 126:11, 128:3, 128:7, 128:16, 128:17, 151:25, 179:20
**Miranda** [8] - 22:10, 129:2, 129:3, 129:20, 130:3, 130:5, 131:10, 131:18
**misdemeanor** [3] - 23:22, 26:10, 27:21
**misimpression** [1] - 32:12

**misleading** [2] - 23:23
**missed** [2] - 101:1, 157:7
**missing** [2] - 181:12, 184:7
**mistake** [1] - 123:13
**mixed** [1] - 153:2
**moaning** [1] - 128:4
**Model** [4] - 158:6, 159:22, 176:10, 178:19
**model** [5] - 165:25, 166:24, 168:1, 168:2
**modification** [2] - 111:23, 112:10
**modified** [1] - 90:8
**Modify** [4] - 112:23, 113:3, 113:23, 114:4
**modify** [1] - 113:24
**modifying** [1] - 90:15
**mom** [5] - 101:16, 101:19, 101:20
**moment** [17] - 49:24, 53:8, 61:23, 68:8, 74:8, 85:5, 109:21, 115:8, 122:3, 122:12, 123:5, 136:15, 136:19, 140:4, 144:3, 145:22, 176:23
**money** [2] - 119:11, 119:12
**month** [2] - 31:1, 88:12
**months** [3] - 122:14, 122:17, 122:18
**moon** [2] - 170:12, 170:14
**morning** [23] - 16:12, 18:8, 36:8, 36:9, 50:8, 50:9, 55:17, 55:18, 68:20, 68:21, 85:15, 85:24, 85:25, 93:14, 109:3, 115:2, 121:4, 121:17, 152:6, 152:9, 152:10, 153:10, 179:5
**most** [6] - 75:25, 87:14, 118:19, 153:25, 166:11, 179:21
**mostly** [1] - 120:13
**mother** [6] - 18:8, 97:9, 117:3, 132:19, 132:22, 132:25
**mother-in-law** [4] - 18:8, 97:9, 132:22, 132:25
**motions** [1] - 99:17
**motive** [1] - 97:21
**motor** [2] - 38:17, 38:18
**move** [21] - 41:12, 46:9, 48:21, 49:17, 60:7, 82:17, 93:1, 107:8, 110:18, 113:20, 130:7, 134:18, 140:19, 141:23, 143:1, 143:12, 156:7, 160:18, 173:25, 175:1, 175:4
**moved** [4] - 29:17, 91:1, 115:10, 120:4
**movement** [1] - 91:4
**moves** [1] - 163:1
**movie** [6] - 89:22, 90:1, 92:19,

92:20, 109:18, 114:13
**Movie** [1] - 159:16
**moving** [4] - 93:13, 100:12, 152:10, 153:6
**MP4** [1] - 112:19
**MR** [148] - 15:5, 15:8, 15:15, 15:18, 31:16, 31:19, 31:22, 33:21, 34:4, 35:14, 35:16, 35:21, 36:7, 40:21, 41:12, 41:18, 41:21, 41:23, 42:2, 42:11, 42:18, 42:25, 43:8, 43:14, 43:21, 44:1, 44:12, 45:21, 45:23, 46:9, 46:15, 46:17, 47:5, 47:21, 48:2, 48:21, 49:2, 49:6, 49:8, 49:17, 49:23, 50:1, 51:18, 52:11, 52:16, 52:22, 53:4, 53:24, 54:2, 54:5, 54:8, 54:25, 55:5, 55:16, 60:3, 60:9, 61:23, 61:25, 85:13, 85:23, 91:9, 91:11, 91:13, 91:25, 92:3, 93:7, 94:2, 94:10, 94:15, 95:2, 95:13, 96:3, 96:8, 96:19, 96:22, 97:13, 97:19, 98:16, 98:20, 98:24, 99:1, 99:16, 99:19, 100:3, 100:6, 100:12, 100:15, 101:1, 101:4, 103:1, 103:25, 104:17, 104:25, 105:1, 105:4, 105:17, 105:19, 107:5, 107:8, 107:15, 107:18, 109:21, 109:24, 110:18, 110:23, 110:25, 111:2, 113:20, 114:15, 115:3, 115:8, 115:10, 115:19, 116:6, 118:16, 121:18, 121:24, 122:3, 122:5, 124:8, 137:11, 140:4, 140:10, 144:24, 153:6, 153:22, 154:3, 155:3, 155:8, 155:15, 177:6, 177:9, 177:14, 177:25, 180:12, 180:16, 180:23, 181:2, 181:9, 181:15, 181:17, 181:24, 183:11, 184:3, 184:18, 184:22, 185:25, 186:2
**MS** [169] - 15:6, 15:22, 16:1, 17:6, 23:5, 32:17, 34:11, 41:15, 46:12, 48:24, 49:20, 50:4, 50:7, 51:16, 53:14, 54:9, 54:22, 55:1, 62:3, 62:7, 62:23, 65:16, 67:25, 68:8, 68:15, 68:17, 68:19, 73:16, 73:19, 74:5, 74:8, 74:10, 74:12, 74:16, 74:19, 74:20, 74:24, 75:10, 79:19, 81:25, 82:2, 82:17, 82:20, 82:23, 82:25, 83:2, 83:22,

85:5, 85:7, 85:9, 94:18, 98:1, 100:21, 100:25, 102:4, 102:7, 102:11, 102:22, 104:3, 104:14, 107:11, 110:20, 115:14, 122:8, 122:10, 122:22, 122:25, 124:12, 124:24, 127:7, 129:22, 130:7, 130:10, 130:13, 130:15, 132:2, 133:21, 134:18, 134:21, 134:24, 135:1, 135:3, 135:8, 135:10, 135:13, 135:16, 135:24, 136:3, 136:15, 136:17, 136:19, 136:23, 137:9, 137:15, 137:19, 137:20, 137:21, 137:24, 138:6, 138:8, 138:15, 140:6, 140:19, 140:25, 141:9, 141:23, 142:1, 142:6, 143:24, 144:1, 144:3, 144:6, 144:18, 144:21, 145:22, 145:24, 146:1, 146:6, 146:16, 151:21, 152:24, 154:20, 155:2, 155:21, 156:5, 156:13, 157:1, 157:3, 157:7, 157:11, 160:2, 160:18, 160:21, 160:24, 161:1, 161:21, 162:5, 162:22, 163:19, 164:7, 164:17, 164:25, 165:10, 166:15, 168:3, 169:6, 170:20, 171:11, 171:20, 173:2, 173:22, 174:11, 175:1, 175:21, 176:5, 176:23, 176:25, 177:3, 177:21, 180:7, 180:9, 182:15, 183:5, 183:10, 183:13, 183:19, 184:16, 185:22, 186:3
**multipage** [1] - 160:5
**multiple** [5] - 52:17, 148:23, 149:1, 150:6, 167:16
**murder** [2] - 32:6, 34:25
**muzzle** [10] - 162:8, 162:9, 162:11, 162:13, 162:14, 169:15, 171:3, 172:6, 173:6, 175:12

## N

**nail** [1] - 179:21
**Name** [1] - 111:9
**name** [33] - 35:24, 46:8, 55:8, 62:10, 68:13, 73:23, 75:2, 78:13, 85:1, 85:3, 85:16, 92:16, 105:13, 106:11, 108:7, 108:8, 108:9, 111:9, 115:4, 115:6, 115:23, 118:8, 124:18, 130:18,

130:21, 132:22, 133:10, 133:11, 143:18, 146:8, 181:10, 182:2, 182:17
**namely** [1] - 98:8
**names** [1] - 81:21
**national** [1] - 147:13
**National** [2] - 87:14, 147:18
**nature** [5] - 32:3, 52:19, 64:22, 94:8, 96:20
**near** [4] - 18:23, 58:4, 123:24, 126:24
**necessarily** [1] - 182:19
**need** [17] - 54:6, 92:5, 94:3, 95:7, 95:9, 95:10, 96:7, 97:8, 99:23, 103:15, 136:19, 138:4, 144:19, 152:16, 153:24, 179:11, 180:20
**needed** [5] - 30:11, 37:7, 47:25, 138:10, 145:17
**needs** [4] - 54:14, 148:13, 148:18, 183:2
**neglected** [1] - 140:14
**neighbor** [1] - 26:3
**neighborhood** [2] - 29:12, 73:3
**neutral** [1] - 34:14
**Newton** [3] - 21:10, 153:7
**next** [18] - 38:10, 43:8, 55:4, 62:6, 74:23, 85:12, 94:4, 113:21, 114:15, 115:18, 124:11, 131:2, 143:12, 146:5, 165:5, 166:7, 177:5, 179:4
**night** [1] - 121:4
**nine** [3] - 71:1, 115:5, 128:16
**ninety** [1] - 78:2
**nobody** [1] - 74:11
**nomenclature** [2] - 149:12, 149:24
**none** [1] - 156:25
**normal** [3] - 67:1, 79:16, 113:3
**North** [2] - 158:16, 167:25
**notable** [1] - 30:24
**notation** [1] - 80:11
**notes** [2] - 45:15, 46:7
**nothing** [5] - 24:23, 31:5, 67:20, 74:20, 101:13
**notice** [1] - 156:24
**noting** [1] - 34:11
**notoriously** [1] - 29:12
**number** [25] - 16:7, 21:11, 43:25, 44:9, 46:24, 47:2, 47:8, 48:18, 49:15, 86:18, 87:19, 89:25, 106:4, 108:20, 130:20, 131:7, 163:17, 166:24, 167:3, 167:4, 167:5, 167:8, 167:9, 167:12, 178:20

**Number** [1] - 111:4
**numbers** [3] - 56:24, 64:15, 84:3

---

# O

**o'clock** [4] - 93:12, 109:3, 109:4, 109:5
**oath** [1] - 104:22
**obeyed** [1] - 69:9
**objected** [1] - 99:11
**objection** [27] - 34:11, 41:14, 46:11, 46:12, 48:23, 48:24, 49:19, 49:20, 53:11, 82:19, 82:20, 102:4, 102:6, 102:21, 107:10, 110:20, 130:9, 130:10, 134:20, 134:21, 137:16, 140:9, 140:21, 141:25, 160:20, 160:21, 177:19
**objections** [2] - 15:21, 15:22
**objective** [1] - 30:23
**observations** [1] - 169:11
**observe** [3] - 59:24, 65:22, 65:25
**observed** [1] - 117:18
**obstacles** [1] - 67:13
**obtain** [2] - 58:25, 92:20
**obtained** [7] - 19:5, 56:8, 59:9, 103:22, 110:5, 139:10, 156:19
**obviously** [2] - 34:16, 181:12
**occupants** [3] - 58:11, 65:20, 65:23
**occur** [1] - 63:16
**occurred** [2] - 67:16, 140:11
**October** [1] - 132:17
**odd** [1] - 154:17
**offense** [10] - 20:13, 21:1, 21:4, 21:7, 21:21, 52:19, 154:7, 181:21, 182:2, 184:24
**Offense** [1] - 52:9
**offering** [1] - 104:4
**Office** [2] - 88:3, 88:8
**office** [3] - 156:11, 158:4, 180:24
**officer** [13] - 19:23, 21:18, 25:15, 26:1, 26:17, 30:4, 36:25, 38:13, 50:18, 69:2, 86:11, 103:20, 146:23
**Officer** [3] - 50:22, 59:24, 60:5
**officers** [18] - 29:23, 29:25, 30:10, 30:13, 30:22, 34:17, 37:7, 38:2, 40:18, 50:21, 51:3, 51:10, 60:15, 70:8, 70:13, 71:22, 71:25, 72:18
**offices** [1] - 150:11
**official** [1] - 185:15

**officials** [1] - 28:18
**offset** [1] - 108:20
**often** [4] - 35:10, 87:20, 108:17, 110:15
**old** [3] - 29:2, 113:9
**old-school** [1] - 113:9
**omitted** [2] - 181:19, 184:24
**on-site** [1] - 72:5
**on-the-job** [1] - 149:3
**once** [5] - 15:12, 79:1, 101:3, 161:25, 163:1
**one** [55] - 15:16, 20:17, 20:24, 22:20, 23:7, 23:17, 23:18, 24:2, 25:4, 25:6, 30:4, 31:11, 35:9, 37:10, 39:10, 40:8, 50:20, 51:8, 52:4, 53:24, 56:20, 70:2, 71:3, 72:16, 72:23, 72:25, 73:1, 77:5, 83:4, 83:5, 87:1, 90:13, 92:14, 92:19, 95:15, 95:19, 99:17, 103:1, 103:5, 114:2, 117:7, 120:24, 144:3, 152:15, 153:17, 163:11, 168:17, 169:1, 169:22, 176:15, 178:9, 183:16
**one-to-one** [1] - 77:5
**ones** [1] - 113:24
**ongoing** [1] - 125:20
**open** [24] - 15:2, 16:4, 35:17, 52:3, 55:2, 77:1, 79:22, 91:14, 93:22, 94:21, 100:10, 104:18, 121:23, 135:5, 135:12, 136:2, 138:14, 140:24, 152:3, 154:24, 155:24, 157:6, 157:9, 179:17
**opened** [7] - 33:3, 33:17, 35:5, 52:21, 97:24, 98:15, 121:4
**opening** [8] - 17:3, 23:4, 24:10, 34:15, 34:16, 84:8, 94:6, 96:11
**operate** [2] - 110:7, 147:17
**operated** [3] - 59:7, 75:23, 159:11
**operating** [3] - 90:3, 90:9, 112:3
**operation** [4] - 147:11, 149:15, 150:6, 150:14
**operations** [4] - 63:10, 75:14, 148:16, 163:3
**Ophardt** [5] - 16:9, 22:25, 94:24, 140:8, 180:11
**OPHARDT** [148] - 15:5, 15:8, 15:15, 15:18, 31:16, 31:19, 31:22, 33:21, 34:4, 35:14, 35:16, 35:21, 36:7, 40:21, 41:12, 41:18, 41:21, 41:23, 42:2, 42:11, 42:18, 42:25,

43:8, 43:14, 43:21, 44:1, 44:12, 45:21, 45:23, 46:9, 46:15, 46:17, 47:5, 47:21, 48:2, 48:21, 49:2, 49:6, 49:8, 49:17, 49:23, 50:1, 51:18, 52:11, 52:16, 52:22, 53:4, 53:24, 54:2, 54:5, 54:8, 54:25, 55:5, 55:16, 60:3, 60:9, 61:23, 61:25, 85:13, 85:23, 91:9, 91:11, 91:13, 91:25, 92:3, 93:7, 94:2, 94:10, 94:15, 95:2, 95:13, 96:3, 96:8, 96:19, 96:22, 97:13, 97:19, 98:16, 98:20, 98:24, 99:1, 99:16, 99:19, 100:3, 100:6, 100:12, 100:15, 101:1, 101:4, 103:1, 103:25, 104:17, 104:25, 105:1, 105:4, 105:17, 105:19, 107:5, 107:8, 107:15, 107:18, 109:21, 109:24, 110:18, 110:23, 110:25, 111:2, 113:20, 114:15, 115:3, 115:8, 115:10, 115:19, 116:6, 118:16, 121:18, 121:24, 122:3, 122:5, 124:8, 137:11, 140:4, 140:10, 144:24, 153:6, 153:22, 154:3, 155:3, 155:8, 155:15, 177:6, 177:9, 177:14, 177:25, 180:12, 180:16, 180:23, 181:2, 181:9, 181:15, 181:17, 181:24, 183:11, 184:3, 184:18, 184:22, 185:25, 186:2
**opine** [1] - 153:24
**opinion** [1] - 176:9
**opportunities** [1] - 151:9
**opportunity** [4] - 29:10, 65:22, 117:15, 129:9
**opposed** [2] - 104:9, 152:15
**OR** [1] - 145:16
**order** [2] - 23:15, 96:18
**ordered** [2] - 119:7, 185:10
**ordering** [1] - 148:14
**original** [2] - 54:18, 87:7
**originally** [2] - 97:20, 151:1
**outcome** [1] - 185:7
**outline** [1] - 171:13
**outlined** [1] - 34:1
**outside** [9] - 15:11, 16:15, 37:11, 76:22, 106:11, 129:14, 152:19, 178:24, 179:10
**outsiders** [1] - 29:16
**outsized** [1] - 35:2
**overall** [6] - 56:17, 169:14, 170:3, 172:5, 173:5, 174:6

**overkill** [1] - 32:10
**oversee** [2] - 63:9, 125:13
**own** [3] - 53:12, 93:24, 97:7
**owner** [1] - 58:22
**ownership** [2] - 17:18, 17:22
**owning** [1] - 17:23

## P

**page** [40] - 101:12, 102:3, 114:15, 132:3, 143:12, 143:14, 145:1, 145:10, 153:19, 160:5, 161:1, 161:2, 161:19, 163:14, 165:12, 166:15, 166:16, 168:5, 168:6, 169:6, 169:7, 169:13, 170:16, 170:20, 171:23, 171:24, 173:2, 173:3, 173:24, 173:25, 174:1, 174:5, 174:24, 175:1, 175:6, 175:22, 176:6, 183:7, 183:15
**pages** [4] - 21:6, 141:12, 160:8, 160:15
**paper** [1] - 99:14
**paperwork** [9] - 21:22, 21:25, 27:15, 27:17, 27:18, 52:17, 53:5, 126:9
**paragraph** [2] - 89:17, 101:14
**parallel** [1] - 182:18
**parish** [1] - 28:24
**Park** [1] - 116:24
**parked** [1] - 65:7
**part** [34] - 29:4, 38:8, 39:3, 40:4, 41:4, 41:25, 50:10, 56:8, 56:16, 64:1, 64:13, 68:22, 77:3, 85:3, 96:25, 103:6, 105:24, 108:4, 119:3, 126:4, 140:17, 144:25, 145:10, 149:13, 157:8, 161:14, 163:3, 163:11, 164:13, 166:2, 167:24, 171:12, 171:21, 172:22
**participate** [4] - 22:8, 37:15, 39:1, 40:4
**participation** [1] - 179:9
**particular** [12] - 21:14, 33:21, 37:24, 45:15, 78:10, 81:23, 104:12, 120:24, 130:20, 145:9, 168:23, 182:5
**particularly** [1] - 27:16
**parties** [9] - 20:10, 20:11, 20:17, 20:18, 153:23, 178:6, 178:11, 178:18, 179:3
**parties'** [1] - 99:17
**parts** [2] - 143:9, 169:19
**pass** [4] - 50:1, 61:25, 68:15, 85:7

**passed** [1] - 58:15
**passenger** [10] - 39:4, 39:6, 39:8, 42:4, 59:22, 66:4, 66:7, 66:9
**passenger's** [1] - 39:11
**past** [2] - 153:15, 184:12
**Patch** [1] - 117:7
**patience** [1] - 136:24
**Patois** [3] - 26:25, 27:1
**patrol** [3] - 55:25, 56:2, 63:9
**pattern** [1] - 176:1
**pause** [2] - 93:10, 174:11
**pay** [1] - 24:16
**paying** [4] - 52:8, 119:9, 119:10, 119:20
**PD** [5] - 63:14, 73:23, 74:2, 82:11, 112:17
**Peggy** [4] - 18:9, 115:20, 115:24
**PEGGY** [1] - 116:1
**penalty** [2] - 21:4, 21:7
**pending** [1] - 155:18
**Pennsylvania** [7] - 20:19, 21:2, 24:13, 25:2, 26:10, 30:17, 148:21
**people** [18] - 19:15, 26:7, 27:15, 40:17, 52:8, 52:13, 60:24, 61:1, 61:5, 61:11, 61:13, 64:13, 65:2, 69:16, 70:10, 97:17, 108:14, 180:2
**per** [3] - 89:1, 89:25, 114:13
**peremptory** [1] - 177:16
**perfect** [1] - 36:10
**perfectly** [3] - 33:3, 104:7, 137:12
**perhaps** [3] - 128:2, 128:5, 183:17
**perimeter** [2] - 38:8, 38:10
**period** [9] - 36:23, 99:24, 100:17, 119:22, 119:23, 120:1, 128:2, 148:11, 149:18
**period-correct** [2] - 148:11, 149:18
**periods** [1] - 149:14
**permissible** [3] - 33:16, 101:22, 104:7
**permission** [1] - 41:18
**person** [12] - 21:20, 24:8, 26:9, 34:20, 34:21, 68:3, 106:24, 135:20, 136:3, 181:19, 184:23
**personally** [1] - 40:13
**perspective** [2] - 32:20, 32:24
**persuaded** [1] - 180:3
**pertain** [2] - 125:23, 182:5
**pertaining** [1] - 89:16
**pertinence** [1] - 95:22
**pertinent** [2] - 95:17, 145:8
**Philadelphia** [7] - 21:2, 21:10,

23:6, 25:1, 25:13, 26:16, 29:12
**Phillips** [3] - 59:8, 61:14, 74:16
**phone** [8] - 88:21, 101:14, 101:20, 113:12, 113:14, 120:17, 120:18, 120:19
**photo** [9] - 43:8, 43:23, 44:17, 76:16, 83:17, 135:20, 162:20, 165:11, 172:2
**photograph** [18] - 39:25, 40:14, 41:24, 42:4, 43:3, 44:2, 44:13, 45:2, 49:15, 76:22, 164:15, 165:7, 165:19, 168:4, 168:9, 169:12, 171:12, 174:13
**photographed** [1] - 40:1
**photographer** [1] - 44:5
**photographs** [13] - 19:24, 38:25, 40:19, 41:4, 41:7, 41:8, 41:9, 157:20, 160:11, 160:12, 162:2, 162:11, 166:10
**photography** [8] - 44:3, 150:22, 150:25, 151:1, 151:4, 166:8, 166:9, 166:11
**photos** [6] - 18:15, 76:19, 160:16, 161:4, 163:4, 174:18
**phrase** [1] - 96:3
**Physical** [1] - 145:18
**physical** [7] - 96:23, 97:4, 97:10, 98:11, 99:8, 101:8, 128:1
**physically** [1] - 97:1
**pick** [1] - 155:21
**picket** [1] - 29:10
**picture** [18] - 39:17, 39:18, 39:19, 42:12, 42:22, 43:4, 46:3, 49:13, 89:22, 89:25, 90:15, 166:13, 170:23, 172:3, 172:18, 174:4, 174:16, 175:8
**pictures** [2] - 160:13, 166:12
**piece** [3] - 99:14, 161:20, 164:18
**pin** [1] - 161:15
**piques** [1] - 182:23
**pistol** [6] - 18:6, 18:24, 19:11, 19:13, 161:14, 178:20
**place** [8] - 126:19, 130:21, 130:22, 145:9, 166:20, 166:25, 167:21, 170:12
**placed** [2] - 39:24, 43:13
**places** [2] - 93:12, 167:16
**plan** [2] - 54:18, 54:20
**planning** [1] - 154:5
**plans** [1] - 100:10
**plate** [3] - 167:3, 173:16
**platform** [2] - 76:1, 76:4

**play** [11] - 95:11, 99:2, 99:5, 99:21, 121:21, 135:1, 135:3, 135:24, 138:11, 140:20, 157:3
**playback** [1] - 114:22
**played** [11] - 98:18, 100:5, 100:11, 121:23, 135:5, 135:12, 136:2, 138:14, 140:24, 157:6, 157:9
**playing** [3] - 99:13, 99:25, 140:9
**plea** [5] - 21:11, 21:15, 25:22, 122:19, 185:3
**plead** [1] - 119:1
**pleaded** [4] - 23:6, 23:7, 23:9, 27:20
**pleading** [1] - 21:7
**pleads** [1] - 21:15
**pled** [7] - 21:1, 21:4, 21:12, 21:21, 22:19, 119:2, 119:3
**plug** [1] - 165:23
**PM** [10] - 47:19, 47:22, 94:21, 104:19, 126:10, 152:3, 154:24, 155:25, 179:17, 186:5
**PMF** [1] - 176:18
**Poblubinski** [1] - 16:23
**POBLUBINSKI** [1] - 17:2
**pocket** [18] - 17:25, 39:11, 39:15, 39:16, 39:21, 39:22, 41:6, 42:5, 42:7, 42:10, 42:14, 42:16, 42:19, 42:23, 43:3, 43:12, 43:25, 44:14
**podium** [2] - 16:25, 181:6
**point** [34] - 31:13, 33:1, 38:11, 38:15, 39:10, 52:20, 53:14, 54:21, 73:24, 77:21, 80:20, 86:14, 87:23, 93:6, 95:3, 100:9, 120:21, 123:12, 123:13, 123:15, 125:25, 128:21, 132:7, 151:20, 152:10, 155:4, 161:17, 161:19, 162:13, 162:20, 164:23, 165:22, 167:15, 174:21
**pointed** [8] - 28:4, 35:9, 164:25, 170:5, 171:11, 171:20, 173:23, 174:5
**pointing** [6] - 170:7, 170:9, 173:15, 174:22, 175:10, 175:11
**points** [1] - 98:7
**police** [30] - 22:9, 22:11, 28:5, 28:13, 28:14, 28:20, 28:21, 28:23, 29:13, 29:14, 29:23, 30:4, 30:12, 31:2, 36:25, 37:4, 37:19, 38:2, 38:13, 40:3, 45:17, 46:20, 50:18, 51:5, 58:24, 63:4, 72:9, 72:12, 126:18, 142:7

17

**Police** [46] - 19:2, 19:3, 19:5, 19:8, 19:11, 22:5, 36:17, 37:19, 37:21, 45:11, 45:13, 51:2, 55:6, 55:21, 57:8, 57:11, 58:1, 62:8, 62:25, 63:1, 63:22, 63:23, 63:24, 64:3, 71:23, 72:1, 78:4, 78:23, 79:2, 79:5, 80:17, 80:21, 103:8, 122:1, 125:3, 125:4, 125:15, 125:16, 129:1, 129:20, 130:3, 130:19, 131:9, 133:20, 136:14, 145:4
**port** [3] - 166:4, 166:5, 175:17
**portion** [26] - 43:15, 44:1, 111:1, 111:12, 111:14, 111:17, 130:17, 131:2, 140:12, 161:15, 161:22, 161:24, 162:6, 162:9, 162:23, 163:20, 164:8, 165:11, 166:5, 172:15, 173:10, 174:12, 174:23, 176:6, 184:14
**portions** [3] - 94:25, 99:2, 134:16
**position** [12] - 16:24, 36:14, 63:3, 63:5, 67:8, 67:19, 75:13, 75:15, 125:7, 125:10, 146:22, 153:10
**positioned** [4] - 38:20, 58:7, 166:1, 170:1
**possess** [7] - 17:22, 17:24, 22:16, 22:21, 26:11, 30:18, 133:5
**possessed** [9] - 17:7, 17:11, 17:17, 18:3, 26:13, 28:8, 57:9, 133:15, 133:16
**possessing** [7] - 17:11, 21:23, 22:21, 27:25, 28:14, 30:21, 31:5
**possession** [15] - 17:15, 17:17, 17:22, 17:24, 18:1, 20:3, 20:7, 20:8, 22:13, 23:15, 32:10, 33:4, 33:18, 97:22, 133:3
**possible** [9] - 65:12, 66:15, 76:16, 76:22, 84:18, 90:20, 90:21, 176:11, 180:2
**possibly** [2] - 118:7, 159:21
**postarrest** [3] - 28:2, 28:5, 30:25
**potential** [6] - 57:8, 57:18, 57:21, 57:23, 64:7, 67:7
**potentially** [1] - 64:5
**pouch** [6] - 59:21, 59:23, 59:25, 60:2, 60:5, 60:8
**power** [5] - 170:9, 170:13, 171:15, 172:4, 173:8
**practice** [2] - 25:22, 153:14
**preceded** [1] - 98:9

**preceding** [1] - 99:10
**precluded** [1] - 99:13
**precludes** [1] - 102:17
**prefer** [2] - 54:2, 155:9
**preference** [1] - 180:6
**prejudice** [1] - 182:12
**prejudicial** [6] - 34:19, 98:3, 98:5, 101:13, 102:14, 102:18
**preliminary** [1] - 179:24
**premise** [1] - 24:5
**prep** [1] - 140:13
**preparation** [1] - 58:2
**prepare** [4] - 147:3, 147:5, 147:10, 148:17
**prepared** [1] - 160:16
**preparing** [2] - 19:1, 56:11
**presence** [4] - 29:13, 29:14, 33:15, 179:10
**present** [16] - 16:5, 16:10, 31:8, 32:4, 50:12, 51:6, 55:3, 68:24, 72:10, 72:12, 94:21, 97:14, 104:19, 129:10, 154:24, 155:25
**presentation** [1] - 31:13
**presented** [5] - 16:22, 27:5, 32:8, 81:11, 185:12
**preservation** [4] - 77:19, 77:20, 77:22, 78:15
**preserved** [1] - 78:1
**preserving** [1] - 77:20
**Presidents'** [3] - 119:23, 121:3, 121:4
**press** [2] - 113:7, 164:3
**pressure** [1] - 163:1
**presumption** [1] - 24:6
**pretty** [8] - 70:25, 110:13, 110:14, 111:20, 112:6, 113:4, 117:22, 137:23
**previous** [1] - 132:17
**previously** [7] - 86:11, 87:16, 91:19, 91:21, 136:8, 138:24, 178:8
**primarily** [2] - 27:1, 60:23
**primary** [1] - 36:23
**printed** [1] - 89:19
**printer** [1] - 89:18
**printout** [1] - 110:5
**prison** [7] - 20:17, 20:24, 21:5, 21:8, 22:20, 23:18, 24:3
**privately** [2] - 176:14, 176:18
**probation** [21] - 21:3, 21:17, 21:23, 23:11, 25:15, 25:17, 25:25, 26:1, 26:9, 26:12, 26:17, 27:19, 27:22, 27:24, 28:2, 30:16, 30:18, 30:19, 31:3, 31:7, 133:6
**probative** [2] - 94:7, 98:6
**problem** [4] - 35:8, 52:13,

94:14, 154:14
**problems** [1] - 29:1
**proceed** [3] - 17:5, 37:25, 156:4
**proceeded** [1] - 38:2
**proceeding** [1] - 38:4
**proceedings** [1] - 186:10
**process** [3] - 104:5, 126:16, 131:21
**processing** [5] - 89:14, 89:15, 126:14, 126:17, 126:19
**produced** [3] - 80:3, 81:7, 138:10
**produces** [1] - 164:10
**product** [2] - 75:25, 153:19
**productively** [1] - 179:19
**Professional** [1] - 138:2
**profile** [14] - 162:12, 168:7, 169:10, 170:1, 170:4, 170:24, 171:8, 172:5, 173:5, 174:6, 175:9, 175:14, 175:19, 175:20
**prohibited** [2] - 17:10, 22:20
**prohibition** [2] - 21:23, 21:25
**project** [1] - 116:16
**projectile** [4] - 148:4, 159:12, 161:25, 178:23
**proposal** [1] - 184:4
**propose** [1] - 179:18
**prosecution** [2] - 28:4, 31:14
**prosecutor** [6] - 21:9, 21:10, 21:11, 25:13, 25:21, 26:17
**prosecutors** [1] - 17:4
**protected** [1] - 143:5
**protective** [1] - 30:1
**protrusion** [5] - 170:12, 170:14, 171:7, 171:17, 173:8
**prove** [7] - 20:6, 20:7, 20:14, 20:20, 23:17, 24:16, 28:6
**provide** [7] - 21:14, 64:3, 78:18, 133:11, 147:10, 150:13, 153:2
**provided** [8] - 40:23, 45:24, 88:22, 92:21, 130:19, 150:6, 150:9, 151:15
**provision** [3] - 141:1, 141:3, 153:22
**proximity** [1] - 38:18
**public** [1] - 147:8
**publications** [1] - 87:9
**publish** [16] - 41:19, 46:15, 49:23, 82:23, 95:7, 110:23, 121:19, 130:13, 134:24, 141:23, 153:25, 154:5, 154:11, 155:5, 160:24, 177:7
**published** [2] - 95:6, 107:15
**pull** [9] - 67:1, 84:24, 85:1, 92:3, 116:15, 154:6,

158:22, 163:2, 181:2
**pulled** [2] - 93:4, 183:6
**pulls** [3] - 110:8, 110:10, 111:25
**punishable** [4] - 23:18, 25:3, 25:6, 178:8
**punished** [1] - 24:2
**punishment** [3] - 20:16, 20:24, 22:20
**purging** [1] - 77:18
**purpose** [1] - 52:12
**purposes** [3] - 33:25, 103:5, 167:11
**pursuant** [2] - 63:18, 143:4
**push** [4] - 138:4, 164:10, 179:19, 180:12
**put** [14] - 23:18, 31:3, 31:22, 45:14, 45:19, 46:4, 48:2, 64:24, 91:22, 92:24, 100:16, 143:18, 144:18, 184:24
**putting** [1] - 45:17

## Q

**quarter** [2] - 115:1, 180:1
**questioned** [2] - 30:12, 30:20
**questioning** [2] - 129:11
**questions** [19] - 33:23, 35:6, 51:16, 74:6, 102:9, 104:10, 115:12, 122:6, 124:6, 130:24, 131:12, 136:17, 138:12, 139:13, 139:18, 144:1, 145:24, 147:8, 176:25
**quick** [1] - 53:24
**quiet** [1] - 127:12
**quite** [5] - 28:9, 73:6, 96:13, 106:16, 183:21
**quotes** [1] - 148:18

## R

**racial** [1] - 35:1
**radio** [4] - 58:9, 58:10, 65:10, 131:7
**rails** [1] - 163:25
**raise** [9] - 35:24, 55:8, 62:10, 75:2, 85:15, 115:22, 124:17, 146:8, 152:4
**raised** [2] - 16:20, 94:24
**range** [1] - 159:4
**rate** [2] - 29:13, 88:24
**rates** [1] - 89:3
**rather** [4] - 64:10, 66:22, 104:4, 129:10
**ray** [2] - 138:2, 138:4
**re** [3] - 159:24, 175:9, 183:20
**re-create** [1] - 183:20
**re-created** [1] - 159:24
**re-creating** [1] - 175:9

**reach** [5] - 17:13, 18:23, 19:16, 22:3, 22:22
**reaching** [1] - 39:20
**read** [11] - 25:9, 27:23, 47:12, 58:23, 130:24, 131:14, 140:3, 167:6, 177:15, 177:18, 179:23
**readily** [2] - 148:4, 178:22
**reading** [9] - 25:11, 27:11, 27:17, 126:9, 131:9, 138:16, 138:18, 167:5, 185:5
**reads** [3] - 153:17, 178:1, 178:13
**ready** [5] - 52:16, 104:15, 155:5, 179:23, 181:3
**real** [2] - 73:18, 158:23
**realistic** [1] - 166:13
**really** [6] - 23:24, 24:11, 71:4, 153:24, 184:8, 185:5
**rear** [4] - 42:4, 42:13, 43:13, 172:15
**rearward** [1] - 163:1
**reask** [1] - 73:19
**reason** [8] - 29:4, 51:13, 71:19, 95:18, 95:21, 102:16, 103:7, 104:4
**reasons** [4] - 28:9, 31:3, 95:15, 95:20
**rebuttal** [1] - 15:14
**receive** [4] - 78:3, 120:9, 120:16, 121:14
**received** [25] - 18:10, 23:13, 24:1, 41:17, 46:14, 49:1, 49:22, 78:15, 81:3, 82:22, 83:14, 107:13, 110:22, 120:25, 122:13, 123:8, 130:12, 134:23, 137:18, 140:23, 142:3, 142:18, 142:21, 160:23, 177:23
**receiver** [10] - 148:6, 163:10, 163:11, 163:14, 163:15, 163:18, 163:21, 166:5
**receiving** [3] - 78:16, 84:14, 121:25
**recent** [1] - 112:6
**recently** [5] - 87:14, 132:20, 140:2, 151:3, 153:18
**recess** [4] - 54:12, 94:20, 154:23, 186:5
**recipient** [1] - 143:5
**recognize** [25] - 45:25, 46:5, 48:13, 67:21, 79:25, 82:6, 91:13, 91:18, 92:9, 92:13, 105:21, 110:2, 121:9, 121:12, 127:3, 129:25, 133:24, 134:3, 135:20, 141:14, 141:15, 141:16, 141:17, 160:8, 160:10
**recognized** [1] - 105:7

**recoil** [4] - 162:24, 162:25, 169:15, 170:2
**recollection** [3] - 25:18, 122:20, 123:23
**record** [41] - 35:18, 35:25, 42:18, 55:9, 60:9, 67:25, 75:3, 85:16, 94:22, 101:10, 104:20, 107:5, 107:7, 115:23, 118:16, 118:18, 124:18, 127:7, 127:9, 131:17, 132:2, 146:9, 153:17, 156:1, 161:21, 162:5, 162:22, 163:19, 164:7, 164:17, 164:25, 165:10, 168:3, 171:11, 171:20, 173:22, 174:12, 175:21, 176:5, 184:15, 186:10
**recorded** [1] - 22:12
**recording** [2] - 113:13, 139:3
**records** [23] - 20:25, 21:3, 21:5, 79:11, 79:12, 79:13, 80:3, 80:9, 81:1, 81:5, 81:7, 81:21, 84:24, 139:21, 140:7, 141:5, 144:16, 145:7, 145:14, 145:19, 154:4, 183:2, 184:25
**recover** [1] - 19:12
**recovered** [2] - 19:11, 19:17
**recross** [1] - 145:25
**red** [11] - 67:24, 68:3, 118:13, 164:10, 169:16, 169:19, 169:23, 170:10, 171:16, 172:3, 173:8
**redact** [1] - 183:2
**Redacted** [16] - 52:6, 52:23, 53:5, 53:10, 54:3, 154:7, 181:4, 181:23, 183:8, 183:15, 183:25, 184:2, 184:5, 184:13, 185:8, 185:21
**redacted** [6] - 52:9, 154:6, 154:8, 154:11, 181:10, 183:4
**redaction** [2] - 182:4, 182:14
**redactions** [6] - 155:4, 180:24, 181:5, 182:19, 182:23, 185:10
**REDIRECT** [1] - 144:5
**redirect** [4] - 51:17, 74:7, 124:7, 144:2
**redisclosed** [1] - 143:4
**redneck** [2] - 99:12, 101:24
**rednecks** [1] - 102:2
**refer** [15] - 81:13, 83:8, 83:11, 83:23, 84:4, 84:16, 149:4, 169:19, 169:23, 170:17, 170:22, 171:14, 172:3, 174:9, 182:9
**reference** [2] - 102:24, 123:24

**referenced** [5] - 32:6, 111:18, 133:1, 153:6, 169:20
**references** [1] - 104:1
**referred** [2] - 76:2, 108:14
**referring** [3] - 114:11, 161:6, 170:25
**refers** [5] - 83:3, 83:7, 83:24, 84:5, 162:9
**reflect** [5] - 67:25, 107:5, 118:16, 127:7, 161:21
**reflection** [1] - 174:16
**reflects** [3] - 107:7, 118:18, 127:9
**refresh** [1] - 122:20
**refreshes** [1] - 123:23
**refuse** [3] - 69:11, 139:18, 139:20
**regard** [1] - 185:15
**regarding** [1] - 94:3
**regular** [2] - 70:25, 117:22
**regulations** [2] - 147:17, 147:20
**regulatory** [1] - 147:21
**relate** [2] - 20:13, 90:2
**related** [12] - 26:15, 27:19, 46:5, 84:25, 88:7, 90:9, 90:19, 91:2, 94:6, 111:12, 118:23, 119:6
**relating** [1] - 114:18
**relation** [11] - 25:7, 61:15, 95:19, 99:3, 99:8, 109:14, 112:3, 144:14, 147:9, 165:14, 170:3
**relationship** [1] - 117:15
**relatively** [1] - 88:15
**relayed** [1] - 101:6
**release** [4] - 103:6, 139:21, 140:7, 140:25
**released** [1] - 142:7
**relevance** [1] - 102:19
**relevancy** [1] - 103:12
**relevant** [11] - 32:1, 96:1, 96:18, 96:20, 96:23, 97:21, 100:9, 102:13, 102:18, 102:20, 102:21
**relief** [1] - 174:8
**remain** [8] - 15:13, 29:5, 51:25, 93:19, 129:7, 131:14, 152:1, 179:10
**remainder** [1] - 53:9
**remained** [1] - 31:1
**remaining** [1] - 149:16
**remarks** [1] - 95:19
**remember** [23] - 16:21, 25:4, 37:21, 50:25, 51:3, 51:13, 69:17, 69:24, 71:17, 71:19, 71:24, 71:25, 72:6, 73:6, 73:8, 73:25, 119:23, 123:16, 182:17, 182:21, 182:22, 183:7

**remembers** [2] - 26:1, 26:3
**remotely** [1] - 16:19
**removed** [9] - 30:9, 39:22, 50:12, 68:24, 69:2, 112:14, 134:13, 168:8, 168:10
**removing** [2] - 39:21, 73:9
**render** [1] - 147:2
**renewed** [2] - 94:24, 98:8
**repairs** [1] - 148:12
**rephrase** [1] - 89:12
**replay** [1] - 157:8
**reply** [1] - 130:25
**reported** [1] - 31:24
**reporter** [1] - 48:7
**reports** [2] - 147:3, 147:6
**representation** [1] - 96:15
**representative** [1] - 107:20
**representing** [1] - 16:8
**request** [14] - 41:18, 57:15, 77:19, 77:20, 78:10, 78:15, 94:24, 98:8, 98:17, 150:12, 177:7, 180:24
**requested** [3] - 77:25, 78:8, 151:11
**requests** [2] - 75:20, 77:23
**require** [1] - 110:12
**required** [2] - 166:20, 166:22
**requires** [2] - 102:19, 149:19
**rescue** [2] - 128:10, 128:11
**research** [5] - 16:16, 93:16, 149:19, 153:18, 179:13
**resemble** [1] - 159:22
**resembled** [1] - 26:3
**resembling** [2] - 61:3, 170:24
**reserve** [1] - 100:8
**reserved** [1] - 100:6
**reside** [1] - 116:8
**residence** [31] - 18:23, 19:2, 19:6, 32:9, 37:23, 38:7, 38:12, 38:19, 38:21, 40:5, 40:7, 40:8, 40:11, 40:15, 40:17, 45:9, 56:12, 56:15, 56:25, 57:19, 57:21, 58:5, 58:11, 58:12, 61:2, 63:19, 63:20, 64:9, 64:11, 65:11, 70:11
**residences** [3] - 56:17, 56:18, 56:20
**resized** [1] - 90:15
**resolution** [1] - 114:18
**resource** [1] - 36:25
**respect** [3] - 152:8, 168:9, 174:24
**respond** [3] - 58:15, 75:20, 131:16
**responded** [2] - 31:24, 32:1
**responding** [1] - 95:18
**response** [20] - 31:23, 32:9, 32:14, 32:18, 32:21, 33:2, 33:4, 33:18, 34:18, 35:2,

78:18, 78:21, 78:23, 79:5, 80:3, 80:17, 81:5, 96:20, 96:25, 131:15
**responses** [3] - 131:12, 131:19, 139:3
**responsibilities** [11] - 36:24, 38:23, 38:25, 59:13, 63:7, 63:13, 75:19, 125:12, 125:18, 146:24, 148:9
**responsibility** [2] - 38:7, 119:4
**responsive** [1] - 102:9
**rest** [3] - 53:4, 170:13, 171:17
**restitution** [2] - 119:6, 119:20
**restoration** [2] - 148:11, 149:19
**Restorative** [1] - 116:22
**result** [1] - 30:19
**resume** [4] - 104:24, 152:21, 155:19, 175:5
**retain** [1] - 152:16
**retained** [4] - 77:3, 77:10, 77:12, 77:15
**retains** [1] - 165:3
**retraced** [1] - 47:2
**retrieve** [6] - 40:24, 48:4, 49:8, 79:2, 92:1, 133:23
**retrieving** [1] - 45:23, 82:2, 135:18
**retyped** [1] - 182:6
**review** [8] - 75:20, 79:4, 82:10, 91:7, 109:20, 114:24, 128:24, 176:8
**reviewed** [7] - 79:11, 80:5, 80:7, 80:9, 80:12, 129:1, 134:7
**reviewing** [2] - 110:16, 129:12
**revisit** [1] - 154:9
**rewrote** [1] - 47:2
**ride** [1] - 30:9
**riding** [1] - 18:22
**right-hand** [2] - 42:19, 60:10
**Rights** [1] - 130:23
**rights** [9] - 22:7, 22:11, 129:4, 129:6, 129:13, 131:3, 131:12, 131:18, 137:1
**rise** [1] - 98:7
**risk** [3] - 64:7, 66:18, 66:25
**risky** [1] - 99:21
**River** [1] - 58:6
**RMR** [1] - 186:13
**road** [2] - 56:6, 65:8
**Road** [1] - 58:6
**Robin** [1] - 124:19
**rod** [3] - 169:15, 170:2, 170:5
**role** [2] - 125:20, 126:4
**rolly** [1] - 142:5
**Ronnie** [1] - 21:18
**room** [7] - 30:8, 31:18, 60:19,

126:19, 126:21, 126:22, 182:20
**rooms** [1] - 60:18
**rough** [1] - 29:12
**round** [4] - 45:6, 165:6, 169:25, 176:4
**rounded** [3] - 175:12, 175:14, 176:3
**rounds** [4] - 44:24, 45:2, 45:4, 165:4
**routinely** [2] - 25:11, 27:14
**ROY** [1] - 124:20
**Roy** [12] - 22:6, 22:7, 22:13, 100:15, 124:13, 124:19, 124:25, 136:3, 137:20, 140:13, 144:7, 145:2
**Ruddy** [2] - 152:12, 180:20
**Ruger** [34] - 18:6, 18:24, 19:11, 19:13, 19:16, 19:17, 19:18, 19:24, 19:25, 20:4, 20:5, 20:9, 20:12, 22:3, 22:4, 39:13, 48:16, 158:6, 158:8, 159:8, 159:13, 159:22, 163:15, 167:20, 169:2, 173:13, 173:14, 173:17, 175:13, 175:25, 176:3, 176:10, 176:19, 178:19
**rule** [1] - 15:9
**rules** [2] - 25:16, 152:18
**ruling** [8] - 52:18, 52:20, 94:3, 95:3, 100:4, 100:7, 100:8, 154:8
**run** [1] - 154:3
**running** [2] - 30:2, 97:12

## S

**Saab** [1] - 59:7
**safe** [2] - 65:1
**safer** [1] - 29:18
**safety** [1] - 29:10
**sat** [1] - 30:15
**save** [1] - 84:9
**Save** [1] - 113:7
**saved** [3] - 84:4, 84:5
**saving** [1] - 113:13
**Savings** [1] - 108:22
**saw** [4] - 19:12, 113:24, 141:18, 183:5
**scared** [3] - 101:22, 101:23, 102:23
**scene** [9] - 29:24, 30:11, 40:4, 61:6, 61:11, 61:12, 61:13, 65:5, 65:9
**schedule** [1] - 152:8
**scheduling** [1] - 179:6
**School** [2] - 36:12, 148:21
**school** [15] - 36:14, 36:16, 36:25, 37:2, 37:6, 37:11,

37:24, 37:25, 38:1, 44:4, 113:9, 117:1, 117:2, 149:11, 150:25
**scolding** [1] - 32:25
**scoot** [1] - 116:12
**scope** [2] - 103:4
**screen** [17] - 41:22, 42:7, 43:2, 43:6, 43:11, 47:7, 48:3, 59:5, 60:4, 121:21, 136:1, 137:24, 157:5, 161:17, 171:21, 178:12, 181:9
**screens** [1] - 178:1
**screenshot** [12] - 105:24, 159:18, 169:9, 169:12, 170:23, 171:13, 172:1, 172:21, 173:23, 174:3, 175:8, 176:6
**Screenshot** [1] - 170:16
**screenshots** [4] - 159:19, 160:11, 160:12, 160:14
**screws** [1] - 168:14
**se** [1] - 114:13
**seam** [1] - 172:11
**search** [64] - 19:1, 19:4, 19:6, 19:10, 32:5, 33:22, 33:24, 34:1, 34:3, 34:5, 34:7, 37:16, 37:17, 37:20, 38:3, 38:4, 38:16, 38:21, 38:23, 39:3, 39:9, 39:10, 40:5, 40:6, 40:8, 40:17, 50:15, 56:9, 56:11, 57:3, 57:9, 57:11, 57:13, 58:16, 58:23, 58:24, 59:9, 59:11, 59:13, 59:14, 60:13, 60:15, 61:2, 63:15, 63:18, 64:5, 70:11, 78:3, 78:8, 78:16, 78:19, 79:5, 80:4, 80:17, 81:2, 81:3, 81:6, 84:24, 98:9, 98:13, 151:11, 151:12
**searched** [4] - 39:4, 41:6, 63:18, 64:10
**searches** [1] - 45:8
**searching** [8] - 39:1, 41:5, 42:1, 56:13, 59:14, 59:15, 59:17, 59:19
**seared** [1] - 29:6
**seat** [10] - 19:16, 39:11, 39:24, 43:13, 59:22, 65:13, 66:4, 66:7, 66:9, 66:12
**seated** [14] - 19:16, 61:20, 61:21, 65:13, 66:12, 66:16, 69:4, 107:1, 107:2, 118:12, 118:13, 126:21, 126:23, 126:24
**second** [13] - 15:18, 59:3, 60:22, 60:23, 90:1, 101:23, 114:2, 128:6, 145:10, 171:14, 171:22, 172:8, 172:9

**seconds** [6] - 106:22, 113:2, 113:7, 113:19, 170:19
**section** [7] - 47:5, 94:25, 125:16, 130:23, 162:14, 162:21, 165:23
**secured** [1] - 40:3
**securing** [2] - 39:20, 60:2
**Security** [1] - 86:7
**security** [1] - 87:12
**see** [88] - 18:4, 18:5, 19:14, 19:17, 20:25, 21:1, 21:2, 21:5, 21:6, 21:24, 24:20, 40:11, 40:13, 43:2, 52:9, 52:10, 52:23, 53:3, 53:18, 60:7, 65:16, 68:4, 79:23, 82:14, 82:25, 83:22, 93:15, 99:11, 103:23, 106:24, 112:6, 112:23, 114:4, 118:10, 123:23, 127:5, 130:15, 138:9, 143:1, 143:14, 151:13, 154:21, 155:12, 162:3, 162:13, 163:17, 166:23, 169:16, 169:24, 169:25, 170:2, 170:11, 170:14, 171:2, 171:6, 171:16, 171:19, 172:11, 172:13, 172:15, 172:18, 173:7, 173:9, 173:10, 173:13, 173:14, 173:19, 174:6, 174:8, 174:10, 174:15, 174:17, 175:12, 175:13, 175:18, 175:19, 175:25, 176:1, 176:3, 179:14, 180:19, 180:20, 181:1, 182:1, 184:13, 186:4
**seeing** [3] - 16:20, 37:21, 138:1
**seeking** [1] - 141:6
**seem** [1] - 30:13
**seer** [1] - 165:17
**sees** [2] - 77:4, 166:14
**seized** [2] - 28:14, 49:4
**seizing** [1] - 60:1
**seizure** [1] - 46:6
**self** [4] - 83:10, 86:2, 86:10, 111:20
**self-employed** [1] - 86:2
**self-employment** [1] - 86:10
**self-explanatory** [2] - 83:10, 111:20
**semester** [1] - 149:11
**semesters** [1] - 149:17
**semiautomatic** [6] - 40:9, 40:12, 48:16, 162:25, 163:7, 163:8
**semicircle** [1] - 169:17
**send** [14] - 76:7, 76:16, 76:20, 76:22, 77:22, 78:21, 78:23, 101:17, 101:24, 120:21,

**182**:8, 182:10, 182:22
**sending** [1] - 84:12
**sends** [1] - 83:17
**sense** [1] - 129:6
**sent** [23] - 18:7, 18:12, 18:19, 77:9, 79:4, 79:7, 80:17, 80:21, 81:1, 81:5, 82:10, 82:12, 82:15, 83:13, 83:25, 84:17, 84:19, 92:4, 102:10, 102:11, 114:22, 121:3, 150:13
**sentence** [8] - 23:11, 23:12, 24:1, 27:19, 102:22, 122:12, 122:15, 123:7
**sentenced** [1] - 21:3
**separate** [2] - 98:5, 164:18
**sequestration** [1] - 15:9
**Sergeant** [9] - 19:4, 19:12, 33:21, 38:13, 50:25, 55:6, 55:19, 59:5, 60:4
**sergeant** [4] - 55:25, 56:2, 63:6, 63:7
**serial** [15] - 43:25, 44:9, 46:24, 47:8, 48:18, 49:15, 163:17, 166:24, 167:3, 167:4, 167:5, 167:8, 167:9, 167:12, 178:20
**seriousness** [1] - 30:14
**served** [2] - 122:16, 122:18
**servers** [2] - 77:17, 79:12
**service** [2] - 23:2, 125:8
**services** [3] - 70:6, 142:18, 142:21
**set** [10] - 16:24, 38:7, 60:21, 97:3, 113:21, 114:3, 123:6, 136:20, 169:22, 173:22
**Setting** [1] - 138:3
**setting** [1] - 138:6
**seven** [2] - 109:4, 109:5
**several** [8] - 28:17, 29:23, 30:3, 71:20, 87:1, 87:12, 120:11, 182:16
**sexual** [1] - 183:3
**sexually** [1] - 142:10
**shape** [6] - 168:15, 169:14, 170:4, 170:12, 173:5, 175:19
**shapen** [1] - 175:20
**share** [1] - 26:6
**sharp** [1] - 174:10
**shell** [1] - 163:16
**shirt** [2] - 67:24, 68:3
**shit** [1] - 101:25
**shoot** [1] - 159:4
**short** [1] - 126:14
**shortened** [1] - 101:7
**shortly** [2] - 50:15, 120:4
**shot** [2] - 137:3, 169:10
**show** [20] - 17:10, 18:19, 20:1, 22:18, 24:5, 24:11,

25:10, 27:10, 27:14, 28:11, 29:20, 59:2, 67:10, 102:8, 133:23, 137:3, 141:7, 155:11, 160:4, 185:24
**showing** [16] - 52:9, 79:21, 106:5, 129:24, 135:18, 137:12, 138:23, 144:23, 149:15, 156:15, 171:1, 172:4, 172:9, 174:16, 175:17, 175:24
**shown** [2] - 155:10, 160:8
**shows** [1] - 106:6
**Shuaiyb** [1] - 21:10
**siblings** [1] - 29:9
**sic** [1] - 115:4
**sickle** [3] - 26:4, 30:7, 128:6
**side** [28] - 31:18, 38:8, 39:4, 39:6, 39:8, 39:11, 56:18, 56:25, 57:1, 66:10, 66:12, 69:4, 73:5, 123:25, 126:23, 126:24, 144:20, 158:14, 159:25, 161:4, 162:12, 168:7, 168:8, 172:12, 173:23, 174:7
**side-by-side** [1] - 159:25
**sight** [5] - 164:1, 164:4, 169:25, 172:5, 174:19
**sign** [5] - 27:17, 139:7, 141:2, 141:20, 143:9
**signature** [8] - 21:5, 21:6, 22:1, 123:24, 131:7, 131:24, 156:19
**Signature** [1] - 131:6
**signatures** [1] - 132:3
**signed** [12] - 21:22, 22:10, 23:9, 25:7, 25:8, 26:16, 27:18, 27:22, 122:19, 178:11, 179:3, 185:4
**significant** [1] - 98:3
**significantly** [1] - 98:5
**signing** [3] - 26:20, 103:7
**signs** [1] - 25:11
**silent** [2] - 129:7, 131:14
**silhouette** [2] - 171:1, 171:9
**similar** [3] - 149:22, 156:21, 169:10
**similarities** [1] - 171:1
**simple** [1] - 88:14
**simply** [3] - 23:18, 31:9, 108:20
**single** [2] - 64:10, 93:4
**single-family** [1] - 64:10
**site** [1] - 72:5
**sits** [2] - 24:7, 168:13
**sitting** [3] - 18:23, 68:3, 129:14
**situated** [3] - 162:23, 172:22, 172:23
**situation** [1] - 181:11
**six** [3] - 19:20, 36:20, 117:1

**Size** [1] - 111:20
**size** [6] - 79:15, 89:25, 111:1, 114:12, 169:14
**slapped** [1] - 185:4
**slated** [1] - 153:7
**slide** [18] - 161:13, 161:14, 161:17, 161:19, 161:20, 162:6, 162:10, 163:1, 163:2, 163:20, 163:24, 163:25, 167:17, 170:1, 172:15, 174:8, 175:12
**sliding** [1] - 173:17
**slight** [3] - 83:1, 98:16, 169:17
**slightly** [1] - 94:6
**slope** [1] - 176:1
**sloppily** [1] - 184:25
**sloppy** [1] - 185:5
**slowly** [1] - 138:18
**small** [8] - 17:12, 39:13, 126:19, 126:23, 129:14, 158:7, 184:5, 185:20
**small-frame** [1] - 158:7
**smaller** [1] - 19:14
**Smith** [4] - 16:10, 62:16, 155:18, 180:11
**SMITH** [84] - 17:6, 62:7, 62:23, 65:16, 67:25, 68:8, 68:15, 74:8, 74:20, 74:24, 75:10, 79:19, 81:25, 82:2, 82:17, 82:23, 82:25, 83:2, 83:22, 85:5, 85:7, 124:12, 124:24, 127:7, 129:22, 130:7, 130:13, 130:15, 132:2, 133:21, 134:18, 134:24, 135:1, 135:3, 135:8, 135:10, 135:13, 135:16, 135:24, 136:3, 136:15, 136:17, 142:1, 144:3, 144:6, 144:18, 145:22, 145:24, 146:6, 146:16, 151:21, 155:21, 156:5, 156:13, 157:1, 157:3, 157:7, 157:11, 160:2, 160:18, 160:24, 161:1, 161:21, 162:5, 162:22, 163:19, 164:7, 164:17, 164:25, 165:10, 166:15, 168:3, 169:6, 170:20, 171:11, 171:20, 173:2, 173:22, 174:11, 175:1, 175:21, 176:5, 176:23, 176:25
**Snap** [25] - 75:12, 75:25, 76:1, 76:9, 76:13, 76:15, 76:23, 77:9, 77:17, 77:22, 77:25, 78:3, 78:15, 78:18, 78:21, 79:4, 80:17, 80:21, 81:9, 82:10, 91:8, 92:21, 93:4, 112:16

**snap** [2] - 75:21, 75:23
**Snap's** [3] - 77:10, 79:8, 79:12
**Snapchat** [27] - 18:13, 18:14, 24:12, 24:18, 24:19, 24:22, 35:3, 75:12, 75:17, 76:2, 76:14, 76:19, 77:1, 84:8, 94:4, 102:10, 102:12, 105:11, 105:25, 107:20, 109:8, 109:12, 112:9, 120:13, 120:14, 120:16
**Snapchatted** [1] - 133:2
**Snapchatting** [2] - 99:3, 101:18
**Snaps** [2] - 76:7, 76:8
**snaps** [1] - 76:9
**sneaky** [3] - 181:13, 181:15, 181:16
**snipers** [3] - 71:12, 71:14, 71:15
**Society** [1] - 87:3
**software** [1] - 111:7
**someone** [3] - 67:6, 67:8, 185:6
**someplace** [1] - 38:6
**sometime** [1] - 121:4
**sometimes** [8] - 27:1, 27:7, 88:21, 88:22, 151:11, 154:14, 154:16
**somewhat** [2] - 33:17, 90:6
**somewhere** [1] - 65:1
**son** [1] - 102:2
**SONIA** [1] - 75:5
**Sonia** [3] - 18:13, 74:24, 75:4
**soon** [2] - 77:6, 137:23
**sorry** [13] - 31:19, 40:24, 60:7, 68:7, 72:11, 74:12, 101:1, 109:5, 116:14, 120:18, 125:22, 177:10, 177:17
**sounds** [3] - 114:12, 128:4, 128:5
**speaking** [5] - 58:21, 136:10, 149:8, 171:17, 172:9
**speaks** [1] - 27:5
**specialist** [2] - 75:14, 117:1
**specialty** [1] - 57:12
**specific** [8] - 26:5, 45:15, 88:5, 106:6, 149:9, 150:7, 150:12, 165:25
**specifically** [5] - 63:23, 88:3, 90:23, 169:2, 171:9
**speculating** [1] - 184:10
**spell** [1] - 131:16
**spelled** [1] - 21:25
**spend** [1] - 126:7
**spent** [2] - 29:3, 166:6
**spinal** [1] - 183:3
**split** [3] - 168:10, 172:13, 173:9

21

**spoken** [1] - 27:1
**sporadic** [2] - 117:22, 117:23
**spot** [1] - 151:15
**spots** [1] - 168:14
**spreadsheet** [6] - 81:12, 81:14, 81:19, 82:12, 106:3, 109:10
**spring** [10] - 162:24, 162:25, 165:4, 165:5, 165:24, 169:15, 170:2, 173:18, 173:21
**squad** [2] - 128:10, 128:11
**stairs** [1] - 60:21
**stamp** [5] - 52:6, 108:8, 108:9, 108:10, 108:23
**stamps** [1] - 81:21
**stand** [9] - 35:22, 85:14, 95:4, 100:16, 104:22, 115:20, 156:3, 175:3, 175:4
**standard** [1] - 108:16
**standing** [1] - 97:12
**stands** [1] - 109:19
**start** [15] - 16:14, 17:4, 24:4, 24:18, 31:14, 37:22, 38:5, 40:25, 87:24, 101:18, 149:23, 161:1, 171:2, 179:15, 180:5
**started** [6] - 62:16, 93:14, 126:9, 126:10, 126:16, 152:21
**starting** [2] - 148:7, 149:11
**starts** [1] - 149:11
**State** [11] - 19:2, 19:8, 37:21, 57:11, 58:1, 62:8, 62:25, 63:1, 63:23, 63:24, 64:3
**state** [20] - 20:9, 20:12, 35:24, 55:8, 62:10, 63:4, 75:2, 85:16, 97:15, 115:23, 124:18, 127:19, 127:22, 127:23, 127:24, 128:1, 143:6, 146:8, 150:8, 178:25
**statement** [8] - 23:4, 24:10, 34:13, 34:16, 94:7, 96:11, 101:23
**statements** [14] - 17:3, 24:14, 28:3, 28:5, 95:15, 95:19, 96:7, 96:9, 96:24, 97:1, 97:17, 98:11, 99:12, 144:13
**States** [21] - 16:7, 16:9, 26:22, 27:16, 29:8, 35:18, 35:21, 55:5, 85:13, 87:25, 88:3, 88:8, 94:22, 104:20, 115:19, 124:12, 156:1, 178:2, 178:3, 178:14, 178:15
**station** [1] - 30:12
**stationed** [1] - 71:16
**status** [1] - 132:15
**statute** [1] - 181:11
**statutes** [1] - 147:22

**stay** [3] - 15:11, 28:20, 97:2
**stayed** [2] - 127:14, 151:2
**steer** [1] - 34:6
**steered** [1] - 27:12
**step** [20] - 35:23, 38:9, 38:16, 51:19, 55:7, 62:4, 62:9, 74:21, 74:25, 85:10, 115:15, 115:21, 124:9, 124:14, 146:2, 146:7, 171:3, 171:5, 177:9, 177:11
**step-down** [2] - 171:3, 171:5
**steps** [1] - 67:14
**sticker** [6] - 172:19, 172:20, 172:22, 172:23, 173:11, 174:18
**still** [14] - 19:25, 28:2, 61:11, 61:13, 95:5, 104:22, 119:9, 119:10, 119:20, 137:3, 140:17, 152:22, 160:16, 176:8
**stipulated** [4] - 20:10, 20:17, 178:5, 178:17
**stipulation** [8] - 137:9, 137:11, 153:20, 153:22, 178:4, 178:10, 178:16, 179:2
**stipulations** [4] - 153:11, 153:16, 177:7, 185:16
**stood** [2] - 29:18, 120:24
**stop** [11] - 50:10, 66:18, 66:25, 67:1, 67:14, 68:22, 95:13, 99:23, 102:1, 121:6, 135:14
**stopped** [10] - 58:13, 58:14, 58:22, 65:19, 66:14, 66:15, 73:2, 73:5, 101:2, 132:9
**stops** [1] - 173:16
**store** [2] - 29:15, 77:25
**stored** [2] - 79:8, 114:21
**story** [1] - 144:17
**straight** [1] - 38:5
**street** [1] - 38:8
**stretch** [2] - 175:3, 175:4
**strictly** [1] - 145:14
**strike** [2] - 155:19, 155:21
**string** [1] - 106:15
**strong** [1] - 27:11
**struggle** [1] - 117:2
**stuck** [1] - 16:24
**studies** [1] - 27:13
**study** [1] - 149:24
**stuff** [2] - 63:11, 101:17
**style** [2] - 48:9, 175:24
**styles** [1] - 163:12
**subcontract** [1] - 88:6
**subject** [2] - 35:13, 106:21
**submission** [1] - 112:17
**submit** [1] - 96:19
**submits** [1] - 95:21
**submitted** [6] - 146:25, 147:4,

156:11, 160:13, 160:14, 169:9
**subscriber** [3] - 78:9, 78:20, 81:9
**subtract** [1] - 108:20
**suffered** [1] - 25:2
**sufficient** [1] - 35:7
**suggest** [1] - 182:24
**suit** [1] - 27:11
**sum** [1] - 22:17
**summarized** [1] - 143:8
**Summary** [1] - 145:18
**summoned** [1] - 128:9
**superseding** [1] - 182:9
**supply** [1] - 182:2
**support** [4] - 125:8, 125:11, 125:20, 126:4
**supports** [1] - 96:14
**supposed** [2] - 17:7, 38:21
**surfaces** [2] - 174:15, 175:15
**surrounded** [1] - 30:9
**susceptible** [1] - 91:3
**suspended** [1] - 122:16
**swamp** [1] - 102:19
**swap** [1] - 101:8
**swear** [1] - 75:8
**sweater** [3] - 107:4, 118:13, 127:6
**switch** [4] - 59:3, 170:9, 172:4, 173:8
**sworn** [8] - 36:3, 55:12, 62:13, 75:6, 85:19, 116:2, 124:21, 146:12
**system** [7] - 29:3, 31:8, 36:16, 37:2, 90:3, 90:10, 112:3
**systems** [4] - 77:10, 79:8, 108:16, 158:21

## T

**table** [5] - 68:1, 68:5, 107:2, 118:14, 155:5
**tactical** [12] - 29:24, 32:4, 57:16, 58:1, 63:24, 64:1, 64:3, 64:9, 64:18, 70:5, 71:7, 71:10
**tag** [2] - 45:16, 156:19
**tall** [2] - 71:1, 71:2
**Tallman** [22] - 41:21, 42:2, 42:25, 43:8, 43:14, 43:21, 44:1, 47:5, 47:21, 48:2, 65:16, 82:25, 83:22, 99:23, 100:18, 101:5, 110:25, 113:20, 135:3, 181:9, 183:5, 183:25
**TALLMAN** [1] - 183:10
**target** [7] - 65:11, 65:12, 65:14, 66:16, 66:21, 66:23, 67:3
**tasked** [1] - 19:4

**tasks** [1] - 37:10
**teach** [2] - 87:13, 150:15
**teacher** [1] - 44:3
**teaches** [1] - 148:22
**team** [13] - 32:4, 58:1, 63:24, 64:1, 64:9, 64:14, 64:17, 64:18, 70:6, 70:12, 70:13, 71:9, 71:12
**tech** [1] - 42:6
**technical** [9] - 18:18, 62:18, 147:3, 147:6, 148:17, 151:13, 151:16, 161:9, 161:11
**techniques** [1] - 149:20
**temperature** [1] - 93:13
**ten** [7] - 54:11, 70:15, 70:16, 71:1, 122:15, 123:8, 128:16
**tends** [1] - 27:17
**tension** [2] - 165:5, 184:11
**term** [3] - 28:20, 28:22, 178:8
**terms** [4] - 23:21, 64:24, 89:6, 161:12
**test** [5] - 102:19, 158:21, 159:1, 159:3, 159:11
**testified** [12] - 15:12, 36:4, 55:13, 62:14, 75:7, 85:20, 87:16, 105:6, 116:3, 124:22, 146:13, 151:6
**testifies** [1] - 154:10
**testify** [4] - 18:10, 25:18, 25:21, 96:16
**testifying** [2] - 95:9, 107:20
**testimony** [7] - 15:12, 15:20, 18:21, 20:1, 20:4, 98:3, 107:22
**testing** [1] - 142:16
**text** [5] - 18:16, 81:21, 83:16, 83:17, 183:14
**texts** [1] - 76:20
**texture** [2] - 175:24, 176:2
**THE** [255] - 15:3, 15:7, 15:10, 15:17, 15:21, 15:23, 16:2, 16:12, 17:3, 23:4, 31:13, 31:17, 31:20, 32:7, 32:25, 34:3, 34:6, 34:21, 35:15, 35:18, 36:1, 36:5, 40:22, 41:14, 41:16, 41:20, 45:22, 46:11, 46:13, 47:22, 47:23, 48:6, 48:23, 48:25, 49:7, 49:19, 49:21, 49:25, 50:3, 51:17, 51:19, 51:21, 52:4, 52:13, 52:20, 52:23, 53:11, 53:18, 54:1, 54:4, 54:6, 54:10, 54:13, 54:23, 55:4, 55:10, 55:14, 61:24, 62:2, 62:4, 62:6, 62:11, 62:15, 62:16, 68:2, 68:5, 68:6, 68:7, 68:9, 68:16, 73:14, 73:17, 73:20, 73:22, 74:7, 74:9, 74:11, 74:15, 74:21,

74:23, 75:4, 75:8, 79:20, 81:17, 81:18, 82:1, 82:19, 82:21, 82:24, 85:6, 85:8, 85:10, 85:12, 85:17, 85:21, 91:10, 92:2, 92:7, 93:6, 93:9, 93:23, 94:9, 94:13, 94:16, 94:19, 94:22, 95:12, 95:23, 96:5, 96:10, 96:21, 97:6, 97:17, 97:20, 98:2, 98:19, 98:23, 98:25, 99:10, 99:17, 100:1, 100:4, 100:8, 100:14, 100:20, 100:23, 101:2, 101:11, 102:6, 102:10, 102:13, 102:25, 103:19, 104:2, 104:7, 104:15, 104:20, 105:5, 105:18, 107:7, 107:10, 107:12, 107:17, 109:23, 110:1, 110:21, 110:24, 115:9, 115:13, 115:15, 115:16, 115:18, 115:24, 116:4, 116:12, 116:14, 116:15, 116:17, 116:18, 118:18, 121:20, 122:4, 122:7, 122:23, 123:3, 124:7, 124:9, 124:11, 124:16, 124:19, 127:9, 129:23, 130:9, 130:11, 130:14, 133:22, 134:20, 134:22, 134:25, 135:6, 135:9, 135:11, 135:17, 136:16, 136:18, 136:21, 137:14, 137:16, 138:1, 140:5, 140:16, 140:21, 141:10, 141:25, 142:2, 143:25, 144:2, 144:4, 145:23, 145:25, 146:2, 146:3, 146:5, 146:10, 146:14, 151:19, 151:22, 152:4, 152:25, 153:15, 154:2, 154:13, 154:21, 154:25, 155:7, 155:11, 155:17, 155:23, 156:1, 156:14, 157:2, 160:3, 160:20, 160:22, 160:25, 175:2, 176:24, 177:2, 177:4, 177:8, 177:10, 177:12, 177:18, 177:22, 179:8, 179:18, 180:8, 180:11, 180:15, 180:19, 181:1, 181:8, 181:14, 181:16, 181:22, 181:25, 183:1, 183:18, 183:23, 184:12, 184:20, 185:8, 185:23, 186:1, 186:4
**themselves** [1] - 184:25
**theoretically** [2] - 25:3, 25:19
**thereafter** [2] - 50:15, 97:2
**they've** [1] - 98:21
**thinking** [3] - 101:5, 152:5,

152:8
**third** [4] - 172:14, 172:15, 174:21, 174:22
**THORNTON** [1] - 85:18
**Thornton** [18] - 15:19, 18:17, 85:14, 85:17, 86:11, 91:13, 92:8, 94:5, 95:4, 104:21, 105:1, 105:6, 105:19, 105:21, 107:18, 110:2, 111:2, 114:17
**thoughts** [1] - 112:13
**thousand** [2] - 119:11, 119:13
**thousands** [1] - 157:16
**threat** [2] - 97:8, 102:15
**threatening** [1] - 95:19
**threats** [3] - 95:1, 96:7, 99:12
**three** [7] - 44:8, 60:16, 61:1, 75:16, 75:18, 152:4, 158:1
**throughout** [2] - 127:15, 150:25
**Thursday** [1] - 152:9
**time's** [1] - 73:18
**timestamp** [1] - 84:16
**timing** [1] - 94:11
**tinkering** [1] - 183:11
**tires** [1] - 71:1
**Tobacco** [3] - 19:22, 146:18, 149:5
**today** [18] - 61:10, 67:21, 79:11, 80:23, 95:12, 100:11, 100:16, 106:24, 118:10, 127:3, 136:6, 151:6, 154:16, 155:5, 156:21, 179:9, 179:14, 180:18
**Todd** [1] - 155:13
**together** [2] - 165:6, 185:4
**tomato** [1] - 16:2
**tomorrow** [4] - 153:9, 154:16, 155:6, 179:5
**took** [30] - 19:24, 30:12, 39:15, 39:17, 39:18, 39:19, 39:24, 41:4, 41:7, 41:8, 41:10, 41:25, 73:24, 92:24, 93:9, 126:19, 145:9, 150:25, 151:1, 151:4, 156:5, 159:23, 160:16, 161:4, 169:10, 170:18, 170:23, 174:4, 175:8
**tool** [4] - 109:20, 110:7, 110:15, 111:6
**top** [26] - 29:16, 32:22, 45:6, 111:1, 111:3, 130:17, 132:2, 144:25, 161:22, 162:6, 168:9, 168:13, 169:22, 169:24, 170:16, 170:25, 171:12, 172:3, 172:6, 174:5, 174:8, 174:12, 174:17, 175:10, 175:11, 178:2

**topics** [1] - 135:2
**topmost** [1] - 161:15
**totally** [1] - 180:19
**touch** [3] - 42:6, 60:4, 161:17
**tough** [1] - 120:1
**toward** [1] - 67:19
**towards** [3] - 27:12, 68:1, 165:11
**Town** [3] - 36:17, 55:20, 125:3
**town** [1] - 37:18
**tracing** [2] - 138:19, 167:11
**track** [1] - 180:4
**Track** [2] - 113:22, 113:23
**trades** [1] - 27:12
**traffic** [7] - 58:9, 58:10, 63:10, 66:25, 67:1, 73:2, 135:14
**trained** [1] - 150:5
**training** [19] - 112:13, 125:16, 147:10, 148:19, 148:24, 149:2, 149:3, 149:9, 149:22, 150:12, 150:13, 150:22, 150:24, 151:9, 156:6, 166:8, 166:9, 166:11, 166:14
**Training** [1] - 151:4
**trainings** [5] - 150:1, 150:3, 150:6, 150:9, 150:17
**transcript** [3] - 95:1, 100:2, 186:9
**transmitted** [1] - 142:10
**transported** [1] - 45:10
**transporting** [1] - 128:15
**traveled** [2] - 151:3, 178:25
**traveling** [1] - 153:8
**travels** [1] - 162:4
**treatment** [1] - 142:24
**treatments** [1] - 144:13
**trial** [8] - 16:11, 17:16, 23:21, 118:25, 123:15, 178:10, 179:2, 182:6
**tried** [2] - 182:8, 184:7
**trigger** [12] - 158:22, 162:15, 162:16, 162:17, 162:18, 162:23, 163:23, 165:16, 168:13, 172:25, 173:1, 175:20
**trigger-shapen** [1] - 175:20
**triggered** [1] - 182:16
**trip** [1] - 69:21
**troopers** [1] - 63:10
**trouble** [2] - 28:23, 28:25
**true** [6] - 25:24, 30:21, 79:13, 80:16, 82:14, 130:5
**truly** [2] - 34:12, 134:16
**trunk** [4] - 18:2, 59:15, 59:17, 59:19
**trust** [1] - 30:22
**try** [3] - 70:12, 159:17, 159:20
**trying** [6] - 43:25, 69:21,

103:14, 103:20, 140:13, 171:10
**Tuesday** [1] - 15:1
**turn** [2] - 144:19, 170:10
**turning** [1] - 145:10
**twenty** [1] - 36:20
**twenty-six** [1] - 36:20
**twice** [1] - 17:11
**two** [25] - 15:15, 21:6, 40:18, 56:17, 60:23, 67:14, 88:12, 101:3, 108:5, 111:14, 126:25, 132:3, 132:20, 143:14, 146:21, 150:4, 153:7, 158:1, 161:4, 161:22, 168:14, 171:1, 174:18, 175:14
**Tyler** [1] - 61:14
**Type** [1] - 112:19
**type** [19] - 39:12, 40:2, 56:12, 56:15, 81:15, 81:19, 88:17, 90:19, 91:1, 91:3, 107:3, 113:3, 113:7, 114:19, 151:14, 163:13, 169:3, 172:10, 176:11
**types** [17] - 33:23, 77:22, 80:25, 81:8, 83:4, 84:1, 87:11, 87:18, 88:13, 89:9, 89:10, 89:13, 113:4, 145:19, 147:14, 150:3, 151:8
**typically** [6] - 67:15, 89:7, 89:21, 91:5, 113:12, 161:15

---

# U

**U.S** [1] - 87:21
**ultimately** [1] - 24:22
**unacceptable** [1] - 183:24
**uncle** [1] - 28:19
**uncomfortable** [2] - 16:24, 29:14
**uncontested** [2] - 96:18, 97:23
**under** [12] - 57:14, 102:19, 104:22, 113:19, 119:13, 143:5, 147:7, 147:17, 154:10, 159:8, 163:1, 165:4
**underlying** [4] - 32:2, 103:8, 103:12, 104:1
**underneath** [4] - 150:5, 173:14, 173:20, 173:21
**undersigned** [2] - 178:6, 178:18
**understood** [9] - 23:10, 23:12, 25:25, 34:22, 53:4, 96:22, 127:16, 130:25, 184:3
**unfairly** [3] - 101:13, 102:14, 102:18
**unfortunately** [3] - 29:6, 43:4,

44:7

**uniform** [3] - 29:24, 50:23, 50:24

**unintelligible** [1] - 101:15

**unique** [3] - 83:24, 84:1, 167:12

**unit** [4] - 29:25, 70:8, 70:13, 72:5

**United** [21] - 16:7, 16:9, 26:22, 27:16, 29:7, 35:18, 35:21, 55:5, 85:13, 87:25, 88:3, 88:8, 94:22, 104:20, 115:19, 124:12, 156:1, 178:2, 178:3, 178:14, 178:15

**universal** [2] - 90:6, 108:13

**University** [2] - 145:3, 145:14

**unlawful** [1] - 23:15

**unless** [1] - 90:23

**unmarked** [3] - 30:4, 51:10, 72:18

**unpleasant** [1] - 29:15

**unpublish** [1] - 50:5

**unsave** [2] - 84:9, 84:10

**unsaved** [1] - 84:6

**unsophisticated** [1] - 27:9

**unsure** [1] - 118:7

**up** [61] - 16:25, 18:6, 28:24, 29:11, 35:23, 38:7, 39:20, 42:13, 42:25, 43:24, 44:1, 47:5, 47:13, 52:4, 52:5, 55:7, 58:21, 59:14, 59:15, 60:1, 60:22, 60:23, 62:9, 66:16, 67:2, 69:21, 74:15, 74:25, 86:18, 88:16, 95:5, 95:17, 101:10, 103:18, 105:3, 108:6, 115:3, 115:4, 115:21, 117:25, 123:5, 124:14, 128:6, 136:20, 144:18, 144:23, 146:7, 154:6, 155:21, 161:7, 161:10, 173:7, 175:3, 175:4, 181:2, 181:9, 183:6, 183:9, 183:16, 184:1, 185:23

**upset** [2] - 30:13, 120:7

**URL** [1] - 83:21

**USA** [1] - 167:25

**USB** [1] - 156:12

**user** [16] - 76:19, 77:1, 77:4, 77:13, 78:10, 83:12, 83:13, 83:17, 83:21, 84:5, 84:8, 84:9, 84:12, 84:14, 113:6, 120:14

**username** [4] - 83:7, 83:8, 83:12, 83:13

**usernames** [5] - 81:20, 83:9, 108:7, 111:14

**users** [3] - 18:15, 76:6, 77:6

**UTC** [5] - 108:12, 108:13,

108:25, 109:1

**utilize** [1] - 145:7

---

## V

**Valentine's** [2] - 119:22, 120:5

**valid** [1] - 152:23

**value** [1] - 98:6

**van** [1] - 30:3

**vans** [1] - 71:3

**variations** [1] - 52:17

**varied** [1] - 88:14

**varies** [1] - 70:14

**variety** [1] - 88:18

**vehicle** [37] - 38:17, 38:18, 38:24, 39:1, 39:2, 39:3, 39:5, 39:24, 40:3, 41:4, 41:25, 42:14, 43:13, 44:15, 45:9, 49:14, 50:13, 50:15, 58:17, 58:23, 58:24, 60:11, 61:10, 61:13, 64:25, 65:7, 65:11, 65:19, 66:22, 66:24, 70:19, 70:22, 70:23, 70:25, 73:4, 132:6, 132:9

**vehicles** [6] - 30:4, 51:5, 51:10, 72:9, 72:12, 72:19

**Vela** [5] - 18:13, 74:24, 75:1, 75:4, 75:11

**VELA** [1] - 75:5

**verdict** [3] - 93:25, 152:23, 179:21

**verify** [1] - 53:9

**Vermont** [23] - 19:2, 19:8, 29:17, 36:12, 37:18, 37:21, 56:9, 57:10, 58:1, 62:8, 62:25, 63:1, 63:23, 63:24, 64:3, 87:21, 108:25, 116:24, 145:3, 145:14, 178:2, 178:14, 178:25

**Version** [1] - 111:4

**version** [3] - 101:7, 111:5, 111:6

**versions** [2] - 154:5, 154:12

**versus** [2] - 89:14, 174:8

**vest** [1] - 71:7

**vests** [1] - 71:10

**via** [3] - 18:12, 77:9, 78:25

**video** [85] - 17:12, 18:4, 18:5, 18:7, 18:10, 18:11, 18:12, 18:18, 18:20, 18:22, 19:18, 19:23, 19:25, 20:3, 21:19, 22:4, 22:14, 22:22, 24:12, 24:18, 24:19, 24:20, 24:21, 24:23, 35:3, 77:2, 83:17, 94:4, 95:6, 95:15, 96:12, 96:17, 97:10, 97:11, 99:8, 106:20, 106:21, 109:15, 110:6, 110:10, 110:16, 112:21, 113:1, 113:17,

113:18, 120:24, 121:3, 121:7, 121:25, 132:11, 135:6, 135:7, 136:1, 136:4, 136:8, 136:25, 137:4, 137:13, 138:15, 139:24, 140:1, 140:2, 140:6, 141:18, 153:9, 156:12, 157:11, 158:3, 159:13, 159:15, 159:17, 159:25, 160:1, 169:9, 170:18, 170:23, 172:1, 172:21, 174:3, 175:8, 176:8, 176:12, 179:5

**video/audio** [1] - 94:25

**videos** [4] - 18:15, 76:21, 120:16, 157:22

**view** [2] - 77:6, 168:7

**viewable** [1] - 77:13

**violation** [3] - 26:11, 30:19, 31:4

**violence** [5] - 32:3, 57:23, 64:8, 67:7, 95:24

**violent** [9] - 31:25, 33:13, 34:10, 34:20, 34:21, 34:24, 64:6, 95:20

**Virginia** [1] - 158:4

**Viridian** [1] - 168:22

**visible** [6] - 49:15, 77:5, 107:19, 162:11, 163:4, 165:7

**visitor** [1] - 30:8

**vocabulary** [1] - 27:8

**voice** [4] - 98:22, 116:16, 121:12, 136:13

**voluntarily** [1] - 185:16

**voluntariness** [4] - 32:20, 34:13, 35:10, 99:4

**VSP** [1] - 57:16

---

## W

**wait** [2] - 31:9, 94:11

**waiting** [3] - 52:18, 58:8, 94:14

**waived** [1] - 185:17

**waiver** [3] - 103:23, 131:2, 139:10

**waiving** [1] - 22:11

**walk** [5] - 66:17, 67:2, 67:12, 105:3, 151:13

**walked** [4] - 60:20, 60:21, 69:15, 70:2

**walking** [5] - 67:15, 67:19, 69:17, 97:7, 98:13

**warned** [1] - 28:19

**warnings** [1] - 130:4

**warrant** [37] - 19:6, 32:5, 33:22, 33:24, 34:2, 34:5, 34:7, 37:16, 37:17, 37:20, 38:3, 38:5, 38:21, 56:9,

56:11, 57:3, 57:10, 57:11, 57:14, 57:24, 58:3, 63:15, 63:18, 70:11, 78:3, 78:6, 78:8, 78:16, 78:19, 79:5, 80:4, 80:18, 81:2, 81:4, 81:6, 95:17, 98:13

**warrant's** [1] - 34:3

**warrants** [2] - 151:11, 151:12

**watch** [4] - 28:21, 121:22, 140:14, 140:17

**watched** [4] - 136:8, 137:13, 159:15, 174:3

**waving** [4] - 17:13, 18:6, 121:5, 121:7

**ways** [3] - 17:23, 20:1, 108:5

**weak** [1] - 103:10

**weapon** [4] - 60:1, 148:3, 148:6, 178:21

**weapons** [2] - 57:9, 64:5

**wearing** [6] - 29:25, 71:6, 71:7, 71:9, 107:3, 127:6

**Wednesday** [2] - 152:9, 153:7

**week** [3] - 100:5, 151:5, 152:15

**week-long** [1] - 151:5

**weekend** [5] - 56:5, 56:8, 120:9, 120:21, 120:25

**weight** [1] - 181:20

**welcome** [1] - 124:5

**well-being** [2] - 97:4, 99:9

**West** [1] - 158:4

**Westlaw** [1] - 180:10

**whatsoever** [1] - 127:17

**Wheatley** [1] - 38:8

**wheelchair** [1] - 97:7

**whereabouts** [2] - 103:20, 144:7

**whirlwind** [1] - 180:17

**white** [16] - 29:10, 53:6, 66:3, 66:8, 73:12, 74:17, 172:19, 180:25, 181:4, 183:7, 183:14, 184:5, 184:20, 184:22, 185:8, 185:20

**whole** [10] - 39:6, 39:8, 56:23, 70:12, 70:13, 106:1, 152:15, 171:8, 184:8, 185:3

**Width** [1] - 114:10

**width** [1] - 114:13

**winded** [1] - 95:14

**window** [1] - 163:17

**Windows** [1] - 159:16

**wish** [4] - 93:17, 151:24, 179:14, 183:20

**witness** [69] - 31:15, 35:20, 40:21, 45:21, 45:24, 48:8, 49:6, 49:9, 50:1, 51:20, 55:4, 61:25, 62:5, 62:6, 67:25, 68:15, 74:22, 74:23, 79:19, 81:25, 82:3, 85:7, 85:11, 85:12, 87:22, 91:9,

91:11, 91:25, 94:4, 95:8,
103:5, 104:22, 107:6,
115:17, 115:18, 124:10,
124:11, 127:7, 129:22,
131:9, 137:8, 137:13,
140:12, 140:14, 146:4,
146:5, 153:11, 156:3,
156:13, 157:1, 161:21,
162:5, 162:22, 163:19,
164:7, 164:17, 164:25,
165:10, 168:3, 171:11,
171:20, 173:23, 174:12,
175:21, 176:5, 177:5,
177:13, 179:5, 179:7
**WITNESS** [26] - 36:1, 36:5,
47:23, 55:10, 55:14, 62:11,
62:15, 68:5, 68:7, 73:22,
75:4, 75:8, 81:18, 85:17,
85:21, 115:16, 115:24,
116:4, 116:14, 116:17,
124:16, 124:19, 146:3,
146:10, 146:14, 177:12
**witnesses** [5] - 15:11, 25:18,
98:20, 153:7, 154:4
**wonderful** [1] - 35:9
**wondering** [1] - 16:23
**Word** [1] - 89:20
**word** [11] - 32:23, 89:14,
89:15, 138:19, 165:17,
165:20, 181:23, 183:4,
184:9, 184:13, 184:19
**words** [4] - 27:7, 173:20,
184:2, 184:21
**works** [8] - 18:14, 18:16,
88:12, 88:25, 94:10, 138:9,
152:6, 185:21
**world** [2] - 52:24, 53:19
**worry** [1] - 54:18
**worse** [1] - 29:1
**worst** [1] - 52:24
**wound** [1] - 103:18
**write** [3] - 45:15, 48:7, 148:17
**writing** [5] - 113:6, 113:8,
131:1, 131:6, 181:21
**written** [7] - 26:20, 46:7, 47:2,
87:9, 106:11, 173:17,
173:20
**wrote** [2] - 47:9, 130:25

## Y

**year** [11] - 20:17, 20:24,
22:20, 23:18, 24:3, 25:4,
25:6, 87:24, 88:10, 132:18,
178:9
**years** [28] - 19:20, 21:4, 21:8,
21:11, 23:5, 23:14, 25:8,
25:19, 26:2, 28:16, 29:2,
29:3, 36:20, 49:3, 55:23,
63:2, 71:20, 75:16, 75:18,
86:14, 116:11, 117:14,

118:20, 118:21, 119:18,
123:8, 146:21, 182:16
**years'** [1] - 122:15
**yell** [1] - 66:16
**yellow** [1] - 40:23
**yesterday** [1] - 185:18
**young** [1] - 26:22
**yourself** [2] - 39:3, 41:7
**yup** [2] - 155:14, 162:14

## Z

**zero** [1] - 170:18
**zip** [2] - 79:3, 93:4
**zone** [3] - 108:16, 108:19,
108:20
**zoom** [1] - 43:14
**Zulu** [1] - 108:15